UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO.: 04 - 10003 PBS

| | |
|---|---|
| Ann Marie Porto and Nicholas Porto, Individually and on Behalf of S.C., a Minor Person with a Disability,<br>    Plaintiff<br><br>vs.<br><br>Town of Tewksbury, Town of Tewksbury Public Schools, Town of Tewksbury School Committee, Christine L. McGrath, James McGuire, Kevin P. McArdle, Pauline King, Loreen R. Bradley, Michelina DeAngelis, Cheryl D. Porcaro, Carole A. Gallo, Jennifer A. Fiore, Julie E. Bossdorf-Paras, Eleanor Edelstein, Robert Ware, Sharon J. Moser, William X. Traveis, Kara M. Buckley and Allison Dixon,<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Defendants, the Town of Tewksbury, Town of Tewksbury Public Schools, Town of Tewksbury School Committee, Christine McGrath, James McGuire, Kevin P. McArdle. Pauline King, Loreen R. Bradley, Michelina DeAngelis, Cheryl D. Porcaro, Carole A. Gallo, Jennifer A. Fiore, Julie E. Bossdorf-Paras, Eleanor Edelstein, Robert Ware, Sharon J. Moser, William X. Traveis, Kara M. Buckley and Allison Dixon, pursuant to Local Rule 56.1, submit the following Concise Statement of Material Facts pursuant to Local Rule 56.1 in support of their Motion For Summary Judgment.

1

Statement of Material Facts[1]

1. The Plaintiff S.C. is currently seventeen years old. He is enrolled in the Eagleton School in Great Barrington, Massachusetts where he resides. Plaintiffs' Complaint at ¶¶ 1, 2, and 12.

2. The Plaintiffs Ann Marie Porto and Nicholas Porto are S.C.'s foster parents. They have been S.C.'s guardians since he was approximately thirteen months old. S.C. is Ms. Porto's nephew. Plaintiffs' Complaint at ¶¶ 1, 12.

3. Mr. and Mrs. Porto have three natural children and at all relevant times had at least two foster or adoptive children in addition to S.C. living at their home. Exhibit 1 – relevant pages of deposition transcript of Ann Marie Porto at pp. 7-12.

4. S.C. has been enrolled in the Tewksbury Public Schools since Mr. and Mrs. Porto moved to Tewksbury in 1994. Because S.C. has been diagnosed with fetal alcohol syndrome and moderate mental retardation, S.C. has continuously received special educational services either directly from or paid for by the Tewksbury Public School system pursuant to an Individualized Education Plan ("IEP"). Plaintiff's Complaint at ¶¶ 3, 13.

5. Up to and including his 4th grade year, (1997-1998), S.C. received his special education services in an inclusion 502.4 classroom at the Heathbrook Elementary School. Defendant Kevin P. McArdle was the

---

[1] The facts contained in this Concise Statement of Material Facts in Support of Defendants' Motion for Summary Judgment are taken in the light most favorable to the Plaintiffs as required in Rule 56 of the Federal Rules of Civil Procedure and are admitted for the purposes of summary judgment only.

Principal of the Heathbrook School. Exhibit 2 – IEPs for 4th and 5th grade years (1997-1998, 1998-1999).

6. Defendant Jennifer A. Fiore was S.C.'s fourth grade teacher. Ms. Porto had rejected the IEP for S.C. developed in May 1997 for S.C.'s fourth grade year because the In-School Evaluation Team ("ISET") did not recommend a summer program for S.C.. Exhibit 2. After discussion with Ms. Porto, she was in agreement with the Team and approved the IEP. Exhibit 3 - letter dated June 12, 1997 to Ms. Porto. At the same meeting, S.C.'s transportation was discussed and it was decided that S.C. would remain on the regular school bus, but would sit in the front of the bus to alleviate any possible problems. Id. At an ISET meeting requested by Ms. Porto on October 6, 1997, Ms. Porto raised concerns about an incident that occurred in the schoolyard and S.C.'s previous difficulties on the school bus and on the playground. According to Ms. Porto, the bus driver was having other children move out of the front seat (pursuant to the June 1997 agreement) for S.C. making the other children upset with S.C.. Ms. Porto requested that the bus come down her street as she was unable to go to the bus stop with S.C.. Exhibit 4- ISET Evaluation Team Meeting Notes dated October 6, 1997. The ISET team recommended that Ms. Fiore discuss the matter with Principal McArdle which she did. Beginning in 5th grade S.C. was transported to school in a small van.

