UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-10003-PBS

* * * * * * * * * * * * * * * * * * * * * * * * * *
Ann Marie Porto and Nicholas Porto,                *
Individually and on Behalf of Stephen Colon,       *
a Minor Person with a Disability                   *
                                                   *
Vs.                                                *
                                                   *
The Town of Tewksbury, et al.                      *
                                                   *
* * * * * * * * * * * * * * * * * * * * * * * * * *

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

This case arises from the deliberate indifference of the Tewksbury Public Schools to

repeated incidents of sexual and disability harassment against a mentally retarded student.  The

Plaintiffs claim that schoolteachers and administrators had actual notice of the harassment, but

failed to take any remedial or protective measures.  Consequently, the harassment continued and

escalated such that Stephen was denied equal opportunities and benefits of education.  Plaintiffs

claim that the school had lower expectations for Stephen because of his disability and therefore

minimized and disregarded recurring violations of his civil rights.

To clarify, Plaintiffs' original complaint included one claim against sixteen individual

Defendants for violations of 42 U.S.C. § 1983.[1]  Plaintiffs have filed a Motion to Amend the

Complaint with their Opposition to Summary Judgment seeking to dismiss the Section 1983

---

[1] The sixteen Defendants include the Christine L. McGrath, James McGuire, Kevin P. McArdle, Pauline King,
Loreen R. Bradley, Michelina DeAngelis, Cheryl D. Porcaro, Carole A. Gallo, Jennifer A. Fiore, Julie E. Bossdorf-
Paras, Eleanor Edelstein, Robert Ware, Sharon J. Moser, William X. Traveis, Kara M. Buckley and Allison Dixon.

claim. Therefore, the remaining claims lie only against the Tewksbury Public Schools, the Town of Tewksbury and the Tewksbury School Committee ("Defendants" or "Tewksbury").

## II. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter or law." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995) (quoting Fed R. Civ. P. 56 (c)). To prevail on summary judgment, the moving party must show that there is an absence of evidence to support the nonmoving party's position. See Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); See also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party satisfies this requirement, the burden shifts to the non-moving party to establish the existence of at least one factual issue that is both genuine and material. See LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To successfully oppose summary judgment, the non-moving party "may not rest upon mere allegation or denials of his pleading," but must set forth specific facts showing that there is a genuine issue for trial. LeBlanc, 6 F.3d at 841 (quoting Anderson, 477 U.S. at 256). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour, 63 F.3d at 36.

## III. Title IX of the Educational Amendments of 1972 (Count I)

Title IX of the Education Amendments of 1972 provides in pertinent part:

"[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. 20 U.S.C. §1681(a).[2]

---

[2] Plaintiffs concede that a Title IX claim does not lie against the individually named Defendants.

In <u>Davis v. Monroe County Board of Education</u>, 526 U.S. 629 (1999), the U.S. Supreme Court

held that Title IX can be a vehicle for damage claims seeking redress for student-on-student

sexual harassment. To establish liability under Title IX, a Plaintiff must demonstrate that (1) the

school district had actual knowledge of the harassment; (2) the school district was deliberately

indifferent to the harassment; and the harassment was "so severe, pervasive and objectively

offensive" that (3) it deprived the student victim of equal access to "an educational program or

activity" or "the educational benefits or opportunities provided by the school." 526 U.S. at 625.

In this case, it is undisputed that the Town of Tewksbury was a recipient of federal funding. As

set forth in detail below, there are genuine material factual disputes surrounding each of the

remaining elements necessary to establish Title IX liability.

### B. Stephen Was Subject To Severe, Pervasive and Objectively Offensive Sexual Harassment

Sexual harassment includes sexual advances, requests for sexual favors and/or other

verbal or physical conduct of a sexual nature. <u>Franklin v. Gwinnett County Public Schools</u>, 503

U.S. 60, 63 (1992). Hostile environment harassment covers acts of sexual harassment

sufficiently severe, pervasive and objectively offensive to compromise or interfere with

educational opportunities normally available to students. <u>Frazier v. Fairhaven Sch. Comm.</u>, 276

F.3d 52, 65 (1st Cir. 2002); <u>Davis</u> 526, U.S. at 651. Courts look to the totality of the

circumstances, including the frequency of the discriminatory conduct; its severity; whether it is

threatening or humiliating, or merely an offensive utterance; and whether it unreasonably

interferes with performance. <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993).[3]

Plaintiffs provide substantial evidence that Stephen was subject to continuous verbal and

physical conduct of a sexual nature by his classmate Richard from 1994 when he was in the first

---

[3] See also, Dept. of Ed., Office for Civil Rights, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students or Third Parties 62 Fed. Reg. 12034 (1997).

grade until 2001 when he was in the seventh grade. The harassment escalated over time from sexually explicit storytelling to fondling genitals to oral sex and finally to repeated incidents of sexual intercourse between the boys. (Ex. 1; Ex. 2; Ex. 3; Ex. 4, p. 63, 72, 83, 117)

The harassment began in the 1994-1995 school year. Stephen testified that Richard told him about things that went on at his house: that "his sister rubbed [a] little boy's private parts and that he (Richard) was feeling the girl's butt and vagina." (Ex. 1). Stephen reported this incident to his mother.[4] (Ex. 1). While in the first grade, Stephen reported Richard using profanity and telling sexually explicit stories about his sister having oral sex with a male foster child who lived in Richard's home. Mrs. Porto reported this information, Mrs. Mason. (Ex. 4, p. 63).

