meet the regulatory requirements. McGuire testified that complaints of sexual harassment are directed to the assistant principal or behavior management facilitator. (Ex. 23, p. 75). Students are not notified of the system-wide harassment officers. (Ex. 23, p. 79). Tewksbury contends students and parents are only provided the Wynn handbook and not the system-wide complaint and grievance policy. (Ex. 23, p. 80). McGuire stated that formal and informal complaints are handled differently, depending on whether the complaints are written or not. (Ex. 23, p. 80). McGuire stated that the person making the complaint determines the level of the formality of the complaint. (Ex. 23, p. 80). Students have discretion in choosing to make a formal or informal complaint, but even Mr. McGuire does not know how the student would know the difference between a formal and informal complaint. (Ex. 23, p. 81, 92). There is no black and white policy regarding the procedure. (Ex. 23, p. 82).

Tewksbury has not adhered to the Notification and Complaint Procedure of 603 C.M.R. 26.08 whereby "The superintendent shall be responsible for ensuring that all school handbooks and codes of conduct reference M.G.L. c. 76, § 5 and affirmatively state and explain the school's obligations thereunder. In order to ensure that such obligations are fulfilled, all school handbooks and codes of conduct shall also contain . . . "(b) the school's procedure for accepting, investigating and resolving complaints alleging discrimination or harassment; and (c) the disciplinary measures that the school may impose if it determines that harassment or discrimination has occurred." 603 C.M.R. 26.08.

The DOE compliance report found Tewksbury out of compliance with the requirements of Title IX and M.G.L. c. 76, § 5 regarding the distribution of student handbooks and failing to identify the complaint resolution procedures. (Ex. 38, p. 66-67, 70).

McGuire admitted the handbook fails to identify any sexual harassment complaint or

grievance procedure for students or parents. (Ex. 23, p. 108). Tewksbury's failure to provide the required notices to the student and family resulted in their inability to access their rights. Mrs. Porto never received a student handbook. (Ex. 2). No one ever told Mrs. Porto she could file a complaint. (Ex. 4, p. 114, 166, 258). Had Stephen and his family been provided notice of the grievance and investigation procedures, they would have acted on those rights and the ongoing sexual harassment been alleviated. Instead, Mrs. Porto continued to make verbal complaints, which were minimized or ignored.

In addition to the superintendent's responsibilities under the regulations, "The principal shall ensure that the applicable school handbook and district code of conduct are annually distributed to students, parents and school personnel . . . ." 603 C.M.R. 26.08(2). Assuming *arguendo* that the handbook is deemed adequate, neither Stephen or the Portos ever received the handbook while Stephen attended the Wynn Middle School. (Ex. 1; Ex. 2). The DOE made a finding against Tewksbury in its June 2002 report that Tewksbury did not fully implement the distributing the district code of conduct annually. This finding was made under Title IX and M.G.L. c. 76, §5: "Review of the district documentation indicates the school codes of conduct are not distributed annually at every school. (Ex. 38, p. 70).

M.G.L. c.76, §5 does not differentiate the obligation of schools to provide notice and protections of Massachusetts's laws to regular education students and special educations students. McGuire concedes that special education students do not understand behaviors which can be construed as sexual harassment and that the education process begins at that point. (Ex. 23, 106-107). Further, these issues are brought, generally speaking, as inappropriate behavior. (Ex. 23, p. 107). This is not an effective policy or one designed to meet the substantial and comprehensive requirements of the regulations.

Special education students may be afforded additional protections or services pursuant to other laws (IDEA 20 U.S.C. 1400 et. seq., M.G.L. c. 71B and 603 C.M.R. 28, et seq.). Each right to which a student is entitled does not have to be memorialized in their IEP in order to be enforced. Moreover, both Mrs. Paris and Mr. Traveis stated that monitoring and supervision should not be part of the IEP. (Ex. 9, p. 90-91; Ex.16, p. 91)

Tewksbury contends that the Plaintiff's cannot rely on this statute and a federal suit to complain of their dissatisfaction with the services Stephen received or his subsequent placement out of the community. However, "Nothing in 603 CMR 26.00 shall abridge or in any way limit the right of a parent, guardian, or person affected to seek enforcement of M.G.L. c. 76, § 5 in any court or administrative agency of competent jurisdiction." 603 CMR 26.00.

