UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-10003-PBS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Ann Marie Porto and Nicholas Porto,           \*
Individually and on Behalf of Stephen Colon,  \*
a Minor Person with a Disability              \*
                                              \*
Vs.                                           \*
                                              \*
The Town of Tewksbury, et al.                 \*
                                              \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFFS' CONCISE STATEMENT OF
## MATERIAL FACTS SUPPORTING TRIABLE ISSUES

1. The harassment began the first grade at the Heathbrook Elementary School in 1994-1995 school year. Specifically, Stephen testified that Richard told him about things that went on at his house; that "his sister rubbed [a] little boy's private parts and that he (Richard) was feeling the girl's butt and vagina." (Ex. 1). Stephen reported this incident to his mother. (Ex. 1). Mrs. Porto testified that, while in the first grade, Stephen reported Richard using profanity and telling sexually explicit stories about his sister having oral sex with a male foster child who lived in Richard's home. Mrs. Porto reported this information to the classroom teacher, Mrs. Mason. (Ex. 4, p. 63).

2. Richard continued telling sexual charged stories in the second grade during the 1995-1996 school year. (Ex. 4, p. 72). Stephen complained to Mrs. Porto that Richard was using profanity, talking about his sister having sex with a male foster child at home, and telling stories about sexual acts involving tying a girl to a tree, taking her clothes off and placing sticks inside

1

her private parts. (Ex. 2). Mrs. Porto reported this information to the classroom teacher, Ms. Gallo. (Ex. 2). Stephen testified that Richard told him that he took a girl into the woods behind his house, "took her shirt off, touched her big boobs and fingered her." (Ex. 1) Both Stephen and his second/third grade teacher, Ms. Gallo, testified that Richard coerced Stephen to lick up urine. (Ex. 1; Ex. 3). On another occasion in the second grade, Richard pulled down his pants and exposed his penis to Stephen on the playground. (Ex. 2; Ex. 4, p. 83). Mrs. Porto reported these incidents to Ms. Gallo and to Principal McArdle. (Ex. 4, p. 79-87).

    3. In the 1996-1997 third grade year, Stephen reported that Richard touched his (Stephen's) penis, described a movie involving a man and woman having oral sex and anal sex, and talked about his sister having sex with different boys. (Ex. 2). Stephen testified that, while at the Heathbrook School, Richard "was touching my ass" and that "a lot of times I got detention for fighting Richard off when he tried to touch me." (Ex. 1). Mrs. Porto reported this information to Ms. Gallo, to Principal McArdle and to the special education team, after Richard disclosed these incidents to her. (Ex. 2; Ex. 4, p. 86; Ex. 5). The meeting notes from Stephen's third grade team meeting specifically state: "Mother discussed incidents on the playground and bus where Stephen and other children exhibit inappropriate behavior (sexual issues) and other behaviors." (Ex. 5). Changes were made to Stephen's transportation arrangements. (Ex. 6). Assurances were made to Mrs. Porto that Stephen was being appropriately supervised. (Ex. 2; Ex. 4, p. 68-69, 183; Ex. 12, p. 51-52, 55; Ex. 16, p. 91).

    4. Stephen and Richard live around the corner from each other, but their homes are more than one half a mile apart. (Ex. 2). The children never had contact with each other outside of school after the third grade, when Mrs. Porto learned that Richard touched Stephen inappropriately during a sleepover. (Ex. 2).

    5. In the 1997-1998 fourth grade year, Stephen reported to his mother that Richard was having sex with a younger cousin. (Ex. 2). Stephen also reported classroom talk about "grabbing butts." (Ex. 4, p. 117). Again, Mrs. Porto notified the classroom teacher, Ms. Fiore.

(Ex. 2). Mrs. Porto did not reject the IEP since Stephen's educational services were not at issue, other than she wanted summer school. (Ex. 7, p. 7). She had been reassured that supervision for the children was appropriate, and changes were made regarding transportation. (Ex. 5; Ex. 6).

