# DISABILITY HARASSMENT IN THE PUBLIC SCHOOLS

## MARK C. WEBER[*]

### TABLE OF CONTENTS

INTRODUCTION .................................... 1081
I. THE FACTS OF DISABILITY HARASSMENT ............... 1085
   A. The Cases ................................... 1085
   B. Ordinary Experience ......................... 1090
II. LEGAL CLAIMS BASED ON DISABILITY HARASSMENT ..... 1093
   A. The Rehabilitation Act and the Americans
      with Disabilities Act ......................... 1093
      1. Claims .................................. 1093
        a. Statutory Liability ...................... 1094
        b. Analogies to Sexual Harassment ............ 1100
      2. Remedies ................................ 1102
        a. Demonstrating Intent ..................... 1103
        b. Additional Policy Considerations Regarding
          Damages Relief ........................... 1107
   B. The Individuals with Disabilities
      Education Act (IDEA) ......................... 1110
      1. Claims .................................. 1110
      2. Remedies ................................ 1112
   C. Common Law ................................. 1119
      1. Claims .................................. 1120
      2. Remedies ................................ 1122
   D. Constitutional Claims ........................ 1124
      1. Equal Protection Claims and Remedies .......... 1124
      2. Due Process Claims and Remedies .............. 1131

    * Professor of Law, DePaul University. B.A., Columbia, 1975; J.D., Yale, 1978. I thank Susan Bandes, Mary Becker, Steven Greenberger, Thomas Guernsey, Andrea Kaufman, Adam Milani, Bruce Ottley, Stephen Siegel, and Bonnie Poitras Tucker for their comments on the Article. Thanks also to my research assistants, Janet Brewer, Victoria Napolitano, and Catherine Tetzlaff.

HeinOnline -- 43 Wm. & Mary L. Rev. 1079 2001-2002

III. DEFENSES TO DISABILITY HARASSMENT CLAIMS ....... 1134
   A. *Exhaustion of Administrative Remedies* ............ 1134
     1. *The Exhaustion Requirement* .................. 1134
     2. *Application of Exhaustion to Harassment Cases* ... 1136
   B. *Official Immunity* ............................ 1141
   C. *Other Immunity Doctrines* ...................... 1145
     1. *General Governmental Immunity from*
       *Common Law Claims* ......................... 1145
     2. *Eleventh Amendment Immunity* ................ 1147
IV. TAKING DISABILITY HARASSMENT SERIOUSLY ......... 1155
   A. *Claims and Remedies* ........................ 1156
   B. *Defenses* ................................... 1156
CONCLUSION ...................................... 1157

## INTRODUCTION

It is a common mistake to view disability discrimination as mere thoughtlessness or failure to take extra steps to accommodate the unique needs of people with disabilities.[1] In reality, much disability discrimination is the overt expression of hostility and the conscious effort to subordinate members of a group with less power and social standing than the majority. A key example of intentional discrimination against individuals with disabilities[2] is harassment on the basis of differences in physical or mental characteristics. Courts, however, wedded to the idea that disability discrimination is the mere failure to accommodate, frequently fail to take seriously the damage that harassment inflicts and refuse to provide an adequate legal response.

Nowhere is the injury more common or more severe than in elementary and high schools. A few cases illustrate this point. Robert Kubistal was a seventh grader with an undiagnosed visual impairment.[3] His teacher routinely called him "butthead" and said she would like to take out his eyes and give them to a child who would work harder. His mother complained to Robert's principal and ultimately to the Board of Education. After the principal assured Robert's mother that the teacher would apologize if necessary, the teacher called Robert up to the front of the class, got

---

1. *See* Alexander v. Choate, 469 U.S. 287, 295 (1985) ("Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference ...."). Justice Marshall, who described this congressional view, was himself quite fully aware of the "grotesque" legacy of intentional segregation and discrimination against people with mental retardation. *See* City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 461 (1985) (Marshall, J., concurring in part and dissenting in part); *see also Choate*, 469 U.S. at 295 n.12 ("To be sure, well catalogued instances of invidious discrimination against the handicapped do exist.").

2. Terms such as "individual with disabilities" and "people with disabilities" seem awkward at first, but they convey the important idea of placing the person first and the condition second—thus the usage is employed by the Americans with Disabilities Act (ADA) and other recent statutes. *E.g.*, 20 U.S.C. § 1400 (2000) (Individuals with Disabilities Education Act); 42 U.S.C. § 12111(8) (1994) (ADA); *see also* JIM RYAN, MANUAL OF STYLE FOR DEPICTING PEOPLE WITH DISABILITIES 2 (2001) (giving usage guidelines), *available at* http://www.ag.state.il.us/publications/manualstyle.htm.

3. Kubistal v. Hirsch, No. 98 C 3838, 1999 WL 90625, at *1 (N.D. Ill. Feb. 9, 1999). This account assumes that the plaintiffs' allegations are true—an assumption the court was required to make.

down on her knees and in an exaggerated voice said, "I'm so sorry, Bobby!"[4] She then turned to the class and stuck a finger in her throat to mimic inducing vomiting. At some point the next year, after the visual impairment was diagnosed, Robert was moved to another teacher's room. During that time, the principal came to the classroom and erected an "isolation chamber"[5] for Robert with movable bookcases. Robert sat in the isolation chamber every day for several weeks, including during his lunch period. Robert's mother complained to the teacher, who said the principal was responsible, so she then complained to the principal, who said the teacher was responsible. Robert graduated despite never having been assigned eighth grade work. At the ceremony, the graduation marshal skipped over Robert's name, looked at Robert's mother, giggled, and finally said, "Oh, Robert Kubistal." As a result of these humiliations, Robert suffered from depression, bed-wetting, and lost interest in school.[6]

Charlie F. was a fourth grader with attention deficit disorder and was prone to panic attacks.[7] Every week, his teacher held sessions in which she asked her students to discuss their feelings. She repeatedly asked them to discuss Charlie and his behavior, "and they all too willingly obliged, leading to humiliation, fistfights, mistrust, loss of confidence and self-esteem, and disruption of Charlie's educational progress."[8] Although the teacher instructed the students to keep the sessions a secret, the truth came out. Charlie's parents moved him to another school, but children from the seventh-grade class still taunted and ridiculed him when they ran into him outside school.[9]

Shawn Witte was a ten-year old with Tourette's syndrome, asthma, attention deficit disorder, an emotional disability, and deformities of the feet and legs.[10] At school, his teacher forced him

---

4. *Id.* at *2.

5. *Id.* at *3.

6. *Id.* at *1-*3.

7. Charlie F. v. Board of Educ., 98 F.3d 989, 990 (7th Cir. 1996). This account is taken from the plaintiffs' allegations reported in the opinion.

8. *Id.*

9. *Id.*

10. Witte v. Clark County Sch. Dist., 197 F.3d 1271, 1272-73 (9th Cir. 1999). Again, this account is based on the plaintiffs' allegations.

to eat oatmeal, though his mother had told the teacher that Shawn was allergic to it. The teacher and an aide force-fed Shawn, one of them holding his hands behind his back while the other spooned him oatmeal mixed with his own vomit. The principal was aware of the practice and explained it to Shawn's mother as a form of punishment. To punish Shawn for not running fast enough during an exercise period, the aide choked him, causing an emergency room visit in which the physician diagnosed strangulation. When Shawn made involuntary body movements due to tics, the teacher and aides tackled and sat on him. The staff placed Shawn on a treadmill with weights attached to his ankles in an effort to tire him out and keep him from leaving the classroom. At times, Shawn was punished for failing to perform tasks by being deprived of meals or having water sprayed on his face. The teacher screamed degrading remarks at Shawn. Shawn was also forced to write the sentences "I will not tell my mom" and "I will not tic."[11] He was threatened with physical harm if he ever told his mother about what was happening at school.[12]

In two of the three cases just described, the courts dismissed claims for damages, and in the third the trial court did so.[13] As will be discussed below, courts in numerous cases have dismissed claims based on abuse by teachers or on toleration of peer harassment by principals and other school officials. They have cited a variety of grounds: failure to state a constitutional or statutory claim,[14] failure to exhaust administrative remedies,[15] and failure to surmount immunity defenses.[16] Not all courts have joined this chorus. Many have recognized that harassment is a violation of legal rights for which a damages remedy is appropriate. But the pattern of failing to take disability harassment seriously is apparent, and it contrasts

---

11. *Id.* at 273.

12. *Id.*

13. *Compare Charlie F.*, 98 F.3d at 993 (remanding case with instructions to dismiss), *and* Kubistal v. Hirsch, No. 98 C 3838, 1999 WL 90625, at *7 (N.D. Ill. Feb. 9, 1999) (dismissing case), *with Witte*, 197 F.3d at 1276 (reversing dismissal). As the parenthetical indicates, in the third case the trial court dismissed the action but was reversed on appeal.

14. *See infra* text accompanying notes 49-52, 187-90.

15. *See infra* text accompanying notes 290-95.

16. *See infra* text accompanying notes 318-26.

sharply with the current heightened awareness of sexual and racial harassment claims.

Just as courts have frequently failed to take disability harassment seriously, scholars have rarely addressed the topic, and when they have done so they have focused primarily on harassment in the workplace, rather than in schools.[17] On a more general level, however, the embryonic study of disability harassment is part of the rapidly growing scholarly project of applying a minority-group model to discrimination against people with disabilities.[18] This approach takes the conceptualization of disability away from a medical model in which people with disabilities have impairments that need to be fixed or adjusted for the person with the disability to fit into society.[19] The movement is towards recognition that conditions and attitudes everyone takes for granted operate in discriminatory ways against people with disabilities, just as other conditions and attitudes that oppress other minority groups in society.[20] To end discrimination, society needs to change those

17. A few authors have addressed workplace disability harassment. Susan Stefan, *"You'd Have to Be Crazy to Work Here": Worker Stress, the Abusive Workplace, and Title I of the ADA*, 31 LOY. L.A. L. REV. 795, 796-99 (1998) (collecting cases involving abusive workplaces); Mark C. Weber, *The Americans with Disabilities Act and Employment: A Non-Retrospective*, 52 ALA. L. REV. 375, 398-406 (2000) (discussing disability harassment claims in employment context); Eric Matusewitch, *Courts Are Recognizing Claims for Hostile Work Environment Under ADA*, ANDREWS EMPLOYMENT LITIG. REP., March 24, 1998, at 3 (discussing nature of claim).

18. *See* Michelle Fine & Adrienne Asch, *Disability Beyond Stigma: Social Interaction, Discrimination, and Activism*, 44 J. SOC. ISSUES 3, 6-14 (1988) (developing and elaborating on minority-group model of people with disabilities); Harlan Hahn, *Advertising the Acceptably Employable Image: Disability and Capitalism*, *in* THE DISABILITY STUDIES READER 172, 174 (Lennard J. Davis ed., 1997) (describing "minority-group model of disability"); *see also* JAMES I. CHARLTON, NOTHING ABOUT US WITHOUT US: DISABILITY OPPRESSION AND EMPOWERMENT 127 (1998) (defending minority-group, civil-rights model of disability); SIMI LINTON, CLAIMING DISABILITY 9 (1998) (describing oppression against people with disabilities); Jacobus tenBroek & Floyd W. Matson, *The Disabled and the Law of Welfare*, 54 CAL. L. REV. 809, 814-16 (1966) (applying civil rights approach to disability); Jonathan C. Drimmer, Comment, *Cripples, Overcomers, and Civil Rights: Tracing the Evolution of Federal Legislation and Social Policy for People with Disabilities*, 40 UCLA L. REV. 1341, 1357-58 (1993) (describing civil rights model of disability). For a discussion of the uses and limits of this model, see Mark C. Weber, *Disability and the Law of Welfare: A Post-Integrationist Examination*, 2000 U. ILL. L. REV. 889, 902-15.

19. *See, e.g.*, tenBroek & Matson, *supra* note 18, at 815-16 (criticizing medicalized model of "custodialism" of people with disabilities).

20. David M. Engel, *Law, Culture, and Children with Disabilities: Educational Rights and the Construction of Difference*, 1991 DUKE L.J. 166, 183 (noting that artificial

conditions.[21] This Article contends that one condition in need of change is disability harassment in the schools.[22]

Part I of this Article looks at the facts of harassment in public schools. Part II examines how conduct that most observers would agree to be harassing behavior should give rise to claims for damages under a reasonable interpretation of the laws against disability discrimination, special education laws, common law, and the Constitution. Part III then considers defenses such as failure to exhaust administrative remedies and various immunity doctrines. The Article concludes in Part IV with a discussion of proposals for modification of case law doctrines so that more courts will take disability harassment seriously and provide adequate remedies for it. Part I of this Article covers the facts; Part II the claims; Part III the defenses; and Part IV the proposed legal reforms.

## I. THE FACTS OF DISABILITY HARASSMENT

The reality of disability harassment can be discerned from the reported cases on the subject and from everyday observations of what happens in the public schools.

### A. The Cases

The cases dealing with allegations of disability harassment in the schools fall into several categories: first, outright physical mistreatment and verbal abuse of highly vulnerable children by school personnel; second, conduct by teachers that treats children with disabilities unfairly and actively encourages fellow students to join in the ridicule; and third, failure to provide protection against

---

environment and social constructs make bodily conditions disabling); *see also supra* note 18.

21. In developing feminist theory, writers and advocates have exposed how harassment, including verbal intimidation and physical violence, reinforces the position of subordination of women. *E.g.*, CATHARINE A. MACKINNON, SEXUAL HARASSMENT OF WORKING WOMEN 174-92 (1979) (linking harassment to systematic subordination).

22. This Article will not attempt a comprehensive definition of disability harassment in the schools. Harassment takes a variety of forms. It may come from teachers or from peers, it may be a continuing pattern of conduct or a single incident, it may consist of verbal assaults, physical violence, or both. No matter what its form, it deprives students with disabilities of equal access to public education.

known risks of physical or psychological harm by other students, often including the risk of physical assault. Each category contains cases that fail and cases that succeed in establishing a claim for relief. This pattern itself supports an inference that courts do not fully appreciate the gravity of the conduct and its character as a form of disability discrimination.

Cases in the first category include, in addition to the *Witte* case described above,[23] *Franklin v. Frid*,[24] in which a child with severe cerebral palsy was assigned an aide at public school. The aide "intentionally humiliated and tormented"[25] Craig Franklin, poking, hitting, and slapping him. She routinely yelled at him and called him degrading names. The aide's supervisors did nothing to stop the abuse, even after a psychological evaluation of the child concluded that it was probable he had been repeatedly assaulted.[26] Some other cases are, if anything, more troubling. In *Covington v. Knox County School System*,[27] a child with multiple mental and emotional disabilities attended a public school's adaptive education center. There he was routinely locked in a "vault-like" time-out room for hours at a time without supervision. The room was four-by-six feet, dark, and unheated, with a concrete floor but no furniture and no ventilation. There was one small reinforced window five feet above the floor. At least once he was made to disrobe before being locked in the room. At least once he was in the room so long he had to relieve himself on the floor.[28]

In addition to *Kubistal*[29] and *Charlie F.*,[30] cases in the second category include *Baird v. Rose*,[31] in which a high school girl, Kristen Baird, was diagnosed with severe depression and placed on a program of counseling and medication after a suicide attempt. Her

---

23. Witte v. Clark County Sch. Dist., 197 F.3d 1271 (9th Cir. 1999); *see supra* text accompanying notes 10-12.

24. 7 F. Supp. 2d 920 (W.D. Mich. 1998).

25. *Id.* at 922.

26. *Id.*

27. 205 F.3d 912 (6th Cir. 2000).

28. *Id.* at 914.

29. Kubistal v. Hirsch, No. 98 C 3838, 1999 WL 90625 (N.D. Ill. Feb. 9, 1999); *see supra* text accompanying notes 3-6.

30. Charlie F. v. Board of Educ., 98 F.3d 989 (7th Cir. 1996); *see supra* text accompanying notes 7-9.

31. 192 F.3d 462 (4th Cir. 1999).

mother informed a counselor at the school about the diagnosis, and the counselor informed Kristen's teachers. The next day, the teacher in Kristen's musical performance class announced to the class that Kristen would not be permitted to participate in the next performance and assigned her role to another student. After Kristen's mother complained, the teacher told her that it was her belief that individuals with depression could not be counted on to meet their responsibilities.[32]

When the mother submitted letters from a doctor and psychologist stating that Kristen was able to participate and would suffer harm from exclusion, the teacher decided to exclude her on the ground of several absences from class.[33] The principal informed the teacher that if she were to take that action, she had to exclude all students who exceeded the number of absences set in the teacher's previously unenforced absences policy. Later, in Kristen's presence, the teacher announced to the class that, against her will, she was being forced to exclude three other students from part of the performance. The teacher "then asked the class members if they understood why she was being forced to adhere to the strict attendance policy, and other students commented that someone was taking advantage of the lax enforcement of the attendance policy."[34] Kristen left class crying uncontrollably and shaking, and required tranquilization by a doctor. She ultimately was kept from participating in many practice sessions and in all but a small part of the performance. The effects of the humiliation continued, including sleeplessness, fear of humiliation, symptoms of physical illness, and academic decline.[35]

The third category of cases, those concerning failure to supervise students who present a known danger to students with disabilities, includes numerous cases arising from incidents of sexual assault by other students. In cases decided before 1999, claims based on these occurrences were regularly dismissed.[36] It is possible that some of

---

32. *Id.* at 465.
33. *Id.* at 468.
34. *Id.* at 466.
35. *Id.*
36. *See, e.g.,* Stevens v. Umsted, 131 F.3d 697 (7th Cir. 1997) (finding no liability and upholding immunity in case concerning sexual assaults at state school when child was voluntarily enrolled there, despite superintendent's knowledge of ongoing attacks); Larson

these assaults would now be considered actionable as sexual harassment in light of the Supreme Court's declaration in *Davis v. Monroe County Board of Education*[37] that under sex discrimination laws, a damages claim may be made for deliberate indifference to known acts of peer sexual harassment at school.[38] *Sutton v. Utah School for the Deaf and Blind*[39] is a failure-to-supervise case sadly typical on its facts but unusual in that the constitutional claim[40] it raised was sustained. James Sutton had severe cerebral palsy and was mentally retarded, totally blind, and unable to speak.[41] Though fourteen, he had the mental development of a three- to five-year

---

v. Miller, 76 F.3d 1446 (8th Cir. 1996) (en banc) (finding insufficient evidence to support section 1983 or section 1985 conspiracy claims in case regarding sexual assault by school bus driver); Walton v. Alexander, 44 F.3d 1297 (5th Cir. 1995) (finding immunity and no liability when child who was assaulted by another student was voluntarily enrolled at state school for deaf); Dorothy J. v. Little Rock Sch. Dist., 7 F.3d 729 (8th Cir. 1993) (finding insufficient support for section 1983 case against school district arising from sexual assault of student by other students); D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364 (3d Cir. 1992) (en banc) (finding insufficient support for section 1983 or section 1985 claim against school district arising out of molestation of one student by other students); Hunter v. Carbondale Area Sch. Dist., 829 F. Supp. 714 (M.D. Pa.), *aff'd*, 5 F.3d 1489 (3d Cir. 1993) (granting school district's motion to dismiss section 1983 claim arising from drowning of special education student).

37. 526 U.S. 629 (1999).

38. *Id.* at 643 (establishing statutory liability for peer sexual harassment); *see also* Kelly Dixson Furr, Note, *How Well Are the Nation's Children Protected from Peer Harassment at School?: Title IX Liability in the Wake of* Davis v. Monroe County Board of Education, 78 N.C. L. REV. 1573, 1574 (2000) (noting likely difference in results in some cases after *Davis*). *See generally infra* text accompanying notes 92-94, 111-13 (discussing *Davis*). Same-sex harassment is actionable under title VII of the Civil Rights Act of 1964, and it is probable that this rule will be extended to the school actions. *See* Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998) (recognizing statutory claim for same-sex harassment).

39. 173 F.3d 1226 (10th Cir. 1999).

40. The case law has not shown instances in which assaults on vulnerable students with disabilities are analyzed as disability discrimination in the sense that comparable assaults engaged in by those with sex-based motivations or on the basis of racial hostility would be approached as sex or race discrimination. As this Article contends, if a victim is selected on account of his or her disability, the assault does constitute disability discrimination. *See infra* text accompanying notes 70-121 (discussing statutory claims for disability harassment). Because the theory has not been presented in the cases, the opinions generally do not discuss to what degree the fact of the victim's disability (extreme vulnerability and low social prestige, for example) motivated the attack, though in some instances it seems obvious that the disability did. By and large, cases have been brought under theories of denial of substantive due process for failure to afford adequate protection to those whose liberty is limited, or on a state-created danger theory. *See infra* text accompanying notes 272-75 (discussing constitutional theories in assault cases).

41. *Sutton*, 173 F.3d at 1230.

old.[42] He was a day student at a state school. One day, he communicated to his mother through sign language that a very large boy who was not in his class had touched him in his genital area while he was in the bathroom at school. James's mother immediately notified the school superintendent, the principal, and the teacher. She met with them the next morning and was assured that the incident could not have occurred because students never went to the bathroom without adult supervision.[43] A week later, a teacher's aide escorted James to the door of the bathroom but left to answer the telephone. After the call, she returned and discovered that the same student James had previously described was sexually attacking him. Following the occurrence, James suffered from uncontrollable outbursts of rage, nightmares, compulsive behavior, and other signs of acute mental distress.[44]

In *Franklin v. Frid*,[45] the case of the violently abusive aide, the court dismissed the claim for failure to exhaust administrative remedies, even though damages are unavailable in the administrative process and the parent had withdrawn the child from that school system and enrolled him elsewhere.[46] In *Covington*, the case regarding the time-out vault,[47] the court of appeals reversed a dismissal on exhaustion grounds.[48] In *Baird v. Rose*, the musical performance case,[49] the court of appeals reversed the district court's judgment of dismissal for failure to state a claim under the Americans with Disabilities Act (ADA).[50] In *Sutton*,[51] the appellate court also reversed the trial court's dismissal for failure to state a

---

42. *Id.* at 1240.

43. *Id.* at 1230.

44. *Id.* at 1231.

45. 7 F. Supp. 2d 920 (W.D. Mich. 1998). For discussion of *Frid*, see *supra* text accompanying notes 24-26.

46. *Id.* at 925.

47. Covington v. Knox County Sch. Sys., 205 F.3d 912 (6th Cir. 2000). For discussion of *Covington*, see *supra* text accompanying notes 27-28.

48. *Id.* at 917-18.

49. 192 F.3d 462 (4th Cir. 1999). For discussion of *Baird*, see *supra* text accompanying notes 31-35.

50. *Id.* at 468-70.

