UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO.: 04 - 10003 PBS

Ann Marie Porto and Nicholas Porto,      )
Individually and on Behalf of S.C., a         )
Minor Person with a Disability,                 )
                                                                    )
                              Plaintiffs                        )
                                                                    )
vs.                                                                )
                                                                    )
Town of Tewksbury                                      )
                                                                    )
                              Defendants                     )

## DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

### Introduction

The Plaintiffs brought an action against the Defendant Town of Tewksbury (hereinafter the "Town" or the "school") claiming that the minor plaintiff, SC, was subjected to severe and pervasive sexual harassment by his classmate, a fellow minor, RC, while they were both students in the Tewksbury Public Schools. The Plaintiffs claimed that the Town violated Title IX because, they alleged, the School and its employees were aware that SC was being sexually harassed by his classmate and were deliberately indifferent in their response. The Plaintiffs further contended that the Town discriminated against SC on the basis of his disability in violation of Title II. After trial, a jury returned a verdict on October 21, 2005 against the Town on the Plaintiff's Title IX claim and in favor of the Town on the plaintiff's Title II claim. The jury awarded the Plaintiffs $250,000 in compensatory damages and $1 in punitive damages. The Court entered judgment on November 10, 2005. The Town hereby requests that this Court enter judgment notwithstanding the verdict against it on the Title IX claim or order a new trial on that claim.

1

## I.    The Defendant is Entitled to Judgment Notwithstanding the Verdict on the Title IX Claim

The Defendant Town of Tewksbury hereby requests that this Court enter judgment notwithstanding the verdict on the Title IX claim on the grounds that the Plaintiffs failed to introduce sufficient evidence on any of the key prongs of proof necessary to support a verdict against the Defendant regarding such claim.

The right to recover against schools for student on student sexual harassment is a relatively new cause of action created by the United States Supreme Court in 1999. The Supreme Court set high standards of proof necessary to support such a claim, none of which were met in the instant case.  In order for a plaintiff to prevail on a Title IX claim against a defendant school district for student-on-student harassment, he must show that he was the victim of sexual harassment, that the harassment was so severe, pervasive and objectively offensive in nature that he was effectively barred access to an educational opportunity or benefit and that the defendant school district acted with deliberate indifference to acts of harassment in its programs or activities of which it had actual knowledge.  See Davis v. Monroe County Board of Education, 526 U.S. 629  (1999); see also Doe v. Lennox School District No. 41-4, 329 F. Supp.2d 1063 (D. South Dakota 2003);  Hawkins v. Sarasota County School Board, 322 F.3d 1279 (11th Cir. 2003).   The Plaintiff here failed to present sufficient evidence at trial to support any of these requirements in order to prevail on his Title IX claim.

### A.    Sexual Harassment

In creating and interpreting a cause of action for student on student sexual harassment in a school setting, all prior courts have been clear that the claimant

2

has to be the victim of a "harasser". There has been no previous reported case where mutual inappropriate sexual conduct between two students has been recognized as forming the basis of a student on student sexual harassment claim by one of the participants. However, in this action, the Plaintiffs were allowed to proceed on the theory that any sexual conduct between these two boys was "harassment" as to both of them because neither was capable of "consent". The Defendant suggests that the Plaintiffs misconstrued both the law and the defense in this case.

The Defendant agrees with the Court's pre-trial ruling that consent is not a proper defense to a sexual harassment action; however, this concept is only true in some circumstances, not in the circumstances of this case. Moreover, the Defendant suggests that even if consent is not a defense, the plaintiff still has to prove that the "harasser" initiated the conduct and persuaded the "victim" to agree. Further, in order for consent to be irrelevant, there has to be a differential in capacity between the initiator of sexual activity and the Plaintiff. In this case, the two participants were of equal capacity, indeed, the "victim" was older than the "harasser"; thus the question of whether one was a "harasser" and another a "victim" was a relevant question of fact and a necessary element of proof of the claim which was eliminated by the court.

The Plaintiff has relied on the case of <u>Mary M. v North Lawrence Community School Corporation,</u> 131 F. 3d 1220, 1998 ( 7th Cir.  1998) to suggest that the fact that SC welcomed the sexual behavior with SC was not relevant and that any sexual conduct between SC and RC was per se harassment. However, that case is inapplicable and this theory is untenable.  In <u>Mary M.</u>, the Plaintiff was a 13 year-old student who became involved in a "consensual" sexual

3

relationship with a 21 year-old school employee. The Defendant argued that the question of consent by the 13 year-old student to the advances of the 21 year-old employee was an issue to be presented to the jury. The court disagreed and ruled that welcome ness was not a proper inquiry in Title IX cases involving sexual discrimination of elementary school children because they were too young to consent to sexual advances. First, a point of crucial distinction is the fact that Mary M. was a case of an employee harassing a student, not student on student harassment. Second, the court in no way removed the requirement that there be a harasser. It is clear that in Mary M., the 21 year-old initiated the sexual activity with the 13 year-old victim, thus can be said to have harassed her.

The question has been addressed in various court opinions. Indeed, when courts in peer-on-peer cases sexual harassment cases brought under Title IX considered the question of capacity, rather than focus on the Plaintiff's capacity to consent, they have questioned whether the claim was even viable if the alleged "harasser" was a young child. "There is a threshold question, altogether reasonable or rational, whether a five or six year old kindergartner can ever engage in conduct constituting 'sexual harassment' or 'gender discrimination' under Title IX. Common sense at least would reject any such extension of Title IX." Gabrielle M. v. Park-Forest-Chicago Heights, Illinois School District 315 F.3d 817, 821-22 (7th Cir. 2003). In this case, there is a serious question whether either of the two boys can be deemed a "harasser" so that any action under title IX can even lie. The Defendant suggests that lack of capacity of the plaintiff to consent to sexual activity does not convert all sexual behavior to harassment. However, the lack of capacity of the harasser may well eliminate a Title IX claim altogether.

4

As such, for this Plaintiff to prove a Title IX claim of peer-on-peer sexual harassment in circumstances where the capacity of the two individuals involved is equal, there must be proof of harassment -- meaning that there must be a harasser. The term "harass" is defined as "to annoy or torment repeatedly and persistently". Webster's II New College Dictionary. That the offensive touching be unwelcome has universally been a requirement in all reported peer-on-peer sexual harassment cases. For example, in <u>Hawkins</u>, the court found that, "[a]lthough neither the perpetrator nor the victims fully understood its ramifications, the harassment was unwelcome and intimidating." <u>Hawkins</u>, 322 F.3d at 1288. In this case, one can say that neither of the boys fully understood that their sexual behavior had ramifications, however, there was no evidence from which a reasonable finder of fact could determine that it was "unwelcome and intimidating" to SC.