7. Pursuant to an IEP developed for S.C. for his 5th grade year (1998-1999) S.C. worked in a 502.4 classroom, the "Life Skills Classroom", that provided a structured learning environment with a high teacher/student ratio(1:4) and inclusion opportunities with age-level peers. Exhibit 2.

8. From the 5th grade to the date that Ms. Porto refused to allow S.C. to return to the John Wynn Middle School to complete his 7th grade year (2000-2001), the Life Skills Classroom for S.C.'s grade consisted of seven children. Exhibit 5 – relevant portions of the deposition of Eleanor Edelstein at pp. 32, 33.

9. At all times there were at a minimum two staff, comprised of teachers and/or certified aides, who supervised the seven children while in the Life Skills Classroom. When the children were in inclusion classes (mainstreamed) there was always at least one staff member from the Life Skills Classroom present to assist them. Exhibit 5 at pp. 27-39; Exhibit 6 – relevant portions of the deposition of Alison Dixon at p. 15; Exhibit 1 at p. 168.

10. S.C.'s IEP has never required that he have an aid with him at all times ("a shadow aid") to assist him in a one on one learning environment. Exhibit 2.

11. In March 1999 when S.C. was twelve-years old and was in the 5th grade, Ms. Porto's foster daughter (who she has since adopted) while in Ms. Porto's house discovered S.C. acting sexually inappropriate with her younger sister, another of Ms. Porto's foster daughters. Because she knew that Ms. Porto would be very angry, she took S.C. and her sister to Ms. Porto's mother's house. Exhibit 1 at pp. 130-136.

12. Ms. Porto was subsequently informed that S.C. had been discovered engaging in sexually inappropriate behavior with his foster sister. Upon learning this, Ms. Porto was very angry and while she picked up the two girls from her mother's house, she left S.C. there for a couple of days. Id.

13. Prior to being informed of the incident between S.C. and his foster sister in 1999, Ms. Porto had never informed anyone in the Tewksbury Public Schools that S.C. was engaging in any sexual behavior, that he was engaging in any inappropriate sexual behavior, or that any other student at the Tewksbury Public Schools was touching S.C. in a sexually inappropriate manner. Exhibit 1 at pp. 130-140.

14. Ms. Porto never filed a report with the Department of Social Services regarding the 1999 incident between S.C. and his foster sister that took place in her house while she was at home.

15. Ms. Porto did not believe that it was necessary for S.C. to be removed from her house after the 1999 incident between he and his foster sister. Exhibit 1 at pp. 150, 230.

16. Ms. Porto did not approach anyone at the Tewksbury Public Schools about any inappropriate sexual behavior involving S.C. until after she discovered that S.C. had engaged in sexually inappropriate behavior with his foster sister in 1999. After the incident, Ms. Porto met with Defendant Julie Bossdorf-Paris ("Ms. Paris") and told her about the incident between S.C. and his foster sister. Ms. Porto did not inform anyone at the Tewksbury Public Schools that the inappropriate sexual behavior between S.C. and his foster sister occurred on more than one occasion. Exhibit 7 – Evaluation reports produced by the Plaintiff from Ms. Pilachowski and

Dr. Weida.. During that same conversation with Ms. Paris, Ms. Porto alleged for the first time that S.C. and another boy in the Life Skills Classroom were engaging in some form of "sexual experimentation" on the Special Education van.

17. Ms. Porto never informed Ms. Paris or anyone else in the Tewksbury Public School system that the sexual experimentation alleged was not consensual. Exhibit 8 – Memorandum dated March 10, 1999 to Dr. McGrath from Loreen Bradley.

18. Ms. Paris did not witness any inappropriate sexual behavior or touching between Stephan and his classmate. Exhibit 9 – relevant portions of the deposition transcript of Julie Paris at pp. 62, 63, and 79.

19. S.C. never told anyone at the Tewksbury Public Schools that he was engaged in any type of sexual behavior appropriate or otherwise, that his classmate was touching him without his consent or that he was being harassed by the specific classmate or anyone at school. Exhibit 1 at p. 195.

20. S.C. considered this classmate to be his friend. Exhibit 1 at p. 125. The two boys played together and lived in the same neighborhood until an incident that occurred between Ms. Porto's daughter and the classmate's sister during which Ms. Porto's daughter beat up the classmate's sister and was subsequently suspended. The incident occurred prior to 1999.