Richard continued telling sexual charged stories in the second grade during the 1995-1996 school year. (Ex. 4, p. 72). Stephen complained to Mrs. Porto that Richard was using profanity, talking about his sister having sex with a male foster child at home, and telling stories about sexual acts involving tying a girl to a tree, taking her clothes off and placing sticks inside her private parts. (Ex. 2). Mrs. Porto reported this information to his second/third grade teacher, Ms. Gallo. (Ex. 2). Stephen testified that Richard told him that he took a girl into the woods behind his house, "took her shirt off, touched her big boobs and fingered her." (Ex. 1) Stephen and Ms. Gallo testified that Richard coerced Stephen to lick up urine. (Ex. 1; Ex. 3). Also in the second grade, Richard pulled down his pants and exposed his penis to Stephen on the playground. (Ex. 2; Ex. 4, p. 83). Mrs. Porto reported these incidents to Ms. Gallo and Principal McArdle. (Ex. 4, p. 79-87).

The sexual harassment continued in the third grade. Stephen reported that Richard touched his (Stephen's) penis, described a movie involving a man and woman having oral sex and anal sex, and talked about his sister having sex with different boys. (Ex. 2). Stephen

---

[4] Stephen and Mrs. Porto consider each other mother and son.

4

testified consistently that, while at the Heathbrook School, Richard "was touching my ass" and that "a lot of times I got detention for fighting Richard off when he tried to touch me." (Ex. 1). Mrs. Porto reported this information to Ms. Gallo, to Principal McArdle and to the special education team, after Stephen disclosed the incidents to her. (Ex. 2; Ex. 4, p. 86) The third grade team meeting notes specifically state: "Mother discussed incidents on the playground and bus where Stephen and other children exhibit inappropriate behavior (sexual issues) and other behaviors." (Ex. 5).

In the 1997-1998 fourth grade year, Stephen reported to his mother Richard was having sex a younger cousin. (Ex. 2). Stephen also reported classroom talk about "grabbing butts." (Ex. 4, p. 117). Mrs. Porto notified the fourth grade teacher, Ms. Fiore. (Ex. 2). Defendants attempt to characterize the behavior that occurred in grades one through four as mere "teasing" that is not actionable under the law. However, the evidence creates a material factual dispute regarding the sexual nature of the conduct.

In the 1998-1999 fifth grade year at the Dewing Elementary School, Stephen disclosed that Richard touched his private parts behind a poster board in the class and that this occurred in the plain view of the fifth grade teacher, Mrs. Paris. (Ex. 1; Ex. 2) Stephen also disclosed to his mother and to his therapist, Dr. Bradford Smith, that he and Richard were involved in oral sex on the school van. (Ex. 2; Ex. 8). Stephen told Mrs. Porto that Richard touched and penetrated his buttocks with his fingers and described a movie involving naked women wrestling. (Ex. 2). Mrs. Porto notified Mrs. Paris and Principal Bradley. (Ex. 2). Nevertheless, Stephen again reported that Richard grabbed him and tried to stick his fingers in his buttocks through his pants while in school. Mrs. Porto reported this conduct to Mrs. Paris, to Principal Bradley a second time and threatened to call the police. (Ex. 2; Ex. 4, p. 171). Stephen also disclosed to his

mother that Richard was playing doctor and touching girls in his house. (Ex. 4, p. 130-131). Stephen also stated that Richard stuck a butter knife in the girl's vagina (Ex. 4, p. 131, 133). Mrs. Porto reported this to Mrs. Paris. (Ex. 4, p. 131).

Furthermore, Stephen testified to the following incidents of sexual harassment in the fifth grade: Richard grabbed his ass during recess; Richard touched his private parts behind a poster board and at a computer station in the view of the classroom teacher; Richard described touching his cousin's private parts and having sex with his cousin, specifically, Richard was "touching her ass" and "she touched his penis." Richard also described pornographic movies in which girls touched themselves in the crotch and ripped off their clothes. Stephen learned from Richard that "the breasts are on top, the vagina is on the bottom, and that a girl has three holes: the ass, crotch (vagina hole) and mouth. (Ex. 1).

Defendants make a poor attempt to portray Stephen as a child that was an aggressor predisposed to sex outside of school . Defendants rely on disputed facts in support of this argument. Plaintiffs contend that, as a result of exposure to sexualized behavior in the school setting, Stephen was discovered touching his sister Melinda. (Ex. 1; Ex. 4, p. 133). Thereafter, Mrs. Porto immediately brought Stephen to his pediatrician and to a therapist. (Ex. 4, p. 136, 138). Stephen disclosed that he touched Melinda because "Richard gave [him] the idea." (Ex. 1, Ex. 4, p. 133, 137). He also disclosed to Dr. Smith that he and Richard were involved in oral sex on the school van. (Ex. 1; Ex. 4, p. 139; Ex. 8). Stephen testified as follows:

"After Richard told me these stories, I went home and started playing doctor with my sister Melinda. I used a drumstick and touched Melinda. Then I would always see Dr. Smith. Dr. Smith asked me about what happened with Melinda, and I told him that Richard gave me the idea. Dr. Smith asked me questions about Richard, and I told him that all the time in the van we were touching each other's private parts. I told Dr. Smith that I didn't want Richard to touch me. Richard would talk me into putting my mouth on his penis." (Ex. 1).

6

Mrs. Porto reported Stephen's disclosures regarding oral sex on the school bus to Mrs. Paris. (Ex. 4, p.169; Ex. 9, p. 55). Mrs. Paris then reported this information to Principal Bradley. (Ex. 4, p. 169; Ex. 9, p. 61).