The claims as presented are properly within the scope of M.G.L. c. 76, §5. Tewksbury's policies and procedures during the relevant time were inadequate, as Tewksbury failed to abide by the regulations and thereby violated M.G.L. c.76, §5. Assuming *arguendo* the standards in the Wynn handbook are deemed adequate, Stephen was not able to access the content due to his level of disability. There is no dispute regarding Stephen's low cognition and reading levels. (Ex. 31; Ex. 34; Ex. 35). The purpose of the statute is to eradicate discrimination, and the ensuing regulations impose affirmative obligations on public schools to thwart such discrimination without regard to disability. The statute and regulations apply to "Every person . . . shall . . . "

"If a liberal, even if not literally exact, interpretation of certain words is necessary to accomplish the purpose indicated by the words as a whole, such interpretation is to be adopted rather than one which will defeat the purpose." North Shore Realty Trust v. Commonwealth, 434 Mass. 109, 112 (2001), quoting Champigny v. Commonwealth, 422 Mass. 249, 251 (1996).

## V.  M.G.L. c. 214, §1C and M.G.L. c. 151C (Counts II and III)

Under G.L. c. 151C, §2(g), it is an unfair educational practice "[t]o sexually harass students in any program or course of study in any educational institution," as defined by M.G.L. c. 151C.  Section 1(e) of Chapter 151C defines sexual harassment, in relevant part, as follows:

> "Any sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when . . . such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's education by creating an intimidating, hostile, humiliating or sexually offensive educational environment."

Defendants argue that Plaintiffs claim is untimely given that it was filed with the Massachusetts Commission Against Discrimination ("MCAD") beyond the six-month statute of limitations.  However, Defendants' argument is flawed, given that the MCAD dismissed Plaintiffs 151C claim for lack of jurisdiction. (Ex. 36).  The MCAD held that the Town of Tewksbury is not an educational institution as defined by M.G.L. c. 151C, § 1(b).  The MCAD has no jurisdiction over Plaintiff's claims.  Thus, the statute of limitations is irrelevant.

The MCAD has also held that the agency lacks jurisdiction under the Fair Educational Practices Act to hear a student's claim of adverse treatment because that statute "prohibits discrimination in admissions to educational institutions, not discrimination in treatment of students." Oliver v. Holyoke Community College, 23 MDLR 291 (2001).  The Commission noted that "while General Laws c. 151B and 272 do not offer redress before this Commission, M.G.L. c. 76 and the Massachusetts Department of Education regulations at 603 CMR 26 (Access to Equal Educational Opportunities) prohibit discriminatory treatment both in admission to school and in obtaining the advantages, privileges and courses of study of such public school on account of . . . sex." Oliver, 23 MDLR at 23, FN 2.

Plaintiffs argue that the Superior Court nonetheless retains jurisdiction over Stephen's sexual harassment claim, pursuant to M.G.L. c. 214, §1C. Although §1C states that "No claim under this section that is also actionable under . . . Chapter 151C shall be brought in superior court unless a complaint was timely filed with the MCAD . . .," Plaintiffs' claim was determined by the MCAD not to be actionable under 151C. Thus, the six-month MCAD filing period in effect at the time is inapplicable. Pursuant to M.G.L. c. 214, §1C, the statute of limitations for filing a sexual harassment claim in the Superior Court is set forth in M.G.L. c. 151B, § 9. Section 9 states that a complaint may be filed "not later than three years after the alleged unlawful practice occurred." Plaintiffs' claim was timely filed on January 7, 2004.