6. In the 1998-1999 fifth grade school year, Stephen made additional disclosures regarding Richard's sexual conduct. Stephen disclosed to his mother that Richard touched him behind a poster board in the class and that this occurred in the plain view of the classroom teacher, Mrs. Paris. (Ex. 1; Ex. 2). He also told Mrs. Porto that Richard touched and penetrated his (Stephen's) buttocks with his fingers and described a movie involving naked women wrestling. (Ex. 2).

7. During the February vacation week of 1999, Mrs. Porto discovered that Stephen had inserted a drumstick into her daughter Melinda's vagina while playing doctor. (Ex. 1; Ex. 4, 133-134). Mrs. Porto immediately took both children to the pediatrician, Dr. Tanguay. (Ex. 4, p. 136). Dr. Tanguay referred Stephen for therapy. (Ex. 4, p. 136, 138). Stephen started therapy with Dr. Brad Smith at the New England Medical Center. (Ex. 4, p.138; Ex. 8). Stephen told Dr. Smith that he touched Melinda because "Richard gave [him] the idea." (Ex. 1; Ex. 4, p. 133, 137). He also disclosed to Dr. Smith that he and Richard engaged in oral sex on at least three occasions on the school van. (Ex. 1; Ex. 4, p. 139; Ex. 8). Mrs. Porto reported Stephen's disclosures regarding oral sex on the school bus to Mrs. Paris. (Ex. 4, p. 169; Ex. 9, p. 55). Mrs. Paris, accompanied by Mrs. Porto, reported this information to Principal Bradley. (Ex. 4, p. 169; Ex. 9, p. 61). Mrs. Porto threatened to call the police. (Ex. 2; Ex. 4, p. 171). Stephen then disclosed to his mother that Richard was playing doctor and touching the girls in his house. (Ex. 4, p. 130-131). Stephen also stated that Richard stuck a butter knife in the girl's vagina. (Ex. 4, p. 131, 133). Mrs. Porto reported this to Mrs. Paris. (Ex. 4, p. 131).

8. Mrs. Porto was not advised of the right to file a sexual harassment complaint. (Ex. 2; Ex. 4, p. 166). Nor was she informed that Tewksbury was undertaking an investigation. (Ex. 2). Tewksbury did not interview Stephen during its investigation. (Ex. 1). Tewksbury did not

inform Mrs. Porto that the school filed a 51A report. (Ex. 2). Mrs. Porto filed a 51A report on herself. (Ex. 4, p. 139). Mrs. Porto signed releases for Mrs. Paris and Dr. Bradley to speak with Dr. Smith. (Ex. 2). Dr. Bradley does not recall speaking with Dr. Smith (Ex. 10, p. 60). Dr. Smith testified that Stephen did not have the cognitive ability to distinguish between appropriate and inappropriate touching. (Ex. 8). The Tewksbury police have no record of an investigation in March 1999. (Ex. 2.)

9. Dr. Bradley, the Dewing School principal, testified that there was no sexual harassment policy in the Dewing handbook (Ex. 10, p. 76). Principal Bradley documented the bus incident in a memorandum to the Superintendent McGrath dated March 10, 1999. (Ex. 11). This memorandum was included as part of Stephen's academic record and directed that Stephen and Richard "are never to travel alone in or outside the building." (Ex. 11).

10. Stephen testified to the following incidents of sexual harassment in the fifth grade: Richard grabbed his ass during recess; Richard touched his private parts behind a poster board and at a computer station in the view of the classroom teacher; Richard described touching his cousin's private parts and having sex with his cousin, specifically, that Richard was "touching her ass" and that "she touched his penis." Richard also described pornographic movies in which girls touched themselves in the crotch and ripped off their clothes. Stephen learned from Richard that "the breasts are on top, the vagina is on the bottom, and that a girl has three holes: the ass, crotch (vagina hole) and mouth. (Ex. 1).

11. Stephen, as a result of exposure to Richard's stories and sexualized behaviors, touched his sister Melinda. (Ex. 1; Ex. 4, p. 133). Stephen testified as follows: "After Richard told me these stories, I went home and started playing doctor with my sister Melinda. I used a drumstick and touched Melinda. Then I would always see Dr. Smith. Dr. Smith asked me about what happened with Melinda, and I told him that Richard gave me the idea. Dr. Smith asked me questions about Richard, and I told him that all the time in the van we were touching each other's

private parts. I told Dr. Smith that I didn't want Richard to touch me. Richard would talk me into putting my mouth on his penis. (Ex. 1).