51. Sutton v. Utah State Sch. for the Deaf and Blind, 173 F.3d 1226 (10th Cir. 1999). For discussion of *Sutton*, see *supra* text accompanying notes 39-44.

claim, in this instance a claim for violation of substantive due process rights.[52]

The checkered pattern of results in the cases may show a fine sensitivity to legal doctrine and the factual nuances of the cases. This Article will seek to demonstrate, however, that the dismissals are by no means compelled by existing doctrine and in reality are contrary to a sensible application of the law.[53] The fact that all of the cases described lost on at least one level and that many more cases also fail indicates, instead, that many courts simply do not view disability harassment as a form of disability discrimination for which damages are the logical remedy.[54] Instead, the incidents typically are viewed as aspects of disputes over levels of special education services to be resolved by an administrative process, or as unfortunate life experiences that simply must be borne in silence.[55] To use the phrase made popular with respect to sexual harassment accusations in the Clarence Thomas confirmation hearings, the judges "just don't get it."

## B. *Ordinary Experience*

Completely apart from the court cases, observations from daily life show that disability harassment occurs constantly at school as well as outside the schoolhouse gates, that it is a form of discrimination, and that its effects are harmful and severe. Flannery O'Connor once said, "Anybody who has survived childhood has enough information about life to last him the rest of his days."[56] Anyone who spent childhood in a public school in which special education students attend with other students knows that the children who are different are subjected to verbal abuse and physical intimidation every day.[57] Even some efforts by schools to

---

52. *Id.* at 1238-41.
53. *See infra* text accompanying notes 79-121 (discussing ADA claims for harassment); 272-82 (discussing constitutional claims); 283-317 (discussing exhaustion).
54. *See infra* text accompanying notes 122-60 (discussing damages remedies).
55. *See infra* text accompanying notes 283-317 (discussing administrative exhaustion).
56. THE COLUMBIA WORLD OF QUOTATIONS (Columbia University Press 1996), *available at* http://www.bartleby.com/66/35/42835.html.
57. For a revealing personal narrative regarding the treatment by peers and teachers of a deaf student in high school, see BONNIE POITRAS TUCKER, THE FEEL OF SILENCE 31-35

increase disability awareness simply reinforce the message that people with disabling conditions are to be gaped at or, at best, pitied.[58] The word "retard" has become a common insult on and off the playground.[59] Lines such as "I didn't ride the short bus" are heard in everyday conversation. Students with disabilities, particularly those with mental retardation and mental illness, and those with disfigurements, are frequently objects of ridicule and mistreatment.[60]

The selection of incidents for litigation is itself revealing. The cases are largely those in which school personnel have personally engaged in the abuse or actively encouraged students to do so. No one even bothers to sue over the far more common phenomenon of continual verbal abuse and physical intimidation of students with disabilities, particularly those with mental retardation, inflicted by other students with the knowledge and tacit consent of teachers and administrators.

Harassment is a form of discrimination. It reinforces hierarchies of prestige and peer acceptance within the school setting. School children with disabilities are significantly lower in social prestige than other students.[61] If a harasser can verbally tease or physically intimidate a child with impunity, it reinforces a sense of power and diminishes both the perceived and real power of the child who is

---

(1995).

58. *See* Dona Avery, *Freaks on Exhibit: A Critical Review Essay of Levinson and St. Onge*, Disability Awareness in the Classroom, 20 DISABILITY STUD. Q. 348, 349 (2000). The author criticizes teaching materials that include flashcard photographs of teenagers with various disabling conditions and messages such as "If Raymond is gradually losing all his abilities, do you think it's a blessing that he's also losing his mental awareness?" She concludes that the messages delivered "by these cards and photos, and by the teachers who use them in class, are perpetuating several stereotypes rather than helping to demystify disability .... [The program] may actually crystallize the myth-understandings, as well as increase the frequency of staring that an incoming disabled student will be made to endure." *Id.*

59. Judging from random eavesdropping on conversations among teens, the current usage is, "He is so retarded!" to describe someone who has made a mistake or said something naive.

60. *See* Engel, *supra* note 20, at 184 ("Physically disabled persons are viewed with fear and revulsion because they occupy an anomalous social position .... Stigma, fear of contagion, stereotyping, and rejection have thus typified the responses of 'normal' society to those labeled physically 'handicapped.'").

61. *See* Paul Sale & Doris M. Carey, *The Sociometric Status of Students with Disabilities in a Full-Inclusion School*, 62 EXCEPTIONAL CHILDREN 6, 16-17 (1995) (reporting attitude study to this effect).

harassed. In any context, school or work, harassment frequently
serves to reinforce lessons about who is in the accepted group and
who is in the out group. Vicki Schultz has observed how even sexual
harassment is often not at all sexual.[62] It consists instead of
constant reinforcement of the message that the woman does
not belong in the position she occupies.[63] Similarly, disability
harassment constantly reinforces the message that the child with
disabilities does not belong and that nothing he or she does can
change that reality. Unfortunately, the negative attitudes that the
children encounter at school are likely to follow them the rest of
their lives, harming them in the workplace and other settings.[64] In
these settings as well, they will suffer harassment from peers and
supervisors because of mental and physical differences.[65]

Children cannot avoid reacting to harassment. Some children
who are teased and bullied by peers resist going to school and even
develop physical symptoms such as headaches and abdominal pain
to support their pleas to stay home.[66] Hostility from teachers leads

---

62. *See* Vicki Schultz, *Reconceptualizing Sexual Harassment*, 107 YALE L.J. 1683, 1720-28 (1998).

63. *Id.* at 1686-87; *cf.* Anita Bernstein, *Treating Sexual Harassment with Respect*, 111 HARV. L. REV. 445, 483 (1997) (proposing "respectful person" standard for sexual harassment liability); Miranda Oshige, Note, *What's Sex Got To Do With It?*, 47 STAN. L. REV. 565, 567 (1995) (proposing reconfiguration of sexual harassment as gender-based different treatment).

64. *See* Hugh Gregory Gallagher, *"Slapping Up Spastics": The Persistence of Social Attitudes Toward People with Disabilities*, 10 ISSUES L. & MED. 401 (1995) (discussing negative social attitudes towards persons with disabilities). Popular culture provides many other examples, such as the recent controversy over the Nike advertisement describing an injured trail runner as "'drooling, misshapen, ... forced to roam the Earth in a motorized wheelchair with my name embossed on one of those cute little license plates you get at carnivals.'" William McCall, *Nike "Steps Over the Line": Running Shoe Firm Pulls Magazine Ad After Complaints*, ASSOCIATED PRESS, Oct. 26, 2000, *available at* http://more.abcnews.go.com/ sections/business/dailynews/nike001026.html.

65. *E.g.*, Easley v. West, No. CIV.A.93-6751, 1994 WL 702904, at *1 (E.D. Pa. Dec. 13, 1994) (describing supervisor and co-worker abuse of employee with visual impairments); Matusewitch, *supra* note 17 (describing harassment and negative stereotyping of workers with disabilities).

66. Susan G. Parker, *School Avoidance Often Signals Child Being Bullied*, PEDIATRIC NEWS, June 1998, at 46 ("Children who refuse to go to school and present with somatic symptoms like chronic headaches and abdominal pain may be victims of bullies."); Leslie Z. Paige, *School Phobia/School Avoidance/School Refusal* ("Many children [who refuse to attend school] have social concerns and may have been teased or bullied at school ...."), *available at* http://www.ldonline.org/ld_indepth/parenting/naspschool_avoidance.html (last modified Dec. 27, 2001).

to the same fear and refusal to attend class.[67] Not surprisingly, children with disabilities have dropout rates three times those of other children.[68] That fact alone has severe consequences: The unemployment rate for students with disabilities who drop out of high school is forty percent higher than the rate for students with disabilities who graduate.[69]

## II. LEGAL CLAIMS BASED ON DISABILITY HARASSMENT

There are several sources of law under which claims for disability harassment in the public schools can be analyzed: Section 504 of the Rehabilitation Act and title II of the ADA; the Individuals with Disabilities Education Act (IDEA); the common law; and the United States Constitution.

### A. The Rehabilitation Act and the Americans with Disabilities Act

Disability harassment treats people with disabilities unequally and unfairly; it is thus disability discrimination. Accordingly, statutes barring disability discrimination are the logical starting point in analyzing claims for disability harassment and corresponding remedies.

### 1. Claims

The statutes and their regulations set out the standards for liability for harassing conduct. An analogy to other anti-

---

67. David R. Branch, *Helping Parents Deal With Child's School Refusal*, PEDIATRIC NEWS, Mar. 1998, at 24 (noting link between school refusal and problem of hostility from teachers).

68. U.S. DEP'T OF EDUC., THE TRANSITION EXPERIENCES OF YOUNG PEOPLE WITH DISABILITIES: A SUMMARY OF FINDINGS FROM THE NATIONAL LONGITUDINAL STUDY OF SPECIAL EDUCATION STUDENTS 2-9 (1993).

69. U.S. DEP'T OF EDUC., TWENTY-SECOND ANNUAL REPORT TO CONGRESS ON THE IMPLEMENTATION OF THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT IV-15 (2000). The data reflect similar trends regarding the population as a whole. *See* 143 CONG. REC. S4311-19 (daily ed. May 12, 1997) (statement of Sen. Kennedy) (reporting that high school dropouts are more than three times as likely to be unemployed as high school graduates and that dropouts constitute disproportionate percentage of welfare family heads and the prison population).

discrimination statutes and liability under those laws for other forms of harassment gives depth to the discussion.

### a. Statutory Liability

Section 504 of the Rehabilitation Act of 1973 and title II of the Americans with Disabilities Act of 1990 forbid discrimination on the basis of disability in, respectively, federally funded activities and activities of state and local government.[70] Both statutes, as well as their regulatory interpretations, bar disability harassment. Some, but not all, violations might be compared to the kind of hostile environment cases familiar to those who follow employment discrimination case law.

### (1) Rehabilitation Act Section 504

Section 504 provides that no otherwise qualified individual with a disability shall, "solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[71] Public schools and state educational agencies receive federal financial assistance, so the law covers them.[72] Students receive the protection of the law if they meet a disability standard of having a physical or mental impairment that substantially limits one or more of the person's major life activities, have a record of such an impairment, or are regarded as having such an impairment.[73] Regulations promulgated under section 504 further define the discrimination prohibited by the Act, barring conduct that denies a person with a disability the opportunity to

---

70. The relevant statutes are section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994 & Supp. V 1999), and title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 (1994). Section 504 forbids disability discrimination in federally funded activities (such as public schools), and title II forbids disability discrimination in activities of state and local government (such as public schools).

71. 29 U.S.C. § 794 (1994 & Supp. V 1999).

72. RUTH COLKER & BONNIE POITRAS TUCKER, THE LAW OF DISABILITY DISCRIMINATION 255 (3d ed. 2000).

73. 29 U.S.C. § 705(20)(B) (Supp. V 1999).

benefit from services that are not equal to those provided others, and that are not as effective as those provided to others.[74]

Disability harassment constitutes discrimination that violates section 504 and its regulations. Being subjected to abuse either at the hands of school personnel or at the hands of peers with the knowledge of school personnel makes the public school experience decidedly unequal to the experience of others. Harassment excludes students with disabilities from the educational environment provided to students without disabilities and discourages students with disabilities from continuing their education beyond the minimum period required by law.[75]

In *Witte v. Clark County School District*,[76] the case concerning the force-feeding and other physical and psychological abuse, the court overturned a dismissal of claims under Rehabilitation Act section 504 and title II of the ADA.[77] Although most of its discussion centered on exhaustion, the court effectively approved a cause of action for disability harassment under the two statutes.[78]

### (2) ADA Title II

Title II of the ADA recapitulates the section 504 prohibition against discrimination by public entities,[79] and the definition of banned conduct in the ADA regulations echoes that found in the

---

74. 34 C.F.R. § 104.4(b) (2001).

75. Students with disabilities have a much higher dropout rate than those without disabilities. *See supra* note 68 and accompanying text.

76. 197 F.3d 1271 (9th Cir. 1999). For discussion of *Witte*, see *supra* text accompanying notes 10-12.

77. *Witte*, 197 F.3d at 1272.

78. *But see* Waechter v. Sch. Dist. No. 14-030, 773 F. Supp. 1005 (W.D. Mich. 1991). In *Waechter*, a recess supervisor forced a child whom the school knew had a heart defect to run a 350-yard sprint as punishment for talking in class. The child suffered cardiac arrest and died. The court dismissed a claim for violation of section 504, reasoning that the statute does not provide damages relief. *Id.* at 1011. The court appeared to misread applicable section 504 precedent on this point. *See infra* text accompanying notes 122-60 (discussing damages relief under section 504).

79. *See* 42 U.S.C. § 12132 (1994) ("Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

section 504 regulations.[80] Although there are some technical distinctions between the two laws, the only difference for purposes of the current discussion is that title II extends section 504 coverage to any public educational agency that somehow does not receive federal money.[81]

*Baird v. Rose*, the case about the child with depression and her exclusion from the musical performance class,[82] sustained a claim for damages under title II of the ADA. The court stated that to establish an ADA claim, three elements must be shown: that the person has a disability, is otherwise qualified for the benefit at issue, and was excluded from the benefit due to discrimination on the basis of the disability.[83] The court said there could be no dispute that the plaintiff adequately alleged she had a disability and was otherwise qualified to participate in the class.[84] On the issue of whether discrimination was on the basis of the student's depression, the court ruled that plaintiffs had made sufficient allegations to support a conclusion that the charge of absenteeism was a pretext,[85] and that the disability discrimination did not need to be the sole cause of the adverse action, but only a motivating factor.[86] Applied to other cases of harassment, *Baird* stands for the proposition that if a child is treated in such a way that she is excluded from an academic activity—or by extension, deprived of equal enjoyment of the activity—and disability is a motivating

---

80. *Compare* 28 C.F.R. § 35.130 (2001) (ADA title II), *with* 34 C.F.R. § 104.4 (2001) (section 504).

81. *See generally* Mark C. Weber, *Disability Discrimination by State and Local Government: The Relationship Between Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act*, 36 WM. & MARY L. REV. 1089, 1109-16 (1995) (discussing differences between section 504 and ADA title II). In one minor difference, the ADA removed the word "solely" from the definition of "discrimination on the basis of disability" to solve the potential coverage problem created if someone were discriminated against on account of disability as well as race or sex. *See id.* at 1110-11 (collecting and discussing sources from legislative history of ADA). The primary difference in coverage is the obvious one: Title II of the ADA covers state and local government entities irrespective of their receipt of federal funds, but section 504 covers all entities that receive federal funds irrespective of whether they are government agencies.

82. 192 F.3d 462 (4th Cir. 1999). For discussion of *Baird, see supra* text accompanying notes 31-35.

83. *Id.* at 467.

84. *Id.*

85. *Id.* at 468 & n.6.

86. *Id.* at 470.

factor, a title II ADA action exists to recover damages for all the losses, including humiliation, that the child suffers.[87]

The title II regulations include a provision specifically prohibiting retaliation and coercion,[88] as do the ADA's general provisions, embodied in title V.[89] By barring conduct that interferes with, threatens, or intimidates individuals exercising their rights to participate in public programs, these provisions furnish an additional basis for prohibiting harassment.[90] Physical or verbal abuse that children with disabilities sustain simply because they are on public school grounds is conduct that intimidates and interferes with people who are exercising rights to participate in a public educational program.

### (3) Hostile Environment Claims Under Section 504 and Title II

In workplace harassment cases, courts have frequently decided ADA claims based on the existence of a hostile environment.[91] There has been no dispute that the employment provisions of the ADA, title I, create a remedy for an employer's creation or toleration of a

---

87. A damages claim exists under the ADA even for conduct that is not necessarily motivated by hostility, as long as it causes harm to a child on the basis of her disability. *See* Padilla v. School Dist. No. 1, 233 F.3d 1268 (10th Cir. 2000); *infra* notes 187-91 and accompanying text (discussing *Padilla*).

88. 28 C.F.R. § 35.134(b) (2001) ("No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed ... any right granted or protected by the Act or this part."). Regulations applicable to section 504 impose a similar duty. 34 C.F.R. § 104.6 (2001) (incorporating by reference antiretaliation provision of 34 C.F.R. § 100.7(e) ("No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by ... the Act or this part ....")).

89. 42 U.S.C. § 12203(b) (1994) ("It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised ... any right granted or protected by this chapter.").

90. *See* sources cited *supra* notes 88-89.

91. *See generally* Matusewitch, *supra* note 17 (discussing cases); Weber, *supra* note 17, at 398-406 (discussing recent cases and characterizing topic as emerging issue). For a discussion of the difficulty of establishing that conduct is severe and pervasive enough to satisfy the hostile-environment standard for sex discrimination cases, see James C. Chow, Comment, *Sticks, Stones, and Simple Teasing: The Jurisprudence of Non-Cognizable Harassing Conduct in the Context of Title VII Hostile Work Environment Claims*, 33 LOY. L.A. L. REV. 133 (1999).

work environment hostile to persons with disabilities.[92] Drawing analogies to hostile-environment sexual harassment cases, courts have applied a test that focuses on whether the harassment is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and to create an abusive working environment.[93] With regard to intent, they have required that the defendant knew or should have known of the harassment and failed to take prompt, effective remedial action.[94]

Two cases from 2001 exemplify these holdings. In *Flowers v. Southern Regional Physician Services*,[95] the Fifth Circuit Court of Appeals affirmed judgment on a jury verdict in favor of an employee who had been diagnosed with HIV infection. After her supervisor learned of the infection, the supervisor stopped going to lunch with her and socializing with her, and instead eavesdropped on her.[96] The employer's president refused to shake her hand and generally avoided her.[97] She was made to undergo four drug tests in a week, and subjected to other humiliations;[98] eventually, the company terminated her employment.[99] The court ruled that an ADA cause of action exists when an employee is harassed on the basis of

---

92. The circuits are in agreement on this point. *See, e.g.*, Walton v. Mental Health Ass'n, 168 F.3d 661, 666-67 n.2 (3d Cir. 1999) ("Indeed, we have not discovered any case holding that the claim cannot be asserted under the ADA."); *see also* Wallin v. Minnesota Dep't of Corr., 153 F.3d 681, 687-88 (8th Cir. 1998) (assuming cause of action exists); Keever v. City of Middletown, 145 F.3d 809, 813 (6th Cir. 1998) (acknowledging existence of hostile work environment as cause of action); McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 563 (5th Cir. 1998) (proceeding as though cause of action exists).

93. *E.g.*, Fosburg v. Lehigh Univ., No. CIV.A.98-CV-864, 1999 WL 124458, at *6 (E.D. Pa. Mar. 4, 1999).

94. *Id.* An influential early case is *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092 (S.D. Ga. 1995). *Haysman* involved a store employee with back, knee, and mental impairments. After being provided accommodations on the job, he was the victim of a pattern of harassment from the manager and assistant manager of the store: they browbeat him in front of other employees, accusing him of malingering; the assistant manager used extreme profanity with him and would strike or kick him on the weakened parts of his body; and his shift was changed to night without good reason. *Id.* at 1097-98. The court found that the allegations, if proven, would constitute a hostile environment claim. *Id.* at 1106.

95. 247 F.3d 229 (5th Cir. 2001).

96. *Id.* at 236.

97. *Id.* at 237.

98. *Id.*

99. *Id.*

disability.[100] It found the evidence sufficient to support the jury's decision on the merits of the plaintiff's claim.[101]

Two weeks after *Flowers* came down, the Fourth Circuit also affirmed a judgment in favor of an employee in a disability harassment case. The plaintiff in *Fox. v. General Motors Corp.*[102] returned from disability leave with a light-duty work restriction. A supervisor and foreman blocked the efforts of the employee's immediate supervisor to accommodate him; they humiliated him when he refused to do tasks beyond his restrictions.[103] He was placed at a special work table that was too low for him and made his back injury worse.[104] He was prevented from taking steps to obtain a promotion, and he and other workers with disabilities were continually verbally harassed.[105] He introduced expert testimony in support of his claim of emotional damage that included severe depression, anxiety, and thoughts of suicide.[106] The court ruled that a reasonable jury could find the harassment severe and pervasive enough to create a hostile work environment,[107] and affirmed a verdict of $200,000 compensatory damages for emotional injury and other harms.[108]

In the higher education context, a court has ruled that a graduate film student asserted a claim of disability harassment when she alleged that a professor and adjunct professor at the school repeatedly accused her of faking dyslexia and told her that she was mentally retarded, lazy, and stupid.[109] The court noted that the validity of the claim turned on the pervasiveness and severity

---

100. *Id.* at 233.

101. *Id.* at 236. On the topic of remedies, the court held that the plaintiff had not presented adequate evidence of specific emotional injury, and so vacated the damages award and remanded for entry of an award of nominal damages. *Id.* at 239.

102. 247 F.3d 169 (4th Cir. 2001).

103. *Id.* at 173.

104. *Id.*

105. *Id.* at 173-74.

106. *Id.* at 178.

107. *Id.* at 176.

108. *Id.* at 181. The court considered the hostile work environment claim to be something other than a claim of intentional discrimination, and overturned an award of $4000 for unpaid overtime on the ground that it was inconsistent with the jury's finding that General Motors had not intentionally discriminated against the plaintiff. *Id.*

109. Pell v. Trustees of Columbia Univ., No. 97 Civ. 0193(SS), 1998 WL 19989, at *16 (S.D.N.Y. Jan. 21, 1998).

of the conduct, and found that the allegations met this standard.[110] Two other higher education cases recognized the existence of a hostile environment claim, although they found the claim in those cases unsupported by the facts.[111]

A public school student plaintiff in a disability harassment case should be able to make out a claim for relief under section 504 or title II of the ADA by showing a hostile environment.[112] Hostile environment is not the only way to establish a claim; some of the cases described above in connection with specific acts of disability harassment would satisfy a standard based on analogy to hostile-environment employment cases whereas others might not. Nevertheless, when severity and pervasiveness of harassing conduct is shown and the school district is aware or should be aware of the conduct, the analogy to the employment and higher education cases supports a claim for actionable discrimination based on the unequal educational environment to which the student is subjected.

### b. Analogies to Sexual Harassment

Contributing to a heightened awareness of disability harassment in the schools is the heightened awareness of other forms of harassment.[113] Sexual harassment in the public schools furnished the subject for two Supreme Court cases in 1998 and 1999.[114] Both

---

110. *Id.* at *18 (citing Harris v. Forklift Sys., 510 U.S. 17, 21 (1993)).

111. Rothman v. Emory Univ., 123 F.3d 446 (7th Cir. 1997) (evaluating evidence and finding lack of showing of hostile environment); Guckenberger v. Boston Univ., 957 F. Supp. 306, 314 (D. Mass. 1997) (holding that new disability accommodations policy and speeches of university president did not constitute hostile environment).

112. *See* Adam A. Milani, *Harassing Speech in the Public Schools: The Validity Of Schools' Regulation of Fighting Words and the Consequences If They Do Not*, 28 AKRON L. REV. 187, 232 (1995) (discussing claim for hostile environment under section 504).

113. Racial harassment is also actionable. *See, e.g.*, Carter v. Chrysler Corp., 173 F.3d 693 (8th Cir. 1999) (upholding claims for racial and sexual harassment in employment case); Allen v. Michigan Dep't of Corrs., 165 F.3d 405 (6th Cir. 1999) (upholding claim for hostile environment based on racially derogatory language of supervisors in employment case); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3d Cir. 1996) (upholding claim for racially hostile environment in employment case).