The Plaintiffs failed to establish harassment in this case. They had the burden of proving that RC harassed SC between October of 2000 and January 11, 2001, but did not sustain that burden. There simply was no competent evidence that the sexual conduct between SC and RC in the bathroom was initiated by RC and was offensive, or even troubling, to SC. The touching in October, in the classroom, was mutual. Therefore, there simply was no evidence that the Plaintiff SC was a victim of sexual harassment.

The initial "evidence" presented by the Plaintiffs regarding inappropriate verbal behavior between the boys came from the testimony of Anne Marie Porto. She was allowed to testify about alleged conversations between SC and RC which conversations she claims were relayed to her by SC. This Court had ruled prior to trial that these alleged incidents, which occurred prior to SC attending

fifth grade, were not relevant to this case. However, at the trial the Court allowed the testimony into evidence, over objection, as evidence of "notice," as long as Ms. Porto testified that she told teachers about the conversations. Ms. Porto, however, did not witness any of this behavior. Thus, Ms. Porto's testimony, even if properly admitted, can only be used on the issue of notice to the school and cannot support a finding of sexual harassment stemming from the alleged inappropriate verbal behavior.

In March of 1999, when the plaintiff SC was in the fifth grade, further incidents occurred. SC's older foster sister observed SC, then eleven years old, sexually molesting his seven year-old foster sister in the Porto home. As a result, SC was sent to see a therapist, Bradford Smith. Ms. Porto claimed that Dr. Smith told her that SC had revealed to him an allegation of sexual touching on the school bus between SC and RC. SC testified about the happenings on the school bus at trial and his testimony is the only substantive evidence of what occurred. SC testified that he and RC "kept on touching each other" and that "he put his mouth on my private part". Trial Transcript 6 at p. 16. The testimony was the only competent testimony about what occurred on the school bus presented during the Plaintiff's case. As described, it shows mutual touching, not a victim and harasser.

Ms. Porto told Ms. Paris, SC's fifth grade teacher, that she had learned that SC and RC were engaging in inappropriate sexual behavior on the school bus. Ms. Paris then notified the principal of the school, Loreen Bradley, about Ms. Porto's concerns. Rather than ignore the allegations, the school contacted the Tewksbury Police Department, town counsel and the Department of Social

Services. Despite the fact that no one employed by the school had witnessed any inappropriate behavior, the school took action and put the boys on separate vans.

The school bus incident occurred in March of 1999, during the fifth grade year for both boys. The Plaintiff presented no evidence of any inappropriate behavior for the remainder of fifth grade or during the 1999-2000 school year, sixth grade. Trial Transcript 6 at pp. 23-26. Thus, as far as the school knew, all inappropriate behavior had stopped.

The key events in this action occurred during the seventh grade, at middle school. To prove what occurred, the Plaintiffs first called Robert Ware and Allison Dixon to testify. Ware was the school's behavior management specialist and Dixon was an aide. Mr. Ware testified that in October of 2000, Dixon told him that other aides, Ms. Karl and Ms. Buckley, had witnessed inappropriate touching between SC and RC. Importantly, the Plaintiffs did not call these two aides, the actual witnesses to the claimed touching, to the stand. The two witnesses who testified at trial, Mr. Ware and Ms. Dixon, did not witness any inappropriate behavior themselves.

Mr. Ware testified that one aide, Ms. Buckley, told him that RC put his hands on SC's thigh when they were sitting at a table and that, when they were separated, RC moved closer to SC to put his hands on SC. She also told Mr. Ware that in the gym, RC put his hands under SC with SC sitting on his hands in the bleachers and later the boys reversed positions. Ms. Buckley further told Mr. Ware that "Stephen claims that Richard fondled him." Trial transcript 4 at pp. 10-17; also see, Trial Exhibits 19-22. However, this statement contained in Mr. Ware's notes, attributed to SC, that "Richard fondled him", is clearly hearsay and

7

cannot be proof that RC fondled SC because it is a statement introduced by the Plaintiff.

Mr. Ware testified that the other aide, Ms. Carl, told him that SC placed his hands on RC's thigh, as a result of which she sat between them. On another occasion, SC was touching RC on the thigh. Mr. Ware testified that Ms. Buckley told him that she felt that RC was the initiator of the touching, and that Ms. Carl told him that she felt that SC was the initiator. All three aides told him that they were closely monitoring the boys and were separating them when they saw a problem. Trial transcript 4 at pp. 10-17; also see, Trial Exhibits 19-22.

As noted, the Plaintiff did not call either Buckley or Carl, the aides who had observed behavior, to the stand. The Defendant suggests that absent live testimony from the two percipient witnesses, Ms. Buckley and Ms. Carl, no reasonable finder of fact could conclude which of them was right regarding the question of whether SC or RC was the initiator of the behavior in October. Thus, the evidence of who was initiating the contact in October was thoroughly equivocal. SC himself also testified but did not testify regarding any of the behavior in October 2000.

The evidence at trial was undisputed that once notified of the aides concern about inappropriate touching between the boys, rather than ignore the suspicions, an action plan was developed. Mr. Traveis, the School Adjustment Counselor who the boys saw on a regular basis, would meet with the boys and speak with them. Trial Transcript 4 at pp. 62-67. Mr. Traveis testified at trial that he did meet with the boys and both boys appeared remorseful and promised that the behavior would not occur again. Indeed, it did not.

8

The Plaintiffs presented no evidence that any employee of the Tewksbury Schools, nor for that matter anyone else, was aware of any inappropriate conduct after Mr. Traveis spoke with the boys in October 2000 until January 11, 2001 when Mr. Ware observed the boys in the bathroom with their pants down. With regard to that incident, the evidence is overwhelming that SC was the initiator of the sexual behavior in the bathroom on that day. Mr. Ware testified that SC told him that he was the initiator of that bathroom incident. Trial transcript 4 at pp. 31-34, 73, 74; Trial Exhibit 22.SC. Ms. Porto attended a meeting with the Assistant District Attorney assigned to the potential criminal case, Kate MacDougal, along with representatives from the Tewksbury Public Schools including, the Superintendent Dr. McGrath, Mr. McGuire and Mr. Ware. During that meeting, SC admitted that he was the initiator of the conduct in the bathroom which provoked an explosive outburst against him by Ms. Porto. Trial transcript 4 at pp. 73, 74. At the trial, SC testified that "me and Richard started touching each other in the bathroom". During cross-examination, when asked if he and RC would ask each other before they touched each other, SC answered "I believe so". Trial transcript 6 at pp. 39, 40.