21. Immediately after Ms. Porto told Ms. Paris about the alleged sexual experimentation, Ms. Paris informed the Principal of the Dewing Elementary School at the time, Defendant Loreen Bradley. Ms. Bradley in

6

turn reported the allegations to the Superintendent of the Tewksbury Public Schools, Defendant Christine McGrath. According to procedure, the Tewksbury Police Department was notified. The Tewksbury Police Department interviewed the van driver. After conversations with legal counsel, the van driver, and Tewksbury Police, Ms. Porto was contacted and informed of the police department's findings, of the conversations with the van driver and legal counsel. It is only after Ms. Porto was advised of the results and recommendations that she alleged that S.C. alleged additional contact occurred in the classroom and at recess. Exhibit 8.

22. Ms. Bradley filed a 51A application against both boys. Ms. Porto also filed a 51A application against the classmate's parents. The Police Department and the Department of Social Services took over the investigation of the alleged "bus" incident. Exhibit 8.

23. During the course of the investigation, there were no allegations by Ms. Porto or anyone that the boys' behavior was not consensual and there were certainly no allegations that it was anything more than the boys touching one another on one occasion on the school bus. Exhibit 1 at pp. 140-145.

24. After conducting an investigation, the Department of Social Services screened out the Complaint and found no negligence on the part of the bus driver. Exhibit 10 – DSS investigative report.

25. S.C. never told anyone at Tewksbury Public Schools about any inappropriate sexual behavior between he and the classmate on a school bus at any time. Exhibit 1 at pp. 108, 110.

26. In response to the allegations and at Ms. Porto's request, the Tewksbury Public Schools agreed to transport the boys to school in separate vans. Exhibit 8.

27. In a memorandum to Dr. McGrath after the investigations were conducted, Principal Bradley noted that the boys are assigned to the Life Skills classroom that has three adults assigned to it at all times and that while at the Dewing School the boys are never left unattended. Ms. Bradley placed heightened restrictions on the boys that included that they never travel alone in or outside of the building and that both were to be escorted to and from the van transportation and that they be separated during in class groupings. Exhibit 8.

28. Tewksbury Public Schools recommended that S.C. receive counseling in order to educate him on appropriate versus inappropriate sexual behavior. Exhibit 11 – Affidavit of Cheryl Porcaro. The Plaintiffs have provided no documents to evidence that Ms. Porto did take S.C. for counseling after the 1999 incident with his foster sister and alleged bus incident during the same 1999 period.

29. At the end of the 1998-1999 school year, Ms. Porto met with the special education team for an ISET (in-school evaluation team) meeting to develop an IEP for S.C. for 6th grade the 1999-2000 school year. Exhibit 12 – IEP of 6th grade school year (1999-2000). At the beginning of the meeting Ms. Porto was informed of her rights to reject the IEP and/or appeal the IEP, the same instructions she received at all meetings with ISET. Ms. Porto understood these rights and had exercised her rights to reject and

appeal an IEP both for S.C. and for her daughter prior to the meeting at the end of the 1998-1999 school year. Exhibit 1 at pp. 167-169.

30. S.C.'s IEP for the 1999-2000 school year, his 6th grade year, did not include that any heightened restrictions or supervision be placed on S.C. above and beyond the heightened supervision and low staff-to-student ratio already provided to him as a member of the Life Skills Classroom. Exhibit 12. The 1999-2000 IEP did not require that S.C. always have an aid with him when he traveled within the school building and did not call for a one on one student to staff ratio at all times. Exhibit 12. Ms. Porto did not request anywhere in the IEP that such restriction be placed on S.C. or that he have an aid assigned to him personally at all times. Exhibit 12.

31. Ms. Paris who was S.C.'s 5th grade teacher and who was aware of the allegations made by Ms. Porto in 1999 was also S.C.'s 6th grade teacher. The Life Skills classroom for S.C.'s 6th grade year was located in the Ryan Elementary School. Exhibit 1 at p. 169.

32. At no time during his 6th grade year did Ms. Paris observe any inappropriate touching between S.C. and his classmate. S.C. never complained to Ms. Paris during his 6th grade year about any student touching him inappropriately and without his consent. Exhibit 9 at pp. 49-53.

33. At the end of S.C.'s 6th grade year, Ms. Porto attended an ISET meeting with the special education team at the Tewksbury Public Schools to

develop S.C.'s IEP for his 7th grade year, 2000-2001. Exhibit 13 – IEP for 7th grade (2000-2001).