Stephen entered sixth grade at the J.F. Ryan Elementary School in the 1999-2000 school year. Stephen testified that Richard touched him at least once a week in the sixth grade, placing his foot on Stephen's crotch area. (Ex. 1). According to Stephen, Mrs. Paris observed this sexual conduct when it occurred and immediately moved Richard's seat. (Ex. 1). Stephen also testified that at the Ryan School, Richard would follow him to the bathroom. In the bathroom, Richard told him to turn around, and Richard put his penis in his buttocks. (Ex. 1) This happened at the Ryan School and the Wynn School. (Ex. 1).

Stephen attended the seventh grade at the Wynn Middle School in the 2000-2001 school year. In October of 2000, three classroom aides reported three separate incidents of sexual touching between the boys to Robert Ware, the school's behavior specialist. (Ex. 17, p. 37-39; Ex. 18; Ex. 19). Mr. Ware interviewed the aides and documented that Richard placed his hands on Stephen's thigh when sitting at a working table; that Richard moved closer to put his hands on Stephen; that during gym class, Richard was sitting behind Steven and had his hands under Stephen on the bleachers. (Ex. 19). There is also a notation that "Stephen claims Richard fondled him." (Ex. 18, p. 3; Ex. 19).

In January 2001, Mr. Ware discovered the boys in the bathroom with their pants down. (Ex. 17, p. 85). Mr. Ware concluded after conversations with the boys that there was touching of a sexual nature in the bathroom. (Ex. 17, p. 99). Specifically, the boys reported that they were touching each other's private parts underneath their pants. (Ex. 17, p. 106). Stephen testified

that this happened in the bathroom between five and ten times at the Wynn School and there were times that the classroom aides knocked on the restroom door. (Ex. 1; Ex. 8).

The above-described incidents constitute a pattern of ongoing sexual harassment that clearly rises to the level of severe and pervasive. The harassment continued unabated over a period of six years. The severity of the harassment is marked by the physical nature of the conduct including multiple incidents of oral and anal sex. "A single, unusually severe incident of harassment may be sufficient to constitute a Title VII violation; the more severe the harassment, the less need to show repetitive series of incidents. This is particularly true when the harassment is physical. Barrett v. Omaha National Bank, 584, F. Supp. 22, 35 Feb Cases 585 (D. Neb. 1983), aff'd, 726 F.2d 424, 33 EPD ¶ 34, 132 (8th Cir. 1984) (One incident constituted actionable sexual harassment.); Equal Employment Opportunity Commission Policy Guidance on Current Issues of Sexual Harassment (1990). Lastly, the nature of the conduct and the fact that it involved two cognitively impaired minors is objectively offensive by any standard.

Defendants argue that Stephen's claim must fail because he engaged in "consensual" sexual conduct. In support of this argument, Defendants rely on Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 1986. In Meritor, the Supreme Court held that in Title VII employment cases, sexual harassment must be "unwelcome."[5] However, Federal courts have refused to apply this standard in every Title IX case involving sexual harassment in an educational institution. In Mary M., et al v. North Lawrence Community School Corp., 131 F.3d 1220 (7th Cir. 1997), the Court rejected the Appellee's reliance on Meritor as erroneous, holding that "[w]elcomeness is an improper inquiry to be made in Title IX cases involving sexual discrimination of elementary school children."

---

[5] The U.S. Department of Education, Office of Civil Rights and the Supreme Court apply, as appropriate to the educational context, many of the legal principles applicable to sexual harassment in the workplace developed under Title VII. (See Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 75 (1992).

The <u>Mary M.</u> Court held that "[s]exual harassment in the workplace is vastly different from sexual harassment in a school setting . . . Schools are charged with acting *in loco parentis*, while employers owe no such duty to their employees. Further, employees are older and (presumably) know how to say no to unwelcome advances, while children may not even understand that they are being harassed." Id. at 1226. The Court also looked to the state criminal statute and case law on statutory rape noting by analogy that a 13-year-old cannot be said to appreciate the full risk and consequences of sexual intercourse. The Court reasoned that if elementary school children cannot be said to consent to sex in a criminal context, they similarly cannot be said to welcome it in a civil context.[6] Id. at 1227.

The Federal agency charged with administering and enforcing Title IX agrees. The Department of Education, Office of Civil Rights' Policy Guidance states that "If younger children are involved, it may be necessary to determine the degree to which they are able to recognize that certain sexual conduct is conduct to which they can or should reasonably object and the degree to which they can articulate an objection. Accordingly, OCR will consider the age of the student, the nature of the conduct involved and other relevant factors in determining whether a student had the capacity to welcome sexual conduct." Dept. of Ed., Office for Civil Rights, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students or Third Parties 62 Fed. Reg. 12034 (1997).

Stephen is a child with a disability and therefore has no ability to consent to sexual harassment. He has been diagnosed with Fetal Alcohol Syndrome, severely delayed cognitive abilities, moderate mental retardation and delayed expressive and receptive language skills. (Ex. 34). Mrs. Paris testified that Stephen's language skills were immature, and he had difficulty

---

[6] The statutory rape law in Massachusetts states that the legal of consent is 16. M.G. L. c. 265, § 23.

communicating with his age level peers. (Ex. 9, p. 47). He also had trouble expressing his emotion and what he might be upset about (Ex. 9, p. 45).

Stephen was harassed from the first grade through the seventh grade (age 7 through age 13). The limitations imposed by his disability clearly prohibit inquiry into the issue of welcomeness. A speech and language evaluation completed in October 1998 found that Stephen is at least four years behind his current grade level. (Ex. 35). Dr. Smith, who treated Stephen after the March 1999 school bus incident, testified that Stephen did not have the cognitive ability to distinguish between appropriate and inappropriate touching. (Ex. 8).