Defendants also argue that Chapter 151C does not provide a cause of action for a claim of student on student sexual harassment. In 1996, the MCAD rejected a claim of peer sexual harassment for the lack of jurisdiction. Buschini v. Town of Newburyport Public Schools, 18 MDLR 216 (1996). However, the Commission's decision relied upon federal law that has since been overruled by the Supreme Court decision in Davis, *supra*. Thus, a state claim of peer sexual harassment is actionable applying current law. Accordingly, Plaintiffs re-assert the arguments set forth in Section III above in support of their opposition to summary judgment on Counts II and III of the Complaint.

## VI. Title II of the Americans With Disabilities Act (Count V)

### A. Unequal Access to Policies and Services

Pursuant to the Americans with Disabilities Act ("ADA"), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. §12132. Defendant argues that Stephen did not exhaust his

administrative remedy prior to bringing a federal lawsuit under the ADA. Specifically,

Defendant argues that Stephen's claim should have been filed first with the MCAD or the EEOC.

However, the EEOC has no jurisdiction over discrimination in public schools, and the MCAD

declined jurisdiction. (See Section V). It is well established that Federal District Courts have

jurisdiction of proceedings instituted pursuant to ADA without regard to whether the aggrieved

party has exhausted any administrative or other remedies that may be provided by law. 42

U.S.C. §2000a-6.

Tewksbury makes numerous efforts to turn this dispute into one over education as

opposed to civil rights. Stephen is not seeking redress under the ADA for Tewksbury's failure to

provide special education services. Rather, Stephen's ADA claim is inextricably intertwined

with his Title IX claim; Stephen was denied access to policies and services for protection against

sexual harassment that non-disabled students were afforded. The right to be free from sexual

harassment is a right that all children are afforded, whether or not they are entitled to special

education services. Since Stephen's claim is not predicated on a violation of the IDEA,

administrative exhaustion before the BSEA is also not required. Moreover, the BSEA has no

jurisdiction over discrimination in public schools. "[C]laims that [are] not related to "a free,

appropriate public education," such as violations of Title IX based on alleged sexual harassment .

. . are treated separately and [are] not subject to the IDEA. Frazier, 122 F.Supp.2d at 111.

Stephen has been diagnosed with Fetal Alcohol Syndrome and mild mental retardation,

which has a substantial limitation on his major life activities including the ability to learn. (Ex.

37). "To be qualified, an individual with a disability must meet the essential eligibility

requirements for receipt of services or participation in a public entity's programs, activities or

services without or without reasonable modifications to a public entity's rules, policies or practices . . . ." 28 CFR 35.104.

Stephen was denied access to sexual harassment policies and procedures on the basis of his disability. There are no specific eligibility requirements for access to sexual harassment policies and services. Rather, they are a requirement of Title IX, M.G.L. c. 76, § 5 and related regulations. (See Sections II and III). Stephen is otherwise qualified in that he was eligible for such services with an accommodation that would allow Stephen individually or through his legal guardian access to a sexual harassment policy and services to ensure prompt and effective remedial action.

Tewksbury's student sexual harassment policy states that "unwanted" verbal or physical advances of a sexual nature are unacceptable. (Ex. 30). The policy is neutral on its face, but has a discriminatory disparate impact on students who are unable to understand the nature of sexual conduct because of their disability. Principal McGuire testified that Stephen was not sexually harassed because the conduct in question was "welcome." (Ex. 23, p. 118). At the same time, he acknowledged that Stephen did not understand right from wrong in the context of inappropriate sexual behavior. (Ex. 23, p. 123-124). Mr. McGuire's testimony is conflicting and emphasizes that the Wynn Middle School sexual harassment policy does not protect cognitively impaired children such as Stephen who do not understand the dynamics of harassment. (See Section IIIA).

Stephen was also subject to disparate treatment in the application of Tewksbury's anti-harassment polices and services. Although Tewksbury distributed a student handbook to middle school students stating that unwanted verbal or physical advances of a sexual nature were unacceptable. the handbook was never distributed to the special education classroom. Mrs. Paris

32

testified that special education students did not get everything that the general population received and that she did not recall receiving a handbook. (Ex. 9, p. 119). Moreover, both Stephen and Mrs. Porto testified that they never received a student handbook during the time that Stephen attended the Tewksbury Public Schools. (Ex. 1; Ex. 2). Superintendent McGrath, who is responsible for implementing sexual harassment policies and procedures, testified that she was unaware of how the student handbook was distributed and what information it contained. (Ex. 25, p. 34).