12. Stephen complained of leg pain, headaches, stomachaches and chest pain. (Ex. 4, p. 101, 187; Ex. 1). Even on days that he was not symptomatic, Stephen told his mother that he was not feeling well so that he could stay home from school. (Ex. 1). During school, he often went to the nurse with complaints seeking to be dismissed. (Ex. 4, p. 111). Stephen was also unable to focus while he was at school. He experienced staring spells (Ex. 15). He was angry and frustrated; he would "throw books around because [he] was upset and "sometimes not even do [his] schoolwork because [he] was too distracted." (Ex. 1).

13. Mrs. Paris developed the IEP in the fifth grade for the sixth grade year. (Ex. 9, p. 90). She did not include the heightened supervision in the IEP for the sixth grade year because monitoring is not something for the IEP (Ex. 9, p. 90-91). Stephen was never known to be a behavior problem. (Ex. 9, p. 52; Ex. 12, p. 47; Ex 13, p. 88). Mrs. Porto wanted Stephen to be supervised because of Richard's behaviors. (Ex. 2). On the second to last day of school, Stephen punched Richard in the nose and Mrs. Porto was notified. (Ex. 4, p. 170; 258; Ex. 2). Mrs. Porto again threatened to call the police. (Ex. 2.) Dr. Bradley told Mrs. Porto that it was the last day of school, and there was nothing she could do about it. (Ex. 2). Mrs. Porto had made numerous reports to Dr. Bradley over the course of the school year. (Ex. 4, p. 169; Ex. 2).

14. Stephen entered the sixth grade at the J.F. Ryan Elementary School in the 1999-2000 school year. In June 1999, Stephen's educational team noted staring spells. (Ex. 14). Stephen was examined by Dr. Joel Herskowitz at the New England Medical Center in September and December of 1999 as a result of staring spells. (Ex. 15). Dr. Herskowitz noted in the Addendum to his report: "Ms. Porto is extremely frustrated that Stephen remains in the class with a boy who allegedly molested Stephen sexually. This

5

appears to be an ongoing stressor for Stephen and, in my view, will account for some of the staring spells that have been observed." (Ex. 15).

15. Stephen testified that Richard touched him at least once a week in the sixth grade, placing his foot on Stephen's crotch area under the table during math. (Ex. 1). According to Stephen, Mrs. Paris observed this sexual conduct at the time it occurred, and she moved Richard to another side of the table (Ex. 1). Stephen also testified that at the Ryan School, Richard would follow him to the bathroom. In the bathroom, Richard told him to turn around, and he would put his penis in his buttocks. (Ex. 1). This happened at the Ryan School and the Wynn School. (Ex. 1).

16. Sharon Moser knew Stephen as a student in her social studies class while at the Ryan School. (Ex. 13, p. 87). She testified that Stephen did not exhibit difficult behaviors and that Stephen was "excellent . . . a sincere little kid. (Ex. 13, p. 88). Stephen testified that he got in trouble at the Ryan because he hit Richard in attempts to thwart off Richard's advances. (Ex. 1; Ex. 4, 169-171)

17. Stephen attended the seventh grade at the Wynn Middle School in the 2000-2001 school year. Mrs. Paris spoke with the Wynn Life Skills teacher, Eleanor Edelstein, as part of the transition from the Ryan to the Wynn School. (Ex. 9, p. 80). She notified Ms. Edelstein, per the 1999 Bradley memo, that the boys were not supposed to be together and needed to be closely monitored. (Ex. 9, p. 80). Mrs. Paris testified that Stephen's educational team was "aware of the whole situation." (Ex. 9, p. 83-86).