114. Significant recent development has also occurred with regard to workplace harassment based on sex. *E.g.*, Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Oncale v. Sundowner Offshore Servs.,

cases were decided under title IX of the Education Amendments of 1972, a statute whose wording exactly parallels that of section 504.[115] *Gebser v. Lago Vista Independent School District*[116] held that a school district is liable in damages for known acts of sexual harassment of a student by a teacher if the district is deliberately indifferent to the activity.[117] The next year, *Davis v. Monroe County Board of Education*[118] held that a school district is liable if it is deliberately indifferent to known acts of peer harassment.[119] The conduct must be sufficiently severe, pervasive, and objectively offensive that it denies the victim student equal access to education. Deliberate indifference occurs whenever the school's actions or inactions in response to the harassment are clearly unreasonable in light of known circumstances.[120]

Applied to disability harassment in the public schools, the lesson of *Gebser* and *Davis* is that districts face liability under section 504, and thus under title II of the ADA, for activity both by employees and by student-peers, if the conduct is sufficiently severe and the district meets an intent standard, for instance, deliberate indifference to known conduct. A single incident will support a hostile environment-sex harassment claim under title IX, if the incident is severe enough,[121] and a similar rule should apply by analogy in disability harassment cases.

---

Inc., 523 U.S. 75 (1998).

115. *Compare* 20 U.S.C. § 1681(a) (2000) (title IX), *with* 29 U.S.C. § 794 (1994 & Supp. V 1999) (section 504). The similarity of section 504 and title II of the ADA in turn suggests that conduct analogous to that which violates title IX will also violate title II of the ADA in an appropriate case. *See supra* text accompanying notes 80-81 (describing parallel obligations under section 504 and title II of ADA).

116. 524 U.S. 274 (1998).

117. *Id.* at 277.

118. 526 U.S. 629 (1999).

119. *Id.* at 633.

120. *Id.* at 648.

121. *See* Vance v. Spencer County Pub. Sch. Dist., 231 F.3d 253, 259 (6th Cir. 2000) ("[O]ne incident can satisfy a claim . . . ."); Doe v. School Admin. Dist. No. 19, 66 F. Supp. 2d 57, 62 (D. Me. 1999) ("Within the context of Title IX, a student's claim of hostile environment can arise from a single incident.").

### 2. Remedies

Damages are the proper remedy for intentional conduct that violates section 504 of the Rehabilitation Act, or title II of the ADA. Most authorities, however, have rejected the idea of section 504 or title II damages liability against individuals[122] except for coercion or retaliation claims,[123] and courts have not yet begun to view

---

122. The theory is that the general provisions of section 504 only apply to entities that are federal grantees, and that the comparable provisions of title II only apply to state and local governmental agencies. Thus, courts hold there is ordinarily no liability for persons, just entities. Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc) (ADA), *cert. dismissed sub nom.* Alsbrook v. Arkansas, 529 U.S. 1001 (2000); Smith v. Maine Sch. Admin. Dist. No. 6, No. 00-284-P-C, 2001 WL 68305, at *3 (D. Me. Jan. 29, 2001) (both Rehabilitation Act and ADA); Thomas v. Nakatani, 128 F. Supp. 2d 684, 692-93 (D. Haw. 2000) (ADA); Hallett v. New York State Dep't of Corr. Servs., 109 F. Supp. 2d 190, 199 (S.D.N.Y. 2000) (both); Calloway v. Boro of Glassboro Dep't of Police, 89 F. Supp. 2d 543, 557 (D.N.J. 2000) (both); Yeskey v. Pennsylvania, 76 F. Supp. 2d 572, 574-75 (M.D. Pa. 1999) (ADA); Montez v. Romer, 32 F. Supp. 2d 1235, 1241 (D. Colo. 1999) (both). *But see* Niece v. Fitzner, 922 F. Supp. 1208, 1218 (E.D. Mich. 1996) ("There is nothing within Title II which explicitly authorizes or prohibits suits against public actors acting in their official or individual capacities."); Johnson v. New York Hosp., 897 F. Supp. 83, 86 (S.D.N.Y. 1995) (upholding individual liability of hospital president under section 504), *aff'd*, 96 F.3d 33 (2d Cir. 1996); Chaplin v. Consolidated Edison Co., 587 F. Supp. 519, 520 (S.D.N.Y. 1984) (section 504). For an argument that individual liability ought to exist for all intentional ADA title II, Rehabilitation Act section 504, and Individuals with Disabilities Education Act violations, and that qualified immunity should not protect defendants subject to the liability, see Gary S. Gildin, *Dis-qualified Immunity for Discrimination Against the Disabled,* 1999 U. ILL. L. REV. 897.

123. The retaliation provision is different from the rest of the statute in that it clearly applies to all persons, not just to covered entities or federal grantees. 42 U.S.C. § 12203 (1994) (stating that no person "shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter," and that it "shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised ... any right granted or protected by this chapter"). The retaliation-coercion provision is found in ADA title V, apart from the titles that apply to specific covered entities (title I for employers of fifteen or more employees, employment agencies, labor organizations, and joint labor-management committees; title II for state and local governmental entities; title III for public accommodations; and title IV for telecommunications carriers). One case that disagrees with this interpretation of the retaliation provision, however, is *Baird v. Rose,* 192 F.3d 462, 471-72 (4th Cir. 1999) (disallowing individual liability on basis of analogy to title VII of Civil Rights Act). *See supra* text accompanying notes 31-35. The parallel provision for section 504 similarly forbids coercion and retaliation by anyone, not only grantees. 34 C.F.R. § 104.61 (2001) (incorporating by reference antiretaliation provision of 34 C.F.R. § 100.7(e) ("No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by ... the Act or this part ....")). A plaintiff need not be an individual with disabilities to assert a claim based

harassment as a form of coercion or retaliation. Hence, the bulk of the damages case law bears on the liability of school districts for harassment of students with disabilities by school officials or the students' peers. Although damages are available against school districts or other public educational agencies for the harassment, the challenge lies in proving intent on the part of the public agency as a predicate for damages relief. Once that challenge is met, damages are an appropriate form of relief on the basis of considerations of policy as well as statutory interpretation.

### a. Demonstrating Intent

Rehabilitation Act section 504 and ADA title II follow the same wording as title VI of the Civil Rights Act of 1964[124] and title IX of the Education Amendments of 1972[125] in prohibiting discrimination and providing remedies to its victims. As early as 1980, in *Guardians Ass'n v. Civil Service Commission*,[126] the Supreme Court approved the entry of injunctive relief for unintentional violations of title VI.[127] Nevertheless, when confronting actions for damages liability under title VI and its parallel statutes, the courts generally required a showing of intent, just as the Supreme Court had

---

on the ADA retaliation provision. Muller v. Costello, 187 F.3d 298, 311-12 (2d Cir. 1999) (absence of finding that plaintiff was disabled did not preclude finding that employer retaliated against him).

124. Codified at 42 U.S.C. § 2000d (1994).

125. Codified as amended at 20 U.S.C. § 1681 (2000).

126. 463 U.S. 582 (1983).

127. *Id.* at 584; *see also* Alexander v. Choate, 469 U.S. 287, 294 (1985) (explaining application of *Guardians Ass'n* to disparate impact claim under section 504). *Choate* held that section 504 reaches some, but not all, disparate impacts against people with disabilities. *See id.* at 299. *Gurardians Ass'n* appears to have been limited in *Alexander v. Sandoval*, 532 U.S. 275 (2001), which ruled that title VI itself reaches only intentional discrimination, and that no private right of action exists to enforce the title VI regulations that proscribe activities that have only a disparate impact. *Sandoval*, 532 U.S. at 285-86. The Court, however, pointed out in *Sandoval* that section 504, unlike title VI, actually does cover some disparate impacts. *Id.* at 285 (citing *Choate*, 469 U.S. at 299, 309). Four justices dissented in *Sandoval*, arguing that the Court incorrectly overturned the private remedy to enforce the title VI regulations barring disparate-impact discrimination. *Id.* at 293. (Stevens, J., dissenting). Whether the Court's restriction of the reach of *Guardian's Ass'n* is consistent with congressional intent is not of relevance to the interpretation of section 504 put forward in this Article. The discussion here relates to intentional conduct and damages remedies, not disparate-impact conduct and injunctive remedies.

required a showing of intent for damages liability under the Equal Protection Clause of the Constitution.[128] In *Consolidated Rail Corp. v. Darrone*,[129] the Supreme Court held that the Rehabilitation Act permits monetary claims,[130] but courts elaborating on that rule have insisted on a showing of intentional discrimination before compensatory damages may be awarded.[131]

As with municipal liability for equal protection and other constitutional violations, the liability of a corporate entity for an intentional violation of section 504 or the ADA requires a determination of the intent of a constructive being that has no single "mind." In *Monell v. Department of Social Services*,[132] the Supreme Court stressed that liability under section 1983[133] for violations of the Constitution would not attach on the basis of respondeat superior alone.[134] Instead, the conduct of the municipality had to be pursuant to policy or custom, though the Court later ruled that a single decision of an authoritative officer could satisfy the test,[135] as could inadequate training or supervision, if the conduct met a standard of "deliberate indifference."[136]

---

128. Washington v. Davis, 426 U.S. 229 (1976).

129. 465 U.S. 624 (1984).

130. *Id.* (permitting action for back pay pursuant to the Rehabilitation Act); *see also* Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 74-75 (1992) (permitting damages action pursuant to title IX of Education Amendments of 1972 for intentional conduct).

131. *E.g.*, Scokin v. Texas, 723 F.2d 432 (5th Cir. 1984) (requiring showing of intent to support monetary claim); David H. v. Palmyra Area Sch. Dist., 769 F. Supp. 159 (M.D. Pa. 1990) (denying section 504 claim for monetary relief in absence of showing of intent), *aff'd*, 932 F.2d 959 (3d Cir. 1991) (table). This approach has been challenged. Sande Buhai & Nina Golden, *Adding Insult to Injury: Discriminatory Intent As a Prerequisite to Damages Under the ADA*, 52 RUTGERS L. REV. 1121 (2000) (relying on underlying purposes of ADA to conclude that damages should be available for violations without showing of intentional discrimination); Leonard J. Augustine, Jr., Note, *Disabling the Relationship Between Intentional Discrimination and Compensatory Damages Under Title II of the Americans with Disabilities Act*, 66 GEO. WASH. L. REV. 592, 607-12 (1998) (criticizing intent requirement for damages in title II accommodations actions).

132. 436 U.S. 658 (1978).

133. 42 U.S.C. § 1983 (1994 & Supp. V 1999).

134. *Monell*, 436 U.S. at 694 & n.58.

135. Pembaur v. City of Cincinnati, 475 U.S. 469 (1986) (permitting liability based on county prosecutor's approval of police breaking down doctor's door to serve subpoenas).

136. City of Canton v. Harris, 489 U.S. 378, 388 & n.8 (1989). The "deliberate indifference" standard originated in *Estelle v. Gamble*, 429 U.S. 97 (1976), in which the Supreme Court ruled that failure to provide medical attention to a prisoner is a violation of the Eighth Amendment actionable pursuant to 42 U.S.C. § 1983, if there is "deliberate indifference to

In the context of section 504 and ADA title II liability for damages on the part of a school district, the dominant test for intent, and thus for damages liability, is the requirement of bad faith or gross misjudgment,[137] though there is no reason to believe that the test is an exclusive one.[138] What constitutes bad faith or gross misjudgment differs greatly from court to court. For example, in *Sellers v. School Board*,[139] the court affirmed the dismissal of a claim for damages, reasoning that the long-term failure to identify a child's learning disabilities and the consequent failure to provide special education services that the child needed did not amount to bad faith or gross misjudgment. By contrast, in *McKellar v. Commonwealth of Pennsylvania Department of Education*,[140] the court found that the bad faith or gross misjudgment standard could be met when the district failed to provide an appropriate education over a period of time and repeatedly ignored a child's written education programs.[141]

In the context of sexual harassment in the public schools, the Supreme Court has applied the deliberate indifference standard without reference to any bad faith-gross misjudgment test. In *Davis v. Monroe County Board of Education*,[142] the decision permitting damages liability against a school district for sexual harassment by a student's peers, the Court applied a standard for liability requiring that the responsible school official or officials be deliberately indifferent to known behavior serious enough to have

---

serious medical needs of prisoners." *Estelle*, 429 U.S. at 104. The Supreme Court has also applied the standard to generalized complaints that prison conditions violate the Eighth Amendment. Wilson v. Seiter, 501 U.S. 294, 303 (1991).

137. *E.g.*, Walker v. District of Columbia, 969 F. Supp. 794 (D.D.C. 1997) (permitting liability). Cases such as *Walker* contrast with a somewhat greater number of cases applying the test and denying liability. *E.g.*, Thompson v. Board of the Special Sch. Dist. No. 1, 144 F.3d 574 (8th Cir. 1998) (finding test not met in dispute over services); K.U. v. Alvin Indep. Sch. Dist., 991 F. Supp. 599 (S.D. Tex. 1998) (same), *aff'd*, 166 F.3d 341 (5th Cir. 1998) (table).

138. *See* T.J.W. v. Dothan City Bd. of Educ., 26 Individuals with Disabilities Educ. L. Rep. (LRP) 999 (M.D. Ala. Aug. 12, 1997) (permitting a damages claim under standard of intentional discrimination or bad-faith conduct).

139. 141 F.3d 524 (4th Cir.), *cert. denied*, 525 U.S. 871 (1998).

140. No. 98-CV-4161, 1999 WL 124381 (E.D. Pa. Feb. 23, 1999).

141. *Id.* at *5. The court denied the defendants' motion for summary judgment, reasoning that a jury could "reasonably infer that the defendants were acting in bad faith." *Id.*

142. 526 U.S. 629 (1999).

a systemic effect of denying the victim equal access to an educational program or activity.[143] The Court declared that the standard is met and a suit for damages is appropriate when school officials know that a child in the victim's school is engaging in sexually assaultive behavior but fail to do anything to stop it, and the child then sexually assaults the victim.[144] *Davis* involved liability under title IX of the Education Amendments of 1972, but because of the nearly identical wording of title IX and section 504, the decision suggests that assaults motivated by a child's disability will produce liability under section 504 or the ADA if the deliberate indifference standard is met, just as title IX imposes liability if the standard is met regarding assaults related to a child's sex. The Court had previously applied a similar standard to teacher sexual harassment of students.[145]

All the various tests that courts have used in the section 504 cases and analogous situations are simply efforts to construct the intentions of an artificial, corporate body.[146] In the context of disability harassment, damages should be available under section 504 and title II against a school district upon a direct-evidence or inferential showing of intent on the part of that entity. Plaintiffs should be able to demonstrate intent by policy or custom, by a decision of an authoritative official to do or fail to do something, by inadequate training that amounts to deliberate indifference, by an official's deliberate indifference to known acts of harassment, by bad faith conduct of officials, or by the officials' gross misjudgment.

---

143. *Id.* at 633.
144. *Id.* at 648.
145. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274 (1998).
146. For example, the deliberate indifference standard is simply a proxy for the policy or custom that is a form of corporate intent: "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom ...." Collins v. City of Harker Heights, 503 U.S. 115, 123 n.6 (1992) (quoting Canton v. Harris, 489 U.S. 378, 389 (1989)).

### b. Additional Policy Considerations Regarding Damages Relief

Apart from questions about what statutes and precedents require as a predicate for damages relief, the question remains whether damages are a sensible remedy for disability harassment. They are.

Disability harassment's nearest analogy among common law causes of action is the intentional infliction of emotional distress.[147] Indeed, many cases of disability harassment that proceed on federal statutory causes of action include pendent state law claims for intentional infliction of emotional distress.[148] Courts imposing damages remedies in intentional infliction cases have recognized that monetary compensation is the only viable way to respond to the indignity and humiliation imposed on the victim of outrageous treatment. Moreover, it is the only sensible way, short of criminal sanctions, to deter potential defendants from engaging in behavior that oversteps the bounds of civil society.

For these reasons, Judge Easterbrook's discussion in *Charlie F. v. Board of Education*[149] of supposedly preferable alternatives to damages relief borders on the fatuous. Judge Easterbrook rejected the contention that "available relief" for a pattern of teacher-sanctioned peer harassment meant damages, reasoning that compensatory services could be an adequate remedy, even though the child had moved from the school district.[150] On the basis of this reasoning, his opinion for the court required dismissal of the case for failure to exhaust administrative remedies, which could provide compensatory services but not damages.[151] Although it is true that

---

147. *See infra* text accompanying notes 207-30 (discussing intentional infliction cause of action for disability harassment).

148. *E.g.*, Baird v. Rose, 192 F.3d 462, 472-73 (4th Cir. 1999) (denying motion to dismiss liability claim against teacher for intentional infliction of emotional distress when teacher humiliated student in front of class). The intentional infliction cause of action for disability harassment is discussed at greater length *infra* text accompanying notes 207-30. *Baird*'s facts are discussed *supra* text accompanying notes 31-35.

149. 98 F.3d 989 (7th Cir. 1996).

150. *Id.* at 991-93.

151. *Id.* at 993. The relevant statute requires administrative exhaustion when a civil action seeks "relief that is also available under" the Individuals with Disabilities Education Act, whose remedies are generally considered to be limited to prospective relief, tuition

money may pay for compensatory psychological or other services that could be provided in an educational program, money damages for emotional distress represent far more than that.[152]

Compensatory services are, in a word, undercompensatory. They do nothing to pay for the humiliation that the child has suffered, and do little to deter school districts from engaging in similar conduct.[153] Moreover, in the all-too-frequent situation in which a family, seeing no way out, moves away from the district, there is no longer any connection with the school that is supposed to provide the compensatory services. If the child remains in the district, compensatory education prolongs a relationship between the child and the school without necessarily changing the character of the relationship. As a remedy, it is reminiscent of Albert Alschuler's account of the first time Bernard Goetz was robbed: the mugger, savvy to the system, tried to use a mediation process to derail the criminal justice proceedings.[154] Compensatory education may be a good remedy in situations in which solutions can be mediated between a school district acting in good faith and a child whose parents want to maintain a long-term relationship with that school.[155] It is no remedy for a child who has been "mugged"

reimbursement, and compensatory education. 20 U.S.C. § 1415(l) (2000); *see also infra* text accompanying notes 171-201 (discussing remedies under special education law); 283-317 (discussing administrative exhaustion defense to harassment claims).

152. Strangely, the opinion nearly concedes this point. A passage at the end reads: "Perhaps Charlie's adverse reaction to the events of fourth grade cannot be overcome by services available under the IDEA [Individuals with Disabilities Education Act] and the regulations, so that in the end money is the only balm." *Charlie F.*, 98 F.3d at 993. The paragraph concludes: "[A]t least in principle relief is available under the IDEA." *Id.* The purely formal analysis, relying on relief that is available in principle, underscores the point that courts do not accept disability harassment, even of the most outrageous character, as a form of discrimination that works harm in fact, not in principle.

153. *See* Kara W. Edmunds, Note, *Implying Damages Under the Individuals with Disabilities Education Act:* Franklin v. Gwinnett County Public Schools *Adds New Fuel to the Argument*, 27 GA. L. REV. 789, 839-40 (1993) (questioning sufficiency of compensatory education as a remedy in Individuals with Disabilities Education Act cases in general).

154. *See* Albert W. Alschuler, *Mediation with a Mugger: The Shortage of Adjudicative Services and the Need for a Two-Tier Trial System in Civil Cases*, 99 HARV. L. REV. 1808, 1808 (1986). In a much reported incident that occurred in the New York City subway in 1984, Goetz shot several youths when he believed they were about to rob him. *Id.* at 1809-10.

155. These situations could include those in which needed services were delayed on account of administrative snafus or bona fide disputes over appropriateness. *E.g.*, M.C. v. Central Reg'l Sch. Dist., 81 F.3d 389, 395-97 (3d Cir. 1996) (discussing suitability of cases for awards of compensatory education). In some circumstances, however, damages relief may be

—physically or mentally assaulted—by the school district, its employees, or students.

Tuition reimbursement is similarly inadequate as a remedy. Few parents will have incurred tuition bills as a direct result of harassment. Typically, they incur tuition costs because the particular mix of services the child needs is not available in the educational program the school district offers.[156] The parents thus have to contract for education outside the school system and enroll the child elsewhere.[157] It is conceivable that in some cases parents remove their child from public school and pay tuition at a private school to get the child away from abuse by peers or teachers. In that case, however, tuition reimbursement is just as undercompensatory as compensatory education. It makes up for the out-of-pocket costs caused by the defendants' conduct but does nothing to remedy the humiliation and loss of self-esteem the child suffers.

The deterrent effects of damages awards should not be overlooked either.[158] Although school district administrators may not pay awards out of their own pockets, the school superintendent will certainly be in an awkward position trying to explain a large damages award to the school board that renews his contract and sets his salary. If disability harassment is ever to be stopped, the threat of damages will be an important reason for the change.[159] Moreover, as discussed more fully below with respect to common law liability, damages awards have an important symbolic role in

proper for bureaucratic bungling. *E.g.*, W.B. v. Matula, 67 F.3d 484 (3d Cir. 1995) (permitting damages claim to proceed in case involving delays in providing special education services).

156. *E.g.*, Burlington Sch. Comm. v. Department of Educ., 471 U.S. 359, 369-74 (1985) (permitting award of tuition reimbursement in case brought under predecessor statute to Individuals with Disabilities Education Act).

157. *E.g.*, Florence County Sch. Dist. 4 v. Carter, 510 U.S. 7, 9-10 (1993) (permitting award of tuition reimbursement for school unilaterally chosen by parents and not on state's list of approved schools).

158. *See generally* EDWARD D. RE & JOSEPH R. RE, REMEDIES 824 (5th ed. 2000) ("[B]y imposing upon tortfeasors the cost of their wrongful acts, [damages] promote the deterrent value of tort law."). In the last generation, the deterrent effects of damages awards have been the special subject of the law and economics movement. *See, e.g.*, Richard A. Posner, *A Theory of Negligence*, 1 J. LEGAL STUD. 29, 32-33 (1972) (discussing self-interest in taking precautions against harm to avoid damages award).

159. *See* Mark C. Weber, *Comment on Casper, Seasons of Change, The Americans with Disabilities Act: Implementation in the Work Place*, 17 J. REHABILITATION ADMIN. 135 (1993) (describing deterrent effects of ADA regarding discriminatory employment practices).

expressing social disapproval.[160] Social disapproval of disability harassment is crucial to taking harassment seriously and stopping it.

## B. The Individuals with Disabilities Education Act (IDEA)

The Individuals with Disabilities Education Act guarantees children with disabilities a free, appropriate public education. Accordingly, the claims and remedies under the statute merit discussion in the context of legal claims for disability harassment.