The only other source of evidence as to what happened in seventh grade comes from the DSS 51B report and testimony from the DSS worker at trial. However, the Court ruled that the contents of the 51B report were not admitted for the truth of the matter, but only to show the foundation for the DSS opinion. Thus, the statements of SC and RC contained in the DSS report are not competent evidence of the incidents themselves. Even if this Court were to consider the statements by the boys made to the DSS worker, RC stated that SC was the

9

instigator and he was the victim. Further any statements by SC contained in that report cannot be used substantively by the Plaintiff to support their claim.

Finally, when asked several years later by his treating social worker whether, "he was touched in a sexual way that made him feel scared or unsafe?", SC's response was, "no". Trial Exhibit 50.

Mr. Ware only observed one incident of sexual behavior in the bathroom. At trial, SC only testified about the one incident. Any evidence about other incidents in the bathroom came only from two sources. The DSS report suggests three incidents in total, with RC describing them as conduct initiated by SC. Again, the contents of the report are hearsay. Even if they are considered substantively, there is no evidence contained in the report from which a jury could conclude that SC was the victim. While it is certainly Ms. Porto's opinion, it is not supported by the facts reported.

At the time the Plaintiff rested, the above was the only evidence of sexual contact in the seventh grade. The defendant suggests that the above evidence was clearly insufficient to prove that SC was the victim of severe and pervasive known sexual harassment in the seventh grade. The October incidents certainly did not constitute severe and pervasive sexual harassment and the one incident in the bathroom cannot constitute known sexual harassment, since no one knew about it until after it occurred.

During the Defendant's case, Dr. Smith testified that SC circled the number 10 when asked how many times sexual contact occurred in the bathroom. However, there is no further information about these alleged contacts in the testimony, such as when they began, what happened, or who initiated them. SC did not testify about these alleged incidents at trial, he only testified

10

about the one January 11 incident. Absent any elucidation, there is no proof of severe and pervasive known harassment. Any such finding would be left to the imagination of the finder of fact.

The Defendant suggests that the Plaintiff failed to produce competent evidence that RC sexually harassed SC at any time during the seventh grade. There was no evidence from which a reasonable finder of fact could conclude that RC was the aggressor and SC was the victim of sexual activity in the seventh grade that the school knew about and failed to address. As a result, this court should enter a Judgment Not Withstanding The Verdict for the Defendant.

### B.    Severe and Pervasive

Courts have proscribed what behavior would be considered so severe, pervasive and objectively offensive that it can be said to rise to the level of discrimination actionable under the statute. "Having previously held that such harassment is discrimination in the school context under Title IX, this Court is constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute." The statute also requires Plaintiffs to prove that the pervasive harassment 'excluded from participation in' or 'denied benefits of' a recipient's 'education program or activity' on the basis of gender." Davis v. Monroe County Board of Education, 526 U.S. 629, 649, 650 (1999) citing 20 U.S.C. §1681(a). It is not necessary to show an overt, physical deprivation of access to school resources to make out a damages claim for sexual harassment under Title IX, but a Plaintiff must show harassment that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim's educational experience, that the victims are effectively denied equal access to an institution's resources and

11

opportunities. Id. citing <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986). "Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment. By limiting private damages actions to cases having a systematic effect on educational programs or activities, we reconcile the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior, realities that Congress could not have meant to ignore." Id. at p. 652, 653. Peer harassment, in particular, is less likely to satisfy the requirement that the misconduct breach Title IX's guarantee of equal access to educational benefits and have a systematic effect on a program or activity. Id.

Here, the Plaintiffs did not present any evidence that the alleged behavior between the boys had any effect, much less a systematic effect, on educational programs or activities of SC between October of 2000 and January of 2001, or for that matter, at any time. There was no evidence presented at trial that SC's grades dropped during the applicable time period or that he was absent from school. In fact, Dr. McGrath testified that SC had perfect attendance in both the sixth and seventh grade until January 11, 2001 when the decision was made -- after a request from Ms. Porto and upon recommendation of professionals -- that SC be removed from the Wynn Middle School and be placed in a residential setting so that he was not living in Ms. Porto's home. The strict requirement that

12

the alleged harassment have a concrete effect on the educational experience has been illustrated in a number of decisions.

In <u>Hawkins</u> supra, the Court found that the girls in that case, who were clearly victims of severe sexual harassment, nonetheless could not prove that they were barred from educational opportunities for purposes of an action for damages under Title IX. The <u>Hawkins</u> Court found that the record did not reflect concrete, negative effects on either the ability to receive an education or the enjoyment of equal access to educational programs or opportunities. None of the girls in that case had suffered a decline in grades and none of their teachers had observed any changes in their demeanor or classroom participation. The girls testified that they were upset about the harassment, although not enough to tell their parents until months after it began. Two of the girls said they faked being sick four or five times in order not to go to school. However, the <u>Hawkins</u> Court found that even this evidence fell short of demonstrating a systemic effect of denying equal access to an educational program or activity and in a footnote compared facts in other cases"...[A] drop in grades, discovery by her father of a suicide note, seeking an audience with the principal along with other girls who had been victimized by the same student, and conduct that resulted in a sexual battery conviction for the harasser" was sufficient to prove a denial of education. <u>Davis</u>, supra.

In another case, a physically disabled student was battered and sexually assaulted on multiple occasions resulting in self destructive and suicidal behavior, causing her to leave school and enter a psychiatric hospital. <u>Murrell</u>, 186 F.3d at 1243-44. In <u>Vance v. Spencer County Pub. Sch. Dist.</u>, 231 F.3d 253 (6th Cir. 2000). Although the consequences of harassment must not always be as dire

13

in order to trigger liability, the effect on the ability to receive an education must be real and demonstrable …"<u>Hawkins</u>, 322 F.3d at 1289 ftnt 13.