34. Because S.C. was entering the 7th grade, it was decided that the Life Skills Classroom for the 7th grade students should be located in the age appropriate setting, the John Wynn Middle School. The Life Skills Program was altered to resemble a more typical middle schooler's program with changing of classrooms. Exhibit 5 at p. 61. A certified aid or special education teacher, however, was always assigned to be with the Life Skills Students while in the inclusion classrooms to assist them. Exhibit 6 at pp. 15-16; Exhibit 5 at pp. 38, 39.

35. When the IEP for S.C. and the other Life Skills students was being developed at the end of their 6th grade year in June 2000, the plan was for the Life Skills students to be in inclusion classrooms for the exploratory subjects, gym, art and music, as well as for science and social studies. All other blocks were taught in the Life Skills classroom. Exhibit 13.

36. Ms. Porto did not accept the IEP developed for S.C. for the 2000-2001 school year because she did not believe that there "was a teacher for the class". She did not understand that while there certainly was a life skills classroom, the students would be taught in inclusion classes for specified subjects to replicate as much as possible middle school experience. Exhibit 1 at pp. 179-184; Exhibit 13.

37. When it became apparent during the fall of 2000, that the Life Skills students were not doing well in the inclusion classrooms for science and social studies, their IEPs were changed in November, to reflect that those subjects would also be taught in the Life Skills classroom. An ISET

meeting was held with Ms. Porto in November regarding the Amendment to S.C.'s IEP and Ms. Porto accepted the IEP at that time. Exhibit 14 - IEP Amendment from November 2000.

38. S.C.'s IEP for 7th grade did not require that an aid accompany S.C. at all times and the IEP did not provide for a one on one student to staff ratio. Exhibits 13 and 14.

39. In the fall of S.C.'s 7th grade year, the Defendant Alison Dixon was one of the certified aides assigned to the Life Skills classroom. Defendant Eleanor Edelstein was one of the special education teachers assigned to the Life Skills classroom to teach the students certain specified subjects. Exhibit 6 at pp. 13-16; Exhibit 5 at pp. 27-33.

40. Within the first few weeks of the school year, Ms. Edelstein not only had read the IEPs of all of the Life Skills students in the class, but had spoken with their 6th grade teacher, Ms. Paris to learn more about the students and their particular needs. Exhibit 5 at p. 48.

41. In October 2000, another certified aid in the Life Skills Classroom told Ms. Dixon that she thought that the boys were rubbing one anothers' thighs while sitting together in the classroom on two occasions. In addition, Ms. Dixon was told that yet another certified aid in the classroom, Defendant Kara Buckley, believed that S.C. had his hands under Student R while they were sitting in the bleachers and that the boys later reversed positions. Exhibit 15 – letter written by Ms. Dixon dated October, 2000.

42. Ms. Dixon reported these suspicions to Defendant Robert Ware, the Behavioral Management Facilitator, and put the suspicions in writing.

11

Exhibit 15; Exhibit 16 – relevant portions of the deposition of Robert Ware at pp. 37-40.

43. Mr. Ware informed other administrators about the suspicions and collaboratively it was decided that the appropriate action would be to educate the boys through counseling as to what is and is not sexually appropriate behavior. Exhibit 16 at pp. 69-75.

44. The boys met with Mr. Traveis who spoke with the boys about the suspicions. Both boys admitted that they had touched each other. Both were embarrassed, very apologetic and promised Mr. Traveis that they would not do it again. Exhibit 17 – relevant portions of the deposition of William Traveis at pp. 63-68.

45. Neither S.C. nor his classmate ever told Mr. Traveis, who they met with on a regular basis in different groups because he was aware that they were not to be together, that the touching was not consensual or ever complained to Mr. Traveis about each other. Exhibit 17 at pp. 63-68; 83-85.

46. Prior to January 11, 2001, S.C. never filed a verbal or written sexual harassment complaint with anyone at the Tewksbury Public Schools.

47. Prior to January 11, 2001, Ms. Porto never informed anyone at the Tewksbury Public Schools or alleged that S.C. was engaging in inappropriate sexual behavior without his consent with his classmate. Prior to January 11, 2001, Ms. Porto never complained to anyone at Tewksbury Public Schools that S.C. was being sexually harassed by a classmate. Exhibit 1 at p. 195.