Dr. Alexandria Weida evaluated Stephen in March 2001. (Ex. 26). Dr. Weida noted that Stephen is unable to define the basic concept of what constitutes a wrong or bad act from a not wrong or good act and that this inability is consistent with cognitive limitations associated with mental retardation. (Ex. 26). School officials agreed. Robert Ware testified that "the boys needed education on what was right and wrong." (Ex. 17, p. 140-141). Moreover, James McGuire, Principal of the Wynn Middles School, testified that after the January 2001 incident, he had questions regarding the boys' ability to understand the nature of what they were doing and that it was not appropriate. (Ex. 23, p. 123-124).

Even assuming *arguendo* that Stephen possessed the mental capacity to welcome sexual harassment, there is a material factual dispute regarding the issue of consent. In support of the argument that Stephen welcomed sexual harassment, Defendants cite testimony from the deposition of Mrs. Porto. Defendants mischaracterize Mrs. Porto's testimony regarding a conversation with Stephen's therapist about adolescent masturbation as a statement that Stephen enjoyed Richard's sexual advances. (Ex. 4, p. 157-159). Furthermore, Mrs. Porto testified that Stephen learned that sex was good "after the fact of what Richard's been doing to him." (Ex. 4,

p. 206). In fact, Stephen testified that Richard's stories about sex made him "feel uncomfortable." (Ex. 1). He also stated that he regularly told Richard to stop touching him and often defended himself by hitting Richard in an effort to keep him away. (Ex. 1) After the October 2000 incident, Robert Ware, the Wynn Middle School Behavior Specialist documented that "Stephen claims Richard fondled him," and stated "Keep hands to yourself." (Ex. 18, p. 3). Furthermore, Stephen repeatedly complained to his mother about Richard's unwelcome sexual conduct. (Ex. 1; Ex. 2).

Stephen also complained to his classroom teachers in a manner consistent with that of a child who suffers from expressive language delays. Stephen complained that Richard was telling stories, touching him and bothering him. (Ex. 1). He also became angry and frustrated when the conduct did not stop, at times throwing his books and papers. (Ex. 1). Acquiescence does not always mean that a participant in conduct of a sexual nature has, in fact, consented. "The [EEOC] recognizes that victims may fear repercussions from complaining about the harassment and that such fear may explain a delay in opposing the conduct. EEOC Policy Guidance on Current Issues of Sexual Harassment.

Stephen was particularly vulnerable because of his cognitive limitations. He is described as a child who feared ridicule (Ex. 9, p. 127) and who would do anything anyone asked of him. (Ex. 4, p. 206). Stephen testified that "[oral sex] always made me feel uncomfortable. I told Richard that I did not want to do this. Richard told me if I didn't do what he wanted, he would tell everybody what he was doing to me on the bus. He threatened me with words . . . He threatened to tell the kids that I was gay. I always told Richard to stop touching me, but I was afraid not to let him." (Ex. 1). Summary Judgment is seldom appropriate where a case presents

issues involving state of mind or subjective feelings and reactions, such as motive, intent and good faith. Poller v. Columbia Broadcasting System Inc., 368 US 464 (1962).

### B. Tewksbury Had Actual Knowledge of Sexual Harassment

In Davis, the Supreme Court suggested that both the parent and the student had satisfied the actual notice standard where they had made repeated harassment complaints to the teacher and principal. See also Murrell v. Sch. Dist No. 1, Denver, Colo., 186 F.3d 1238 (10th Cir. 1999). In Murrell, the court stated that "[I]t is possible that these teachers would also meet the definition of appropriate persons for the purposes of Title IX liability if they exercised control over the harasser and the context in which the harassment occurred." Id. at 1248.

Defendants argue that there were never complaints of sexual harassment from either Stephen or from Mrs. Porto. In support of this argument, Defendants' mischaracterize the testimony of Mrs. Porto. Read in context, Mrs. Porto's statement that "[Stephen] never told anybody" refers only to sexual conduct that occurred in the bathroom at the Wynn Middle School. (Ex. 4, p. 195).

As set forth in detail in Section IIIA above, Mrs. Porto notified numerous school officials who exercised authority over Richard regarding incidents of sexual harassment in grades one through four. Mrs. Porto's testimony is supported by the testimony of various school officials, who admitted notice of inappropriate sexual contact involving Stephen and Richard. Mrs. Paris acknowledged that she was made aware of sexual touching between the boys in March of 1999 and that she notified Principal Bradley. (Ex. 9, p. 61, 64, 68). Dr. Bradley filed a 51A report with DSS alleging the sexual abuse of Stephen by Richard on the school bus. (Defendants' Ex. 10). Prior to Stephen's transition from the Ryan to the Wynn School, Mrs. Paris notified seventh grade teacher, Mrs. Edelstein, the boys were not supposed to be together and needed to be

closely monitored. (Ex. 9, p. 80). Mrs. Paris stated further that Stephen's educational team was "aware of the whole situation." (Ex. 9, p. 83-86). In addition, Principal Bradley documented the incident in a memorandum to the Superintendent McGrath dated March 10, 1999. (Ex. 11). This memorandum was part of Stephen's academic record.

Mr. Ware was also on notice. Kara Buckley notified him of prior incidents occurring in the elementary years. (Ex. 17, p. 53) and Mr. Ware notified Principal McGuire. (Ex. 17, p. 68). Mr. McGuire denied any knowledge. All Defendants denied having seen the March 1999 memorandum from Principal Bradley to Superintendent McGrath prior to January 2001. Most significantly, in an investigative report prepared by the Department of Social Services ("DSS") as a result of McGuire's 51A report filed in January 2001, several teachers and administrators indicated prior knowledge of sexual harassment. (Ex. 20). Mr. Ware acknowledged that "the elementary school had passed that information along to the middle school about the incident on the bus." (Ex. 20, p. 8). He also stated that he was "aware of the 1999 incident in the school bus and that they both had a previous history in prior schools of touching each other." (Ex. 20, p. 3).