Plaintiffs argue that but for Stephen's disability, there would have been a proactive, remedial response to complaints of sexual harassment. For example, Principal McGuire testified that it was the school's practice to interview students and "listen to both sides of the story" during an investigation of sexual harassment. (Ex. 23, p. 86). However, Stephen was never interviewed in an effort to substantiate reports of sexual touching. (Ex. 1). Moreover, the school failed to provide supervision, education or discipline to keep Stephen safe from ongoing sexual harassment. (See Section IIID). Contrary to Defendants' arguments, Plaintiffs do not assert a preferred course of action, only that school officials should have taken some action to keep Stephen safe.

Despite the principal's directive for heightened supervision in March of 1999, none was implemented. (See Section IIID). Mr. McGuire also testified that "incorporated into any [investigation] is an education as to what is sexual harassment." (Ex. 23, p. 86). However, the school never provided education and counseling to Stephen during the course of its alleged investigations in 1999 and 2000. In fact, it was Mrs. Porto who arranged outside counseling for Stephen in March of 1999 and January of 2001 as a result of sexual harassment. Notably, Mrs. Porto was never contacted in October of 2000. Mr. McGuire testified that if the offense is

"important enough to contact the parent about, the parent would be contacted." (Ex. 23, p. 63-64). Mr. McGuire was aware of the October 2000 incidents (Ex. 17, p. 68), but obviously did not consider three incidents of sexual touching significant enough to contact Stephen's parents. (See Section IIID).

In addition, school officials failed to enforce the school code of conduct in response to incidents of sexual harassment. Stephen's IEP did not require modification to the disciplinary code of conduct. (Ex. 31). Therefore, the school's expectation should have been that the codes would be utilized for Stephen in the same manner that they were utilized for regular education students. Mr. McGuire testified that "there would be disciplinary consequences" for continuing sexual harassment. (Ex. 23, p. 88). Despite Defendants' allegations that Stephen initiated and participated in sexual touching, school officials never disciplined Stephen.

Based on the foregoing facts, Plaintiffs contend that Defendants' behavioral expectations for disabled students were lower than for regular education students, which resulted in a cavalier response to Stephen's complaints. There is a material factual dispute regarding Defendants' motive in minimizing Stephen's complaints and in failing to take any responsive measures. Finally, Defendants' unequal sexual harassment policy, their substandard expectations for special education students and failure to remedy sexual harassment denied Stephen access to educational benefits and services as described in detail in Section IIID above.

## VII. Massachusetts Torts Claims Act (Count VIIA)

Tewksbury advances several arguments against Plaintiffs' tort claims. First, Tewksbury contends that the Plaintiffs made no presentment, thus, the claim must fail. Secondly, Tewksbury contends that the immunity standards under M.G.L. c. 258 § 10 (b) and 10 (j) bar any tort claims

the Plaintiffs may advance. Finally, absent immunity, Tewksbury argues there are no material or genuine facts that meet the legal standards of the claims.

## A. Presentment

Plaintiffs have complied with the statutory prerequisites set forth in the Massachusetts Tort Claims Act ("MTCA") for filing a negligence claim against the Town of Tewksbury. Specifically, Plaintiffs have satisfied the presentment requirement set forth in M.G.L. c. 258, §4. Plaintiffs sent a letter dated February 21, 2002 to counsel for Defendant thereby placing the Town of Tewksbury on notice of negligence claims. (Ex. 33). Tewksbury makes a general denial regarding presentment in its answer to Plaintiffs' complaint. It is settled law that a general denial is not sufficient to support a motion for summary judgment. Tewksbury is under an obligation to deny with specificity and particularity such performance, pursuant to Mass. R. Civ. P. 9 (c). Failure to do so results in a waiver of the defective presentment defense. Vasys v. Metro District Comm'n, 387 Mass.51, 55-56, 438 N.E.2d 836, 849 (1982). Having failed to assert an affirmative defense with particularity as to the reasons why presentment is defective, Tewksbury has not met summary judgment standards and is barred from subsequently raising the defense. G and B Assc. Inc. v. City of Springfield, 39 Mass. App. Ct. 51 (1995).