18. In October of 2000, school officials were notified of inappropriate touching between Stephen and Richard by school personnel. Mr. Traveis testified that he was provided with a written note from Mrs. Moser about the inappropriate touching in the classroom between Stephen and Richard. (Ex. 16, p. 59-61). The information came from Ms. Dixon: "The kids were sitting next to each other and touching each other, things of this nature." (Ex. 16, p.59). Traveis admitted he was notified in the beginning of the 2000 school year that Mrs. Porto wanted

6

the boys separated and that she had relayed information about inappropriate touching. (Ex. 16, p. 81-83). Mr. Traveis notified Mr. Ware. (Ex. 16, p. 61). Mr. Ware instructed Mr. Traveis to handle it as a counseling matter. (Ex. 16, p. 61). Mr. Traveis admitted he did not know the significance of the touching. (Ex. 16, p. 59).

19. Mr. Traveis has no educational background in sexual abuse and only attended one sexual harassment training. (Ex. 16, p. 45). Traveis' advice was to keep the boys separate and, after only one discussion with the boys, he never addressed it again. (Ex. 16, p. 59). Stephen did not tell Mr. Traveis the behavior was consensual. Stephen was upset and concerned and repeated Richard's words, "It won't happen again." (Ex. 16, p. 63-64). Traveis never asked the boys what they were doing or explained to them why the behavior was inappropriate. (Ex. 16, p. 65-67). He assumed they understood and were remorseful. (Ex. 16, p. 65-67, 75). Mr. Traveis never told Mrs. Porto about the behaviors or that he had spoken to Stephen specifically about an incident of inappropriate touching. (Ex. 16, p. 67). At the November 2000 team meeting when Mrs. Porto requested supervision, Mr. Traveis never told her about what transpired, but he assured her the youngsters were being supervised. (Ex. 16, p. 76, 88-89). Traveis testified that supervision was part of regular education. (Ex. 16, p. 91).

20. Three classroom aides reported three separate incidents of physical touching in October 2000 between the boys to Robert Ware, the school's behavior specialist. (Ex. 17, p. 37-39; Ex. 18). Mr. Ware interviewed the aides. His interview notes and a letter written by the classroom aide document that Richard placed his hands on Stephen's thigh when sitting at a working table; that Richard moved closer to put his hands on Stephen; and that during gym class, Richard was sitting behind Steven and had his hands under Stephen on the bleachers. (Ex. 18; Ex. 19). Mr. Ware testified that Kara Buckley notified him of prior incidents occurring in the elementary years. (Ex. 17, p. 53). Ware wrote, "Stephen claims Richard fondled him" and Stephen was reported as saying to Richard, "Keep hands to yourself." (Ex. 18, p. 3).

21. Mr. Ware developed a plan for the boys to have counseling and to be kept apart. (Ex. 17, p. 55, 75). Mr. Ware did not interview Stephen. (Ex. 17, p. 67). Ware did not inform Mrs. Porto. (Ex. 17, p. 75). Ware did not call the police. Mr. Ware notified Mr. McGuire about the October 2000 incidents. (Ex. 17, p. 41).

22. Ms. Moser testified that she disagreed with Mr. Traveis' decision not to call the boys' parents. (Ex. 13, p. 44-45). She also testified "she was upset with Mr. Traveis because of his hesitancy on the whole issue." (Ex. 13, p. 46).

23. Ms. Edelstein acknowledged there were times when the boys were not supervised. (Ex. 12, p. 41). The boys were still left unsupervised while at school, even after the October 2000 incident. The boys traveled to and attended gym class without an aide present. (Ex. 20, p. 8). They were also allowed to go to the bathroom during gym unsupervised. (Ex. 20, p. 8). Mrs. Edelstein testified that a decision was made to keep the boys apart "as much as possible." (p. 12, p. 54).

24. In January 2001, Mr. Ware discovered the boys in the bathroom with their pants down around their ankles. (Ex. 17, p. 85). Mr. Ware concluded after conversations with the boys that there was touching of a sexual nature in the bathroom. (Ex. 17, p. 99). This happened in the bathroom between five and ten times during the time that he attended the Wynn School including gym cafeteria bathrooms. (Ex. 1; Ex. 8).

25. Stephen testified that he went to his locker, returned to class and then asked to use the bathroom. (Ex. 1). Richard was on his way out of the bathroom and in view of the classroom. (Ex. 1). When Stephen entered the bathroom, Richard followed him in. (Ex. 1). The 51B report, completed contemporaneously with the incident, indicates Mrs. Edelstein was not in the classroom when the incident occurred. She was showing a film and had to go down the hall to get a television. (Ex. 20, p. 7). Mrs. Edelstein encountered Ware walking down the hallway and asked him to go into the boy's bathroom and see if the boys were there. (Ex. 20, p. 7).