### 1. Claims

Education in a setting rife with harassment is hardly conducive to learning and is antithetical to "appropriate education" for children with disabilities. Nevertheless, when the drafters of what was to become IDEA conceived of how it would operate, they predominantly had in mind situations in which children with disabilities were getting inadequate or improper services.[161] This preoccupation led the Supreme Court to comment that through the Act "Congress sought primarily to make public education available to handicapped children,"[162] and that Congress relied on the observance of statutory procedures by schools and parents to achieve the correct type and level of services for eligible children.[163] The type of dispute that would be resolved by following procedures for meetings, written plans, and administrative hearings would be like those found in the Supreme Court's special education docket early in the history of the statute: a dispute over whether a sign-language interpreter had to be provided to a deaf child with

---

160. *See infra* text accompanying notes 225-28 (discussing symbolic effects of damages awards and collecting authorities).

161. For example, the legislative history is preoccupied with the concern that large numbers of children were out of school or not getting specialized services while in school. *See* H.R. REP. NO. 94-332, at 11-12 (1975) (reporting that 1,750,000 students with disabilities receive no public schooling and 2,200,000 lack adequate services).

162. Board of Educ. v. Rowley, 458 U.S. 176, 192 (1982).

163. *See id.* at 205 ("When the elaborate and highly specific procedural safeguards embodied in [20 U.S.C.] § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid.").

excellent lip-reading abilities,[164] or a demand that a school district provide catheterization at school for a child who could not urinate normally.[165] Problems such as harassment of children with disabilities subvert the appropriate education guaranteed by the Act, but the Act's focus is on getting the appropriate services in the first place, not on the proper remedies to impose when peers or teachers engage in discrimination and effectively undermine the program.[166]

Moreover, only children who meet the definition of children with disabilities under IDEA are able to obtain the protections of that law. Many children have physical or mental impairments, but the impairments do not force them to receive special education in order to learn, and so they are not covered under the terms of the Act.[167] For example, a child who needs a wheelchair for mobility would meet the ADA's definition of a person with disabilities,[168] but if she

---

164. *Id.* at 184-85.

165. Irving Indep. Sch. Dist. v. Tatro, 468 U.S. 883, 895-96 (1984) (affirming order for services).

166. Indicative of the congressional focus on getting the services to the children rather than providing against intentional interference with use of the services is the failure to enact an antiretaliation provision, even though Congress was familiar with such provisions, as shown by the Civil Rights Act of 1964 and other civil rights laws. *E.g.*, 42 U.S.C. § 1973i (1994) (Voting Rights Act of 1965); 42 U.S.C. § 2000a-2 (1994) (title II of Civil Rights Act of 1964).

167. BONNIE P. TUCKER & BRUCE A. GOLDSTEIN, LEGAL RIGHTS OF PERSONS WITH DISABILITIES 8:2-3 (1991 & Supp. 2000) ("The IDEA only protects children who, by virtue of their disabilities, require special education services. Section 504, however, prohibits discrimination against all school-age children with disabilities, regardless of whether they require special education services.") (footnotes omitted); PETER W.D. WRIGHT & PAMELA DARR WRIGHT, WRIGHTSLAW: SPECIAL EDUCATION LAW 261 (1999) ("If the child has a disability that adversely affects educational performance, the child is covered under IDEA. If the child has a disability that does not adversely affect educational performance, the child is usually covered under Section 504 but does not receive services under IDEA.").

168. The Supreme Court recently narrowed the definition of individuals covered by the Americans with Disabilities Act by ruling that people whose major life activities are not substantially limited when their impairments are corrected by mitigating measures do not qualify unless they are regarded as disabled or have a record of disability. *See* Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 564-65 (1999); Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521-25 (1999); Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-89 (1999). The Court further restricted the definition of being regarded as having a disability. *Sutton*, 527 U.S. at 489; *Murphy*, 527 U.S. at 525. In none of the cases, however, did the Court doubt that a person who needs a wheelchair for mobility meets the ADA's definition. Much recent commentary criticizes the Court's rulings in the *Sutton* trilogy. *E.g.*, Bonnie Poitras Tucker, *The Supreme Court's Definition of Disability Under the ADA: A Return to the Dark Ages*, 52

does not need special education,[169] she is outside the coverage of IDEA. Similarly, children with mental conditions that limit major life activities unrelated to learning or with borderline effects on learning may not qualify for the Act's protection.[170] These children may be entitled to services or to program modifications pursuant to section 504 or the ADA, but they would not be able to make a claim under IDEA for harassment by teachers or peers or for any other conduct.

The emphasis in the Act on educational and related services and the gaps in the coverage of the of the Act make it a less than ideal avenue for relief in harassment cases. This is not to say that a school district's maintenance of an environment in which harassment occurs does not violate IDEA. If the environment renders the education inappropriate for an eligible child's needs, the district has violated IDEA, and so, typically, harassment will violate the Act. As a discussion of the scope of remedies under the Act demonstrates, however, IDEA is often deficient as a remedial mechanism for harassment.

### 2. Remedies

The remedies under IDEA for teacher or peer harassment are far from clear. The consensus of decisions at present appears to be

ALA. L. REV. 321 (2000); Mark C. Weber, *Disability Discrimination in Higher Education*, 26 J.C. & U.L. 351, 354-55 (1999). Nevertheless, the coverage of the ADA and section 504 remains broader than that of IDEA. *See generally* Costello v. Mitchell Pub. Sch. Dist. 79, 266 F.3d 916, 923-24 (8th Cir. 2001) (affirming dismissal of claim of harassment by teachers on ground that child did not meet definition of individual with disabilities).

169. Most children using wheelchairs would be designated as eligible under IDEA if for no other reason than their need for adaptive physical education. Nevertheless, in many jurisdictions high school children do not need to take physical education all four years, so the eligibility would not necessarily be present. A child with a visual impairment who needs only to have large-print materials or other similar adaptations would not necessarily require special education of any type.

170. A child with Tourette's syndrome may require exceptions to ordinary discipline policies but not need any special education services. Similarly, a child with attention deficit disorder may need supplemental services but not meet the standards for eligibility under IDEA. *See, e.g.*, Brittan Elementary Sch. Dist., 16 Educ. Handicapped L. Rep. 1226 (U.S. Dep't of Educ., Off. for Civil Rights 1990) (discussing coverage under section 504 for child not eligible for services under federal special education law). *See generally Costello*, 266 F.3d at 922-23 (ruling that claim failed under IDEA in case of verbal and physical abuse when child was not eligible for special education services).

that the statute itself does not permit administrative hearing officers to award damages,[171] and several circuit courts have generalized the point to forbid damages claims in most court actions under IDEA.[172] Both hearing officers and judges may grant tuition reimbursement and compensatory education services,[173] but for the reasons mentioned in the previous section, tuition reimbursement and compensatory education are no more than second-best remedies for the pain and humiliation that harassment inflicts.

Numerous courts, however, have permitted damages liability to be imposed pursuant to section 1983[174] for at least some classes of

---

171. *See, e.g.*, Padilla v. School Dist. No. 1, 233 F.3d 1268, 1274 (10th Cir. 2000) ("[E]ven if damages are available under the IDEA they should be awarded in civil actions, not in administrative hearings."); Covington v. Knox County Sch. Sys., 205 F.3d 912, 918 (6th Cir. 2000) ("[M]oney damages ... are unavailable through the administrative process ...."); *see also* cases cited *infra* note 172 (finding damages unavailable even in court proceedings under 20 U.S.C. § 1415; Terry Jean Seligmann, *Not as Simple as ABC: Disciplining Children with Disabilities Under the 1997 IDEA Amendments*, 42 ARIZ. L. REV. 77, 85 n.32 (2000) ("Most courts passing on the question have decided that the IDEA was not intended to confer a right to money damages for violations.").

172. *E.g.*, Witte v. Clark County Sch. Dist., 197 F.3d 1271, 1275 (9th Cir. 1999) ("[O]rdinarily, monetary damages are not available under that statute."); Sellers v. School Bd., 141 F.3d 524, 526-27 (4th Cir. 1998) (disallowing damages under IDEA in case characterized as sounding in educational malpractice); Hoekstra v. Independent Sch. Dist. No. 283, 103 F.3d 624, 625-26 (8th Cir. 1996) (finding compensatory damages unavailable under IDEA); Crocker v. Tennessee Secondary Sch. Athletic Ass'n, 980 F.2d 382, 386-87 (6th Cir. 1992) (rejecting damages claim under IDEA); *cf.* Smith v. Robinson, 468 U.S. 992, 1020 n.24 (1984) (noting apparent consensus among courts at time that predecessor statute to IDEA did not allow damages relief). The point applies to typical actions arising under IDEA through its ordinary enforcement mechanism, 20 U.S.C. § 1415; whether the courts in these circuits would permit damages under exceptional circumstances remains unclear. *See* TUCKER & GOLDSTEIN, *supra* note 167 at 18:4-5 (discussing availability of damages in exceptional circumstances). The failure to award compensatory damages in IDEA cases has been criticized. Stephen C. Shannon, Note, *The Individuals with Disabilities Education Act: Determining "Appropriate Relief" in a Post-*Gwinnett *Era*, 85 VA. L. REV. 853, 882-86 (1999) (arguing that denial of damages relief contravenes congressional intent).

173. Burlington Sch. Comm. v. Department of Educ., 471 U.S. 359 (1985); *see also* 20 U.S.C. § 1412(a)(10)(C)(ii) (2000) (1997 IDEA amendment permitting courts and hearing officers to award tuition reimbursement).

174. 42 U.S.C. § 1983 (1994 & Supp. V 1999). The application of a section 1983 cause of action to violations of the federal special education laws originated with the situation in which the plaintiff, because of futility, an emergency, or some other reason, was excused from exhausting the administrative procedures provided in the special education law and filed suit directly with the court. The leading case of this type arose from the defendant's failure to obey the results of a due process hearing. Robinson v. Pinderhughes, 810 F.2d 1270 (4th Cir. 1987). The court ruled that the plaintiff did not need to re-exhaust the claim, but it found that the proper cause of action under the circumstances was not the one contemplating full

IDEA violations.[175] In *W.B. v. Matula*,[176] for example, the Third
Circuit ruled that the plaintiffs could assert a claim for a violation
of IDEA under section 1983 when a school district took most of a
child's first grade year to find that he was eligible for services under
section 504 due to attention deficit hyperactivity disorder, used
most of his second-grade year to determine that he was
neurologically impaired and eligible for services under IDEA, and
then spent all of the following year resisting an independent
evaluation—which ultimately found that the child had Tourette's
syndrome and a severe obsessive-compulsive disorder in addition to
hyperactivity.[177] A hearing officer finally resolved the dispute over
the services, ordering the child placed in a private school with
additional therapy sessions, but the decision did not occur until the
beginning of the following school year.[178]

  The court noted that section 1983 exists to provide a means of
redress for violations of federal law by governmental agents.[179]
Section 1983 will not furnish a remedy if Congress intended to
foreclose its use by adopting a comprehensive statutory enforcement
plan inconsistent with section 1983.[180] But with regard to the
statute that is now IDEA, Congress overruled a Supreme Court
decision, *Smith v. Robinson*,[181] which had found section 1983 to be
foreclosed. The Handicapped Children's Protection Act of 1986
(HCPA) was intended to overrule *Smith*, and to restore the
availability of section 1983 in special education cases.[182] As the *W.B.*

---

use of the administrative process, that under 20 U.S.C. § 1415, but rather the cause of action
for governmental violations of federal law in general, 42 U.S.C. § 1983, for violation of what
is now IDEA. *Robinson*, 810 F.2d at 1273; *see also* Manecke v. School Bd., 762 F.2d 912 (11th
Cir. 1985) (applying section 1983 cause of action to case in which district failed to act on
parents' request for administrative hearing).

  175. *See infra* note 198 (collecting cases) and accompanying text.
  176. 67 F.3d 484 (3d Cir. 1995).
  177. *Id.* at 488-90. Although the case does not directly involve disability harassment, the
court noted that in first grade the child suffered teasing because of his incontinence, a peer
response that the school apparently felt no need to deal with. *Id.* at 488.
  178. *Id.* at 490.
  179. *Id.* at 493.
  180. Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1 (1981)
(finding section 1983 remedy implicitly preempted by comprehensive enforcement
mechanisms in water pollution control statutes).
  181. 468 U.S. 992 (1984).
  182. *See W.B.*, 67 F.3d at 493-94 n.6 ("Nothing in this chapter shall be construed to restrict

court stated: "In enacting [the HCPA], Congress specifically intended that [IDEA] violations could be redressed by § 504 and § 1983 actions ...."[183] Section 1983 actions carry the full range of available civil remedies, including compensatory damages.[184] The *W.B.* court found no obstacle to the award of damages pursuant to section 1983 for IDEA violations,[185] though it cautioned that other remedies may be more suitable under the facts of a given case.[186]

In the recent case *Padilla v. School District No. 1*,[187] the Tenth Circuit took a view contrary to that of the Third Circuit. *Padilla* involved a child with severe disabilities who sued her previous school district, alleging that the district ignored the written program it had created for her services and failed to provide her with behavioral programming, augmentative communication, and tube-feeding services. District personnel also repeatedly placed her in a windowless closet, restrained her in a stroller, and left her without supervision. During one of those incidents, she tipped over and suffered a skull fracture, which exacerbated her seizure disorder. Her injuries kept her from school the rest of the semester, but the district did not provide her with the homebound services to which she was entitled.[188]

Although the court permitted a claim for damages to proceed under the Americans with Disabilities Act,[189] it required the dismissal of a section 1983 claim premised on violations of IDEA.[190]

---

or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973, or other Federal statutes protecting the rights of children and youth with disabilities ....") (quoting 20 U.S.C. § 1415(f)); H. CONF. REP. NO. 99-296, at 4 (1985) ("[S]ince 1987, it has been Congress' intent to permit parents or guardians to pursue the rights of handicapped children through [IDEA], section 504, and section 1983 .... Congressional intent was ignored by the U.S. Supreme Court when it handed down its decision in Smith v. Robinson.").

183. *W.B.*, 67 F.3d at 494.

184. Smith v. Wade, 461 U.S. 30 (1983).

185. *W.B.*, 67 F.3d at 495.

186. *Id.*

187. 233 F.3d 1268 (10th Cir. 2000).

188. *Id.* at 1271.

189. *Id.* at 1274-75. The court held that exhaustion was not required, ruling that IDEA administrative remedies could not provide relief for physical injuries such as a skull fracture, and that damages are generally unavailable in IDEA administrative hearings. *Id.* For this point, the court relied on *W.B.*, 67 F.3d at 494-96, as well as *Covington v. Knox County School System*, 205 F.3d 912, 918 (6th Cir. 2000).

190. *Padilla*, 233 F.3d at 1275.

It held that although Congress overruled *Smith v. Robinson* in the HCPA, the overruling was intended to restore only the ability to make section 1983 claims for constitutional violations, not the ability to make section 1983 claims for violations of what is now IDEA. According to the Tenth Circuit, the HCPA left intact the implication in *Smith* that IDEA supplants section 1983 actions for violations of the statute itself. For support, the court cited two occasions on which the Supreme Court cited *Smith* after the HCPA in discussing the availability of section 1983 in contexts other than the special education laws.[191]

The HCPA's legislative history makes clear that Congress intended to maintain means of enforcing IDEA other than the section 1415 process.[192] The HCPA established that, contrary to what the Supreme Court held in *Smith*,[193] section 1415 is not an

---

191. *Id.* at 1274.

192. *See* 131 CONG. REC. 21,391 (1985) (statement of Sen. Kennedy) ("I do not believe that Congress when it passed ... the Education for All Handicapped Children Act [predecessor to IDEA] intended to in any way limit handicapped children's educational rights or the remedies for protecting those rights."); 131 CONG. REC. 21,389 (1985) (statement of Sen. Weicker) ("The court's decision ... raised questions about the extent to which rights, remedies and procedures available under section 504 of the Rehabilitation Act and other Federal civil rights statutes will be applicable to claims made under the Education of the Handicapped Act [predecessor to IDEA]. The purpose of S. 415 is simple—to overturn the Smith v. Robinson decision and thereby to clarify congressional intent regarding these matters."); 131 CONG. REC. 31,370 (1985) (statement of Rep. Williams) ("The original bill was designed to ... reestablish statutory rights repealed by the U.S. Supreme Court in the decision Smith v. Robinson [and] to reaffirm, in light of this decision, the viability of section 504 of the Rehabilitation Act of 1973, 42 U.S.C. 1983 and the other statutes as separate vehicles for ensuring the rights of handicapped children."); *see also* S. REP. NO. 99-112, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1798, 1800 ("Section 4 provides that the [predecessor to IDEA] does not limit the applicability of other laws which protect handicapped children and youth ...."). *See generally* Thomas F. Guernsey, *The Education for All Handicapped Children Act, 42 U.S.C. § 1983, and Section 504 of the Rehabilitation Act of 1973: Statutory Interaction Following the Handicapped Children's Protection Act of 1986*, 68 NEB. L. REV. 564, 591-92 (1989) (describing purposes and operation of HCPA).

193. The statements of the HCPA's sponsors are utterly inconsistent with any speculation that Congress intended only a partial overruling of *Smith. See* 132 CONG. REC. 16,824 (1986) (statement of Sen. Kerry) ("In passing the pending conference report, Congress is specifically rejecting the reasoning of the Supreme Court in Smith v. Robinson."); 132 CONG. REC. 16,823 (1986) (statement of Sen. Weicker) ("The handicapped children of this country have paid the costs for 2 years now. But today we correct this error. In adopting this legislation, we are rejecting the reasoning of the Supreme Court in Smith versus Robinson, and reaffirming the original intent of Congress ...."); 131 CONG. REC. 31,375 (1985) (statement Rep. Jeffords) ("There is no doubt that there is agreement among all of us that the decision rendered by the court in July 1984 must be overturned."); *supra* note 192; *see also Handicapped Children's*

exclusive remedy.[194] Once the assumption that section 1415 is exclusive is done away with, ordinary principles regarding the scope of section 1983 dictate that it is available to remedy violations of IDEA.[195] The fact that the Supreme Court cited *Smith* in other contexts does not indicate any conscious effort by the Court to maintain an implied holding about the preemptive effect of IDEA in the teeth of congressional action to the contrary. Given that the Supreme Court has decided only nine cases under the special education statute in the quarter century the law has been in existence,[196] it is imputing to the Court a phenomenal degree of knowledge of the intricacies of the statute to conclude that the Court meant to recognize the preservation of an implied holding about IDEA by twice referring to *Smith*. At the most, the citations indicate only the continued use of the same methods that *Smith* used in determining when section 1983 has been preempted when

---

*Protection Act: Hearings on H.R. 1523 Before the Subcomm. on Select Education of the House Comm. on Education and Labor*, 99th Cong. 7 (1986) (statement of Rep. Williams) (declaring rejection of *Smith*).

194. *See* sources cited *supra* note 192. This point is further illustrated by a comment from Senator Simon:

> The Supreme Court reasoned that when Congress adopted the comprehensive enforcement mechanism for the protection of handicapped children's rights in Public Law 94-142 [now IDEA], we superseded and eliminated rights previously enacted under other laws. This reasoning was particularly faulty, and in passing S. 415, Congress is rejecting that reasoning. As legislative approaches to protecting the rights of handicapped persons grow, and we adopt new laws, we are building upon the existing laws, with the full knowledge of those laws and with the assumption that their provisions remain in effect as the context for new legislation. When there is an intent to modify, limit, or supersede existing law, Congress does not hesitate to do so explicitly.

132 CONG. REC. 16,825 (1986).

195. *See, e.g.*, Wright v. City of Roanoke Redev. and Hous. Auth., 479 U.S. 418, 423 (1987) (ruling that defendant must demonstrate "by express provision or other specific evidence from the statute itself that Congress intended to foreclose" the section 1983 remedy); Maine v. Thiboutot, 448 U.S. 1, 4 (1980) ("[T]he § 1983 remedy broadly encompasses violations of federal statutory as well as constitutional law."); ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 8.8, at 529 (3d ed. 1999) ("*Wright* ... makes clear that the presumption is in favor of the availability of § 1983 to enforce a federal statute.").

196. Cedar Rapids Cmty. Sch. Dist. v. Garret F., 526 U.S. 66 (1999); Florence County Sch. Dist. v. Carter, 510 U.S. 7 (1993); Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1 (1993); Dellmuth v. Muth, 491 U.S. 223 (1989); Honig v. Doe, 484 U.S. 305 (1988); Burlington Sch. Comm. v. Department of Educ., 471 U.S. 359 (1985); Irving Indep. Sch. Dist. v. Tatro, 468 U.S. 883 (1984); Smith v. Robinson, 468 U.S. 992 (1984); Board of Educ. v. Rowley, 458 U.S. 176 (1982). None of the later cases revisited the issues decided in *Smith*.

Congress has said nothing explicit about preemption one way or the other.[197] The majority of the courts of appeals that have ruled on the question have found that section 1983 provides a private action for IDEA violations, at least in some circumstances.[198]

Harassment is a violation of IDEA for which the section 1983 remedial avenue seems the most logical. If section 1983 is a vehicle for remedying statutory torts, harassing conduct that violates the federal special education statute falls within the center of that purpose. Unlike some statutes whose private enforcement would be inconsistent with federal policies,[199] IDEA's basic purpose was to give parents a means by which they personally could enforce federal special education law.[200] Moreover, as noted above with regard to the ADA and section 504 claims, damages are the most sensible remedy for harassment. Accordingly, a remedial vehicle that

---

197. That was the situation in both *Blessing* and *Wright*. Blessing v. Freestone, 520 U.S. 329, 341 (1997); *Wright*, 479 U.S. at 423. If one does think that the references to *Smith* were more than adventitious, one might as well conclude that they were an "I told you so" by a Court that believed it was right in *Smith* and that a vindictive Congress actually changed the law in the HCPA. There also remains the possibility that the Supreme Court justice or clerk who provided the citations in *Blessing* and *Wright* may not have realized *Smith* was overruled, much less how thorough the overruling happened to be. On Westlaw, for example, the case is described merely as "superseded by statute/rule."

198. Marie O. v. Edgar, 131 F.3d 610, 621-22 (7th Cir. 1997); N.B. v. Alachua County Sch. Bd., 84 F.3d 1376, 1379 (11th Cir. 1996); Angela L. v. Pasadena Indep. Sch. Dist., 918 F.2d 1188, 1193 n.3 (5th Cir. 1990) (dictum); Mrs. W. v. Tirozzi, 832 F.2d 748, 753-55 (2d Cir. 1987). *But see* Padilla v. School Dist. No. 1, 233 F.3d 1268 (10th Cir. 2000). *Compare* Robinson v. Pinderhughes, 810 F.2d 1270, 1274 (4th Cir. 1987) (permitting section 1983 action to redress school district's failure to obey administrative decision), *with* Sellers v. School Bd., 141 F.3d 524, 532 & n.6 (4th Cir. 1998) (not permitting section 1983 action for "the more general denial of a free appropriate public education"). Two circuits have permitted actions under section 1983, but they have limited the availability of compensatory damages in the actions. Crocker v. Tennessee Secondary Sch. Athletic Ass'n, 980 F.2d 382, 387 (6th Cir. 1992) (denying damages under section 1983); Digre v. Roseville Indep. Sch. Dist. No. 623, 841 F.2d 245, 249-50 (8th Cir. 1988) (same); *cf.* Birmingham v. Omaha Sch. Dist., 220 F.3d 850, 856 (8th Cir. 2000) (allowing section 1983 claim for compensatory education for violation of IDEA).