In this action, there was absolutely no evidence that the behavior between RC and SC during the subject period between October 2000 and January 11, 2001 had any negative effect on SC whatsoever. While Ms. Porto testified that he did not like going to school in December of 2000, his attendance was perfect and he missed no school nor did his grades drop. It was undisputed at trial that SC never complained to any school personnel or his parents about his classmate or about anything else relating to school during the seventh grade. Indeed, Ms. Porto testified that he loved school during the seventh grade and she was not aware of any issues whatsoever prior to January 11, 2001. SC was asked at trial …"did it [the sexual activity] make a difference in terms of how you felt about school?" SC answered, "No". Trial transcript 6 at p. 6-32.

The Plaintiffs argued at trial that the fact that SC was removed from the school after he was discovered in the bathroom with his classmate on January 11, 2001 is evidence that he was excluded from an educational opportunity because of the severe and pervasive sexual harassment. The Plaintiff's argument is akin to that made by the Plaintiff in <u>Doe v. Lennox School District No. 41-4</u>, 329 F.Supp. 2d 1063 (D. South Dakota, 2003), where the Plaintiff similarly did not return to the school. There, the Court held that the Plaintiff did not present evidence that the harassment at the school prevented her from access to an educational opportunity or benefit. Rather, the evidence showed that the Plaintiff stopped going to school based on recommendation of a child psychologist and parent's decision that she thought it would be best for her daughter if she didn't see the boy on a regular basis. <u>Doe</u>, 329 F.Supp. 2d at 1068.

14

Here the Court properly instructed the jury in response to a jury question, that the exclusion from access to an educational opportunity or benefit had to have occurred between October 2000 and January 11, 2001, and not as the result of events that occurred after the boys were caught in the bathroom on January 11, 2001.

There is no question that the Plaintiffs failed to introduce any evidence whatsoever on the critical element of negative effect on SC's education in the period of October 2,000 through January 11, 2001 during this trial. In the absence of such evidence, this Court must enter Judgment for the Defendant.

### C.    Actual Knowledge

The Plaintiffs were required to present sufficient evidence from which a jury could find that the Defendant had <u>actual</u> knowledge of severe and pervasive sexual harassment. School systems are only liable for damages where they are deliberately indifferent to sexual harassment of which they have <u>actual</u> knowledge. <u>Davis</u> 526 U.S. 629, 650. The standard is not whether the Defendant "should have known", but what the Defendant actually knew.

It is without dispute that the Plaintiffs presented no evidence that the school knew about any inappropriate behavior between March of 1999 and October of 2000. Regarding the behavior of October 2000, the Defendant suggests that the behavior described by Ms. Buckley and Ms. Carl in their conversations with Mr. Ware, as discussed above, simply does not constitute pervasive and severe sexual harassment in the first instance. Second, there is no evidence that any person other than the two boys involved knew of any behavior in the bathroom of the Middle School until January 11, 2001.

15

The Plaintiffs' case is premised on their improper suggestion that the school <u>should have known</u> of sexual behavior in the bathroom and had they conducted a more thorough or different type of investigation in October of 2000, would have discovered that the boys were engaging in inappropriate behavior in the bathroom of the Middle School prior to January 11, 2001. The Plaintiff's theory is flawed – first because it is legally insufficient and demonstrates the failure to prove actual knowledge as required. Further, there was no evidence that any sexual behavior was in fact occurring in the bathroom in October 2000 to be discovered.  There was absolutely no evidence presented at trial as to when that behavior began or that it had occurred on any date prior to January 11, 2001.

In any event, the Plaintiff's theory of the case is fatally flawed because "should have known" is not the appropriate inquiry under Title IX. The standard is actual knowledge, and it is uncontroverted that no one, not the aides, not the teachers, not even Ms. Porto, had an inkling that the boys were engaging in sexual behavior in the bathroom prior to January 11, 2001.  It is uncontroverted that the school personnel had no knowledge of any inappropriate behavior between SC and RC after Mr. Traveis spoke with them in October 2000 and before they were discovered in the bathroom on January 11, 2001. Accordingly, the evidence is that as far as the school personnel knew, the measures taken in October to stop the known behavior, touching in the classroom, were fully effective.

The absence of evidence of actual knowledge of severe and pervasive sexual harassment requires that this court enter a judgment for the defendant.

**D.    Deliberate Indifference**

16

The Plaintiffs did not present evidence sufficient for a jury to find that the Defendant was deliberately indifferent in its response to the alleged harassment that it did know about. The evidence was clear that each time suspicions were raised of inappropriate behavior between the boys, even prior to October 2000, the Defendant took action and the behavior stopped.

Mrs. Porto alleged in 1999 that the boys were acting inappropriately on the school bus. As a result, the Superintendent contacted Town Counsel, the Police, the District Attorney's Office as well as the Department of Social Services. In order to prevent any further problems, the Superintendent placed the boys on separate vans. The school was aware that the Plaintiff SC was in private counseling to address the sexual behavior alleged and Ms. Paris, SC's fifth and sixth grade teacher, testified that she spoke with SC's counselor, Dr. Smith after the March 1999 bus incident. As a result of the Superintendent's actions, no further incidents occurred between the boys during transportation. Indeed, no improper behavior between the two was observed or reported for the following eighteen months.

The next time the school became aware of a problem was when it was reported that the classroom aides observed the boys touching each other inappropriately on the thighs and on the buttocks. Each time such behavior was observed, the aides took action to stop the behavior by sitting between the boys or separating them. When concerns about such conduct was raised to Mr. Ware, they were not ignored.

Mr. Ware spoke with the aides, the classroom teacher, the case manager as well as the school adjustment counselor and whether or not he spoke with the principal, as he recalls, the decision was made to have the boys speak with the

17

school adjustment counselor with whom they met on a regular basis to discuss the behavior.

**Ware** - I recommended that these boys could see our school adjustment counselor, and I asked Bill to make a recommendation to the team and the teachers…

**Court** - So your follow up was to make sure he did something?

**Ware** - Yes and that he get in touch with the teachers.

**Court** - Did he tell you he had done that?

**Ware** - I believe so.

Trial transcript 4 at p. 29.

**Kesten?** - And Mr. Traveis met with them?

**Ware -** He did.

**Kesten** - And you talked to him afterwards?

**Ware** - I did . He said he met with the boys, they were very apologetic and told Mr. Traveis that it wouldn't happen again.

Trial transcript 4 at p. 64.

The evidence is clear that the Defendant did not ignore the suspicions raised, but rather decided to treat the matter as an opportunity to educate and counsel the boys. After Mr. Traveis spoke with the boys, the behavior stopped. The discussion that Mr. Traveis had with the boys had worked.