48. S.C. has never told anyone at the Tewksbury Public Schools that the alleged inappropriate sexual behavior between he and his classmate,

including any behavior that took place on January 11, 2001 was not consensual. Exhibit 16 at pp. 83-89 and 139-140; <u>Also see</u> Exhibit 7; Exhibit 5 at pp. 47.

49. On January 11, 2001, during passing time, the classmate arrived at the Life skills classroom and asked Ms. Edelstein if he could go to the bathroom. Ms. Edelstein gave the classmate permission to go to the bathroom. Exhibit 5 at pp. 63-64; Exhibit 16 at pp. 83-89; Exhibit 18 – Memorandum dated January 12, 2001 to Dr. McGrath from Mr. McGuire.

50. S.C. then asked Ms. Edelstein if he could go to his locker that was located directly outside of the classroom. Ms. Edelstein gave him permission to go to his locker. <u>Id.</u>

51. S.C. did not go to his locker, but instead went to the bathroom. <u>Id.</u>

52. S.C. did not have permission from Ms. Edelstein or from one of the certified aids to go to the bathroom as was required. <u>Id.</u>

53. Ms. Edelstein realized that S.C. was not at his locker. She immediately saw Mr. Ware walking down the hallway and asked him to look for the boys in the bathroom. <u>Id</u>.

54. Mr. Ware walked into the bathroom and saw the boys with their pants around their ankles. He did not see the boys touching each other. Mr. Ware asked if the boys were o.k. and both replied that they were. S.C. asked if they were in trouble and if Mr. Ware was going to call his mother. Exhibit 16 at pp. 83-89.

55. Mr. Ware brought the boys to his office. Both boys told Mr. Ware that they said "yes" and agreed to touching each other. Neither boy ever told Mr.

Ware or anyone at the Tewksbury Public Schools that the touching was not consensual. Id.

56. Mr. Ware separated the boys and informed Mr. McGuire of the incident. Mr. McGuire subsequently contacted the Superintendent Dr. McGrath who next contacted the Tewksbury Police. The boys parents were both called and told to come pick up the boys. Exhibit 18; Exhibit 19 – relevant portions of the deposition transcript of James McGuire at pp. 94-99.

57. Only after the boys were taken home did Ms. Porto call Principal McGuire and alleged that there had been anal penetration. Exhibit 18.

58. A SAIN hearing was held at the Essex County District Attorneys Office. Both boys were in attendance as were their parents, Dr. McGrath, Mr. McGuire, Ms. Porcaro, and Mr. Ware among others. At that hearing, Ms. Porto was visibly angry at S.C. and told him that he could not live at her house. Exhibit 11 – Porcaro Affidavit.

59. Ms. Porto was very angry with the Assistant District Attorney when she was told that there was going to be no prosecution and that the matter should be handled through counseling of the two boys. Exhibit 1 at pp. 224-225.

60. While the other boy received counseling and returned to the Life Skills Class at the Tewksbury Public Schools, Ms. Porto refused to have S.C. return to school even though the Tewksbury Public Schools was willing to have him return and despite S.C.'s desire to do so. Exhibit 1 at pp. 213-219, 232-233.

61. S.C. received tutoring at home until a suitable education program could be found for him. Tewksbury Public Schools wanted to place S.C. in a day

program so that he could reside at home. Ms. Porto refused to have S.C. live at her house and repeatedly has told S.C. that he is not allowed to come home. Accordingly, S.C. was placed in a residential program in Great Barrington, Massachusetts. The Tewksbury Public Schools pays for S.C.'s residential placement. Exhibit 11.

62. Ms. Porto never filed a presentment letter pursuant to M.G.L. c, 258 § 4 with the Town of Tewksbury.

>Respectfully submitted,
>The Defendants,
>**Town of Tewksbury, Town of Tewksbury Public Schools, Town of Tewksbury School Committee, Christine L. McGrath, James McGuire, Kevin P. McArdle, Pauline King, Loreen R. Bradley, Michelina DeAngelis, Cheryl D. Porcaro, Carole A. Gallo, Jennifer A. Fiore, Julie E. Bossdorf-Paras, Eleanor Edelstein, Robert Ware, Sharon J. Moser, William X. Traveis, Kara M. Buckley and Allison Dixon,**
>By their attorneys
>
>_____
>Deborah I. Ecker, BBO # 554623
>BRODY, HARDOON, PERKINS & KESTEN, LLP
>One Exeter Plaza
>Boston, MA 02116
>(617) 880-7100

DATED: November 30, 2004