Sharon Moser, the special education case manager, reported to the DSS investigator that "[T]he aides in the room were aware of the incidents of sexual acting out between these boys and that Mrs. Edelstein was also aware." (Ex. 20, p. 3). She brought this history to the attention of the school principal. (Ex. 20, p. 8). Furthermore, Mrs. Edelstein stated that she was "aware that the boys had this proclivity for touching each other and acting out sexually." (Ex. 20, p. 7). William Traveis, the School Adjustment Counselor, stated that he "had been made aware of the previous incident in the elementary school through Ms. Moser". (Ex. 20, p. 8). Significantly, the DSS investigator supported a finding of neglect on the part of Mrs. Edelstein. (Ex. 20, p. 8).

Notification was appropriate for the purposes of Title IX liability, the identified schoolteachers and administrator were directly involved with Stephen and exercised control over the children and the context in which the harassment occurred.

### C. Tewksbury Acted With Deliberate Indifference

Tewksbury violated Title IX through its deliberate indifference to known acts of harassment. The Supreme Court describes deliberate indifference as a "clearly unreasonable response in light of the known circumstances." Davis, 526 U.S. at 648. "[D]eliberate indifference must, at a minimum, cause [students] to undergo harassment or make them . . . vulnerable to it. McGowen, 231 F.3d 253 (6th Cir. 2000), quoting Davis, 526 U.S. at 645. Moreover, "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." Id. at 261. In this case, Defendants made no legitimate efforts to end the sexual harassment.

Despite extensive prior knowledge, no action was taken until it was disclosed that the boys were engaging in oral sex on the school van in March of 1999. At that time, Principal Bradley issued a directive for heightened supervision, stating "They are never to travel alone in or outside the building." (Ex. 11). However, the directive was never implemented. Richard and Stephen continued to have access to one another unsupervised. (See Section IIIA-C). Defendants insist their response to the 1999 incident was not unreasonable because they conducted an investigation and made a report to the police. However, there is no police report to substantiate that an investigation ever occurred, and Stephen and Mrs. Porto were never interviewed. (Ex. 1; Ex. 2). Contrary to Defendants claim, Mrs. Porto was never informed of any investigative conclusions. (Ex. 2).

14

There is substantial evidence that Principal Bradley's directive for heightened supervision was not implemented. Sexual touching continued in the fifth and sixth grades. (See Section IIIA-C). In October 2000, the boys were observed engaged in sexual touching during class on three occasions by a classroom aide. (Ex. 20, p. 7; Ex. 19). Defendants argue that educating the boys through counseling was an appropriate response to this incident. However, no such education and counseling ever took place.

Mr. Traveis was responsible for counseling and educating the boys as a result of the October 2000 incidents. (Ex. 16, p. 61). He was aware there was a past history between the boys. (Ex. 16, p. 58; Ex. 20, p. 8). Mr. Traveis has no educational background in sexual abuse and only attended one training in sexual harassment. (Ex. 16, p. 45). Mr. Traveis admitted he did not know the significance of the touching. (Ex. 16, p. 59). Traveis' advice was to keep the boys separate and, after only one discussion with the boys, he never addressed the subject again. (Ex. 16, p. 59). During this one meeting, Mr. Traveis never addressed any specifics regarding the incidents; he never asked the boys what they were doing or explained to them why the behavior was inappropriate. (Ex. 16, p. 65-67). He assumed they understood and were remorseful. (Ex. 16, p. 65-67, 75).

Moreover, Mr. Traveis never told Mrs. Porto about the behaviors or that he had spoken to Stephen specifically about an incident of inappropriate touching. (Ex. 16, p. 67). At the November 2000 team meeting when Mrs. Porto requested supervision, Mr. Traveis never told her about what transpired, but he assured her the youngsters were being supervised. (Ex. 16, p. 76, 88-89). Ms. Moser testified that she disagreed with Mr. Traveis' decision not to call the boys' parents. (Ex. 13, p. 44-45). She also testified that "she was upset with Mr. Traveis

because of his hesitancy on the whole issue." (Ex. 13, p. 46). Defendants' action was clearly unreasonable in light of the boys' known history and because they effectively did nothing.

The boys were still left unsupervised while at school, even after the October 2000 incident. The boys traveled to and attended gym class without an aide present. (Ex. 20, p. 8). They were also allowed to go to the bathroom during gym unsupervised. (Ex. 1; Ex. 20, p. 8). The lack of monitoring left Stephen vulnerable to continued sexual harassment. In fact, Stephen testified that Richard had anal sex with him in the bathroom five to ten times including the gym and cafeteria bathrooms before Mr. Ware was sent to find them in January 2001. (Ex. 1). Stephen also reported to Dr. Smith that he and Stephen were involved in sexual activity in the bathrooms at school an estimated ten times. (Ex. 8).

The absence of an effective policy on sexual harassment left Stephen vulnerable to continued sexual harassment. Schools are required by Title IX to adopt and publish a policy against sexual harassment and grievance procedures providing for prompt and equitable resolution of complaints. 34 CFR 106.8(b) and 106.9. The purpose of such a policy is to prevent sexual conduct from becoming sufficiently severe and pervasive so as to create a sexually hostile environment. "A grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint." Dept. of Ed., Office for Civil Rights, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students or Third Parties, 62 Fed. Reg. 12034 (1997).