## B. Immunity

Tewksbury is not entitled to immunity under the MTCA, as Defendant claims. Counts VIIA,VIIB,VIII and IX of Plaintiffs' Complaint fall squarely within the exceptions which bar immunity under M.G.L. c. 258, § 10 (j), the statutory duty rule, and § 10(b), discretionary function.

The statutory duty rule precludes liability from the harm brought about by the wrongful acts of third parties. Brum v. Town of Dartmouth, 428 Mass 684 (1999). Thus, Tewksbury

denies any liability or duty to protect Stephen from the tortious conduct of a third party under Section 10(j). However, any straightforward analysis has eroded into an "interpretive quagmire" as distinctions within the exceptions have been identified. Brum, 428 Mass 692.

Under M.G.L.c.258 10(j) (1), immunity does not apply to "a claim made upon specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or had been undertaken, made to the direct victim or a member of his family . . . provided that the injury resulted in part from reliance on those assurances. A . . . report of findings of an investigation or inspection shall not constitute such assurances of safety or assistance. Brum required an inquiry as to the "original cause" the liability analysis. In Kent v. Commonwealth, 437 Mass. 312, 771 N.E. 2d 770 (2002), the Court clarified this standard and held that there is liability when a public employer creates an affirmative act and such act materially contributes to creating the condition or situation that resulted in the harm. Kent, 437 Mass. at 319.

The court analyzed liability under 10(j) in Brum and Bonnie W. V. Commonwealth, 419 Mass. 122 (1994) as a dichotomy between a proactive affirmative act that causes a dangerous condition and a failure to act. On the instant facts, Tewksbury administrators, teachers and personnel assured Mrs. Porto that Stephen was appropriately supervised. Mrs. Porto's repeated complaints were placated with assurances of appropriate supervision by Ms. Gallo, Mrs. Paris, Mr. Travis and Mrs. Edelstein, in particular. (Ex. 2; Ex. 4, p. 68-69, 183; Ex. 12, p. 51-52, 55; Ex. 16, p. 91). Mrs. Porto's complaints exceeded a general inquiry regarding the safety of her child; she relied on Ms. Gallo, Mrs. Paris, Mrs. Edelstein and Mr. Traveis' assurances that her mentally retarded child would be kept safe from Richard and relied on Tewksbury's representations that this supervision request was not appropriate for an IEP.[10]

---

[10] Arguably, the supervision Mrs. Porto sought was not in fact an appropriate service for Stephen's IEP, as Stephen was not noted to be a student with any kind of behavior issues. Mrs. Porto never contended that Stephen required

Moreover, in March 1999, Tewksbury developed a specific directive regarding the supervision and monitoring of Stephen (Ex. 11). Dr. Bradley directed that Stephen and Richard be monitored, both inside and outside of the building. (Ex. 11). This plan was specifically developed in response to complaints about sexualized behaviors between the boys. (Ex. 11). Incredibly, a second series of sexualized behaviors was documented. "Stephen complained of being fondled," according to one of the classroom aides. (Ex. 18, p. 3). Mr. Ware developed yet another action plan calling for counseling and heightened supervision. (Ex. 16, p. 61).

In spite of this second plan, Stephen was injured in a foreseeable manner as he was injured by the student who was supposed to be monitored and supervised. Mr. Traveis sat with Mrs. Porto at an IEP meeting in November 2000, listened to Mrs. Porto's requests for supervision and did not tell her about the October 2000 reports of sexualized behaviors or his role in addressing the behaviors. (Ex. 16, p. 76, 87-89). Instead, he assured Mrs. Porto that the youngsters were being supervised. (Ex. 16, 87-88). Thus, Mrs. Porto never appealed this component of her IEP. Rather, she relied on Tewksbury's representations. Shortly thereafter, Stephen was injured by Richard, the specific harm she was trying to prevent by her requests for supervision.