26. McGuire filed a 51A child abuse and neglect report with the Department of Social Services on January 11, 2001. (Ex. 20). An investigative report was completed by DSS on February 16, 2001. (Ex. 20). The report concluded Ms. Edelstein was negligent in supervising Stephen. (Ex. 20, p. 8). Robert Ware acknowledged "the elementary school had passed that information along to the middle school about the incident on the bus." (Ex. 20, p. 8). He also stated that he was "aware of the 1999 incident in the school bus and that they both had a previous history in prior schools of touching each other." (Ex. 20, p. 3).

27. Sharon Moser, the special education case manager, reported to the DSS investigator that "[T]he aides in the room were aware of the incidents of sexual acting out between these boys and that Mrs. Edelstein was also aware." (Ex. 20, p. 3). She brought this history to the attention of the school principal. (Ex. 20, p. 8).

28. Ms. Edelstein reported that she was "aware that the boys had this proclivity for touching each other and acting out sexually." (Ex. 20, p. 7).

29. William Traveis, the School Adjustment Counselor, stated that he "had been made aware of the previous incident in the elementary school through Ms. Moser. (Ex. 20, p. 8).

30. Mrs. Porto, after learning of the incident and speaking to Stephen, called the school and reported that the act was forced upon Stephen. (Ex. 21). Mrs. Porto called Dr. Tanguay and took Stephen to the emergency room at the New England Medical Center. (Ex. 4, p. 136  Semen was found in Stephen's underwear. (Ex. 22). Tewksbury Police Inspector James Hood retrieved the underwear from Mrs. Porto and turned it over to the State Police lab. (Ex. 22).

31. Principal McGuire wanted the matter handled therapeutically. (Ex. 23, p. 127). Moreover, Principal McGuire had questions regarding the boys' ability to understand the nature of what they were doing and that it was not appropriate. (Ex. 23, p. 123-124). McGuire wanted recommendations as to whether Tewksbury and the Wynn Middle School was an appropriate placement for Stephen.(Ex. 23, p. 134).

9

32. Dr. Alexandria Weida evaluated Stephen in March of 2001 as part of the plan to deal with the issues therapeutically. (Ex. 26). Dr. Weida noted that Stephen is unable to define the basic concept of what constitutes a wrong or bad act from a not wrong or good act and that this inability is consistent with cognitive limitations associated with mental retardation. (Ex. 26). Stephen was exposed to inappropriate sexualized conduct while attending the Tewksbury Public Schools, according to Dr. Weida's report. (Ex. 26). Dr. Weida concluded that Stephen was at risk because of his mental retardation and the fact that he was sexualized at a young age as a result of being involved in sexual activity with an age mate for several years in the school setting. (Ex. 26). She recommended that Stephen would best be served by placement in a residential setting. (Ex. 26).

33. Mrs. Porto accessed her IDEA rights and requested mediation regarding services Stephen needed. (Ex. 27). The Parties agreed that tutoring would be provided while appropriate services were being identified. (Ex. 27). Finally, in July 2001, Tewksbury determined that Stephen required residential placement based on their reconsideration of the independent evaluations. (Ex. 28).

34. In September 2001, Stephen was hospitalized at the Charles River Hospital for suicidal ideation and depression directly associated with incidents of sexual harassment at school. (Ex. 2; Ex. 4, p. 232-233). In November 2001, he was admitted to the Bournewood for one month while awaiting placement in a residential school. (Ex. 2). In February 2002, Stephen was admitted to the Eagleton School. (Ex. 29). The Eagleton School is a residential school for boys with cognitive, emotional and behavioral disabilities. (Ex. 29). Stephen remains at Eagleton to date. (Ex. 29). Eagleton is a highly structured residential facility, and Stephen's freedom is significantly restricted. (Ex. 29).