199. *See* Suter v. Artist M., 503 U.S. 347 (1992) (holding section 1983 action unavailable to enforce Adoption Assistance and Child Welfare Act in light of conclusion that Congress intended only Secretary of Health and Human Services to enforce Act).

200. The legislative history of the law stresses the difficulty with enforcement of existing statutory rights. *E.g.*, S. REP. NO. 168, at 8 (1975) (commenting on lack of enforceability of state law rights). Private enforceability by parents of statutory rights was a principal feature distinguishing the Education for All Handicapped Children Act of 1975, which became IDEA in 1990, from the grant-in-aid statutes that preceded it.

provides damages relief merits consideration, if only because of that fact. If the section 1983 claim is available for outrageous conduct such as harassment, the ordinary action under IDEA can be reserved for placement disputes or other cases in which prospective relief, tuition reimbursement, or compensatory services are the most sensible remedies.[201]

## C. Common Law

Catharine MacKinnon's early work on sexual harassment drew on the development of tort liability for harassing conduct.[202] She considered common law tort actions inadequate to provide protection against sex harassment.[203] Nevertheless, common law actions have served as precedent for courts finding the existence of statutory claims for sexual[204] and racial[205] harassment.[206] In the remedial plan for disability harassment, common law claims have great importance because of the difficulties of showing intent so as to trigger school district liability under federal statutory and

---

201. *See* Judith Welch Wegner, *Educational Rights of Handicapped Children: Three Federal Statutes and an Evolving Jurisprudence*, 17 J.L. & EDUC. 625, 675 (1988). As Dean Wegner notes:

> The [IDEA]'s principal function is to ensure that handicapped children receive appropriate educations. Recognition of a reimbursement remedy and the award of compensatory educational services ... accomplish that end. While the availability of a damages remedy might serve to penalize school authorities and thus discourage particular egregious misconduct, this function is adequately performed by the availability of limited damage remedies under section 504 and 1983 ....

*Id.* For a criticism of some aspects of Dean Wegner's view, see Mark C. Weber, *The Transformation of the Education of the Handicapped Act: A Study in the Interpretation of Radical Statutes*, 24 U.C. DAVIS L. REV. 349, 419 n.346 (1990) (questioning proposal to limit application of section 504 to disputes other than those regarding levels of special education services).

202. *See* MACKINNON *supra* note 21, at 164-74 (1979) (discussing tort law causes of actions applicable to sexual harassment).

203. *Id.* at 173 ("To treat [sexual harassment] as a tort is less simply incorrect than inadequate.").

204. *E.g.*, Skousen v. Nidy, 367 P.2d 248 (Ariz. 1961) (assault and battery action).

205. *E.g.*, Alcorn v. Anbro Eng'g, Inc., 468 P.2d 216 (Cal. 1970) (action for intentional infliction of emotional distress).

206. MARC A. FRANKLIN & ROBERT L. RABIN, TORT LAW AND ALTERNATIVES 825-28 (6th ed. 1996) (providing history of common law racial and sexual harassment claims and discussing relation to statutory discrimination claims).

constitutional claims, and the uncertainty whether any given plaintiff will defeat official immunity defenses to individual liability. Common law liability, which can be obtained upon the establishment of elements different from the statutory ones, may be the only avenue of relief available in some instances. The relevant claims and defenses pertaining to common law liability thus deserve explanation.

### 1. Claims

Intentional infliction of emotional distress is the most obvious common law tort cause of action in cases of disability harassment. To establish liability for intentional infliction, the plaintiff must show that the defendant, by extreme and outrageous conduct, intentionally or recklessly caused the plaintiff severe emotional distress.[207] As the *Restatement* notes, the "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."[208] Instead, "[g]enerally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"[209]

Harassing conduct inflicted on an individual relating to the individual's disability is clearly included in the tort, as long as the conduct and the harm reach the requisite level of severity.[210] One of the illustrations in the 1965 *Restatement* notes that liability exists for pulling a prank on a gullible person who is "eccentric and mentally deficient."[211] A leading authority stresses that a characteristic of the tort is the misuse of power: "[T]he defendant uses the

---

207. RESTATEMENT (SECOND) OF TORTS § 46(1) (1965).

208. *Id*. cmt. d.

209. *Id.*

210. *But see* Costello v. Mitchell Pub. Sch. Dist. 79, 266 F.3d 916, 924 (8th Cir. 2001) (finding no cause of action for intentional infliction of emotional distress under Nebraska law when teacher daily called child "retarded," "stupid," and "dumb" in front of class). This conclusion provoked a strenuous dissent from Judge Hamilton. *Id.* at 924-27 (Hamilton, J., dissenting).

211. RESTATEMENT (SECOND) OF TORTS § 46(1) cmt. f, illus. 9 (1965).

inequality [of position] to inflict emotional harm without regard for the plaintiff's interests."[212]

The power that teachers, principals, and other school personnel have over children with disabilities gives rise to liability for outrageous conduct such as belittling students with disabilities who report assaults, threats, or taunts. In an analogous situation, a court found that an intentional infliction action lay against a police officer who belittled a victim's report of sexual assault.[213] Children with disabilities in the schools are in a subordinate position not only with regard to educational personnel, however. They are also in a subordinate position in the social hierarchy of students. As noted above, students with disabilities have the lowest social status of all children in school.[214] They are therefore uniquely vulnerable to abuse from other students with greater social prestige, which abuse in turn reinforces their inferior position.

When teachers or administrators willfully harass students with disabilities, not only are they liable for their outrageous behavior, but there is also a basis to find their employers liable through vicarious responsibility. In addressing the problem of an employer's tort liability for an employee's hostile environment-sexual harassment,[215] one authority looks to the test of *Burlington Industries, Inc. v. Ellerth*,[216] which determines when an employer is liable for hostile environment-sexual harassment under title VII of the Civil Rights Act of 1964.[217]

Under the *Burlington* test, the employer is liable for the harms caused by its supervisors' creation of a hostile environment, unless the employer shows that it took reasonable measures to prevent and correct the conduct, and that the employee-victim unreasonably failed to use the corrective measures the employer made

---

212. DAN B. DOBBS, THE LAW OF TORTS § 304, at 827 (2000).

213. Drejza v. Vaccaro, 650 A.2d 1308 (D.C. 1994).

214. *See* Sale & Carey, *supra* note 61, at 16-17. The conclusion remains true for children not officially identified by the school system as having disabilities as well as for children with disabilities mainstreamed in regular education classes. *See id.* at 17.

215. Hostile environment-sexual harassment is usually distinguished from quid pro quo-sexual harassment. Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986) (drawing distinction and recognizing claim for both forms of harassment).

216. 524 U.S. 742 (1998).

217. DOBBS, *supra* note 212, § 335 (discussing standard).

available.[218] To the extent that this liability is imposed on the basis of such a test, it might be characterized more as the active negligence of the school district in entrusting the school employee with a position in which the harm could be done. The analogy is thus to other instances of negligent entrustment or supervision.[219]

In the context of disability harassment, the school district should be liable in tort at least in the same situations in which an employer would be liable for hostile environment-sexual harassment under title VII.[220] Thus if the district places a person in a position of authority over the victim, and that person creates an environment that is pervasively hostile or abusive, the school district should be liable, and that liability should be defeated only by the district showing that it exercised reasonable care to prevent and promptly correct the harassing behavior and that the plaintiff failed to use opportunities provided for prevention or correction of the conduct.[221] This reasonable care standard and related shift in the burden of proof would occasion liability in a greater range of circumstances than a test derived from title IX sexual harassment cases, which require deliberate indifference to known acts of harassment.[222] It is, nevertheless, more protective of school districts' interests than a respondeat superior standard.[223]

## 2. Remedies

Intentional infliction actions afford money damages. Perhaps monetary awards can never make a person whole for humiliation or

---

218. *Burlington Indus.*, 524 U.S. at 765.

219. *See, e.g.*, Jackson v. Righter, 891 P.2d 1387 (Utah 1995) (discussing and applying law regarding tort of negligent supervision); Vince v. Wilson, 561 A.2d 103 (Vt. 1989) (discussing and applying law regarding tort of negligent entrustment).

220. *See* DOBBS, *supra* note 212, § 335 (proposing standard for employer tort liability in sexual harassment cases, but noting usual dependence of liability on statutory standards).

221. *See* Faragher v. City of Boca Raton, 524 U.S. 775, 802 (1998) (establishing vicarious liability standard for hostile environment sexual-harassment under title VII); *Burlington Indus.*, 524 U.S. at 765 (discussing defense based on reasonable care).

222. *See supra* text accompanying notes 113-21, 142-45 (describing title IX standards for sexual harassment liability).

223. DOBBS, *supra* note 212, § 335, at 915-16 ("Although the Court has described this liability-with-a-defense as vicarious liability, the presence of a defense sharply distinguishes it from the ordinary case of vicarious liability, where the employer cannot defend by showing [the] reasonableness of its actions.").

insult, but in our society damages are the ordinary means for compensating a person for all past wrongs, including those that entail emotional injury.[224] Moreover, damages punish the wrongdoer[225] and deter future abuses.[226] They correct the injustice that has been done by redressing the balance of harm.[227] They also vindicate and reinforce the sense of the community that an injustice has been done by the defendant's wrongful conduct.[228]

An action for intentional infliction of emotional distress is not an exclusive remedy;[229] frequently, these actions have been appended to ADA or section 504 claims for disability harassment.[230]

---

224. *See* CHARLES T. MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES 287 (1935) ("The jingle of the guinea soothes the hurt that honor feels."). Problems of determining the appropriate amount of damages are difficult, but they are no more difficult than those presented by awards of pain and suffering for physical injury. DOUGLAS LAYCOCK, MODERN AMERICAN REMEDIES: CASES AND MATERIALS 185 (2d ed. 1994) ("Dignitary torts, including assault, false imprisonment, malicious prosecution, intentional infliction of emotional distress, libel, slander, invasion of privacy, and batteries that are offensive but do no physical harm, present valuation problems comparable to those of pain and suffering.").

225. Exemplary damages, which are ordinarily permitted in intentional infliction actions, are of special importance in this regard. *See* DAN B. DOBBS, LAW OF REMEDIES § 3.11(2), at 318-19 (abr. 2d ed. 1993) (discussing basis in punishment for exemplary damages remedy); LAYCOCK, *supra* note 224, at 5 ("[T]here are punitive remedies: The best known is punitive damages. . . . One may question whether punitive remedies . . . remedy anything in the usual sense of correcting, repairing, or fixing. But punitive damages are sometimes necessary to make it economically feasible . . . to enforce important rights.").

226. *See* DOBBS, *supra* note 225, § 3.1, at 212 ("Even if the defendant is not subject to punitive damages, an ordinary 'compensatory' damages judgment can provide an appropriate incentive to meet the appropriate standard of behavior."); *id.* § 3.11(3), at 322-27 (discussing deterrence basis of punitive damages).

227. *See* JULES L. COLEMAN, RISKS AND WRONGS 317 (1992) ("[T]he duty to compensate and the right to compensation for the invasion of rights derive from the principle of corrective justice."); ERNEST J. WEINRIB, THE IDEA OF PRIVATE LAW 135 (1995) ("With the materialization of wrongful injury, the only way the defendant can discharge his or her obligation respecting the plaintiff's right is to undo the effects of the breach of duty."). *See generally* Symposium, *Corrective Justice and Formalism: The Care One Owes One's Neighbors*, 77 IOWA L. REV. 403 (1992) (discussing corrective justice theories).

228. *See* DOBBS, *supra* note 225, § 3.1, at 211 ("A sense of justice and support for rights underlies much of the legal system and would certainly seem to justify an award for pain or for the loss of a valued constitutional right.").

229. The *Restatement's* definition of the cause of action does not even purport to define the only circumstances under which tort liability for intentional infliction of emotional distress will apply. The *Restatement* provides: "The Institute expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability for the intentional or reckless infliction of emotional distress." RESTATEMENT (SECOND) OF TORTS § 46, caveat (1965).

230. *See, e.g.*, Soodman v. Wildman, Harrold, Allen & Dixon, 4 Wage & Hour Cas. 2d

## D. Constitutional Claims

Constitutional claims over disability harassment sound in equal protection and due process. Within due process structures, the claims may be brought under both substantive and procedural due process.

### 1. Equal Protection Claims and Remedies

As is the case with race and sex harassment, constitutional theories about disability harassment are underdeveloped because statutes generally provide more convenient avenues for relief.[231] Harassment is intentional discrimination, however, and intentional discrimination may violate the Equal Protection Clause.[232] The initial question in determining whether a given form of discrimination violates equal protection is what standard of review to apply. The Supreme Court has asserted that it applies a rational-basis test in evaluating claims of discrimination based on mental retardation, although many commentators believe that the leading case, *City of Cleburne v. Cleburne Living Center, Inc.*,[233] in fact applies a higher standard of review.[234]

---

(BNA) 1043 (N.D. Ill. Feb. 10, 1997) (upholding claim for intentional infliction of emotional distress); Martinez v. Monaco/Viola, Inc., No. 96 C 4163, 1996 WL 547258 (N.D. Ill. Sept. 18, 1996) (same); Dutson v. Farmers Ins. Exch., 815 F. Supp. 349, 354 (D. Or. 1993) (same).

231. Perhaps the most famous example of this phenomenon is in the sexual harassment case involving Paula Jones and President Clinton. Although the statute of limitations barred all but the constitutional claims based on harassment, the court used title VII authority in analyzing the case because case law has not developed the constitutional theories separately. Jones v. Clinton, 990 F. Supp. 657, 668 (E.D. Ark. 1998) ("Throughout the pendency of this lawsuit, this Court and the parties have been operating under the assumption, based on the clear weight of authority, that a § 1983 sexual harassment claim should be analyzed under the standards developed in similar Title VII litigation."), *appeal dismissed*, 138 F.3d 758 (8th Cir.).

232. *E.g.*, Hunter v. Underwood, 471 U.S. 222 (1985) (finding equal protection violation on the basis of evidence of intent); Washington v. Davis, 426 U.S. 229 (1976) (requiring showing of intent for equal protection violation).

233. 473 U.S. 432 (1985).

234. *E.g.*, ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 9.2.3, at 544 (1997) ("Although the Court [in *Cleburne*] expressly declared that it was applying rational basis review, it appears that there was more 'bite' to the Court's approach than usual for this level of scrutiny."); James Leonard, *The Shadows of Unconstitutionality: How the New Federalism May Affect the Anti-Discrimination Mandate of the Americans with*

In *Cleburne*, the Court ruled that a municipality violated equal protection by not permitting a group home to be established for persons with mental retardation.[235] The Court swept aside asserted justifications for application of the zoning ordinance barring the proposed use of the land, including congestion in the neighborhood, overcrowding of the home, fire hazards, and other safety concerns.[236] Though the Court correctly noted that these justifications had not been used to zone out other, comparable uses of the land, such as nursing homes or fraternities,[237] the Court appeared to be ignoring a key aspect of rational-basis review: that when the rational-basis test applies, the government simply needs to have a rational connection between the chosen category and the legitimate goal,[238] not pursue the goal consistently across all categories.[239] Under the rational-basis test, the government does not violate equal protection when it approaches a problem piecemeal or along lines of least political resistance for what it is doing.[240] Thus *Cleburne* in its language might be a rational-basis case, but it implicitly sets a higher standard.

In a later case, *Heller v. Doe*,[241] the Supreme Court applied a garden-variety rational-basis test to sustain a statute that imposed

---

*Disabilities Act*, 52 ALA. L. REV. 91, 105 (2000) ("It is impossible to square this approach [in *Cleburne*] with traditional rational basis review."); Gayle Lynn Pettinga, Note, *Rational Basis With Bite: Intermediate Scrutiny by Any Other Name*, 62 IND. L.J. 779, 796 (1987) ("If the Court's opinion is viewed in light of what the Court actually did—not what it said it did—then Justice Marshall was correct in arguing that the Court had essentially employed intermediate scrutiny."); *see also* Mark C. Weber, *Disability Discrimination in Higher Education*, 27 J.C. & U.L. 417, 438 (2000) ("In fact, the Court apparently applied something stricter than a rational-basis test, despite what the opinion itself called it.").

235. *Cleburne*, 473 U.S. at 450.

236. *Id.* at 449-50.

237. *Id.* at 450.

238. JOHN E. NOWAK & RONALD D. ROTUNDA, CONSTITUTIONAL LAW § 14.3, at 639 (6th ed. 2000) ("[I]f a classification is of this type the Court will ask only whether it is conceivable that the classification bears a rational relationship to an end of government which is not prohibited by the Constitution.").

239. *E.g.*, Williamson v. Lee Optical, 348 U.S. 483 (1955) (finding no equal protection violation in ordinance that forbade opticians from fitting eyeglasses without prescription but permitted drug stores to sell ready-to-wear glasses).

240. *See, e.g.*, Railway Express Agency, Inc. v. New York, 336 U.S. 106 (1949) (finding no equal protection violation in law that forbade truck owners from advertising other businesses on sides of their trucks but permitted owners to advertise owners' business).

241. 509 U.S. 312 (1993).

a clear-and-convincing-evidence standard of proof and provided party status for relatives in proceedings for civil commitment of persons with mental retardation.[242] The state's law established that persons subject to proceedings for civil commitment on the basis of mental illness had to be shown to meet the test for commitment by a reasonable-doubt standard, and it denied relatives the status of parties to the case.[243]

Most recently, in *Board of Trustees of the University of Alabama v. Garrett*,[244] the Court denied that *Cleburne* established anything higher than a rational-basis standard for the disability classification it considered.[245] The Court used that conclusion to support the deduction that the portion of the ADA permitting damages claims against state governments in employment cases for failure to accommodate workers violates the Eleventh Amendment.[246] The Court reasoned that Congress lacks the power under the Fourteenth Amendment to provide damages remedies against states for violating any prohibition that is not proportional to and congruent with what the Fourteenth Amendment forbids.[247] If the Fourteenth Amendment prohibits only irrational discrimination against persons with disabilities, failure to provide what the Court called "special accommodations" does not violate the Amendment, for the Court considered it "entirely rational, and therefore constitutional, for a state employer to conserve scarce financial resources by hiring employees who are able to use existing facilities ...."[248] Thus the Court again affirmed the use of a rational-

---

242. *Id.* at 330.
243. *Id.* at 315.
244. 531 U.S. 356 (2001).
245. *Id.* at 367.
246. *Id.* at 274.
247. *Id.* at 372.
248. *Id.* The Court's reasoning regarding accommodations is a stunning example of failure to see beyond one's own point of reference. It may seem rational from the viewpoint of someone without disabilities to retain or build facilities knowing that they will exclude a significant fraction of the forty-three million Americans with disabilities. From the viewpoint of someone with a disability, however, it hardly seems rational to fail to make even a reasonable accommodation, for example, making slightly wider doors and flush entrances for new buildings so that they can be used by those with wheelchairs and placing portable ramps in older facilities where feasible.

As a more general matter, people without disabilities frequently overlook the large number of accommodations made for them. Chief Justice Rehnquist's chair is an accommodation for

basis test for disability classifications under the Equal Protection Clause.

*Heller* and *Garrett* might lead to the conclusion that the Court has once and for all rejected elevated scrutiny for legislation that disadvantages persons on the basis of disability. This conclusion, however, may be premature. With regard to *Garrett*, it is worth noting that the case was a five-to-four decision, with a strenuous dissent arguing for a broader view of *Cleburne* in which state decision making based on negative attitudes and stereotypes violates equal protection.[249] Two Justices who made up part of the five-member majority steered clear of the controversy over *Cleburne*'s meaning and read the conduct that title I of the ADA sought to correct with regard to state employers more as "failure of a State to revise policies now seen as incorrect under a new understanding of proper policy" than anything that would violate the Constitution, seemingly under any test, rational-basis or elevated scrutiny.[250]

For its part, *Heller* was an unusual case in which the parties challenging the statute never properly presented the contention that elevated scrutiny ought to apply.[251] It is at least arguable that

---

people who walk and stand. Some other people wheel their chairs with them. As Harlan Hahn has written, "[T]he basic difficulty stems from widespread ignorance of the unequal implications of everyday surroundings." Harlan Hahn, *Equality and the Environment: The Interpretation of "Reasonable Accommodations" in the Americans With Disabilities Act*, 17 J. REHABILITATION ADMIN. 101, 104 (1993). *See generally* Mark C. Weber, *Beyond the Americans with Disabilities Act: A National Employment Policy for People with Disabilities*, 46 BUFF. L. REV. 123, 135-38, 147-50 (1998) (distinguishing nondiscrimination measures such as reasonable accommodation from more aggressive steps to integrate people with disabilities in the workplace).

249. *See Garrett*, 531 U.S., at 376 (Breyer, J., dissenting). Justices Stevens, Souter, and Ginsburg joined the dissent. Even in *Cleburne* itself, the six-member majority included two Justices (Justice Stevens and Chief Justice Burger) who expressed skepticism that an ordinary rational-basis test applied to the case and three Justices (Justices Marshall, Brennan, and Blackmun) who would have forthrightly applied elevated scrutiny. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 453-54 (1985) (Stevens, J., concurring); *id.* at 473 (Marshall, J., concurring in part and dissenting in part).

250. *See Garrett*, 531 U.S., at 375 (Kennedy, J., concurring). Justice O'Connor joined the concurrence.

251. *See* Heller v. Doe, 509 U.S. at 312, 319 (1993) ("Even if respondents were correct that heightened scrutiny applies, it would be inappropriate for us to apply that standard here. Both parties have been litigating this case for years on the theory of rational-basis review . . . .").

the distinctions drawn between people with mental retardation and those with mental illness would pass an intermediate scrutiny test, had *Heller* employed one. A substantial relation between the distinctions and important governmental goals does not appear that difficult to demonstrate, for the long-term nature of mental retardation and the relative ease of showing its existence compared to mental illness,[252] combined with the relative intrusiveness of forced psychiatric treatment compared with forced commitment for mental retardation,[253] all support the idea of more modest safeguards for individuals with mental retardation.

In other words, the Court might still be on a road to elevated scrutiny for disability categories, or at least some disability categories in some instances. History suggests that an erratic pattern of decisions, combined with protests by the Court that it is applying a rational-basis test, may lead to an eventual use of intermediate scrutiny.[254] The Court's modern decisions on sex discrimination initially used a rational-basis test,[255] then in one instance, applied a strict-scrutiny test,[256] then settled down into an intermediate test,[257] though the content of the test remains a subject of debate.[258] The characteristics of long-term, severe disability (its permanence and the stigma that attaches to it, for example) support the application of some form of elevated scrutiny, as Justice Marshall's opinion in *Cleburne* convincingly demonstrated.[259] The concern that some legislation beneficial to people with disabilities might be put at constitutional risk can be handled by the flexible nature of an intermediate scrutiny test.[260]

---

252. *See id.* at 322-24 (describing significance of distinction).