**Kesten** -After you talked with Mr. Traveis and he told you that he met with Stephen, for the rest of October for all of November, for all of December up until January 11, did anyone report to you that the conduct had recurred?

**Ware** - No.

**Kesten** - Did anyone report to you that these children had touched each other on the thigh in the classroom?

**Ware -** No.

**Kesten**  - Had anyone reported to you that they had stuck their hands underneath each other in the bleachers?

**Ware** - No

**Kesten**  - ..talked to all the aides?

**Ware** -  I did,

19

**Kesten -** you talked to the teacher?

**Ware -** I did.

**Kesten** - Did any of them tell you of any further problems with these children prior to January 11?

**Ware -** No.

Trial transcript 4 at p. 66.

There was no evidence introduced at trial by the Plaintiffs during their case, or during the Defendant's case for that matter, that even raises an inference that anyone from the Tewksbury Public Schools had any knowledge that the boys continued to touch each other inappropriately after Mr. Traveis spoke with the boys in October 2000 until the boys were caught in the bathroom on January 11, 2001.

Ms. Porto testified that she had no knowledge of any inappropriate behavior during that time period. SC did not testify that any inappropriate behavior occurred other than the touching in the bathroom in January and he certainly did not testify that he told anyone at school about any such behavior after Mr. Traveis spoke to he and RC.

It is clear that if the school takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment. Wills v. Brown University, 184 F.3d 20, 25 (1st Cir. 1999). Here, the evidence not only showed that the school took reasonable measures to address the behavior

20

between the boys when it learned of it, but in fact after the school took these measured, the behavior stopped. Accordingly, there was insufficient evidence introduced at trial to support the Plaintiffs' claim that the Defendant was deliberately indifferent to known acts of inappropriate behavior between the boys. The absence of evidence of deliberate indifference requires the Court to enter judgment not withstanding the verdict on the Plaintiff's Title IX claim and certainly requires the Court to enter judgment notwithstanding the verdict on the jury's aware of $1 in punitive damages.

### E.    Damages

There was no evidence introduced at trial that the Plaintiff suffered any damages as a result of the behavior engaged in between him and RC in the seventh grade. Rather, what is clear from the evidence is that SC did not suffer any emotional distress until he was caught in the bathroom with RC on January 11, 2001. It was only after he was caught that his emotional state began to deteriorate. However, the evidence was clear that his emotional suffering at that time was not linked to his sexual behavior with RC but was solely related to his isolation from his family and his being told by Mrs. Porto that she did not want him to live in her house. Mrs. Porto was clear in front of everyone in attendance at the SAIN hearing that she did not want SC to live with her any more and that she had told him to pack his bags before the meeting as he was not coming back if he was the perpetrator of the conduct with RC. Thus, he was not being banished because he was a victim of harassment, he was banished because he was a perpetrator.

The plethora of evidence introduced at trial clearly showed that most if not all of SC's counseling after January 11, 2001 focused on his sexual molestation of his foster sister, the danger of initiating sexual contact with other young girls, and the effect that it had on his family and his relationship with them. SC was removed from the school setting and from living in the Porto household not because he had been sexually misbehaving with RC, but because he had become a danger to his siblings and fellow students because of his uncontrollable sexual attraction to very young girls. Trial Exhibit 9, 48, 49, and 50.

The best evidence of the cause for SC's problems was contained in the records of Daniel Pilachowski. This clinician interviewed SC in February of 2004. At that time, SC testified that he was sad because he had messed up his sister. He also said that he had never been touched in any sexual way that made him feel scared or unsafe. Trial Exhibit 50. He also admitted, in the portion of the report not allowed into evidence by this court, that his sexual molestation of his sister was extensive, not one time as Ms. Porto suggested, but 4-5 times a week. This admission sheds a great deal of light on why he became attracted to very young girls, not other boys, which attraction persists. However, the jury was not allowed to hear this critical evidence.

The Plaintiffs in this action were obliged to present evidence that it was the claimed sexual harassment by RC in the seventh grade, which caused SC damages. In fact, the Plaintiffs produced evidence of a sexually confused young boy who had abused his foster sister and had become, as a result, a danger to other young people. The sad result of this was that he was placed in a residential facility and was isolated from his family, friends, and classmates. While this is a

22

tragic result, it does not prove that he was damaged by any sexual harassment in the seventh grade.

The evidence in this trial suggested that SC had become sexually uncontrollable well before he entered the 7th grade. There was no evidence introduced that the sexual interactions between SC and RC caused SC to become attracted to very young girls, which is his primary issue and was present in 2001. The Plaintiff's suggestion that RC somehow taught SC how to be sexual with young girls earlier in life is unsupported by any competent evidence and is not actionable under Title IX, or for that matter, under any theory. As a result, there was no showing that the isolation of SC from his loved ones in 2001 was caused by actionable sexual harassment. The absence of evidence of any damage caused to SC by the inappropriate behavior between him and RC in the seventh grade requires the Court to enter judgment notwithstanding the jury verdict awarding the plaintiff $250,000 in damages and $1 in punitive damages.

## II.    The Defendant's Request for a New Trial

The Town hereby requests a new trial based on errors in evidentiary rulings made during the course of the trial as well as errors in the jury instructions given by the Court. Further, the defendant also requests a new trial regarding damages, as the jury award of $250,000.00 in damages is excessive. The specific errors are addressed below.

### A.    Jury Instructions

The Defendant properly objected to several of the jury instructions given by the Court pursuant to Rule 51(c) of the Federal Rules of Civil Procedure and objected to the omission of jury instructions proposed by the defendant as well.

Such errors and omissions by the Court warrant a new trial on the plaintiff's Title IX claim.

### 1.    Jury Instruction No. 13 – First Element Sexual Harassment

The defendant objected to the Courts instruction to the jury as to what constitutes sexual harassment for purposes of the plaintiff's Title IX claim. Specifically, the Court instructed the jury in relevant part as follows:

> ...To show that Richard sexually harassed Stephen, the plaintiff must demonstrate that he was a student who was subjected to harassment based upon his sex and that the harassment was sufficiently severe and pervasive to create an abusive educational environment. **However, if you find that Stephen initiated the sexual touching on any given occasion, he was not the subject of sexual harassment on that occasion. Sexual harassment that creates a hostile educational environment is defined as "sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature." Even if you find Stephen consented to Richard's touching, you may nonetheless determine there was sexual harassment. That is because children of that age and ability cannot legally consent to sexual touching....** Instruction 13 (emphasis added)

The Court's instruction as given is improper because it allows a finding of sexual harassment even if the finder of fact decides that the behavior between RC and SC was mutual and even if the sexual behavior was welcome by SC. In creating and interpreting a cause of action for student on student sexual harassment in a school setting, all courts have been clear that there must be a harasser and a victim. There has been no previous reported case where mutual conduct between two students has been recognized as forming the basis of a student on student sexual harassment claim. However, in this action, the plaintiffs were allowed to proceed on the theory that any sexual conduct between these two boys was "harassment" as to both of them because neither

24

was capable of "consent". Instruction 13 supports this theory and is a clear error of law as it allows a finding of sexual harassment even when the inappropriate behavior was mutual and was welcome by SC.