Tewksbury provided limited information about sexual harassment to students, if any. There was no student handbook or sexual harassment policy while Stephen attended the Heathbrook, Dewing and Ryan Schools. (Ex. 10, p. 76; Ex. 38). The Wynn Middle School handbook contained a brief statement that unwanted verbal or physical advances of a sexual

nature were unacceptable, but provided no complaint or grievance process. (Ex. 30). Despite
numerous meetings with Mrs. Porto regarding complaints of sexual touching, no one ever
informed of the right to file a complaint. (Ex. 2; Ex. 4, p. 166).

The 1999 plan for supervision and the 2000 plan for education and counseling were never
put into effective practice, and Defendants had actual knowledge that the sexual behavior
continued. In light of the known circumstances, there are clearly material factual disputes
regarding deliberate indifference.

### D. Stephen Was Denied Equal Educational Opportunities And Benefits

A Plaintiff must establish that sexual harassment so undermines and detracts from the
victim's educational experience, that the student is effectively denied equal access to an
institution's resources and opportunities. Davis, 526 U.S. at 652. The behavior must be serious
enough to have a systemic effect of denying the victim equal access to an educational program or
activity. Davis at 652.

The inability to fully access an education is inherent in a school environment permeated
by severe and pervasive sexual harassment. "A non-discriminatory environment is essential to
maximum intellectual growth and is therefore an integral part of the educational benefits that
student receives. A sexually abusive environment inhibits, if not prevents, the harassed student
from developing [his] full intellectual potential and receiving the most from the academic
program." Davis, 74 F.3d at 1193 (11th Cir. 1996). "Children are far less able to articulate the
fact and extent of their injuries and may manifest an array of different reactions to the
harassment." Gabrielle M. v. Park Forest-Chicago Heights, et al., 315 F.3d 817 (7th Cir. 2003).
This is particularly true for Stephen, given his expressive language delays.

There are genuine and material facts that Stephen lost his excitement for school and suffered physically and emotionally from the hostile learning environment. Stephen complained of leg pain, headaches, stomachaches and chest pain. (Ex. 4, p. 101, 187; Ex. 1). Even on days that he was not symptomatic, Stephen told his mother that he was not feeling well so that he could stay home from school. (Ex.1). During school, he often went to the nurse with complaints seeking to be dismissed. (Ex. 4, p. 111). Stephen was unable to focus while he was at school. Ex. 37). He testified that he would "throw books around because [he] was upset and "sometimes not even do [his] schoolwork because [he] was too distracted." (Ex. 1).

The impact of sexual harassment on Stephen's ability to focus also manifested through staring spells. Stephen was examined by Dr. Joel Herskowitz at the New England Medical Center in September and December of 1999 as result of staring spells. Dr. Herskowitz noted in the Addendum to his report: "Ms. Porto is extremely frustrated that Stephen remains in the class with a boy who allegedly molested Stephen sexually. This appears to be an ongoing stressor for Stephen and, in my view, will account for some of the staring spells that have been observed." (Ex. 15).

The impact on Stephen's intellectual growth is apparent from Stephen's academic testing. Since leaving Tewksbury and receiving intensive treatment for the emotional trauma associated with sexual abuse, Stephen's reading level increased from Grade 1 level to Grade 10 level; his spelling increased form a Grade 1 level to a Grade 7.8 level; and his math increased from a Grade 2 to a Grade 5.6 level. (Ex. 31, p. 1, 395, 610, 340, 258). Maureen Pryjma, the Clinical Director at the Eagleton School, testified that Stephen's placement in a therapeutic milieu has provided him with stability, predictability and safety such that he has acquired the self-esteem and focus to make academic and clinical progress consistent with his true potential. (Ex. 37).

Years of sexual harassment ended on January 11, 2001 when Richard was discovered having anal sex with Stephen in the boy's bathroom, but the impact of the harassment on Stephen's education continued. After January 2001, Stephen never returned to the Tewksbury Public Schools. For three months, he received no educational services. (Ex. 2). From April 2001 through mid August 2001, Stephen received approximately 11 hours of tutoring per week. (Ex. 2). In September 2001, Stephen was hospitalized at the Charles River Hospital for suicidal ideation and depression associated with incidents of sexual harassment at school. (Ex. 2; Ex. 4, p. 232-233). In November 2001, he was admitted to the Bournewood Hospital day program for one month while awaiting placement in a residential school. (Ex. 2). He was also hospitalized at the Lowell Youth Treatment Center. (Ex. 2).

Finally, in February 2002, Stephen was admitted to the Eagleton School, a residential program for boys with cognitive, emotional and behavioral disabilities. Stephen remains at Eagleton to date. Eagleton is a highly structured residential facility, and Stephen's freedom is significantly restricted. (Ex. 37). The decision to place Stephen at Eagleton was a decision of the educational team based, in part, upon the evaluation of Dr. Alexandria Weida.(Ex. 26). Tewksbury authorized placement at the Eagleton School in a letter to Mrs. Porto dated. (Ex. 28). Stephen's exposure to inappropriate sexualized conduct while attending the Tewksbury Public Schools formed the basis Dr. Weida's recommendation. (Ex. 28). Dr. Weida concluded that Stephen was at risk because of his mental retardation and the fact that he was sexualized at a young age as a result of being involved in sexual activity with an age mate for several years in the school setting. (Ex. 28). The foregoing evidence creates a material factual dispute regarding the impact sexual of harassment on the Stephen's education.