On the instant facts, Tewksbury created two plans for heightened supervision to safeguard Stephen against inappropriate touching. Nonetheless, negligent supervision of the students resulted in a sexual assault on Stephen. Mr. McGuire filed a 51A child abuse and neglect report in January 2001. (Ex. 24). DSS investigated the report and issued a finding of neglect against the classroom teacher, Mrs. Edelstein. (Ex. 20). The adequacy of a teacher's supervision is an appropriate subject for expert testimony. McInnis v. Town of Tewksbury, 19

---

the assistance of a paraprofessional for one on one academic modifications or assistance with anything other than to be kept safe from Richard.

Mass. App. Ct. 310, 313, 473 N.E.2d 1160, 1162 (1985). Thus, Plaintiffs have not only stated a claim, but identify genuine and material facts to support liability under 10(j).

Assuming *arguendo* that these assurances do not meet the identified exception and no further duties are imposed, the Court must consider whether the duty is heightened because Stephen is a special needs student with substantial limitations.

Plaintiffs further contend that the school's actions regarding supervision of Stephen were not discretionary and, therefore, actionable as an exception to M.G.L. c. 258 §10 (b). The exception requires a two-step analysis to determine whether the conduct should be immunized from liability. The first inquiry is whether the governmental actor had discretion regarding the course of conduct she chose to follow or, alternatively, whether the conduct was prescribed by statute, regulation or established agency practice. The second prong is whether the actor had discretion and whether such discretion rose to the level of policymaking or planning meant for protection under M.G.L. 258 10 (b). Deference has been made to schools for "management of student imbriglios, student discipline and school decorum," as they are often deemed discretionary functions. E.G. Bencic v. City of Malden, 32 Mass. App. Ct. 186, 188, 587 N.E. 2d 795, 796 (1992). However, if a school acts in a non-discretionary manner, rather than relying on policy or plans, then the act is deemed non-discretionary. Alake v. City of Boston, 49 Mass. App. Ct. 610, 66 N.E. 2d 1022 (1996).

Here, Tewksbury developed the Life Skills class as a separate education program with an inclusionary component, a highly structured class with teachers and support staff. The special education regulations proscribe the student teacher ratio, thus the placement was a policy/planning decision by Tewksbury. The same can be said where Tewksbury undertook investigations on the reports of sexual harassment. However, once Tewksbury developed the

action plans, their negligent supervision of Stephen implicates liability. (Failure to implement

procedures designed to meet the needs of special ed students held not discretionary.)

McLaughlin v. City of Lowell, 8 Mass. L. Reporter 343 (Middlesex Superior Ct 1998).

### C. Negligent Infliction of Emotional Distress

Stephen and Mrs. Porto state sufficient facts to support the required elements of negligent

infliction of emotional distress including (1) negligence; (2) emotional distress; (3) causation; (4)

physical harm; and (5) that a reasonable person would have suffered under the circumstances.

Payton v. Abbot Labs, 386 Mass. 540 (1982). A Plaintiff must do more than allege "mere upset,

dismay, humiliation, grief, and anger." Guiterrez v. Massachusetts Bay Transportation

Authority, 437 Mass. 396 at 412, 772 NE.2d 552 (2002). The physical harm requirement has

been expanded such that a Plaintiff can corroborate their mental distress claims with enough

objective evidence of harm to convince a Court that their claims present a sufficient likelihood of

genuiness to go to trial.

As a result of Tewksbury's negligence, Stephen has suffered substantial harm. Stephen's

trauma symptoms, headaches, stomachaches, staring spells, leg cramps and chest pains (Ex. 1;

Ex. 15; Ex. 4, p. 101, 187; Ex. 8) manifested while he attended Tewksbury schools. It is

undisputed that he was psychiatrically hospitalized three times in 2001 and has participated in

intensive specialized counseling since then. Stephen's needs could only be met in a severely

restrictive residential setting which requires he live away from is family. This evidence clearly

demonstrates there are sufficient material facts in dispute for all the elements of negligent

infliction of emotional distress such that the claims must not be dismissed as a matter of law.