35. Defendants mischaracterize Mrs. Porto's testimony regarding a conversation with Stephen's therapist about adolescent masturbation as a statement that Stephen enjoyed Richard's sexual advances. (Ex. 4, p. 157-159). Mrs. Porto actually testified that Stephen learned that sex

was good "after the fact of what Richard's been doing to him." (Ex. 4, p. 206). Stephen testified that Richard's stories about sex made him "feel uncomfortable." (Ex. 1). He also stated that he regularly told Richard to stop touching him and often defended himself by hitting Stephen in an effort to keep him away. (Ex. 1). Stephen also became angry and frustrated when the conduct did not stop, at times throwing his books and papers. (Ex. 1). Stephen is described by Tewksbury as a child who feared ridicule (Ex. 9, p. 127) and by his mother as a child who would do anything anyone asked of him. (Ex. 4, p. 206). Stephen testified that "[oral sex] always made me feel uncomfortable. I told Richard that I did not want to do this. Richard told me if I didn't do what he wanted, he would tell everybody what he was doing to me on the bus. He threatened me with words . . . He threatened to tell the kids that I was gay. I always told Richard to stop touching me, but I was afraid not to let him." (Ex. 1).

36. There was no sexual harassment policy in the student handbook at the time Stephen attended the Heathbrook, Dewing and Ryan Schools. (Ex. 10, p. 76). In the 2000-2001 school year, the Wynn Middle School handbook included the Code of Conduct and a statement that "unwanted" verbal or physical advances of a sexual nature are unacceptable (Ex. 30). The Wynn handbook does not contain a sexual harassment grievance process for students or parents or procedures for investigating and resolving such complaints. (Ex. 26; Ex. 23, p. 108). Mr. McGuire admitted that the policy has been "boned up" since 2001. (Ex. 23, p. 108). Mrs. Porto never received a student handbook. (Ex. 2). No one ever told Mrs. Porto she could file a written sexual harassment complaint. (Ex. 4, p. 114, 166, 258).

38. Complaints of sexual harassment are directed to the assistant principal or behavior management facilitator. (Ex. 23, p. 75). Formal and informal complaints are handled differently, depending on whether they are written or not. (Ex. 23, p. 80). The level of the formality of the complaint is left to the discretion of the person making the complaint. (Ex. 23, p. 80). Students have this same discretion (Ex. 23, p. 81), but even Mr. McGuire does not know how the student would know the difference between a formal and informal complaint. (Ex. 23, p. 92). The

assistant principal would ask student what they are opting for. (Ex. 23, p. 81). There is no black and white policy regarding the sexual harassment procedures. (Ex. 23, p. 82). Mr. McGuire concedes that special education students do not understand behaviors which can be construed as sexual harassment and that the education process begins at that point. (Ex. 23, 106-107).

38. Mrs. Edelstein has never received training in sexual harassment. (Ex. 12, p. 78). The Wynn Middle School behavior facilitator, Mr. Ware, has been employed by Tewksbury Schools for eight years but only participated in one training on sexual harassment. (Ex. 17, p.10, 14-15). Ms. Moser, the seventh grade case manager for Stephen, testified she never received training in sexual harassment. (Ex. 13, p. 15). Dr. Bradley, former principal, thought that sexual harassment was presented at some yearly retreats. (Ex. 10, p. 42).

39. Dr. McGrath relies on the principals to draft a sexual harassment policy for their respective schools. (Ex. 25, p. 30). Tewksbury relies on police intervention when an allegation of sexual touching is made. (Ex. 25, p. 30). Tewksbury does not conduct its own investigation when sexual touching is involved. (Ex. 25, p. 30).

40. Stephen was placed at the Eagleton School as a result of emotional trauma caused in part by exposure to sexualized behaviors in the Tewksbury Public Schools. (Ex. 29). This trauma impacted his self-esteem, his ability to focus on academics and consequently his learning progress. (Ex. 29). At the time he attended the Wynn Middle School, Stephen's academic scores, as reflected in his 2000-2001 IEP, placed him at a Grade 3 reading level, a Grade 1 spelling level and a Grade 1 math level. (Ex. 31, p. 1, 395, 610, 340, 258).

41. Stephen's placement in a therapeutic milieu has provided him with stability, predictability and safety such that he has acquired the self-esteem and focus to make academic