253. *Id.* at 324-26 (describing significance of distinction).

254. *See* NOWAK & ROTUNDA, *supra* note 238, § 14.20 (describing evolution of intermediate scrutiny in sex classification cases).

255. Reed v. Reed, 404 U.S. 71, 76 (1971).

256. Frontiero v. Richardson, 411 U.S. 677, 682 (1973) (plurality opinion).

257. Craig v. Boren, 429 U.S. 190, 197 (1976).

258. *Compare* United States v. Virginia, 518 U.S. 515, 531 (1996) (requiring "exceedingly persuasive justification" for treating sexes differently), *with id.* at 559 (Rehnquist, C.J., concurring) (criticizing use of "exceedingly persuasive justification" standard).

259. *See* City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 461-65 (1985) (Marshall, J., concurring in part and dissenting in part) (describing history of discrimination and other factors supporting application of elevated scrutiny).

260. *See* NOWAK & ROTUNDA, *supra* note 238, § 14.23, at 834 (describing preservation of "benign classifications" on the basis of sex under intermediate review).

Applying intermediate scrutiny to disability harassment yields the unavoidable conclusion that the harassing conduct violates equal protection. The government singles out an individual for ridicule or physical intimidation or other harm simply because that person is different and vulnerable. There is no substantial relationship to any important goal that the government is actually pursuing.[261]

Even if that position were disputed, however, it is hardly necessary to apply elevated scrutiny to conclude that disability harassment in the public schools violates equal protection. The rational-basis test requires that the government classification be rationally related to a legitimate governmental end. In cases of harassment, the government singles out children with disabilities for mistreatment. No legitimate governmental end is served. Indulging popular prejudices is not a legitimate governmental goal,[262] nor is the "bare ... desire to harm a politically unpopular group."[263] As James Leonard has recently pointed out, the Court's condemnation of the antigay initiative in *Romer v. Evans*[264] in 1996 shows that disadvantaging unpopular groups for the simple sake of

---

261. *See United States v. Virginia*, 518 U.S. at 534 (applying intermediate scrutiny to require genuine, "exceedingly persuasive justification" for government action and substantial relation between category and goal).

262. *See* Romer v. Evans, 517 U.S. 620, 635 (1996) (finding no legitimate governmental purpose in placing unique political disadvantage on gays and lesbians); Palmore v. Sidoti, 466 U.S. 429, 433 (1984) (finding that avoiding potential problems from racial bias in population fails to constitute permissible ground for use of race in child custody determination); *see also Cleburne*, 473 U.S. at 448 ("[M]ere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently."). This reasoning is, of course, independent of the reasoning by which the Court in *Cleburne* dismissed the other justifications for the zoning decision. The dismissal of the other reasons is what might be characterized as scrutiny that is stricter than the rational-basis test.

263. *Cleburne*, 473 U.S. at 447 (stating that objectives such as "'a bare ... desire to harm a politically unpopular group' are not legitimate state interests") (quoting United States Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973)). As Professor Sunstein explains:

When the government operates to benefit A and burden B, it may do so only if it is prepared to justify its decision by reference to a public value.

... The institution that made the discrimination must be attempting to remedy a perceived public evil, and must not be responding only to the interests or preferences of some of its constituents.

Cass R. Sunstein, *Public Values, Private Interests, and the Equal Protection Clause*, 1982 SUP. CT. REV. 127, 134.

264. 517 U.S. 620 (1996).

so doing continues to be a clear violation of equal protection.[265] Disadvantaging for the sake of doing so is precisely what harassment does. *Garrett* further reinforces the conclusion that government-sponsored or tolerated harassment violates equal protection by reaffirming *Cleburne*'s central holding that irrational conduct motivated by negative attitudes against people with disabilities is indeed a Fourteenth Amendment violation.[266] The concurring opinion of Justice Kennedy took special pains to distinguish what the Court said did not clearly violate the Constitution from conduct based on "malicious ill will," which clearly does.[267]

Courts are beginning to recognize that disability harassment in the schools constitutes a violation of equal protection. In *Smith v. Maine School Administrative District No. 6*,[268] the plaintiff, a student with mental retardation and other disabilities, alleged that the assistant principal excluded her from a school dance because of her disabilities; that room was not made for her to sit with the rest of the school chorus during a performance until her father intervened; and that at the instruction of the chorus director, a fellow student directed her to stop singing too loudly during the performance. The incidents resulted in students ridiculing and shunning the plaintiff.[269] The court found that the allegations gave rise to an inference of discriminatory intent, and that if a rational-basis test were applied to the way in which the defendants treated the plaintiff on the basis of her disability, the allegations were sufficient to support the conclusion that defendants violated equal protection.[270]

---

265. Leonard, *supra* note 234, at 108 ("The principle that disadvantaging unpopular groups for its own sake violates equal protection was reasserted by the recent opinion in *Romer v. Evans*."); *see also* Daniel Farber & Suzanna Sherry, *The Pariah Principle*, 13 CONST. COMMENT. 257 (1996) (contending that government violates equal protection by treating people as pariahs); Joseph S. Jackson, *Persons of Equal Worth: Romer v. Evans and the Politics of Equal Protection*, 45 UCLA L. REV. 453 (1997) (arguing that equal protection imposes principle of equal worth of individuals).

266. *See* Board of Trs. v. Garrett, 531 U.S. 356, 366 n.4, 367 (2001).

267. *Id.* at 375 (Kennedy, J., concurring).

268. No. 00-284-P-C, 2001 WL 68305 (D. Me. Jan. 29, 2001).

269. *Id.* at *2.

270. *Id.* at *6.

Damages are an appropriate remedy for equal protection violations. In general, proof of equal protection and other constitutional violations brought under section 1983 gives rise to the full range of remedial options, including compensatory and punitive damages.[271]

### 2. Due Process Claims and Remedies

Abuse of power by individuals with governmental authority over persons subject to them violates due process of law. Governmental creation of a danger to an individual may support liability for the resulting harm. For example, in *Armijo v. Wagon Mound Public Schools*,[272] the Tenth Circuit upheld a substantive due process claim based on a child's suicide when school officials were on notice of a child's suicidal propensities, but they suspended him and drove him home where they knew he had access to firearms, without determining whether an adult was present there.[273] Liability for violations of substantive due process may also be premised on the existence of a special relationship between the school officials and the victim, such as when the child is in the school's custody. For example, in another Tenth Circuit case, *Sutton v. Utah State School for the Deaf and Blind*,[274] the court held that the plaintiff stated a

---

271. Smith v. Wade, 461 U.S. 30 (1983) (finding punitive damages appropriate in section 1983 case).

272. 159 F.3d 1253 (10th Cir. 1998); *see also* Maxwell v. Sch. Dist., 53 F. Supp. 2d 792-93 (E.D. Pa. 1999) (finding state-created-danger standard met in case involving rape by classmates when substitute teacher told unruly class she did not care what they did if they did not bother her, remained idle during attacks, and participated in locking children in classroom).

273. The contours of this doctrine remain uncertain, but they appear to require the affirmative creation of danger, rather than inaction in the face of danger. For example, the Supreme Court found that no due process violation occurred when a social service department repeatedly received reports of a father physically abusing a child, but took no action, and the father eventually beat the child so severely that he suffered permanent brain injuries leaving him profoundly mentally retarded. DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989).

274. 173 F.3d 1226 (10th Cir. 1999); *see also* Waechter v. School Dist. No. 14-030, 773 F. Supp. 1005 (W.D. Mich. 1991). In *Waechter*, the court denied a motion to dismiss a claim for violation of substantive due process against a teacher, principal, superintendent, district, and school board when the plaintiffs alleged that the teacher, who knew their son had serious heart impairments, forced the child to sprint for 350 yards for talking in line on the playground. The child suffered cardiac arrhythmia and died. The court found the child to be

substantive due process claim against the principal of a state school in his individual capacity, when the principal failed to adopt or implement a policy or training program to prevent sexual assaults on a child with disabilities after the principal was placed on notice of a previous assault on the same victim by the same offender.[275]

On analogy to these cases, substantive due process liability exists for disability harassment at least in instances in which serious mental or physical harm is visited on a child with disabilities in school and the school, as in *Armijo*, is aware of the dangers and places the child in a dangerous position, such as an unsupervised classroom or playground, without taking precautions to prevent abuse on account of the child's difference. Similarly, substantive due process liability exists when, as in *Sutton*, the child is in a custodial relationship, the school officials are on notice of the danger to the child, and they take no precautions to prevent harassment.

There also exists a sense in which disability harassment, even in ordinary, rather than more extreme, cases constitutes a deprivation of procedural due process. Procedural due process applies when government makes an individualized determination that deprives a person of life, liberty, or property. The Supreme Court has found that suspending a child for a disciplinary infraction violates procedural due process if the child does not receive some kind of hearing before the punishment.[276] Harassment by teachers,

---

in the custody of the defendants, and found the conduct sufficiently outrageous to violate the constitutional duty. *See id.* at 1010.

275. *Sutton*, 173 F.3d at 1226. Some courts, however, have rejected substantive due process claims based on abuse of children in custodial situations if the child is voluntarily enrolled at the school or if the only coercion is that of compulsory school attendance laws. *E.g.*, Stevens v. Umsted, 131 F.3d 697 (7th Cir. 1997) (finding no liability and upholding Eleventh Amendment immunity of superintendent in his capacity as a state actor in case concerning sexual assaults at state school against child voluntarily enrolled there, despite superintendent's knowledge of ongoing attacks); Maldonado v. Josey, 975 F.2d 727 (10th Cir. 1992) (finding no liability when boy was left unsupervised, resulting in strangulation).

276. Goss v. Lopez, 419 U.S. 565, 566 (1975) (holding that procedural due process requires notice and hearing before suspension from public school); *see also* Quackenbush v. Johnson City Sch. Dist., 716 F.2d 141, 145 (2d Cir. 1983) (finding due process violation based on allegation of deprivation of special education hearing rights). Though post-deprivation remedies may suffice for some school discipline, the procedural due process right is still applicable. *See* Ingraham v. Wright, 430 U.S. 651 (1977) (finding no due process deprivation when corporal punishment in school remained subject to later remedies).

principals, and others with governmental authority over a child deprives the child of a liberty and property interest in receiving educational services.[277] When a teacher ridicules a child or physically abuses her, the teacher is singling the child out for mistreatment without affording the child any fair opportunity to contest whether the harm is merited.

In one of the two cases that led to congressional passage of the law that is now IDEA, a court found a violation of procedural due process in the conduct of District of Columbia schools in excluding children from regular classes, without a hearing or other procedures, on the grounds that they had behavior problems, mental retardation, emotional disturbance, or hyperactivity.[278] If exclusion from school on these bases requires a hearing, so too does singling out a child for harassment on the same basis, official action that interferes with the child's enjoyment of the right to attend school and profit from it.

Damages are an appropriate remedy for violations of due process.[279] Even when the denial of due process causes no discernable harm, the plaintiff is entitled to a remedy of nominal damages.[280]

As emphasized above, harassment may also be viewed as a form of retaliation: the child is punished for exercising her right to attend public school like everyone else.[281] Had she not asserted that right, had she stayed at home or not ventured into the mainstream, teachers (or peers with the tacit or explicit approval of school personnel) would not have mistreated her. Claims for retaliation for

---

277. *See Goss*, 419 U.S. at 565 (finding protected interest in continued attendance at public school).

278. Mills v. Board of Educ., 348 F. Supp. 866, 875 (D.D.C. 1972) ("[M]any [children] are suspended or expelled from regular schooling or specialized instruction or reassigned without any prior hearing and are given no periodic review thereafter. Due process of law requires a hearing prior to exclusion, termination [or] classification into a special program."). The court also found that the exclusion of children with disabilities from public school violates the equal protection component of due process. *Id.*

279. *Quackenbush*, 716 F.2d at 148 (upholding damages claim for alleged due process violation based on deprivation of special education hearing rights).

280. Carey v. Piphus, 435 U.S. 247 (1978) (permitting nominal damages claim for suspension that took place without hearing but with just cause).

281. *See supra* text accompanying notes 88-90 (discussing retaliation claims).

the exercise of statutory rights may constitute First Amendment violations giving rise to damages relief.[282]

## III. DEFENSES TO DISABILITY HARASSMENT CLAIMS

The discussion of disability harassment claims suggests that the conduct is actionable under any number of theories. Although some courts succeed in misunderstanding the nature of the remedy and dismiss valid cases on that basis, the greater number of cases are dismissed on the ground of various defenses to liability. These defenses include failure to exhaust administrative remedies; the application of official immunity; and the application of other immunity doctrines, including Eleventh Amendment immunity of state governmental agencies. Many courts, however, misapply these defenses in dismissing harassment actions.

### A. *Exhaustion of Administrative Remedies*

The exhaustion requirement poses the single greatest obstacle to damages claims for disability harassment. Some courts recognize exceptions to exhaustion for these cases and properly treat the claims as discrimination cases. Other courts do not appreciate the significance of the discrimination at work and apply the exhaustion defense without serious consideration of the nature of the claim.

### 1. *The Exhaustion Requirement*

To bring a civil action under 20 U.S.C. § 1415 for violations of IDEA, the plaintiff must be a "party aggrieved by the findings and decision" of the hearing procedure created by the statute.[283] This restriction on who can sue operates as an administrative exhaustion requirement, keeping anyone who has not pursued the hearings procedure from filing an action under section 1415.[284] Furthermore,

---

282. *E.g.*, Crocker v. Tennessee Secondary Sch. Athletic Ass'n, 980 F.2d 382, 387 (6th Cir. 1992) (acknowledging merit of claim but finding allegation of retaliation not supported by facts of case).

283. 20 U.S.C. § 1415(i)(2)(A) (2000).

284. *See generally* MARK C. WEBER, SPECIAL EDUCATION LAW AND LITIGATION TREATISE

the statutory amendment[285] that overruled *Smith v. Robinson*[286] and permitted section 504, section 1983, and, once the ADA was passed, title II actions, provides that "before the filing of a civil action under such laws seeking relief that is also available under [section 1415], the procedures [for administrative hearings and appeals] shall be exhausted to the same extent as would be required had the action been brought under this subchapter."[287] Although Congress intended the exhaustion requirement to be flexible so that meritorious cases would get a judicial hearing,[288] many courts have

---

§ 21.8 (1992 & Supp. VIII 2000) (discussing administrative exhaustion in special education cases). The policies behind administrative exhaustion include maximization of the expertise of administrators and economy in the use of procedural mechanisms to challenge government conduct. *Id.* (collecting authorities). Ideally, the scope of an exhaustion requirement would conform to these policies. Because Congress has resolved the question of the operation of the IDEA exhaustion requirement, this Article approaches the issue as a statutory, rather than a policy matter. It may be noted, however, that futility of exhaustion constitutes a valid excuse both in policy and under the legislation.

285. The amendment codifies the HCPA. *See supra* notes 182-98 and accompanying text (discussing HCPA).

286. 468 U.S. 992 (1984).

287. 20 U.S.C. § 1415(l) (2000).

288. The legislative history of the predecessor of IDEA, the Education for All Handicapped Children Act, includes a statement by Senator Harrison Williams, its principal author, that "exhaustion of the administrative procedures established under this part should not be required ... in cases where such exhaustion would be futile either as a legal or practical matter." 121 CONG. REC. 37,416 (1975). When the HCPA restored section 504 and other remedies to IDEA cases in 1986, the additional remedies were made subject to the same exhaustion obligation that applies to the Act. Senator Simon and Representative Miller, who managed the bill, set down what Congress understood about exhaustion in special education cases:

> It is important to note that there are certain situations in which it is not appropriate to require the exhaustion of EHA [Education of the Handicapped Act, now IDEA] administrative remedies before filing a civil law suit. These include complaints that: First, an agency has failed to provide services specified in the child's individualized educational program [IEP]; second, an agency has abridged or denied a handicapped child's procedural rights—for example, failure to implement required procedures concerning least restrictive environment or convening of meetings; three, an agency had adopted a policy or pursued a practice of general applicability that is contrary to the law, or where it would otherwise be futile to use the due process procedures—for example, where the hearing officer lacks the authority to grant the relief sought; and four, an emergency situation exists—for example, failure to provide services during the pendency of proceedings, or a complaint concerning summer school placement which would not likely be resolved in time for the student to take advantage of the program.

131 CONG. REC. 21,392-93 (1985) (statement of Sen. Simon). Representative Miller

WILLIAM AND MARY LAW REVIEW          [Vol. 43:1079

applied the rule rigidly, barring cases even when the plaintiffs present persuasive reasons for excusing exhaustion.[289]

## 2. *Application of Exhaustion to Harassment Cases*

In a number of cases involving allegations of disability harassment or closely analogous claims, courts have dismissed cases for lack of administrative exhaustion.[290] The most prominent of these

---

elaborated: "[N]either I nor others who wrote the law intended that parents should be forced to expend valuable time and money exhausting unreasonable or unlawful administrative hurdles . . . ." *Id.* at 31,376.

289. Perhaps the most striking of these cases are those in which the plaintiffs challenge a practice of general applicability that the hearing officer (who, according to 20 U.S.C. § 1415(f)(3), must be independent of the educational agency) lacks the power to change. Despite the futility of exhaustion and applicability of the statements of Senator Simon and Representative Miller, courts in recent years have frequently dismissed cases of this type on the basis of failure to exhaust administrative remedies. *E.g.,* Doe v. Arizona Dep't of Educ., 111 F.3d 678 (9th Cir. 1997) (requiring exhaustion in action over failure to provide special education to eligible inmates of county jail); Gardner v. School Bd., 958 F.2d 108 (5th Cir. 1992) (requiring exhaustion in challenge to policy not to permit taping of individualized education program meetings); Hayes v. Unified Sch. Dist. No. 377, 877 F.2d 809 (10th Cir. 1989) (requiring exhaustion in case challenging use of time-out rooms for students in special education programs); Crocker v. Tennessee Secondary Sch. Athletic Ass'n, 873 F.2d 933 (6th Cir. 1989) (overturning preliminary injunction against operation of rule preventing participation in sports by child who transferred between schools when transfer was allegedly caused by learning disabilities; holding that lawsuit was subject to dismissal for failure to exhaust state administrative remedies); Radcliffe v. School Bd., 38 F.Supp. 2d 994 (M.D. Fla. 1999) (requiring exhaustion in dispute over scheduling of individualized education program meeting outside of school hours). Contrary to what the HCPA sponsors said of congressional intent, many other recent cases have required exhaustion even though hearing rights or other procedural guarantees have been violated. *E.g.,* Doe v. Walker County Bd. of Educ., No. A.4:95-CV-0219-H, 1997 WL 866983 (N.D. Ga. Sept. 19, 1997) (requiring exhaustion even though district failed to develop individualized education programs to provide basis for hearing); W.L.G. v. Houston County Bd. of Educ., 975 F. Supp. 1317 (M.D. Ala. 1997) (holding that claim for failure to obey settlement agreement needed to be exhausted); Koster v. Frederick County Bd. of Educ., 921 F. Supp. 1453 (D. Md. 1996) (requiring exhaustion despite claimed inadequacy of notice).

290. *E.g.,* Kubistal v. Hirsch, No. 98 C 3838, 1999 WL 90625 (N.D. Ill. Feb. 9, 1999) (involving ridicule and humiliation by teacher of student with visual impairment); Franklin v. Frid, 7 F. Supp. 2d 920 (W.D. Mich. 1998) (involving aide's physical and psychological abuse of child with cerebral palsy); Shields v. Helena Sch. Dist. No. 1, 943 P.2d 999 (Mont. 1997) (involving exclusion from trip, humiliation, and name-calling by teachers). In two cases, courts dismissed cases brought by parents based on allegations of retaliation, despite the obvious fact that the administrative process could provide no useful relief to the parents. *See* Weber v. Cranston Sch. Comm., 212 F.3d 41 (1st Cir. 2000); Babicz v. School Bd., 135 F.3d 1420 (11th Cir. 1998). In *Weber,* the court relied on the plaintiffs' failure to allege that exhaustion was burdensome or futile. *Weber,* 212 F.3d at 52-53. In *Babicz,* the court appears

is *Charlie F. v. Board of Education*,[291] the case about the fourth-grade encounter sessions in which students were encouraged to vent their rage at Charlie. The court ruled that the case had to be dismissed on exhaustion grounds,[292] even though the child was no longer in the school system, was not suing under IDEA,[293] and was asking only damages as a remedy. It declared that the portion of the exhaustion requirement referring to relief available means relief for events or conditions at issue in the suit, not relief preferred by the plaintiff.[294] The court concluded that some useful forms of relief that were not asked for, such as compensatory education or services, would be available from the administrative process even though damages were not.[295]

The court's reasoning that the usefulness of any potential relief in an IDEA proceeding triggers the duty to exhaust is impossible to square with the relevant language of the HCPA. The HCPA phrase "seeking relief that is also available under this subchapter" clearly refers to the civil action filed by the plaintiff, not a hypothetical action that the plaintiff could have brought.[296] The court neatly read the word "seeking" out of the statute. Moreover, the court's argument about the usefulness of alternate relief is weakened by the fact that the child was no longer in the district at the time of the suit, and then toppled by the reality that compensatory services

---

not to have been aware that Congress overruled *Smith v. Robinson*, or perhaps it was not aware that the parent was suing on her own behalf as well as that of her children. *See Babicz*, 135 F.3d at 1422.

291. 98 F.3d 989 (7th Cir. 1996). For more on *Charlie F.*, see *supra* text accompanying notes 7-9.

292. *Charlie F.*, 98 F.3d at 993.

293. Claims were advanced for violations of the Constitution, section 504, title II of the ADA, and state law. *Id.* at 991.

294. *Id.* ("The statute speaks of available relief, and what relief is 'available' does not necessarily depend on what the aggrieved party wants. Certainly not in litigation.").

295. *Id.* at 992-93.

296. 20 U.S.C. § 1415(l) (2000). The context clarifies the meaning:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 . . ., title V of the Rehabilitation Act . . ., or other Federal laws . . . except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, [the administrative] procedures [required by] this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

*Id.*

will never make a victim whole for humiliation and intimidation.[297] If they did, courts would award services in intentional tort cases, not damages.[298]

Courts have frequently excused exhaustion in cases involving ADA or section 504 claims, as well as cases in which violations of IDEA are asserted either through section 1983 or the statute itself. Many of these cases use reasoning that casts doubt on that employed in *Charlie F.* A leading case is *W.B. v. Matula,*[299] discussed above in connection with section 1983 claims to enforce IDEA. The plaintiffs alleged protracted delays in the evaluation of and delivery of services to a child who was eventually diagnosed with neurological impairments and other disabilities. The court noted that the mere assertion of a section 1983 claim does not excuse exhaustion, but it stressed that the plaintiffs in the case were seeking damages and that damages were not available in an IDEA administrative proceeding.[300] Accordingly, following the statement in the HCPA legislative history that "'[e]xhaustion of administrative remedies would ... be excused where ... resort to those proceedings would be futile,'" the court ruled that exhaustion was not required.[301] The court also pointed out that evidentiary matters concerning evaluation, classification, and placement were no longer in dispute, and thus there was no justification for exhaustion for developing a record on those issues.[302]

Harassment cases present an even stronger basis for excusing exhaustion than does *W.B.* For one thing, the cases are likely not to include an IDEA claim at all, but instead to be framed in terms of

---

297. *See supra* text accompanying notes 122-60 (discussing appropriate relief in harassment cases). This characteristic of harassment claims distinguishes them from cases having to do with educational methodology or levels of educational services, in which a damages claim might be pled simply to circumvent the administrative process. *See* Covington v. Knox County Sch. Sys., 205 F.3d 912, 917 (6th Cir. 2000) (excusing exhaustion; distinguishing cases "simply [] appending a claim for damages").