As stated above, while the Defendant agrees in part with the Court that consent is not a proper defense in a sexual harassment action in some circumstances where there is a differential in capacity between the initiator of sexual activity and the plaintiff, here the two participants were of equal capacity thus the question of whether one was a "harassor" and another a "victim" and whether the behavior was "welcome" by the alleged victim is relevant. That offensive touching be unwelcome has universally been a requirement in all reported peer-on-peer sexual harassment cases. The defendant had requested that the Court instruct the jury as to the need to find that the sexual advances were "unwelcome". The case law is clear that the gravaman of any sexual harassment claim is that the alleged sexual advances were unwelcome. <u>Meritor Savings Bank FSB v. Vinson</u>, 477 U.S. 57 (1986); <u>Beaupre v. Cliff Smith & Associates</u>, 50 Mass. App. Ct. 480 (2000). In the defendants Supplemental Proposed Jury Instructions filed with the Court on October 17, 2005, the Defendant requested such an instruction. In addition, the defendant requested that the Court instruct the jury as follows:

> 4.    Sexual activity among students who are voluntary participants absent evidence of unwelcome sexual advances, cannot be characterized as sexual harassment. <u>Winzer v. School District for the City of Pontiac</u>, 2004 WL 1543160 (6th Cir. Mich. 2004) citing, <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 68 (1986)("the gravaman of any sexual harassment claim is that the alleged sexual advances were 'unwelcome'). <u>29 C.F.R. § 1604.11(a)(1985)</u>".

5.   If you find that the sexual behavior alleged was mutual between S.C. and R.C., the behavior does not constitute harassment and you must enter a verdict for the defendant.

6.   If you find that the sexual behavior alleged was welcome by S.C. then the behavior does not constitute harassment and you must enter a verdict for the defendant.

7.   If you find that S.C. was the instigator of the sexual behavior with R.C. then you cannot find that S.C. was harassed and you must enter a verdict for the defendant.

The Court denied the defendant's above request for jury instructions and committed an error of law by failing to instruct the jury in any manner in order to find that SC was sexually harassed by RC the jury must find that the sexual behavior between SC and RC was unwelcome or at the least that it was initiated by RC.

Further, the Court improperly placed the burden on the defendant to prove that SC initiated the conduct rather than placing the burden on the Plaintiff to prove that it was RC who initiated unwelcome sexual behavior between the boys. The Court's instruction number 13 states, in relevant part, **However, if you find that SC initiated the sexual touching on any given occasion, he was not the subject of sexual harassment on that occasion.** Later in the instruction, the court stated that consent was not a defense. The defendant objected to this instruction. The result of the instruction as a whole is that the jury was told that all touching between the boys is sexual harassment unless the defendant proves that SC initiated that particular activity. This cannot be the case. The proper instruction should have been that the plaintiff had the burden of proving that RC initiated inappropriate touching, and that it was unwelcome by SC, in order for the jury to find that the behavior was harassment.

26

In the instant case, it is entirely possible that the jury concluded that the sexual behavior between the boys was entirely mutual and not initiated by either. Following the court's instruction, a factual finding that both boys wanted to have sexual contact with each other would allow the jurors to conclude that the conduct was sexual harassment of SC. This is not, nor should it be, the law.

As Jury Instruction 13 was clearly an error of law and allowed the jury to find sexual harassment even where the behavior was mutual and was welcome by SC, the defendants are entitled to a new trial.

### A.    Evidentiary Rulings

The Court made a number of evidentiary rulings, which allowed the plaintiff to present an improper theory of liability to the jury.

### 1.    Sexualization of SC

The plaintiff's central theory of the case rested on the suggestion that SC had been sexualized by RC over a number of years causing him to become a sexual perpetrator. As a result, he became a risk to his classmates as well as to the foster children in the Porto household. Following this theory, even if it was SC who sexually harassed RC in the seventh grade, it was still the fault of the Tewksbury schools. The defendant suggests that the plaintiff through evidentiary rulings was allowed to improperly suggest this theory to the jury. The plaintiff was likewise allowed to suggest to the jury that SC's sexual molestation of his foster sister was likewise "caused" by RC's alleged sexualization of SC through a number of years. This suggestion was

27

inappropriate, unsupported by the evidence, and never should have been allowed to see light in the courtroom.

As the Court knows, the defendant moved for summary judgment in this action. In their opposition to the summary judgment motion, the plaintiff suggested that they were relying on evidence of events between RC and SC which occurred in the boys second, third, fourth, and fifth grade years. The Court determined that any such events were time barred and not sufficient to form the basis for a sexual harassment claim. The Court ruled that all events prior to the fifth grade were not relevant. However, once trial commenced, the court allowed Mrs. Porto to testify as to incidents which SC allegedly told her about which occurred prior to the fifth grade. The defendant objected to the introduction of any such evidence, but the Court ruled that if Mrs. Porto subsequently testified that she told various teachers about these incidents, the incidents could go into evidence as "notice" to the school of problems between the boys. As a result, Ms. Porto's version of what SC told her that RC had allegedly said to SC came into evidence.

The plaintiff then used these alleged statements to suggest that RC had sexualized SC causing him to molest his foster sister. Whatever that theory may be, it is not a theory that supports an action under title IX. Recognizing this problem, the defendant asked for a supplemental instruction as follows:

"You have heard testimony in this case regarding alleged sexual conduct by RC which occurred prior to October of 2,000. I instruct you that any testimony about alleged sexual conduct or statements by RC made prior to October of 2000 are not relevant to the question as to whether RC sexually harassed SC between October 2000 and January 11, 2001". If given, this instruction would have gone a

28

long way to cure the confusion sowed by the allegations of years of "sexualization". However, the Court declined to give the instruction. The Court then placed limitations on the defendant ability to introduce evidence to rebut the plaintiff's improperly admitted assertion that SC was sexualized by RC.