**IV. M.G.L. c. 76, §5 (Count IV)**

M.G.L. c. 76, §5 is a civil rights statute analogous to Title IX of the Education Amendments of 1972. The statute has been used for injunctive and declaratory relief as well as damages. Leonard v. School Committee of Attleboro, MA 212 N.E.2d 458 (1965) (stating that torts are not the exclusive remedy provided by the statute) Attorney General v. Massachusetts Interscholastic Athletic Association, Inc. Mass., 393 N.E.2d 284 (1979) (enjoining sex discrimination in athletics). Tewksbury contends Plaintiffs' reliance thereon is incorrect and that Plaintiff cannot advance a claim under M.G.L. c. 76, § 5 as it circumvents the special education process. Tewksbury asserts that a federal lawsuit cannot now be used to challenge inadequate education programming or that Stephen has been denied access to public school since January 12, 2001.

M.G.L. c. 76, §5 is the state equivalent to Title IX. The statute affords the same protections as Title IX. The regulations were implemented at the same time as the Title IX regulations.[7] Many of the regulations in 603 C.M.R. 26.00 through 26.09 mirror the Title IX regulations and requirements.[8] Accordingly, Plaintiff adopts and incorporates all arguments set forth in Section III.

---

[7] Title IX requires that agencies promulgate regulations to provide guidance to recipients of federal financial assistance who administer education programs or activities on Title IX enforcement. After the passage of Title IX, the Department of Health, Education, and Welfare (HEW) adopted implementing regulations. 40 Fed. Reg. 24128 (1975).

[8] Recipients of federal financial assistance, including state and local educational agencies, must comply with the Title IX implementing regulations. The Title IX implementing regulations at 34 C.F.R. § 106.8(a) require that each recipient designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX. The coordinator's responsibilities include investigating complaints communicated to the recipient alleging noncompliance with Title IX. Section 106.8(a) also requires the recipient to notify all students and employees of the name, address, and telephone number of the designated coordinator. Section 106.8(b) requires that each recipient adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints under Title IX. The Title IX regulations at 34 C.F.R. § 106.9 require that each recipient publish a statement (notice) that it does not discriminate on the basis of sex in the education programs or activities it operates. The notice must state, at a minimum, that the recipient does not discriminate on the basis of sex in admission to or employment in its education programs or activities. The notice must further state that inquiries to recipients concerning the application of Title IX and its implementing regulations may be referred to the Title IX coordinator or to OCR.

M.G.L. c.76, §5 provides, in pertinent part:

> "Every person shall have a right to attend the public schools of the town where he actually resides, subject to the following section. No person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of . . . sex . . . ."

Plaintiff's reliance on the statute is proper. "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain ... the sole function of the courts is to enforce it according to its terms." James J. Welchand Co. V. Deputy Comm'r of Capitol Planning and Operations, 387 Mass. 662, 666 (1982) quoting Caminetti v. United States, 242 U.S. 470, 485 (1917). Although there are few cases on this statute, it is clear that the statute and the regulations developed and adopted by the Massachusetts Department of Education ("DOE") have the intent of eliminating discrimination based on sex. "When the Legislature delegates to an administrative agency a broad grant of authority to implement a program of reform or social welfare, the administrative agency generally has a wide range of discretion in establishing the parameters of its authority pursuant to the enabling legislation." Levy v. Board of Registration & Discipline in Med., 378 Mass. 519, 525 (1979). "A reviewing court accords due weight and deference to an agency's reasonable interpretation of a statute within its charge." Massachusetts Med. Soc'y v. Commissioner of Ins., 402 Mass. 44, 62 (1988), but "[t]he duty of statutory interpretation is for the courts." Cleary v. Cardullo's, Inc., 347 Mass. 337, 344 (1964).

M.G.L. c. 76, §5 has not been as narrowly construed as Tewksbury asserts and is not limited to discrimination in admissions only. The statute is straightforward, that students have the right to obtain the advantages, privileges and courses of study free from

discrimination. "The purpose of the regulation shall be liberally construed." 603 C.M.R. 26.01. The subsections of the regulations clearly identify the specific steps public schools are required to take to address discrimination and affirmatively obligate schools to do so under subsections entitled "Purpose", "Active Efforts" and "Complaint and Notification Procedure." The use of the word "shall" makes implementation of the regulations mandatory. Hashimi v. Kalil, 388 Mass. 607, 609 (1983).

Regulations are entitled to great deference. Soliz v. Plunkett, 615 F.2d 272 (CA5 1980). Most statutes give to the administrative regulations the force and effect of law. Griffin v. Harris, 571 F.2d 767 (CA3 1978). "There is a presumption that the regulation does not exceed the statute which is as strong as the presumption that a statute squares with the Constitution." White Dove, Inc. v. Director of the Div. of Marine Fisheries, 380 Mass. 471, 477 (1980).

The regulations are a vehicle to achieve the purpose of the statute. 603 C.M.R. 26.00 (2) requires that "all public schools shall strive to prevent harassment or discrimination based upon students' . . . sex . . ., and all public schools shall respond promptly to such discrimination or harassment when they have knowledge of its occurrence." Although Tewksbury adamantly denies the occurrence of sexual harassment or notice of harassment, Plaintiffs have extensively addressed these issues under Section III.

Tewksbury has not complied with the Active Efforts requirements that "The school committee and the superintendent shall provide in-service training for all school personnel at least annually regarding the prevention of discrimination and harassment based upon . . . sex . . . and the appropriate methods for responding to such discrimination and harassment in a school setting." 603 C.M.R. 26.07 (3).

Tewksbury failed to provide adequate annual training. Mrs. Edelstein has never had any

training in sexual harassment. (Ex. 12, p. 78). Nor had Mrs. Edelstein been provided with the

Wynn school harassment policy, faculty handbook or the system-wide policy. (Ex. 12, p. 77).

The Wynn Middle School behavior facilitator, Mr. Ware, has held his current position for eight

years but only participated in one sexual harassment training. (Exhibit 17, p. 10, 14-15 ). Mrs.