In addition, Mrs. Porto suffered both emotional and financial harm. Mrs. Porto was

employed as a specialized foster care provider earning $1,500 per month for each child that was placed in her home for foster care and respite care. As a result of the January 2001 incident, two children were removed from her home. (Ex. Ex. 32). This resulted in a minimum loss of 3,000 of income per month for a period of approximately nine months. (Ex. 4, p. 11, 17). Mrs. Porto also suffered from depression as a result of the harm caused to her child. Family conflicts arose including marital discord. She was prescribed medication. Mrs. Porto began counseling in January 2001 and continues in therapy to date. (Ex. 4, p. 244-245).

### D. Loss of Consortium (Count VIII)

Pursuant to M.G.L. c 231, § 85X (1990), "The parents of a child or an adult child who is dependent on his parents for support shall have a cause of action for loss of consortium of the child who has been seriously injured against any person who is legally responsible for causing such injury." As a general rule, a claim for loss of consortium requires proof of a tortious act that caused [spousal] personal injury. Diaz v. Eli Lilly and Co., 364 Mass 153, 161-168 (1973). See also Prosser & R.E. Keeton Torts, Section 125 at 934 (5th ed. 1984).

This fundamental of tort law is equally required under a loss of consortium between a parent and a child. The Legislature's passage of G. L. c. 231, § 85X was clearly a response to this court's decision in Norman v. Massachusetts Bay Transp. Auth., 403 Mass. 303 (1988), which held that a parent has no common law cause of action for loss of his or her child's consortium resulting from injuries to the child. Monahan v. Methuen, 408 Mass. 381, 388 (1990).

In January 2001 to February 2002, Stephen was psychiatrically hospitalized three times. He was depressed and at times suicidal. He was not the same child he was prior to years of sexual harassment. In February 2002, Stephen was placed in Eagleton Schools located in Great

Barrington, Massachusetts. But for the injuries Stephen suffered and the maladaptive behaviors he was exposed to at Tewksbury, he would be living at home with his family. Stephen comes home some weekends, but the program is located more than two hours away. Thus, the Portos have lost Stephen's daily companionship. Stephen is a mentally retarded child, who is entirely dependent on his family for financial support. It is undisputed that Mr. and Mrs. Porto have been Stephen's guardians since he was thirteen months old; they are "de facto" parents. The Portos had a close relationship with Stephen. As a result of the damage caused by Tewksbury's negligence, they have lost the society and consortium of their relationship with Stephen.

## VIII. Intentional Infliction of Emotional Distress (Count VIII)

Plaintiffs must satisfy four elements under the standards for intentional infliction of emotional distress: (1) that the individual intended to inflict the emotional distress or that he knew or should have known emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous and beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the Defendant were the cause of the Plaintiff's distress and (4) that the emotional distress sustained by the Plaintiff was severe and of a nature that no reasonable man could be expected to endure it. Agis v. Howard Johnson Co., 355 NE.2d 315, 318-319 (1976). This action lies outside the Massachusetts Torts Claims Act.

Parents reasonably expect that their children's school, teachers and staff members will educate their children and keep them safe from sexual harassment. Schools are charged with acting *in loco parentis*. A school's duty to a person with cognitive limitations is heightened, especially in this case where Stephen was known as having decreased language skills and the inability to know the difference between right and wrong. He received specialized services precisely for these kinds of issues. (Ex. 31). In the seventh grade, Mrs. Porto spoke to Mrs.

41

Edelstein, Ms. Dixon and Mr. Traveis about Stephen's need for supervision. Yet she was never told that specific incidents, three in fact, had been reported and investigated by Wynn administrators and a plan developed, despite her repeated requests concerning Stephen's safety and supervision. (See Section III). As a result, Stephen and Mrs. Porto suffered emotional trauma.