298. *See supra* text accompanying notes 207-30 (discussing damages remedies in cases alleging intentional infliction of emotional distress).

299. 67 F.3d 484 (3d Cir. 1995); *see supra* text accompanying notes 176-86 (discussing *W.B.*).

300. *W.B.,* 67 F.3d at 495-96.

301. *Id.* at 496 (citation omitted).

302. *Id.*

violations of section 504, the ADA, and constitutional violations.[303] Any IDEA claims will be, like those in *W.B.*, section 1983 damages claims for violations of the statute. Even more than in a dispute over failure to evaluate and provide services to a child, matters of deliberate harassment go beyond the core concerns of IDEA and its main goal of promptly getting adequate services to children.[304] As a second matter, the propriety of damages relief for harassment is far clearer than it is for delays.[305] As the *W.B.* court said in discussing relief, compensatory services may be a sufficient remedy for delays in some cases.[306] Thus, even if one were to work the kind of changes in the text of section 1415(l) that the *Charlie F.* court did and ignore the drafters' stress on the relief actually sought in the case, exhaustion should be excused because the proper relief in a harassment case—damages—is not available from the IDEA administrative process.

An approach similar to that of *W.B.* was adopted in *Covington v. Knox County School System*,[307] the case in which a child was routinely locked in a darkened, vault-like time-out room. The court declared that in a case in which the child's "injuries are wholly in the past, and therefore money damages are the only remedy that can make him whole[,] proceeding through the state's administrative process would be futile and is not required before the plaintiff can file suit in federal court."[308] The court upheld a claim for violation of substantive due process.[309]

The *W.B.* decision preceded *Charlie F.*; *Covington* apparently did not consider *Charlie F.* relevant and did not cite it. In the years since the *Charlie F.* decision, most courts excusing exhaustion in harassment cases have distinguished the case, rather than

---

303. *See* McKay v. Winthrop Bd. of Educ., No. 96-131-B, 1997 WL 816505, at *2-*3 (D. Me. June 6, 1997) (holding that section 504 and ADA damages claims for failure to make building accessible need not be exhausted; noting absence of IDEA claim and absence of availability of damages pursuant to IDEA).

304. *See supra* text accompanying notes 161-70 (discussing IDEA claims).

305. *See supra* text accompanying notes 148-60 (discussing appropriate relief for harassment).

306. *W.B.*, 67 F.3d at 495.

307. 205 F.3d 912 (6th Cir. 2000). For more on *Covington*, see *supra* text accompanying notes 27-28.

308. *Covington*, 205 F.3d at 917 (citation omitted).

309. *Id.* at 913.

confronting it head on. Thus in *Witte v. Clark County School District*,[310] the case in which a student was force-fed, choked, and otherwise abused, the court said that the situation was different from *Charlie F.* in that the parties in *Charlie F.* did not ultimately agree on a different placement, unlike *Witte*, in which the new placement came about during informal administrative procedures.[311] The court also distinguished *Charlie F.* on the ground that damages there were considered a substitute for remedial services, whereas in *Witte*, "Plaintiff expressly eschews any claim for monetary damages to provide, or to be measured by the cost of, remedial services. Rather, the claim for damages is retrospective only."[312] Finally, the court considered a case involving primarily physical abuse to be distinguishable from one involving primarily verbal abuse.[313] The court permitted the section 504 and ADA claims to stand.[314]

In *Padilla v. School District No. 1*,[315] the case of the child kept in a stroller in a closet, the court also distinguished *Charlie F.*, reading the case as a requirement that when "the IDEA's ability to remedy a particular injury is unclear, exhaustion should be required in order to give educational agencies an initial opportunity to ascertain and alleviate the alleged problem."[316] The court said that damages for the fractured skull and other injuries the child sustained were not redressable through the IDEA administrative process and permitted an ADA damages claim to proceed.[317]

That these decisions distinguished *Charlie F.*, rather than disagreeing with it, does not lend support to the *Charlie F.* approach and its judicial rewriting of section 1415(l). In fact, the first two distinctions relied on in the *Witte* decision are thin, depending entirely on how the plaintiff chose to characterize the

---

310. 197 F.3d 1271 (9th Cir. 1999). For more on *Witte*, see *supra* text accompanying notes 10-12.

311. *Witte*, 197 F.3d at 1275-76.

312. *Id.* at 1276.

313. *Id.*

314. *Id.*

315. 233 F.3d 1268 (10th Cir. 2000). For more on *Padilla*, see *supra* text accompanying notes 187-91.

316. *Padilla*, 233 F.3d at 1274 (citation omitted).

317. *Id.* at 1274-75.

dispute with the school district and the relief being sought. The third distinction, also relied on in *Padilla*, that the injuries were physically as well as verbally inflicted, is dubious in that Charlie also suffered physical attacks from his classmates and the plaintiffs in both *Witte* and *Padilla* also suffered abuse other than physical assaults. Moreover, the courts never explained why psychological abuse is any less a matter for the judicial system than physical abuse. Effectively, the courts have limited the application of *Charlie F.* in their circuits in cases involving disability harassment.

When courts assimilate disability harassment into disputes over services and methodology and apply an exhaustion requirement intended for those cases, they fail to treat with necessary seriousness the real injuries that harassment inflicts. These real injuries are best addressed by court actions for damages, and under the language of the special education law as well as the evidence of the intentions of its drafters, exhaustion of administrative remedies should not be required.

## B. *Official Immunity*

Official immunity also bars some disability harassment claims. Public-official defendants may claim immunity from section 1983 claims[318] for violation of the Constitution if their conduct was not

---

318. As Gary Gildin convincingly demonstrates, if public officials may be found personally liable under section 504, title II ADA, or IDEA damages claims (as opposed to section 1983 claims for constitutional violations), official immunity should not be available as a defense. Gildin, *supra* note 122, at 900. Gildin notes that the disability statutes were not modeled after section 1983, that common law immunities present at the time of section 1983's adoption had been limited or abolished at the time the disability statutes were passed, and that immunity is inconsistent with the legislative purpose behind the statutes. *Id. But see* P.C. v. McLaughlin, 913 F.2d 1033, 1045 (2d Cir. 1990) (finding that immunity protects employees of state department of mental health from section 504 and IDEA damages claims); East Penn Sch. Dist. v. Scott B., No. 97-1989, 1999 WL 178361, at *4 (E.D. Pa. Mar. 25, 1999) (finding that qualified immunity protected individual-capacity defendants from IDEA damages claim). As noted above, although controversy exists whether individual liability is permitted under the general nondiscrimination provisions of the ADA and section 504, individuals clearly may be liable under the retaliation and coercion provisions. *See supra* text accompanying note 123. For the reasons Gildin identifies, individual defendants liable under the ADA should be unable to claim qualified immunity to avoid that liability. The discussion in the text in the current section of this Article addresses immunity from liability for constitutional violations made actionable under section 1983.

contrary to established law a reasonable person would have known of at the time the conduct occurred.[319] In several cases, courts have immunized public school teachers and administrators from liability for violating the Constitution by engaging in conduct that some might consider analogous to engaging in or tolerating disability harassment. Harassment, however, is behavior that is contrary to established law, and so it should not be protected by official immunity against constitutional claims.

Courts have immunized defendants from damages liability in cases alleging violations of substantive due process by improperly using a body-wrapping technique on a child with severe mental retardation,[320] by failing to prevent a child in a state residential school for the deaf from being sexually assaulted by an older classmate,[321] and by confining a young man with mild mental retardation and behavior problems in a state institution where his liberty was unjustifiably restricted and he was sexually abused by an employee.[322]

Without conceding that the courts properly applied qualified immunity in each of these situations, it is easy to conclude that perpetrating or condoning disability harassment is a different case,

319. Harlow v. Fitzgerald, 457 U.S. 800, 815-20 (1982) (emending previous good-faith immunity test to create objective standard, on account of difficulty of applying subjective standard). The current doctrine of official immunity has been subjected to severe criticism. *See, e.g.*, PETER W. LOW & JOHN C. JEFFRIES, JR., FEDERAL COURTS AND THE LAW OF FEDERAL-STATE RELATIONS 944-53 (4th ed. 1998) (summarizing arguments and collecting authorities).

320. Heidemann v. Rother, 84 F.3d 1021, 1029 (8th Cir. 1996). The technique involved wrapping the child tightly in a blanket so that she could not move her arms or legs. *Id.* at 1025. The defendants contended that the technique was a proper one to provide the child with warmth and stability. *Id.* The plaintiffs asserted that the technique was used for prolonged periods as a substitute for educational and habilitative programs, and cited an instance in which the child's mother found the child wrapped in a blanket on the floor, with flies crawling in and around her mouth and nose. *Id.* at 1026. The court ruled that use of the technique was not a substantial departure from the application of accepted practice standards of which the defendants should have known. *Id.* at 1029.

321. Spivey v. Elliott, 29 F.3d 1522 (11th Cir. 1994), *withdrawn in part on recons.*, 41 F.3d 1497 (11th Cir. 1995).

322. *P.C.*, 913 F.2d at 1033. The court also found that defendants were immune from liability on claims based on violation of procedural due process and the Fourth Amendment. *Id.* at 1043-44. In *Smith v. Maine*, discussed *supra* text accompanying notes 268-70, the court found that the individual defendants were shielded by qualified immunity from liability for the equal protection violation, but it relied solely on the plaintiffs' failure to oppose the defense. Smith v. Maine Admin. Sch. Dist. No. 6, No. 00-284-P-C, 2001 WL 68305, at *7 (D. Me. Jan. 29, 2001).

one to which qualified immunity does not apply. In none of the three cases that applied qualified immunity did the individual defendants act out of malice or hostility toward people with disabilities. In each case the court stressed that the defendants did not depart significantly from professional standards without just cause,[323] did not engage in deliberate indifference to the known needs of the plaintiffs,[324] or did not fail to protect an individual for whom the duty to protect was clearly established.[325] Actions undertaken out of malice or hostility, or inactions that constitute deliberate indifference, form the foundation of claims for disability harassment. Malicious conduct and deliberate indifference to known harassment engaged in by others are violations of established rights of which any teacher or school official should be aware.[326]

Accordingly, in a number of cases closely analogous to disability harassment situations, courts have rejected defenses based on qualified immunity. *Armijo v. Wagon Mound Public Schools*[327] is the case involving the child who had told a school aide his suicidal thoughts, but was suspended by the principal, driven home by a counselor without notice to his parents, and killed himself.

---

323. *E.g.*, *Heidemann*, 84 F.3d at 1029 ("Certainly, even if the blanket wrapping treatment did constitute a substantial departure from professional norms (which it did not), a reasonable official would not have known that to be true."); *P.C.*, 913 F.2d at 1043 ("The requirement that professional judgment be exercised is not an invitation to a court reviewing it to ascertain whether in fact the best course of action was taken.") (citations omitted).

324. *E.g.*, *P.C.*, 913 F.2d at 1045 ("Again, there are simply no facts on this record showing deliberate indifference.").

325. *See, e.g.*, *Spivey*, 29 F.3d at 1527. The *Spivey* court stated:

Because no reported case addressed this kind of residential school, the district court and the parties were forced to interpret analogous cases. The district court held that no liberty interest was implicated. On the other hand, we hold that our analysis leads us to an opposite conclusion. Where there is so much room for differing interpretations, we cannot say the contours of the right were clearly established.

*Id.*

326. *Compare* Vance v. Spencer County Pub. Sch. Dist., 231 F.3d 253 (6th Cir. 2000) (finding deliberate indifference when school officials responded to continued reports of peer sexual harassment by talking to offenders without taking more aggressive action), *with* Soper v. Hoben, 195 F.3d 845 (6th Cir. 1999) (finding that immunity barred sex discrimination action against individual defendants in case involving rape of student when prompt and thorough response was made to earlier complaint).

327. 159 F.3d 1253 (10th Cir. 1998). For more on *Armijo*, see *supra* text accompanying notes 272-73.

There, the court of appeals ruled that the principal and guidance counselor increased the danger to the child in violation of the child's established rights.[328] In situations in which teachers or administrators know of dangers of peer harassment but place the children with disabilities in unsupervised situations with students who are prone to harm them because of their disabling conditions, the school personnel knowingly place the children in danger in violation of established rights.

In other situations, such as protracted delays in provision of services[329] and failure to provide required procedures,[330] courts have found that defendants have violated established rights and forfeited official immunity. Harassing children or permitting the harassment to take place would appear to be a clearer violation of rights of which the administrators should have been aware than the omissions that cost defendants their immunity in those cases.[331]

Municipal corporations such as school districts do not enjoy the protection of official immunity.[332] The courts have reasoned that leaving an injured plaintiff without a remedy in order to induce persons to undertake public service is an appropriate tradeoff for immunity from personal, not corporate liability.[333] Hence, school

---

328. *Id.* at 1262-64. The court found evidence from which a reasonable jury could conclude that the defendants "acted recklessly in conscious disregard of the risk of suicide, and ... such conduct, if true, when viewed in total, possibly could be construed as conscience-shocking. ... In addition, these facts taken as true also could be construed to show ... that [defendants] increased the harm to Armijo." *Id.* at 1264.

329. W.B. v. Matula, 67 F.3d 484 (3d Cir. 1995) (denying summary judgment on basis of immunity upon finding that failure to identify and evaluate child for more than six months and other violations could be viewed as violation of clearly established law).

330. Mason v. Schenectady City Sch. Dist., 879 F. Supp. 215, 220-21 (N.D.N.Y. 1993) (holding that long delay in provision of services and failure to afford notice of procedural rights constitute violations of established rights that overcome claim of immunity).

331. *See also* Padilla v. School Dist. No. 1, 35 F. Supp. 2d 1260 (D. Colo. 1999) (finding no qualified immunity for behavior specialist, special education teacher, and paraprofessional when child was restrained contrary to IEP and sustained injury; upholding immunity for school nurse), *aff'd in pt., rev'd in pt. on other grounds, and remanded*, 233 F.3d 1268 (10th Cir. 2000); Bills v. Homer Consol. Sch. Dist., 959 F. Supp. 507 (N.D. Ill. 1997) (holding that principal's daily interrogations of fifth-grader for five days after another child admitted to conduct in question were sufficiently unreasonable that Fourth Amendment claim would not be dismissed on ground of immunity).

332. Owen v. City of Independence, 445 U.S. 622 (1980) (holding that municipalities do not have official immunity).

333. *Id.* at 653 & n.37 (explaining distinction).

districts may not claim immunity from liability for disability harassment.

## C. Other Immunity Doctrines

Two immunity doctrines that operate to bar some disability harassment claims are general governmental immunity from common law liability and Eleventh Amendment immunity of state defendants in federal court.

### 1. General Governmental Immunity from Common Law Claims

Common law claims for disability harassment are an important part of any plan to remedy harassment in the schools, but they are not available in all states. Various states confer immunity on school districts or their officers for all sorts of tort claims, and these immunities may be construed to bar claims for failure to prevent disability harassment.[334] Numerous courts, however, have ruled that immunities do not apply to causes of action for failure to prevent assaults or other intentional injuries.[335] In states whose

---

334. Soper v. Hoben, 195 F.3d 845, 851-52 (6th Cir. 1999), *cert. denied*, 530 U.S. 1262 (2000) (finding that statutory immunity barred negligence and gross negligence action against school district superintendent and other officials in case involving rape of student); Larson v. Miller, 76 F.3d 1446, 1457 (8th Cir. 1996) (en banc) (finding no liability against district officials for school bus driver's sexual assault on student; applying discretionary function doctrine); Sargi v. Kent City Bd. of Educ., 70 F.3d 907, 913 (6th Cir. 1995) (applying statutory immunity to dismiss claims for failure to provide emergency medical aid to child on school bus); Estes v. Chicago Bd. of Educ., No. 98 C 2197, 1998 WL 516107, at *1 (N.D. Ill. Aug. 13, 1998) (relying on state immunity statute to dismiss claim against school district for sexual assault by students); Sanchez v. School Dist. 9-R, 902 P.2d 450, 453-54 (Colo. Ct. App. 1995) (finding tort claim over injury in mainstreamed physical education class barred by governmental immunity); Brown v. Houston Sch. Dist., 704 So.2d 1325, 1327 (Miss. 1997) (finding sovereign immunity barred wrongful death action against school district); Tinkham v. Groveport-Madison Local Sch. Dist., 602 N.E.2d 256, 262 (Ohio Ct. App. 1991) (finding district protected by sovereign immunity in case regarding sexual assault of student by cab driver).

335. Doe v. Escambia County Sch. Bd., 599 So.2d 226, 227 (Fla. App. 1992) (reversing dismissal of action based on abduction and rape of child with disabilities, finding duty to supervise students to be operational, not discretionary function); Hernandez v. Rapid Bus Co., 641 N.E.2d 886, 891 (Ill. App. 1994) (reversing summary judgment for bus company in action for damages over assault and rape on school bus); Kansas State Bank & Trust Co. v.

immunity doctrines are limited in that fashion, plaintiffs are free
to bring analogous common law claims for harassment.

Immunity doctrines undermine the social objectives of tort law
and block the tort system's shifting of losses from the innocent
victim to the wrongdoer.[336] Governmental entities and officers
inflict losses that are every bit as real as those inflicted by
private actors not shielded by immunities. For these reasons,
courts and legislatures in many jurisdictions have limited or
abolished a number of immunity doctrines, most notably immunity
for charitable institutions[337] but also municipal and other govern-
mental unit immunities.[338] Though there may be some logic to
limiting liability for the exercise of government's discretionary
functions,[339] the scope of discretion should not include harassment
or its toleration. School districts and their officials have no
discretion to perpetrate or permit racial, sexual, or disability
harassment.[340]

The Supreme Court has been reluctant to find that creation of
immunities from common law liability constitutes a denial of due
process under the Constitution.[341] Although an immunity that
would operate solely to bar causes of action pertaining to disability

---

Specialized Transp. Servs., Inc., 819 P.2d 587, 599 (Kan. 1991) (upholding verdict against bus
company and school district for sexual molestation of student with disabilities); S.P. v. Collier
High Sch., 725 A.2d 1142, 1154 (N.J. Super. Ct. App. Div. 1999) (reversing dismissal of action
against principal by student-victim of sexual harassment on school bus).

336. JERRY J. PHILLIPS ET AL., TORT LAW 770 (2d ed. 1997) (noting that arguments in favor
of immunity for government "are gradually losing out to better ones," such as loss of
deterrence, unfairness of shifting of losses from beneficiaries of government activity to
victims, and considerations regarding insurance availability).

337. E.g., President & Dirs. of Georgetown Coll. v. Hughes, 130 F.2d 810, 827 (D.C. Cir.
1942); Albritton v. Neighborhood Ctrs. Ass'n for Child Dev., 466 N.E.2d 867, 871 (Ohio 1984).

338. See DOBBS, supra note 212, § 260, at 694 ("[I]t is now usually accepted that
government, instituted to protect and foster the well-being of citizens, should be obliged to
make good on the losses it causes by misconduct.").

339. See RICHARD A. EPSTEIN, TORTS § 22.6.2, at 624 (1999) ("Although some might lament
the broad range of government activities, once that decision is made it is difficult to quarrel
with using the discretionary function exception to protect the agents of the new regulatory
state.").

340. See Berkovitz v. United States, 486 U.S. 531, 548 (1988) (permitting liability under
Federal Tort Claims Act for licensing of polio vaccine in light of absence of discretion to
approve license without required test data).

341. See Martinez v. California, 444 U.S. 277, 283 (1980) (upholding immunity from suit
conferred on state employees).

might be viewed as discriminatory and therefore a violation of equal protection,[342] typically the relevant immunities are not so narrowly drawn as to be vulnerable on that ground. The Supreme Court has recently held that state defendants may assert immunity in the state's own courts even on federal causes of action, unless the immunity has been waived or validly abrogated.[343] The questions of waiver and abrogation of state sovereign immunity from federal claims overlap with the same inquiries with regard to Eleventh Amendment immunity from suit on federal claims in federal court.[344]

### 2. *Eleventh Amendment Immunity*

Elementary and secondary school districts are municipal corporations rather than arms of the state, and so Eleventh Amendment immunity does not protect them.[345] Nevertheless, some public entities that provide educational services are state agencies, such as state schools for children who are blind or deaf, and schools on the site of state institutions for children with developmental disabilities or mental illness. State defendants in these settings may attempt to claim Eleventh Amendment immunity from harassment causes of action brought in federal court.[346] Because so

---

342. Government discrimination against persons with disabilities may violate Fourteenth Amendment equal protection. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 447-50 (1985) (finding that zoning exclusion of group home for people with mental retardation violated Equal Protection Clause).

343. In suits brought in state courts by private individuals, states may assert their sovereign immunity on claims based on federal statutes, unless the sovereign immunity is validly abrogated. Alden v. Maine, 527 U.S. 706, 754-57 (1999).

344. States are totally immune from unconsented suit in federal court on state law causes of action. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). *Compare* George D. Brown, *Beyond* Pennhurst—*Protective Jurisdiction, the Eleventh Amendment, and the Power of Congress to Enlarge Federal Jurisdiction in Response to the Burger Court*, 71 VA. L. REV. 343 (1985) (criticizing *Pennhurst*), *with* Ann Althouse, *How to Build a Separate Sphere: Federal Courts and State Power*, 100 HARV. L. REV. 1485 (1987) (defending result in *Pennhurst*).

345. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280-81 (1977) (finding Eleventh Amendment immunity not to bar suits against municipalities such as school districts).

346. If suit is brought against the state officials for their own actions in directly harassing a student with disabilities, Eleventh Amendment immunity does not shield them. *See* Hafer v. Melo, 502 U.S. 21, 25-26 (1991) (finding personal liability for political firings not barred

many harassment cases concern conduct that occurred in the past rather than ongoing conduct,[347] the Eleventh Amendment barrier to retrospective monetary remedies is a serious obstacle to enforcement of the right to be free from harassment, even in cases of blatant or acknowledged violations of the law.[348]

The Eleventh Amendment's text appears merely to limit the provision in Article III of the Constitution establishing federal court diversity jurisdiction.[349] The Amendment bars foreigners and

---

by immunity). Nevertheless, many state school employees do not have assets to pay a judgment or cannot be identified. If the plaintiff claims that the state is responsible for the conduct, the state will assert immunity, and it does not matter that state officials are sued rather than the state or state agency itself. *See* Edelman v. Jordan, 415 U.S. 651, 663 (1974) (barring action against state official when state treasury provides source of recovery).