Specifically, the court placed limitations on the defendant regarding testimony about SC's molestation of his sister. The defendant was not allowed to introduce portions of a report written by SC's counselor in 2004 which clearly indicates that SC told him that he was molesting his foster sister three to four times a week. **Trial Exhibit 50. and full report of Piachowski attached as Exhibit A(by mail only, not scanned for confidentiality).** Not only the above evidence, he also described sexual contact, rubbing his penis against his sister, which was identical to what he did to RC in the bathroom. Further, he described enjoying when his sister touched his penis, behavior which was not described in the one incident of molestation that Ms. Porto claimed was isolated. Taken as a whole, SC's admissions to Mr. Pilachowski directly contradict the claim that the alleged "sexualization" of SC was caused by RC. They indicate that it was caused by his regular sexual contact with his foster sister. However, the court excluded this evidence and thus allowed the plaintiff to argue that the sexualization was the fault of the Tewksbury schools.

The Court excluded evidence and severely proscribed questioning by defense counsel of witnesses regarding SC's sexual behavior with his foster sister which pre dated his sexual behavior with RC. Had the jury been allowed to hear the truth of SC's sexual history, it would have become abundantly clear that the plaintiff's suggestion that SC's sexual behavior was the result of RC's suggestions was wholly improper. While the plaintiff was allowed to continually

suggest that RC "taught" SC to be sexual, the defendant was prevented from eliciting testimony about SC's sexual behavior and the court even excluded documents which demonstrated that SC was a sexual offender in 2001.

As a result of the evidentiary rulings allowing the plaintiff to put into evidence alleged incidents between the boys prior to the 5th grade and precluding the defendant from putting in evidence to rebut the plaintiff's theory, the Court allowed the plaintiff to paint a one-sided picture of SC as a "victim" of RC. The defendant respectfully suggests that evidence of SC's inability to control himself sexually with young girls was and is extremely probative of the question as to who was the aggressor in the seventh grade. Most importantly, regardless of how he became the way he was, it was obvious that SC was not a "victim" of the behavior in the bathroom in seventh grade. Accordingly, there is a realistic likelihood that the jury based its decision based on the improper suggestion that the Tewksbury schools could be blamed for the plaintiff's sexual misconduct. Accordingly, the defendant is entitled to a new trial.

### 2.    Testimony of Bradford Smith

The Court allowed improper testimony of Dr. Smith to be introduced into evidence at trial over the Defendant's objections and then did not provide the Defendant sufficient time to conduct re-direct of Dr. Smith in order to rebut the improper testimony. Dr. Smith's improper testimony is the only testimony that even potentially supports Plaintiff's damage claim.

First, the Court allowed Dr. Smith, who was SC's treating therapist, to testify as an expert giving opinions beyond his treatment of SC, nowhere indicated in any of his treatment notes. The Plaintiff never disclosed Dr. Smith as an expert witness prior to or at the time of trial and accordingly, it is an error

30

for the Court to allow such expert testimony. Specifically, the Court allowed the

following testimony over the objection of the Defendant:

Ms. Leonard: Okay, have you ever heard of the term "sexually reactive"?

Mr. Kesten: Your Honor, I object on the disclosure grounds.

The Court: overruled

Dr. Smith:    Have I heard of that term?  Yes. ....

Ms. Leonard: Okay, can you tell me what your familiarity is with the term "sexually reactive?"

Dr. Smith: Yes. The term "sexually reactive" or "abusive reactive" is that a child has been sexualized, they have experienced some kind of powerful sexual experiences. It can be abuse, it can be exposure to pornography or something else that has a major contributing factor to them acting out against others sexually.

Ms. Leonard: Okay. And would an example of that be long-term exposure to sexual contact at school?

Mr. Kesten: Your Honor, I object. Could I be heard?

The Court: Overruled. No.

Trial Transcript 7 at pp. 57-58.

Ms. Leonard: Okay. And it's also fair to say that mental retardation has an impact on age-appropriate normal sexual urges, isn't it?...

Mr. Kesten: Your honor I object on disclosure grounds.

The Court: Overruled, She's crossing your witness.

Mr. Kesten: Your Honor—

The Court: Overruled, overruled. We have ten more minutes.

Trial Transcript 7 at pp. 59-60.

Ms. Leonard: Okay. Based on Stephen's mental retardation and your treatment of him over a considerable period of time, did you think that he had the ability to consent to such conduct?

Mr. Kesten: Objection.

31

The Court: Overruled. …

Ms. Leonard: It's fair to say, isn't it, that if Stephen didn't know right from wrong or good from bad in a sexual context, that he didn't really have the ability to consent, did he?

Mr. Kesten: Objection.

Court: Overruled. Do you agree?

Trial transcript 7 at pp. 60-62.

Ms. Leonard: Okay, so when he was hospitalized at the Charles River Hospital and at the Bournewood Hospital it's fair to say isn't it Dr. Smith, that that was inextricably intertwined with his experience at school?

Mr. Kesten: Objection.

The Court: Overruled. You can answer.

Dr. Smith: That the experience at Charles River was inextricably intertwined?

Ms. Leonard: With what had happened to him at school

Dr. Smith:    Uhm, that what had happened at school contributed to his mental state that contributed to him needing to be inpatient hospitalized.

Ms. Leonard: Yes?

Dr. Smith:    That was my opinion back then.

Ms. Leonard: His stay at the Charles River Hospital was related to what happened at school, correct?

Dr. Smith:    Yes that there was a whole linkage of events that unfolded during that year, and the school experience was part of that.

Trial Transcript 7 at pp. 62-65.

The line of testimony above, is clearly expert testimony and not merely testimony as to Dr. Smith's treatment of SC. In fact, none of the above testimony is contained anywhere in Dr. Smith's treatment. The Plaintiff did not disclose Dr. Smith as an expert witness at any time prior to trial and their failure to disclose Dr. Smith as an expert including, the expert opinion the Plaintiff's anticipated he

32

will render at trial and the basis for that opinion is clearly improper and should never have been allowed to be introduced into evidence at trial. The Court appeared to believe based on her statements during trial, that because Dr. Smith was called by the Defendant as a fact witness, the Plaintiff could then cross-examine him as their expert witness. There is no such rule of evidence. Rather, the law is clear. A party must disclose their expert prior to trial.