Moser, the seventh grade case manager for Stephen testified she has never had any training on

sexual harassment. (Ex. 13, p. 15). Dr. Bradley, former principal thought that sexual harassment

was presented at some yearly retreats. (Ex. 10, p. 42). Mr. Traveis went to a sexual harassment

training once. (Ex. 16, p. 45). Dr. McGrath stated that sexual harassment training is provided as

part of the legal training for administrators at some yearly retreats. (Ex. 25, p. 59). DOE made a

finding against the Tewksbury Public Schools in a written compliance report dated June 2002

stating that "Review of district documentation and staff interviews indicates that annual staff

training in the area of civil rights is not taking place." (Ex. 38, p. 79). This DOE finding was

made in reference to the requirements of Title IX and M.G.L. c. 76, §5 as "not implemented."

(Ex. 38, p. 79).[9]

Tewksbury's policy of responding to complaints is ineffective, and there are genuine and

material facts as to the effectiveness of Tewksbury's school based procedures. The requirement

is: "The superintendent, as an agent of the school committee, shall promote and direct effective

procedures for the full implementation of 603 CMR 26.00 and shall make recommendations . . ."

603 C.M.R. 26.07 (4). Dr. McGrath testified that Tewksbury's policy for physical touching of a

sexual nature is to call the police. (Ex. 23, p. 29-30). Tewksbury does not engage in detailed

---

[9] As one part of its school and school district accountability system, the DOE oversees local compliance with education requirements through the Coordinated Program Review system. All reviews include selected requirements in special education under the federal Individuals with Disabilities Education Act, 20 U.S.C. Section 1400 et seq. (IDEA-97) and M.G.L. Chapter 71B (Chapter 766 of the Acts of 1972) and certain federal civil rights requirements under Titles I and II of the Americans with Disabilities Act of 1990, Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and Section 504 of the Rehabilitation Act of 1973, together with related state requirements under M.G.L. Chapter 76, Section 5 (Chapter 622 of the Acts of 1971). (Ex. 38).

conversations with the child. (Ex. 23, p. 30). Plaintiffs contend that reliance on the police is an ineffective procedure because it disregards civil rights; the actions complained of may not rise to the level of criminal behavior, but nonetheless be sexual harassment.

Moreover, even if this policy were effective, Mr. Ware did not call the police in October 2000 when he learned that Stephen was being fondled. Mr. McGuire, in conjunction with the January 2001 investigation stated, "We were instructed by the police department, and, you know, that is part of an agreement we have with the police department. Once something has been turned over to the D.A's office, the investigation is in their hands." (Ex. 23, p. 120-121). Despite notice of sexual harassment on at least three documented occasions, Stephen's civil rights were disregarded under Tewksbury's own policy. Mr. McGuire was aware that sexual inappropriate touching can violate civil as well as criminal laws. (Ex. 23, p. 129).

Where investigations were undertaken, they were equally ineffective and simply unreasonable. Dr. Bradley doesn't recall having spoken to Stephen in order to complete her March 1999 investigation. (Ex.10, p. 56). Mr. Ware "investigated" the October 2000 written complaints of the Life Skills classroom aides to try to find out if there was an unwanted touching. (Ex. 17, p. 31). Mr. Ware does not know why, but he did not speak to Stephen. (Ex. 17, p. 68). Mr. Ware noted in his investigation that "Stephen claims Richard fondled him." (Ex. 17, p. 64; Ex. 18, p. 3). Mr. Ware did not to contact Mrs. Porto. (Ex. 17, p. 75). Notably, Mrs. Porto accessed therapy for Stephen when it came to her attention that Stephen's behaviors were inappropriate in February 1999 as well as in January 2001.

Tewksbury was ineffective in resolving the sexual harassment that was reported over the years. Effective resolution would have prevented continued inappropriate sexual touching. In the fall of 2000, the aides reported the same behaviors complained of by Mrs. Porto and Stephen

in previous years. Dr. Bradley's memo issued a directive for supervision, but there was no follow up as to the effectiveness of the supervision. Dr. Bradley did not recall speaking to Dr. Smith on the risks or outcome of Stephen's counseling. (Ex. 10, p. 60). Although Mr. Ware made a referral to Mr. Traveis for education and counseling as a result of the October 2000 incident, Mr. Traveis has limited experience dealing with issues of sexualized behavior. (Ex. 16, p. 45). In fact, Mr. Traveis never provided any type of education or counseling. (Ex.16, p. 51). His inexperience and disregard for the seriousness of the ongoing nature of the sexual behavior rendered Tewksbury's fall 2000 action plan ineffective.

Dr. McGrath relies on the principals to draft a sexual harassment policy for their respective schools, but she is ultimately responsible. (Ex. 25, p. 45). Her review of the individual school policies is limited to reviewing the consistency of language. (Ex. 25, p.32). The Wynn School Student Handbook Sexual Harassment policy states: "Boys and girls should show respect toward each other in the school setting. Bothering another person with unwanted verbal or physical advances of a sexual nature is unacceptable. Displays of affection are also not considered appropriate in the school setting or events. These behaviors may lead to disciplinary action." (Ex. 30).

The Wynn handbook fails to state any procedures for filing a complaint, investigating or resolving conflicts. Mr. McGuire admitted that the handbook does not instruct students and parents on what actions to take if they feel there is sexual harassment, but the policy has been "boned up" since then. (Ex. 23, p.108). Mr. McGuire's crass characterization of updating the policy is indicative of Tewksbury's disregard for sexual harassment.

According to McGuire, the student handbook is "a condensation of that policy that makes sense to a middle school youngster." (Ex. 23, p. 73). However, the condensed policy fails to