Stephen's trauma was severe. It impacted his academic and emotional progress. (Ex. 1; 32). He complained of headaches, nervousness, loss of appetite and had difficulty sleeping. (Ex. 8). After leaving school, he felt worthless, sad and lonely due the circumstances. (Ex. 8). He had three psychiatric hospitalizations including the Lowell Youth Treatment Center, the Charles River Hospital and the Bournewood Hospital. In September 2001, he was hospitalized at the Charles River Hospital for suicidal ideation and depression (Ex. 2; Ex. 4, p. 232-233). He was transferred to the Bournewood in November 2001. (Ex. 2). His trauma eventually resulted in placement in a highly structured residential facility where contact with his family is limited. (Ex. 32).

Whether the conduct is so outrageous in character and so extreme to be considered beyond all possible bounds of decency is something the trier of fact must determine. "From their own experience, jurors are aware of the extent and character of the disagreeable emotions that may result from the Defendants' conduct" Agis v. Howard Johnson Co., 355 NE.2d 315, 318. The Courts in Massachusetts extended the action to include cases where the injuries were mental anguish rather than limiting it to only physical injury.

On the instant facts, Tewksbury was well aware of Mrs. Porto's repeated requests that Stephen be kept safe and she was assured that he was monitored, supervised and safe. Mrs. Porto was horrified to learn that her son was exposed to sexual harassment and the level of

ongoing victimization by Richard as the harassment escalated. Tewksbury's failure to notify Mrs. Porto of the fall 2000 investigation after complaints made by Stephen to the classroom aides was extreme and outrageous and shocks the conscience. As in Agis, the facts "reasonably could lead the trier of fact to conclude that Defendants' conduct was extreme and outrageous, having a severe and traumatic effect on Plaintiff's emotional tranquility." Agis v. Howard Johnson Co., 355 NE 2d 315,319 citing Alcorn v. Anbro Engineer Inc., 2 Cal.3d 493, 498, 86 Cal. Rptr. 88, 90, 468 P.2d 216, 218 (1970).

The failures and omissions by Tewksbury caused Stephen's distress, not simply the conduct of his peer Richard. The Defendants failed to protect Stephen from Richard's repeated sexual advances, failed to properly investigate Stephen's complaints of sexual harassment, and failed to take sufficient remedial action to prevent future sexual victimization. The Defendants ineffective sexual harassment policies resulted n Stephen's escalating emotional trauma and harm. In order to make a plausible cause of outrage, the conduct must approach the abuse of ordinary decencies. Richey v. AAA Inc., 380 Mass 835, 839. There is no question that the individual Defendants knew or should have known that Stephen would suffer as a result of their omissions. The facts in this case are similar to the facts in Morehouse v. Berkshire Gas Co. 989 F.Supp 54, 65 (D. Mass 1997) where the Court upheld the denial of a motion for summary judgment as the evidence indicated the Defendants allowed defaced copies of a picture of the Plaintiff to be posted at an event attended by most of the Plaintiffs co-workers and supervisors.

In Guckenberger v. Boston University, 957 F.Supp 306 (D. Mass. 1997), this Court determined Students had no claim for intentional infliction of emotional distress, even though university officials knew students with learning disabilities are particularly susceptible to

emotional injury. In the case at bar, Tewksbury, armed with considerable knowledge about Stephen's vulnerabilities, created the situation where Stephen was harmed.

Plaintiffs have presented more than a mere scintilla of evidence to satisfy the elements this and all their claims. Accordingly, Defendants' Motion for Summary Judgment should be dismissed on all counts.

PLAINTIFFS
By their Attorneys,


Lynn A. Leonard
Attorney-At-Law
527 Main Street, Suite 8
Melrose, MA  02176
(781) 662-6161
B.B.O. No. 561662

Anita B. Sullivan
Attorney-At-Law
458 Main Street
Wakefield, MA  01880
(781) 224-0701
B.B.O. No. 628873


Dated: December 31, 2004

44