347. Except in very limited circumstances, federal courts retain the power to enjoin ongoing violations of federal law under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908).

348. There is a wealth of scholarship on the Eleventh Amendment. For a valuable collection of recent articles, see Symposium, *State Sovereign Immunity and the Eleventh Amendment*, 75 NOTRE DAME L. REV. 817 (2000).

349. Proponents of the view that the Amendment ought to be limited to this impact include Justices Stevens, Souter, Ginsburg, and Breyer. *See* CHEMERINSKY, *supra* note 195, § 7.3, at 396 n.1. Justice Brennan explained the position at length in *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 258-59 (1985) (Brennan, J., dissenting). The current majority of the Court disagrees with Justice Brennan's diversity view and holds that the Amendment stands for a broad-ranging immunity from suit, including immunity from claims by defendant-state citizens and immunity when the suit's jurisdictional basis is a federal question. *E.g.*, Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996) ("Although the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, 'we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms.'") (quoting Blatchford v. Native Village of Noatak, 501 U.S. 775, 779 (1991)). That position is hotly disputed by four Justices. *Id.* at 130 (Souter, J., dissenting) (joined in dissent by Justices Stevens, Ginsburg, & Breyer). Scholarship on the Eleventh Amendment generally supports the idea that the Amendment is limited in its operation to diversity cases. *E.g.*, William A. Fletcher, *A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather Than a Prohibition Against Jurisdiction*, 35 STAN. L. REV. 1033 (1983); John J. Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation*, 83 COLUM. L. REV. 1889 (1983); David L. Shapiro, *Wrong Turns: The Eleventh Amendment and the* Pennhurst *Case*, 98 HARV. L. REV. 61 (1984); *see also* Pennsylvania v. Union Gas Co., 491 U.S. 1, 24 (1989), *overruled by* Seminole Tribe v. Florida, 517 U.S. 44 (1996) (Stevens, J., concurring) ("Justice Brennan's opinion in *Atascadero* and the works of numerous scholars have exhaustively and conclusively refuted the contention that the Eleventh Amendment embodies a general grant of sovereign immunity to the States . . . .") (citation omitted). *But see* Lawrence C. Marshall, *Fighting the Words of the Eleventh Amendment*, 102 HARV. L. REV. 1342 (1989) (challenging diversity theory); William P. Marshall, *The Diversity Theory of the Eleventh Amendment: A Critical Evaluation*, 102 HARV. L. REV. 1372 (1989) (same). Still another view is that the Amendment represents a broad federal common law immunity that is nevertheless totally subject to congressional

citizens of other states from suing a state in a federal court, and it
originated in the controversy that followed a Supreme Court case
upholding the ability of out-of-state or foreign holders of state
obligations to collect against a state government by suing in federal
court.[350] Under the Supreme Court's case law since 1890, however,
the Amendment has come to represent a broad immunity from
private suit in federal court that may be asserted by state
defendants. The immunity extends to suits by citizens of the state
being sued,[351] and it extends to actions when there is federal
question or another basis for jurisdiction, not just when diversity is
the reason the case is in federal court.[352]

Eleventh Amendment immunity may present an obstacle to
monetary claims against state entities for harassment in the school
setting, but two doctrines are available to escape the operation of
the immunity. One is the recognized authority of Congress to
abrogate the immunity; the other is the states' own power to waive
the immunity. In *Fitzpatrick v. Bitzer*,[353] the Court held that
Congress has the power to abrogate Eleventh Amendment
immunity if it imposes liability on states using its power under
Section 5 of the Fourteenth Amendment, the amendment's
enforcement provision.[354] Congress intended to act pursuant to its
Section 5 authority to enforce the Equal Protection Clause when it
made the ADA and section 504 damages remedies apply to the
states.[355]

---

abrogation. *See* Vicki C. Jackson, *The Supreme Court, the Eleventh Amendment, and State
Sovereign Immunity*, 98 YALE L.J. 1 (1988).

350. *See* Hans v. Louisiana, 134 U.S. 1, 10-11 (1890) (describing history of Eleventh
Amendment); *cf.* Chisholm v. Georgia, 2 U.S. (2 Dall.) 419 (1793) (enforcing debt obligation
against Georgia).

351. *See Hans*, 134 U.S. at 18 (holding states immune from suit by same-state citizens);
*see also* Edelman v. Jordan, 415 U.S. 651 (1974) (reaffirming immunity of states from suit
by same-state citizens).

352. *E.g.*, *Seminole Tribe*, 517 U.S. at 64.

353. 427 U.S. 445 (1976).

354. *Id.* at 445-46.

355. 42 U.S.C. § 12101(b) (1994) (stating intention to exercise Fourteenth Amendment
power in passage of ADA); *see* Smith v. Robinson, 468 U.S. 992, 1016-18 (1984) (noting "equal
protection premise" of section 504). The statutes might also be considered exercises of
authority over interstate commerce, of course, and section 504 is also an exercise of
conditional spending power. These additional bases of authority are important with regard
to the statutes' application to nongovernmental entities, for the traditional rule has been that

The Supreme Court, however, has recently placed limits on what Congress may do under its Section 5 powers, finding in several cases that statutes proscribed conduct too far afield from what the Court had established were violations of the Fourteenth Amendment. In each of those cases, *City of Boerne v. Flores* (concerning the Religious Freedom Restoration Act),[356] *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank* (Patent Remedy Act),[357] *United States v. Morrison* (Violence Against Women Act),[358] and *Kimel v. Florida Board of Regents* (Age Discrimination in Employment Act),[359] the Court found that the statutes imposed duties that were not congruent with and proportional to the constitutional violations they sought to remedy, and so the Court held the statutes not to be proper exercises of Section 5 authority.

Most recently, the Supreme Court ruled in *Board of Trustees of the University of Alabama v. Garrett*[360] that Congress did not validly abrogate state immunity from suit for damages in an employment case brought under title I of the ADA. An employee brought an action against the trustees of a state university for damages for disability discrimination under titles I and II of the ADA and section 504, and her case was consolidated with that of an employee of the Alabama Department of Youth Services asserting violations of those laws as well as the Family and Medical Leave Act.[361] Alabama argued that the ADA and section 504 exceeded the Section 5 power because the reach of those statutes lacks a congruence with

---

congressional power under the Fourteenth Amendment does not permit obligations to be imposed on private actors. *See* The Civil Rights Cases, 109 U.S. 3 (1883).

356. 521 U.S. 507 (1997).

357. 527 U.S. 627 (1999).

358. 529 U.S. 598 (2000).

359. 528 U.S. 62 (2000).

360. 531 U.S. 356 (2001). Chief Justice Rehnquist wrote the majority opinion. Justice Kennedy, joined by Justice O'Connor, filed a brief concurrence, and Justice Breyer dissented in an opinion joined by Justices Stevens, Souter, and Ginsburg. *See supra* text accompanying notes 244-50 (discussing *Garrett*).

361. The Family and Medical Leave Act claim failed on the ground that it was not a valid exercise of Fourteenth Amendment power so as to permit abrogation of state immunity. Garrett v. Univ. of Alabama at Birmingham Bd. of Trs., 193 F.3d 1214, 1219-20 (11th Cir. 1999), *rev'd sub nom.* Board of Trs. of the Univ. of Alabama v. Garrett, 531 U.S. 356 (2001). This aspect of the holding provoked a dissenting opinion. *Garrett*, 193 F.3d at 1220-35 (Cook, J., dissenting).

and proportionality to the violations of the Fourteenth Amendment that they seek to remedy. The court of appeals, however, found for the employees, relying on an earlier holding,[362] which concluded that in enacting the ADA, Congress acted on the basis of ample evidence of purposeful unequal treatment of people with disabilities by state and local government, and thus the congressional response was within its powers under Section 5.[363] The *Garrett* court extended that holding to section 504, relying on similar evidence that Congress sought to remedy and prevent violations of equal protection.[364]

The Supreme Court reversed.[365] It restricted its decision to employment claims against states under title I of the ADA, however, dismissing certiorari on the question whether employees may sue their state employers for damages under title II.[366] As described above in connection with *Garrett's* treatment of equal protection, the Court reasoned that mere rational-basis scrutiny applies to Fourteenth Amendment claims of disability discrimination by state government, so special accommodations are not constitutionally required.[367] The Court found there was no congressional identification of a pattern of unconstitutional employment discrimination against people with disabilities by the states, and that the provisions of the statute were not proportional to and congruent with the constitutional violations.[368] According to the Court, not only does title I's outlawing of failure to provide reasonable accommodation exceed the constitutional duty, but also its forbidding of practices that create unjustified disparate impacts on people with disabilities exceeds barring the kinds of intentional conduct that violate the Fourteenth Amendment.

---

362. Ironically, the holding was the other half of the *Kimel* case, in which the employee sued under the ADA for the same conduct that was the basis of the ADEA claim. *Kimel*, 139 F.3d 1426, 1433 (11th Cir. 1998), *aff'd*, 528 U.S. 62 (2000).

363. *Garrett*, 193 F.3d at 1218.

364. *Id.* at 1218-19.

365. *Garrett*, 531 U.S. 356.

366. *Id.* at 360 n.1. The Court apparently did not view the section 504 issue as covered by the grant of certiorari, for it did not mention it at all.

367. *See id.* at 367. *Garrett's* implications for equal protection claims based on disability discrimination are discussed *supra* text accompanying notes 244-50.

368. *Garrett*, 531 U.S. at 369-72. The Court also stressed that private individuals remain free to enforce title I against states in actions for injunctive relief. *Id.* at 374 n.9.

The impact of the case remains uncertain because of the Court's reservation of decision regarding title II.[369] The Court distinguished the record of violations relating to employment from that relating to state and local governmental services in general, where discrimination was more heavily documented.[370] It is this latter arena—including services to children in schools operated by state and local government—that title II governs. The Court has on more than one occasion suggested that at least a denial of minimum access to a meaningful education violates equal protection,[371] and as noted above, constitutional claims exist under multiple theories for disability harassment in school, so a damages remedy for that constitutional deprivation would pass muster under *Garrett*'s approach.

As a more general matter, *Garrett*'s emphasis on the reasonable-accommodation obligation of title I and its discussion of title I's prohibition of practices with disparate impacts raise the negative inference that when state conduct actually does amount to a constitutional violation, a statute may provide a cause of action that abrogates state immunity. In other words, when the ADA provides a remedy for government mistreatment that is motivated by hostility against people with disabilities or by fear and stereotypes that meet constitutional standards of intentionality, it is a

---

369. One of the first commentaries on the case predicted that the Court would bar damages claims under title II as well, but did not give reasons for the forecast. Linda Greenhouse, *Justices Give the States Immunity From Suits by Disabled Workers*, N.Y. TIMES, Feb. 22, 2001, at 1. Greenhouse wrote:

> The justices will soon consider whether to take up a state immunity claim under the section of the Americans With Disabilities Act that requires government agencies to make their services, programs and activities accessible to people with disabilities. . . . Under the analysis the court applied today, there is every reason to suppose that the justices will find the states immune from suit under this section as well as the employment section.

*Id.* As indicated in the text, title II merits different treatment and at least some title II claims, such as those based on harassment, clearly support abrogation of immunity from damages. *See infra* text accompanying notes 371-72.

370. *See Garrett*, 531 U.S. at 371 & n.7.

371. *Compare* San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 54-59 (1973) (finding no equal protection violation in unequal school resources in light of absence of absolute deprivation of education), *with* Plyler v. Doe, 457 U.S. 202 (1982) (finding violation of equal protection in exclusion of illegal alien children from public school), *and* Lau v. Nichols, 414 U.S. 563 (1974) (finding absence of Chinese language instruction to violate title VI of Civil Rights Act of 1964).

congressional enforcement measure that is proportional to, and congruent with, the prohibition in the Constitution. Disability harassment is precisely the kind of intentional conduct motivated by hostility or the desire to subordinate that exceeds the standard established in *Cleburne* for an equal protection violation.

To make the comparison to *Cleburne* more precise, not only do the state officials deny the permit to the group home, but they then humiliate or abuse the would-be residents or they are deliberately indifferent when those under their control do so. No matter whether *Cleburne* is viewed as a rational-basis case or something more, it established that the Equal Protection Clause forbids conduct that lacks any sensible justification and that works harm on a defined class of people with disabilities. There is no justification for harassment under any constitutional standard. *Garrett* does not bar a damages remedy under the ADA in that case, one far different under the Court's analysis[372] from a reasonable-accommodation-in-employment claim.[373]

Harassment claims may be brought under section 504 and IDEA as well as the ADA. Both section 504 and IDEA are exercises of Fourteenth Amendment enforcement authority,[374] but states might

---

372. As noted, *supra* note 248 (discussing accommodations), an approach other than that of the Court's might view the failure to accommodate less charitably and find it the product of stereotypes about disability and the impact of the environment on disability. One does not need to adopt such an approach to consider harassment to be within the core of the conduct barred by the Fourteenth Amendment.

373. While concluding that ADA title II generally exceeds the scope of congressional authority under Section 5 of the Fourteenth Amendment, the Second Circuit has ruled that monetary remedies under the title are congruent with and proportional to the reach of the Fourteenth Amendment, if damages are permitted only in cases where there is discriminatory animus or ill will based on the plaintiff's disability. Garcia v. S.U.N.Y. Health Sciences Ctr., No. 00-9223, 2001 WL 1159970, at *8 (2d Cir. Sept. 26, 2001). So limited, title II money claims against states comport with congressional power under Section 5 and are not subject to Eleventh Amendment immunity. *Id.* at *9 ("Government actions based on discriminatory animus or ill will towards the disabled are generally the same actions that are proscribed by the Fourteenth Amendment,—i.e., conduct that is based on irrational prejudice or wholly lacking a legitimate government interest."). The Second Circuit's interpretation of Eleventh Amendment immunity would thus permit damages against state entities for intentional wrongdoing such as disability harassment.

374. Smith v. Robinson, 468 U.S. 992, 1019 (1984) (finding "equal protection premise" behind both statute now designated as IDEA and section 504); Parks v. Pavkovic, 753 F.2d 1397, 1407 (7th Cir. 1985) (finding statute now designated as IDEA to be valid exercise of power under Fourteenth Amendment).

raise the same question they have raised regarding the ADA about whether the statutes exceed that power. For the same reasons that the ADA is within Congress's Fourteenth Amendment power, at least with regard to harassment claims against states, so too section 504 and IDEA are proper uses of the authority. Even if the Supreme Court were ultimately to disagree with those arguments, however, section 504 and IDEA would be constitutionally proper exercises of congressional power under the Spending Clause.[375] The spending for which the two statutes provide is for the general welfare, and the conditions that they impose are not coercive; a state may decline the money if it wishes.[376] In the last seventy years, the Court has not found a single federal statute unconstitutional on the ground that it exceeded the scope of that authority.[377]

The successful defense of the statutes as exercises of spending power has consequences for the Eleventh Amendment immunity analysis regarding waiver. Although the Court has previously found that the mere assertion of a claim for violation of a spending-power statute under section 1983 does not abrogate Eleventh Amendment immunity from damages liability,[378] it has always affirmed that state governments may waive the immunity.[379] Acceptance of

---

375. Jim C. v. United States, 235 F.3d 1079 (8th Cir. 2000) (finding section 504 to be proper exercise of spending power); Bradley v. Arkansas Dep't of Educ., 189 F.3d 745 (8th Cir. 1999) (finding IDEA to be valid exercise of spending power), *vacated on other grounds,* Jim C. v. Arkansas Dep't of Educ., 197 F.3d 958 (8th Cir. 1999).

376. *See Jim C.,* 235 F.3d at 1082 ("The sacrifice of all federal education funds ... would be politically painful, but we cannot say that it compels Arkansas's choice.").

377. The Court rejected a challenge to a spending-clause statute in *South Dakota v. Dole,* 483 U.S. 203 (1987), and although dicta in that case suggest that there might be some limits on Congress's spending power, the restrictions pose no threat to section 504 or IDEA. *See id.* at 207-08 (describing possible limits on spending power); *see also* Leonard, *supra* note 234, at 180-83 (detailing how section 504 meets *South Dakota v. Dole* standards).

378. Edelman v. Jordan, 415 U.S. 651 (1974) (upholding Eleventh Amendment immunity in case brought under Social Security Act and section 1983). This rule was extended to section 504 in *Atascadero State Hospital v. Scanlon,* 473 U.S. 234 (1985). Congress responded to the *Atascadero* decision by enacting an abrogation of immunity for section 504 suits. *See* Pub. L. No. 99-506, 100 Stat. 1807 (1986) (codified as amended at 29 U.S.C. § 701 (1994 & Supp. V 1999)). Similarly, Congress prospectively overruled *Dellmuth v. Muth,* 491 U.S. 223 (1989), which found that the statute that is now IDEA did not clearly abrogate Eleventh Amendment immunity, by enacting an explicit abrogation. *See* Pub. L. No. 101-476, 104 Stat. 1103, 1106 (1990) (codified as amended at 20 U.S.C.A. § 1403 (2000)).

379. *See* Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275 (1959).

federal funds after Congress enacted a clear abrogation of immunity in section 504 and IDEA[380] is a waiver of Eleventh Amendment immunity.[381] The state knowingly relinquishes immunity from suit in federal court for damages in exchange for the federal money that is provided subject to the relinquishment.

## IV. TAKING DISABILITY HARASSMENT SERIOUSLY

School personnel, parents, and others should act voluntarily to establish a climate in which harassment is not tolerated,[382] but the legal system operates as the ultimate tool to ensure equal participation in school without harassment for children with disabilities.[383] Taking disability harassment seriously and acting to stop it will be, as far as the legal system is concerned, a matter of claims and remedies, and a matter of defenses to liability.

---

380. The Eighth Circuit found the exaction of the waivers clear and unambiguous. *Jim C.*, 235 F.3d at 1081 ("The Rehabilitation Act requires States that accept federal funds to waive their Eleventh Amendment immunity to suits brought in federal court for violations of Section 504."); *Bradley*, 189 F.3d at 753 ("When it enacted §§ 1403 and 1415, Congress provided a clear, unambiguous warning of its intent to condition a state's participation in the IDEA program and its receipt of federal IDEA funds on the state's waiver of its immunity from suit in federal court on claims made under the IDEA.").

381. *See Jim C.*, 235 F.3d at 1080; *Bradley*, 189 F.3d at 753 (finding that receipt of funds waives immunity from liability for violations of IDEA), *vacated on other grounds,* Jim C. v. Arkansas Dep't of Educ., 197 F.3d 958 (8th Cir. 1999); Clark v. California, 123 F.3d 1267, 1271 (9th Cir. 1997) (finding waiver of immunity under section 504 by acceptance of federal funds); *see also* Marie O. v. Edgar, 131 F.3d 610, 617-18 (7th Cir. 1997) (suggesting in case for nonmonetary relief that receipt of funds after statutory abrogation of Eleventh Amendment immunity may work as waiver of immunity). *Contra* Garcia v. S.U.N.Y. Health Scis. Ctr., No. 00-9223, 2001 WL 1159970, at *11 (2d Cir. Sept. 26, 2001) (holding waiver ineffective on theory that state would have assumed immunity validly abrogated, and thus failed to make knowing decision).

382. An effective program to combat harassment includes establishing policies against offensive conduct, training staff and students about harassment, encouraging persons who have been harassed to make reports, investigating reports thoroughly and promptly, and disciplining effectively all those who engage in harassment. *See, e.g.*, Steven D. Baderian et al., *Managing Employment Risks in Light of the New Rulings in Sexual Harassment Law*, 21 W. NEW ENG. L. REV. 343, 364-67 (1999) (describing steps to prevent and respond to workplace sexual harassment).

383. *Cf.* Weber, *supra* note 248, at 136 (describing operation of ADA in employment cases as effort to change "the calculus of employers' self-interest" through threat of liability).

## A. Claims and Remedies

There is no shortage of legal claims that may be brought for disability harassment. The disability discrimination statutes, the special education laws, the common law, and the Constitution all impose duties to avoid harassment and stop tolerating it. What is needed, however, is a serious response that will actually have an impact on the behavior of school systems, express society's disapproval of the behavior, and make the victims whole for their humiliation.

This response must come in the form of damages.[384] Accordingly, the legal theories that matter are those establishing violations of section 504 and title II with a sufficient showing of intent to support an award of damages; or violations of IDEA and the Constitution made actionable under section 1983, supporting an award of damages; or common law causes of action that support awards of damages.

The legal developments to arrive at these results are in place. Many courts have recognized the causes of action. The intent requirement, though it may be an obstacle in some cases, is hardly an insurmountable one.[385] The analogy to teacher and peer sex harassment cases, which establishes that damages liability exists if school officials are deliberately indifferent to known acts of harassment, provides a workable standard for a large number of cases.[386] Individual liability under the common law or constitutional theories, supported with direct evidence or other means of showing intent, will come to the fore in others. Common law remedies will be a backstop if other means fail.

## B. Defenses

The pattern of cases suggests that developing means of surmounting defenses is even more important than developing the underlying claims. To take disability harassment seriously and treat it properly, courts need to excuse exhaustion of administrative

---

384. *See supra* text accompanying notes 122-60, 224-28.
385. *See supra* text accompanying notes 124-46.
386. *See supra* text accompanying notes 113-21, 142-45.

remedies. The theory is in place. Only compensatory damages are an adequate remedy for harassment, but compensatory damages are not available through the administrative process under IDEA.[387] Accordingly, neither the special education statute's language nor any sensible construction of congressional intent supports the imposition of an exhaustion requirement.

Qualified immunity defenses depend on whether disability harassment violates an established right about which the defendant should have known.[388] By now, any potential defendant should know enough not to personally engage in harassing conduct, and not to be deliberately indifferent to known harassment engaged in by those under his or her supervision, be they employees or students. The wiser judicial opinions recognize this reality. Sober consideration of the nature of harassment and the harms it produces should influence other courts to join those that have reached the conclusion that immunity is not available under those circumstances.

General governmental immunity and its applicability depend on state legislators' decisions about whose interests are more important—those who hold the localities' checkbooks or those who are victims of illegal, harmful conduct. Eleventh Amendment immunity depends on the decisions of a thoroughly divided group of nine, but the reasoning of even those who support immunity in many circumstances does not support an overturning of the abrogation of the immunity worked by title II of the ADA in harassment cases.[389] Still less would it place any obstacle in the path of waiver of the immunity under section 504.[390]

## CONCLUSION

As an agenda for law reform, the doctrinal developments suggested above are modest indeed. They consist simply of following the better-reasoned precedents in connection with liability, remedies, and defenses for disability harassment. If those modest

---

387. *See supra* text accompanying notes 171-72.
388. *See supra* text accompanying notes 318-19.
389. *See supra* text accompanying notes 369-73.
390. *See supra* text accompanying notes 374-81.

steps are taken, the courts will begin to give a serious, effective judicial response to the social problem of disability harassment in the public schools.