Not only was the Defendant clearly prejudiced by the Plaintiff's improper conversion of Dr. Smith to an expert witness, but the Court then would not allow the Defendant sufficient time to address this new area of evidence on re-direct. This was despite the fact that the Defendant had ample time left on the Court's clock from the time allotted by the Court to the parties to present their respective cases.

After the Plaintiff's cross-examination of Dr. Smith, the following dialogue occurred:

The Court: Thank you. Anything?

Mr. Kesten: Oh, yes.

The Court: No, not "oh, yes." Just a few minutes.

Mr. Kesten: Judge, this is a new area.

The Court: Excuse me. You've got five minutes and then I'm getting that teacher out of here today.

Mr. Kesten: Judge, she works—

The Court: Five minutes.

Mr. Kesten: That's not fair.

Again, after allowing the Plaintiff's to question Dr. Smith as to his expert opinions that were never disclosed to the Defendant, the Court did not allow the Defendant to question the Plaintiff on this new area of the law and the facts.

33

Thus, Dr. Smith's "opinion" that the hospitalization of the plaintiff was "inextricably intertwined" with what happened in the school was left out there unrebutted. The improper sexualization theory was proferred with no notice or even opportunity to cross-examine. The defendant respectfully suggests that it was extremely unfair and prejudicial to allow this to occur and requires a new trial.

**A.    The Plaintiff's state law claim brought pursuant to M.G.L. c. 214, §1C fails to state a cause of action and therefore the Plaintiff is not entitled to 12% interest on any damage award.**

At trial the plaintiff pursued their claim brought pursuant to M.G.L. c. 214, § 1C and M.G.L. c. 151C, the Fair Educational Practices Act and are now seeking 12% interest on the jury's damage award. The Plaintiff's state law claims however, fail to state a cause of action. While Chapter 151C does provide for a cause of action when an "educational institution" as described therein, discriminates against a student or sexually harasses a student in any program or course of study, it does not provide a cause of action for a claim of student on student sexual harassment. As the plaintiff's by their allegations claim that SC was sexually harassed and abused by another student, and not that he was sexually harassed by the School or any of its employees, his claim pursuant to M.G.L. c. 151C, must fail as he is not asserting sexual harassment by an "educational institution". Likewise, as Chapter 214 of the Massachusetts General Laws relies upon the definitions contained in Chapter 151B and 151C for sexual harassment, the Plaintiffs' claim under that statute must fail as well. Accordingly, the plaintiff has failed to state a cause of action under state law and therefore is not entitled to twelve percent interest on any jury award.

**B.    The damage award is not supported by the evidence.**

The award of 250,000.00 in damages for the distress suffered by SC is clearly without basis and requires a new trial. The plaintiff, at the beginning of the trial, made a tactical decision to limit the damage request to the period of time prior to when the plaintiff was placed in a residential facility in or around February 2002. This decision was made so that the plaintiff could then argue that clearly relevant evidence of SC's statements about his true problems would be excluded. As a result, the testimony about SC's damages was severely proscribed and insufficient to support this verdict.

There was no evidence of any damages prior to January 11, 2001. During the entire time of the alleged sexual harassment, SC loved school and had perfect attendance. In fact, his emotional state was so strong that Ms. Porto asked for more foster children to be introduced into her house in the summer before seventh grade. During the seventh grade, at a time when the "harassment" was at it's highest point, SC never complained to anyone about school. He loved going to school every day and never complained to his "mother". His world only fell apart once he was discovered in a sexual act in the bathroom on January 11.

As a result of Mr. Ware discovering the activity, Ms. Porto became abusive to SC, not because he was a victim but once she realized that SC was the initiator. Further, his family and siblings did not want him in the Porto house not because he was a "victim" of harassment, but because he was the initiator of sexual activity with his much younger foster sister. In fact, all of the evaluations of SC conducted after January 11. 2001 demonstrate that by seventh grade, he was not a victim but a perpetrator.

Further, the evidence is clear that when Ms. Porto was providing information to SC's evaluators, she suggested that he had been sexualized by

35

long term sexual behavior with RC. However, the evidence heard at this trial demonstrates that she was actual knowledge of no such thing. She was aware of no sexual contact whatsoever between March of 1999 and January of 2001. Additionally, Ms. Porto insisted that SC's sexual contact with his sister only occurred once. The court allowed this to stand unchallenged because it excluded SC's admission to Mr. Pilochowski that he had in fact molested his sister many times a week over a long period of time.

The evaluations conducted in the relevant period of SC demonstrated that he could not return to school or the Porto home not because he was a victim of sexual harassment in the seventh grade, but because he was now a risk of sexual perpetration on schoolmates and family members. No one even suggested that he had become this way because of conduct in the seventh grade. As this court had limited the period of potential liability to acts of known sexual harassment between October and January of the seventh grade, there was no evidence of damages linked to this period.

It appears obvious that this jury accepted this "sexualization" theory with regard to damages. The Court helped this along by refusing to allow the defense to cross examine Dr. Smith, once the theory was sprung during his cross-examination. Dr. Smith, never identified as an expert and only called as a fact witness by the defense, was allowed to opine that all of SC's problems were "inextricably intertwined" with what occurred in school. This "opinion" was wholly without foundation or explanation and was offered without notice. It should have been excluded, but once allowed into evidence it was wholly unfair for this Court to preclude cross-examination.

36

There was no evidence offered by the plaintiff that the conduct in the seventh grade resulted in damages. It was the discovery of SC's hyper sexuality in the seventh grade that resulted in his being found to be a sexual offender with a high risk of re-offending, which exists to this day. The plaintiff cannot recover damages because the Tewksbury schools brought to light the fact that SC was a danger to young girls such as his foster sister.

In addition, the jury awarded the plaintiff one dollar in punitive damages. As discussed above there is no basis for the award of compensatory damages, much less punitive damages against the defendant and the jury's award of one dollar of punitive damages is nonsensical. Therefore, the court should strike this award, or, at the very least order a new trial with regard as to damages.

### CONCLUSION

For all of the foregoing reasons, the defendant respectfully requests that this Honorable Court grant the defendant's Motion for Judgment Notwithstanding the Verdict or, in the alternative, grant the defendant's request for a new trial.

Respectfully submitted,
The Defendant,
**Town of Tewksbury**
By their attorney,


/s/ Leonard H. Kesten
Leonard H. Kesten, BBO# 542042
Deborah I. Ecker, BBO # 554623
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100

DATED:  November 23, 2005