UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
)
Ann Marie Porto and Nicholas Porto,                    )
Individually and on Behalf of SC,                      )
a Minor Person with a Disability                       )
                                                       )    C.A. No. 04-CV10003-PBS
v.                                                     )
                                                       )
Town of Tewksbury                                      )
———————————————————————)

**PLAINTIFF'S OPPOSITION TO MOTION FOR
JUDGMENT NOTWITHSTANDING THE VERDICT,
OR IN THE ALTERNATIVE, FOR A NEW TRIAL**

NOW come the Plaintiffs, Ann Marie and Nicholas Porto on behalf of SC, and respectfully request this Honorable Court deny the Defendant's Motion for Judgment Notwithstanding the Verdict ("JNOV"), or in the Alternative, For a New Trial. Defendant's motion, filed pursuant to Fed.R.Civ.P. 50(b) and 59, is based on plaintiff's alleged failure to introduce sufficient evidence on the elements of Title IX or in support of damages. Defendant also contends that the Court made errors in evidentiary rulings and in jury instructions. Defendant's motion must fail for the reasons set forth below.

**I. Standard of Review**

In considering defendant's Motion for JNOV, the Court must consider whether there is sufficient evidence to support the jury's finding that SC was subjected to sexual harassment; that Tewksbury was deliberately indifferent; that Tewksbury had actual notice; that SC was denied educational benefits; and whether the damages awarded were excessive. "To set aside a jury verdict, [the Court] must examine the evidence in the light most favorable to the Plaintiff drawing all possible inferences in [his] favor." See Havinga v. Crowley Towing and Transp. Co., 24 F.3d 1480, 1483 (1st Cir. 1994).

To set aside a verdict and remand for a new trial based on the evidence, Tewksbury must show that the verdict was against the great weight of the evidence, viewed in the light most favorable to plaintiff, or would work a clear miscarriage of justice. See Id. at 1482-83. Tewksbury cannot satisfy either standard in their arguments that none of the Title IX standards were met. "A district court should order a new trial only when convinced that the clear weight of the evidence so requires, or that a miscarriage of justice would otherwise result." Consolo v. George, 58 F.3d 791, 793 (1st Cir. 1995) (quoting Veranda Beach Club Ltd. v. Western Sur. Co., 936 F.2d 1364, 1384 (1st Cir. 1991).

Here, the plaintiff needed to meet the prongs under Title IX by a preponderance of the evidence. The weight of the evidence supports the jury finding for the plaintiff.

## II.  The Evidence Supports a Title IX Violation

Title IX of the Education Amendments of 1972 provides in pertinent part:

> "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.  20 U.S.C. §1681(a).

In Davis v. Monroe County Board of Education, 526 U.S. 629 (1999), the U.S. Supreme Court held that to establish liability under Title IX, a plaintiff must demonstrate that (1) the school district had actual knowledge of the harassment; and (2) the school district was deliberately indifferent to the harassment; and the harassment was "so severe, pervasive and objectively offensive" that (3) it deprived the student victim of equal access to "an educational program or activity" or "the educational benefits or opportunities provided by the school."  526 U.S. at 625.

### A.  Severe, Pervasive and Objectively Offensive Sexual Harassment

Tewksbury argues that the evidence was not sufficient for the jury to find there was severe, pervasive or objectively offensive sexual harassment.  Sexual harassment includes

2

sexual advances, requests for sexual favors and/or other verbal or physical conduct of a sexual nature. Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 63 (1992). Hostile environment harassment covers acts of sexual harassment sufficiently severe, pervasive and objectively offensive to compromise or interfere with educational opportunities normally available to students. Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65 (1st Cir. 2002); Davis 526, U.S. at 651. Courts look to the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with performance. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).[1]

There was substantial evidence presented at trial from which the jury could have found that SC was subject to continuous verbal and physical conduct of a sexual nature by RC. At the outset, the Court properly allowed testimony from Mrs. Porto about incidents reported to school officials while SC was in the first grade through the fifth grade for the purpose of notice. Trial Exhibit No. 16 was probative on the issue of notice in that Tewksbury documented and investigated a report based on Mrs. Porto's complaints of oral sex on the school bus. The jury considered these reports subject to the Court's instruction that the sexually explicit storytelling, fondling genitals and oral sex described were probative only on the issue of actual notice to school officials, an essential element of Title IX described in more detail below.

For purposes of Title IX liability, the jury was instructed to consider the time period from October 2000 through January 11, 2001. The evidence presented at trial concerning the relevant time period is as follows. SC attended the seventh grade at

---

[1] See also, Dept. of Ed., Office for Civil Rights, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students or Third Parties 62 Fed. Reg. 12034 (1997).

the Wynn Middle School in the 2000-2001 school year. Robert Ware, the school's

behavior specialist, testified that in October of 2000, three classroom teachers

reported three separate incidents of sexual touching between the SC and RC. Ware

testified that he interviewed the teachers and documented that RC placed his hands

on SC's thigh when sitting at a working table; that RC moved closer to put his hands

on SC; that during gym class, RC was sitting behind SC and had his hands under SC

on the bleachers. Ware documented and testified to his investigation that, "SC

claims RC fondled him." (Trial Transcript 4; Trial Exs. 21-22).

Defendant for the first time argues that Ware's interview notes are hearsay. Ware

acknowledged he completed the investigation and took contemporaneous notes. There was

a proper foundation for the introduction of Ware's notes, and the notes contained

statements of a party opponent. Moreover, defendant never raised this objection at trial;

therefore, defendant waived the right to raise the objection in support of a JNOV. "Even if

the matter had been presented properly to the district court, one may not argue that the

verdict was against the weight of the evidence simply by citing to the evidence which was

favorable [or unfavorable] to one's position. If evidence was offered to the contrary, the jury

was free to accept or reject each party's evidence, and in most cases, a court is not warranted

in overriding the jury's choice." Velazquez v. Figueroa-Gomez, 996 F.2d 425, 426-27 (1st Cir.

1993).

The jury considered notice to the school of at least three separate incidents of sexual

touching in October 2000 as well as the January 2001 bathroom incident. The jury could

have concluded that a series of incidents had occurred, or even that the single January

incident was sufficient to establish severe and pervasive sexual harassment. The severity of

the harassment is marked by the physical nature of the conduct including in appropriate

sexual touching.  "A single, unusually severe incident of harassment may be sufficient to constitute a violation; the more severe the harassment, the less need to show repetitive series of incidents.  This is particularly true when the harassment is physical. Barrett v. Omaha National Bank, 584, F. Supp. 22, 35 Feb Cases 585 (D. Neb. 1983), aff'd, 726 F.2d  424, 33 EPD ¶ 34, 132 (8th Cir. 1984) (One incident constituted actionable sexual harassment.) Moreover, the nature of the conduct and the fact that it involved two cognitively impaired minors is objectively offensive to a fact finder by any standard.

Defendant argues that SC's claim must fail because he engaged in "consensual" sexual conduct and that the Court improperly instructed the jury on this issue.  Over Tewksbury's objection, the Court submitted Jury Instruction No. 13 as follows:

> "To show that [RC] sexually harassed [SC], the plaintiff must demonstrate that he was a student who was subjected to harassment based upon his sex and that the harassment was sufficiently severe and pervasive to create an abusive educational environment.  However, if you find that [SC] initiated the sexual touching on any given occasion, he was not the subject of sexual harassment on that occasion.  Sexual harassment that creates a hostile educational environment is defined as "sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature."  Even if you find [SC] consented to [RC's] touching, you may nonetheless determine there was sexual harassment.  That is because children of that age and ability cannot legally consent to sexual touching."

Review of Jury Instruction No. 13 is for abuse of discretion. See Frank Briscoe Co., Inc. v. Clark County, 857 F.2d 606, 614 (9th Cir. 1988), cert. denied, 490 U.S. 1048 (1989). Abuse of discretion may be found if the jury instructions are worded in such a way that they are likely to mislead or confuse the jury or inaccurately state the issues. Id. Defendant cannot meet this standard.  The Court's instruction regarding the ability to consent is straightforward and consistent with the law:  Children of SC's age and ability cannot legally consent.  Accordingly, the Court did not abuse its discretion.

In support of its challenge, Tewksbury relies on <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57 1986. In <u>Meritor</u>, the Supreme Court held that in Title VII employment cases, sexual harassment must be "unwelcome."[2] However, Federal courts have refused to apply this standard in every Title IX case involving sexual harassment in an educational institution. In <u>Mary M., et al v. North Lawrence Community School Corp.</u>, 131 F.3d 1220 (7th Cir. 1997), the Court rejected the Appellee's reliance on <u>Meritor</u> as erroneous, holding that "[w]elcomeness is an improper inquiry to be made in Title IX cases involving sexual discrimination of elementary school children."

The <u>Mary M</u>. Court held that "[s]exual harassment in the workplace is vastly different from sexual harassment in a school setting . . . Schools are charged with acting *in loco parentis*, while employers owe no such duty to their employees. Further, employees are older and (presumably) know how to say no to unwelcome advances, while children may not even understand that they are being harassed." <u>Id</u>. at 1226. The Court also looked to the state criminal statute and case law on statutory rape noting by analogy that a 13-year-old cannot be said to appreciate the full risk and consequences of sexual intercourse.[3] The Court reasoned that if elementary school children cannot be said to consent to sex in a criminal context, they similarly cannot be said to welcome it in a civil context.[4] <u>Id</u>. at 1227.

The Federal agency charged with administering and enforcing Title IX agrees. The Department of Education, Office of Civil Rights' Policy Guidance states that "If younger children are involved, it may be necessary to determine the degree to which they are able to recognize that certain sexual conduct is conduct to which they can or should reasonably

---

[2] The U.S. Department of Education, Office of Civil Rights and the Supreme Court apply, as appropriate to the educational context, many of the legal principles applicable to sexual harassment in the workplace developed under Title VII. (See Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 75 (1992).

[3] Notably, the child in the Mary M. case was a willing participant in and initiator of sexual conduct with an older male employee. Nevertheless, the court found that she was victimized by virtue of her age.

[4] The statutory rape law in Massachusetts states that the legal of consent is 16. M.G. L. c. 265, § 23.

object and the degree to which they can articulate an objection.  Accordingly, OCR will

consider the age of the student, the nature of the conduct involved and other relevant

factors in determining whether a student had the capacity to welcome sexual conduct."

Dept. of Ed., Office for Civil Rights, Sexual Harassment Guidance:  Harassment of Students

by School Employees, Other Students or Third Parties, 62 Fed. Reg. 12034 (1997).

The testimony of both Dr. Edward Dragan and SC, in addition to school evaluations

performed by Tewksbury, Individual Education Plans ("IEPs") developed by Tewksbury

(Trial Ex. 35-46), and the medical records of SC provided more than sufficient evidence for

the jury to find that SC is a child with a disability and therefore had no ability to consent to

sexual harassment.  SC has Fetal Alcohol Syndrome, severely delayed cognitive abilities,

moderate mental retardation and delayed expressive and receptive language skills.

The limitations imposed by SC's disability clearly prohibit inquiry into the issue of

consent.  A speech and language evaluation completed in October 1998 found that SC is at

least four years behind his current grade level.  (Trial Ex. 39).  Dr. Smith, who treated SC

from March to July 1999 and from January 2001 through January 2002, testified that SC did

not have the cognitive ability to distinguish between appropriate and inappropriate touching.

(Trial Transcript 7).

Dr. Alexandria Weida evaluated SC in March 2001.  This evaluation was completed

at the direction of the Tewksbury schools and entered as a defense exhibit.  (Trial Ex. 49).

Dr. Weida concluded that SC is unable to define the basic concept of what constitutes a

wrong or bad act from a not wrong or good act and that this inability is consistent with

cognitive limitations associated with mental retardation.  (Trial Ex. 49).  Robert Ware and

Principal James McGuire also testified that SC and RC needed education on what was right

and wrong. (Trial Transcript 4). Thus, consent was properly limited by the Court as an issue.

Defendant also argues that Jury Instruction No. 13 improperly shifted the burden of proof to defendant. The instruction stated, "[I]f you find that [SC] initiated the sexual touching on any given occasion, he was not the subject of sexual harassment on that occasion."[5] Defendant's argument must fail for several reasons. First, it was defendant who requested this portion of the jury instruction in the first place. Second, the instruction merely explains to the jury how the facts impact liability under Title IX; if the facts demonstrate that the plaintiff was not the initiator, then the jury could conclude that plaintiff was harassed. It does not speak to the burden of proof in any way whatsoever. Plaintiff prevailed based on the evidence that he was not the initiator.

Furthermore, the standard under which the Court reviews this argument depends upon whether Tewksbury properly preserved it. Plaintiff protests that Tewksbury has not preserved this argument because it failed to lodge a proper objection before the jury retired to consider its verdict. Under Fed.R.Civ.P. 51, objections must "stat[e] distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. An objection based on one ground does not preserve appellate review of a different ground. See <u>Wells Real Estate, Inc.</u> <u>v. Greater Lowell B.U. of Realtors</u>, 850 F.2d 803, 809 (1st Cir.), cert. denied, 488 U.S. 955 (1988).

There was ample evidence to support that RC initiated sexually offensive behavior on several occasions. SC tried to keep RC away. SC testified that he reported RC's conduct to Mrs. Paris and that he defended himself against RC's advances by punching him. (Trial

---

[5] Plaintiff objected to this portion of Jury Instruction No. 13 at trial arguing that the ability to initiate sexual harassment is encompassed in the ability to consent; that welcomeness is simply a non-issue when sexual harassment involves a child, or as here, a cognitively impaired minor such as SC; and that the issue of who initiated sexual harassment was, therefore, an improper inquiry for the jury.

Transcript 6; Trial Ex. 27, p. 5).  After the October 2000 incident, Robert Ware documented that "SC claims RC fondled him" and SC was reported as protesting RC's advances, "Keep hands to yourself."  (Trial Ex. 22).  Mrs. Porto reported that RC goes after SC and that it was difficult for SC to avoid RC.  (Trial Ex. 27, p. 1, 2).  SC reported to DSS investigator Elizabeth Englehart that RC was the aggressor.  (Trial Ex. 27, p. 5).

Defendant argues that a difference in capacity between SC and RC supports that SC initiated sexual harassment.  There is no legal or factual support for defendant's argument that a one-year age disparity or a differential in physical size is considered when determining welcomeness, particularly when two cognitively impaired minors are involved.  In addition, Julie Paris, former teacher for two consecutive years of both SC and RC, testified that RC and SC were of similar cognitive profiles.  (Trial Transcript 3).

Based upon the foregoing, there was sufficient evidence from which the jury could conclude that SC was the victim of sexual harassment and that the Court's instructions to the jury were proper.

### B.  Tewksbury Had Actual Knowledge of Sexual Harassment

Tewksbury argues that there were never complaints of sexual harassment from either SC or from Mrs. Porto.  In Davis, the Supreme Court suggested that both the parent and the student had satisfied the actual notice standard where they had made repeated harassment complaints to the teacher and principal.  See also Murrell v. Sch. Dist No. 1, Denver, Colo., 186 F.3d 1238 (10th Cir. 1999).  At trial, Mrs. Porto testified that she notified numerous school officials regarding incidents of sexual harassment in grades one through five.  (Trial Transcripts 1, 2).  Mrs. Porto's testimony is supported by the testimony of various school officials, who admitted notice of inappropriate sexual contact involving SC and RC.

The 1997 team meeting notes, admitted as Trial Exhibit No. 1, identify Mrs. Porto's concerns about sexual behaviors. Mrs. Paris acknowledged that she was made aware of sexual touching between the boys in March of 1999 and that she notified Principal Bradley. (Trial Transcript 3). Dr. Bradley filed a 51A report with DSS alleging the sexual abuse of SC by RC on the school bus. (Trial Ex. 17). Prior to SC's transition from the Ryan to the Wynn School, Mrs. Paris notified seventh grade teacher, Mrs. Edelstein, and the educational team that the boys were not supposed to be together and needed to be closely monitored. (Trial Transcript 3). In addition, Principal Bradley documented the incident in a memorandum to the Superintendent McGrath dated March 10, 1999. (Trial Ex. 16).

Mr. Ware was also on notice. Kara Buckley notified him of prior incidents occurring in the elementary years. (Trial Ex. 22). Mr. Ware testified that he notified Principal McGuire. (Trial Transcript 4). Most significantly, in an investigative report prepared by the Department of Social Services ("DSS") as a result of McGuire's 51A report filed in January 2001, several teachers and administrators indicated prior knowledge of sexual harassment. (Trial Ex. 27). Mr. Ware acknowledged that "the elementary school had passed that information along to the middle school about the incident on the bus." (Trial Ex. 27, p. 8). He also stated that he was "aware of the 1999 incident in the school bus and that they both had a previous history in prior schools of touching each other." (Trial Ex. 27, p. 3).

Sharon Moser, the special education case manager, reported to the DSS investigator that the teachers in the classroom were aware of the incidents of sexual acting out between these boys and that Mrs. Edelstein was also aware. (Trial Ex. 27, p. 3). She brought this history to the attention of the school principal. (Trial Ex. 27, p. 8). Furthermore, Mrs. Edelstein stated that she was "aware that the boys had this proclivity for touching each other and acting out sexually." (Trial Ex. 27, p. 7). William Traveis, the School Adjustment

Counselor, stated that he "had been made aware of the previous incident in the elementary school through Ms. Moser." (Trial Ex. 27, p. 8). Significantly, the DSS investigator supported a finding of neglect on the part of Mrs. Edelstein. (Trial Ex. 27, p. 8).

Defendant argues that the Court ruled that the contents of the 51B report were not admitted for the truth of the matter, but only to show the foundation for the DSS opinion. Plaintiff disagrees that the Court limited the 51B to foundation. The document was entered as Trial Ex. 27 over defendant's objection. Notwithstanding, the school witnesses did not challenge the accuracy of their statements, but rather their recollection of the contemporaneous statements reported to the DSS investigator pursuant to M.G.L. c. 119 §51B, an official report. Based upon the foregoing, there was sufficient evidence that notification was appropriate for the purposes of Title IX liability.

Lastly, Tewksbury's contention that a "should have known" standard was suggested is misguided. School administrators had actual notice of sexual harassment months before SC and RC were discovered sexually involved in the school bathroom. As discussed, the plaintiff presented substantial evidence that Tewksbury personnel were made aware of inappropriate touching between SC and RC and that SC complained that he was being fondled. Sexual harassment clearly takes many forms. The jury could easily have found the teachers' observations of sexualized behavior on three separate occasions in October 2000 to be actual notice of sexual harassment, particularly given defendant's knowledge of prior incidents. Absent an abuse of discretion, deference is given to the court's denial of a motion for a new trial on the basis of improper argument or conduct of counsel. Meyers v. Moody, 693 F2d 1196, 1220-1221 (5th Cir. 1982), cert denied, 464 U.S. 920 (1983); See also, Johnson v. National Sea Products, Ltd., 35 F3d 626, 631 (1st Cir. 1994).

### C. Tewksbury Acted With Deliberate Indifference

Tewksbury contends that the evidence was not sufficient to show deliberate indifference.  Despite extensive prior knowledge, the school took no action until it was disclosed that the boys were engaging in oral sex on the school van in March of 1999.  At that time, Principal Bradley issued a directive for heightened supervision stating, "They are never to travel alone in or outside the building."  (Trial Ex. 16).  This directive was never implemented, despite that Mrs. Paris testified to alerting SC's educational team and seventh grade teacher middle school teacher.[6]

According to the notes of Robert Ware and testimony of Eleanor Edelstein, RC and SC continued to have access to one another unsupervised.  (Trial Exs. 21-22; Trial Transcript 5).  In October 2000, the boys were observed engaged in sexual touching during class on three occasions by a classroom teacher.  (Trial Exs. 21-23).  Defendants argue that educating the boys through counseling was an appropriate response to this incident, but the testimony of William Traveis established that no such education and counseling ever took place.

Mr. Traveis testified that he was responsible for counseling and educating the boys as a result of the October 2000 incidents.  (Trial Transcript 4).  He was aware there was a past history between the boys.  (Trial Ex. 27, p. 8).  Mr. Traveis testified that he had no educational background in sexual abuse and, in his thirty-year career, attended just one training in sexual harassment and abuse.  Traveis' testified his advice was to keep the boys separate and, after only one discussion with the boys where he admonished SC and RC, he never addressed the subject again.  During this one meeting, Mr. Traveis never addressed any specifics regarding the incidents; he never asked the boys what they were doing or

---

[6] Plaintiff objected at trial to the Court's ruling that reported incidents in grades one through six were admissible solely for purposes of notice to school officials.  Plaintiff contends this series of events constitutes a continuing violation and, therefore, should have been considered by the jury in determining Title IX liability and damages.

explained to them why the behavior was inappropriate. Mr. Traveis testified nonetheless that they understood and were remorseful. (Trial Transcript 4).

Mr. Traveis also testified that he never told Mrs. Porto about the behaviors or that he had spoken to SC specifically about any of the three reported incidents of inappropriate touching. Despite that Mrs. Porto requested supervision at a November 2000 team meeting, Mr. Traveis never told her about what transpired. Rather, he assured her the youngsters were being supervised. (Trial Transcript 4). Ms. Moser testified that she disagreed with Mr. Traveis' decision not to call the boys' parents. (Trial Transcript 4). There was sufficient evidence from which the jury could conclude that defendant's response to sexual harassment was clearly unreasonable in light of the boys' known history.

The boys were still left unsupervised while at school, both after the 1999 Bradley directive and the October 2000 incident reports. SC reported that he was allowed to walk alone between classes and go to the bathroom alone. (Trial Ex. 27, p. 6). SC and RC were also allowed to attend gym and use the gym bathroom and locker room unsupervised. (Trial Ex. 27, p. 8). The lack of monitoring left SC vulnerable to continued sexual harassment. In fact, the records of Dr. Bradford Smith note that SC reported sexual activity in the bathrooms at school an estimated ten times. (Trial Ex. 32).

Under these facts, the jury could easily find that Tewksbury violated Title IX through its deliberate indifference to known acts of harassment. The Supreme Court describes deliberate indifference as a "clearly unreasonable response in light of the known circumstances." Davis, 526 U.S. at 648. "[D]eliberate indifference must, at a minimum, cause [students] to undergo harassment or make them . . . vulnerable to it. McGowen, 231 F.3d 253 (6th Cir. 2000), quoting Davis, 526 U.S. at 645. Moreover, "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use

those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." Id. at 261. In this case, defendants made no legitimate efforts to end the sexual harassment.

Additionally, the absence of an effective policy on sexual harassment also left SC vulnerable to continued sexual harassment. Schools are required by Title IX to adopt and publish a policy against sexual harassment and grievance procedures providing for prompt and equitable resolution of complaints. 34 CFR 106.8(b) and 106.9. The purpose of such a policy is to prevent sexual conduct from becoming sufficiently severe and pervasive so as to create a sexually hostile environment. "A grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint." Dept. of Ed., Office for Civil Rights, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students or Third Parties, 62 Fed. Reg. 12034 (1997).

David Keeler from the Department of Education testified that Tewksbury did not have an adequate sexual harassment policy and grievance procedure for students. Tewksbury provided limited information about sexual harassment to students, if any. The Wynn Middle School handbook contained a brief statement that unwanted verbal or physical advances of a sexual nature were unacceptable, but provided no complaint or grievance process. (Trial Ex. 19). Mrs. Porto testified that despite numerous meetings with school officials regarding complaints of sexual touching, she was never informed of the right to file a complaint. David Keeler testified that the policies were not in compliance with the law.

There was sufficient evidence from which the jury could conclude that the 1999 plan for supervision and the 2000 plan for education and counseling were never put into effective

practice; that Tewksbury had actual knowledge that the sexual behavior continued; and that Tewksbury was, therefore, deliberately indifferent to sexual harassment.

### D.  SC Was Denied Equal Educational Opportunities and Benefits

Tewksbury contends that plaintiff failed to establish through sufficient evidence that SC was denied educational benefits and opportunities.  A plaintiff must establish that sexual harassment so undermines and detracts from the victim's educational experience, that the student is effectively denied equal access to an institution's resources and opportunities. Davis, 526 U.S. at 652.  The behavior must be serious enough to have a systemic effect of denying the victim equal access to an educational program or activity.  Davis at 652.

The inability to fully access an education is inherent in a school environment permeated by severe and pervasive sexual harassment.  "A non-discriminatory environment is essential to maximum intellectual growth and is therefore an integral part of the educational benefits that student receives.  A sexually abusive environment inhibits, if not prevents, the harassed student from developing [his] full intellectual potential and receiving the most from the academic program."  Davis, 74 F.3d at 1193 (11th Cir. 1996).  "Children are far less able to articulate the fact and extent of their injuries and may manifest an array of different reactions to the harassment."  Gabrielle M. v. Park Forest-Chicago Heights, et al., 315 F.3d 817 (7th Cir. 2003).  According to the testimony of Dr. Dragan, this is particularly true for SC, given his expressive language delays.  (Trial Transcript 6).  This is also why schools are charged with acting *in loco parentis.*

Mrs. Porto testified that SC complained about school and about RC.  He also complained about physical ailments during this time period.  (Trial Transcripts 1, 2). The impact of sexual harassment on SC's ability to focus also manifested through staring spells.  SC was examined by Dr. Joel Herskowitz at the New England Medical Center in

September and December of 1999 as result of staring spells at school. (Trial Exs. 30-31).
Dr. Herskowitz noted in the Addendum to his report: "Ms. Porto is extremely frustrated
that SC remains in the class with a boy who allegedly molested SC sexually. This appears to
be an ongoing stressor for SC and, in my view, will account for some of the staring spells
that have been observed." (Trial Ex. 30). Sexual harassment was a significant distraction
that affected SC's access to educational benefits, particularly in light of his cognitive
impairments.

Tewksbury's failure to provide SC meaningful and appropriate counseling or
education after repeated known incidents of sexual harassment also constitutes a denial of
educational benefits. Dr. Dragan testified that the educational benefits of a special education
student are comprised of the services provided relative to the student's particular needs. He
further testified that the failure of Tewksbury to provide appropriate counseling services was
a denial of educational benefits. (Trial Transcript 6). There was evidence from Dr. Smith
and in the report of Dr. Weida that SC lacked the cognitive ability to understand right from
wrong in a sexual context or the implications of sexual conduct. (Trial Transcript 7; Trial
Ex. 49). SC's should have been educated in response to reported incidents of sexual
harassment.

Finally, SC's absence from school from January 11, 2001 through January 2002 was a
direct result of sexual harassment that deprived him of educational benefits. SC's education
during this time was limited to sporadic tutoring. McGuire testified that, until a
psychological evaluation was completed, SC could not return to the Wynn Middle School.
(Trial Transcript 4). Nevertheless, Tewksbury placed SC at further risk by proposing that he
return to the same environment prior to completion. (Trial Ex. 6). The evaluations
recommending residential placement were not reviewed by the team until June 2001. (Trial

Ex. 7). Dr. Smith testified that SC underwent three psychiatric hospitalizations during this time and that sexual harassment at school was a significant factor. (Trial Transcript 7). SC's emotional state caused by his molestation at school as well as the continuing threat of harassment by RC prevented his return thereby denying him access to educational benefits. See Murrell v. Sch. Dist No. 1, Denver, Colo., 186 F.3d 1238 (10th Cir. 1999). (Plaintiff's psychiatric hospitalization and absence from school caused by school's deliberate indifference to sexual harassment deprived her of educational benefits.)

## III. Evidentiary Rulings

Defendant contends that the Court made a number of evidentiary rulings, which allowed the plaintiff to present an improper theory of liability to the jury. In its motion, defendant misrepresents plaintiff's theory of the case and strays far a field of the Title IX requirements. Defendant focuses on an isolated incident between SC and a foster sibling that occurred outside of the school setting. Title IX protects children from sexual harassment in school that effectively deprives them of educational benefits. In fact, plaintiff's theory has always been that Tewksbury was deliberately indifferent to known acts of sexual harassment against SC while he attended school. Conduct occurring at home has no relevance to a Title IX claim, but was nonetheless allowed by the Court over plaintiff's objections and Rule 412 motions in limine clearly benefiting Tewksbury's defense.

There was testimony at trial from Mrs. Porto and from SC that on one occasion while in the fifth grade, SC "played doctor" at home with a foster sibling. Defense counsel used this isolated incident throughout the trial to improperly mischaracterize SC as a sexual predator and the initiator of sexual conduct at school. This became defendant's central argument at trial. In support of this theory, defense counsel called plaintiff's treating psychologist, Dr. Bradford Smith, to testify at trial. Based upon his treatment of SC, Dr.

Smith testified on cross-examination that SC had been sexualized by RC causing him to experiment with a foster sibling.

Displeased with the testimony of his own witness, defense counsel now attempts to strike Dr. Smith's testimony. Defendant contends that Dr. Smith gave expert opinion beyond his treatment of SC and that plaintiff never disclosed Dr. Smith as an expert witness prior to trial. But, while not an expert, Dr. Smith had at all times been identified as a treatment provider in pre-trial disclosures and memoranda. Moreover, Tewksbury never deposed Dr. Smith, and defense counsel examined Dr. Smith about their conversations prior to trial as part of defendant's case in chief (Trial Transcript 7).

Tewksbury contends that Smith was used as an expert. However, this argument is contrary to the legal standards governing the testimony of treating physicians. In <u>Garcia v. The City of Springfield</u>, the First Circuit held that a treating physician may testify as to causation and prognosis in the absence of a report where (1) it is based on the care-provider's personal knowledge and observations obtained during the course of care and treatment, and (2) the care-giver was not specially retained for litigation or for trial. (Ponsor, J.) (USDC) (Civil Action No. 03-30125-MAP) (Aug. 16, 2005).

In this case, Dr. Smith's testimony was based upon his personal knowledge and observation of SC. (Trial Transcript 7). Dr. Smith's treatment records marked as Trial Exhibit No. 32 reflect his observations and corroborate his testimony. Dr. Smith was not specially retained for litigation or for trial by the plaintiffs. Rather, Dr. Smith was subpoenaed to testify in support of defendant's case. The Court, therefore, properly allowed the testimony of Dr. Smith to clarify issues of alleged sexual proclivity raised by defendant in the first instance. Applying the standard set forth in the <u>Garcia</u> decision, Dr. Smith also properly testified regarding the cause of SC's emotional distress. Here again, Dr. Smith's

testimony was based upon his personal knowledge and care and treatment of SC. Moreover, Tewksbury paid for Dr. Smith's services as the treatment provider for SC following SC's departure from school in January 2001.

Defense counsel further contends that the Court placed limitations on his ability to question Dr. Smith on re-direct examination. Fed.R.Evid. 611(a) directs the trial court to exercise reasonable control over . . . presenting evidence, to the end that the truth may be effectively ascertained, needless consumption of time avoided, and witnesses spared from harassment or undue embarrassment. The rule merely sets forth the objectives which the judge should seek to attain, since it is neither desirable nor feasible to spell out detailed rules to govern the order of interrogating witnesses and presenting evidence. Advisory Committee Notes to Federal Rules of Evidence, Fed.R.Evid 611. The Court was clear in the final days of trial about the time limitations she was imposing on the parties, including tallying the time counsel spent on their witnesses compared to their allotted time. Defense counsel had ample opportunity to and extensively addressed both causation and damages during his direct examination. Further testimony on these issues amounted to a needless consumption of time and was properly limited by the Court.

Finally, the impact of SC's exposure to inappropriate sexualized conduct while attending the Tewksbury Public Schools was also introduced through the report of Dr. Alexandria Weida (Trial Ex. 49). Defendant did not pose an objection to the introduction of Dr. Weida's report. Dr. Weida concluded that SC was at risk because of his mental retardation and the fact that he was sexualized at a young age as a result of being involved in sexual activity with an age mate for several years in the school setting. (Trial Ex. 49). Thus, even if the Court improperly allowed the testimony of Dr. Smith, it was harmless error. There is sufficient evidence from Dr. Weida's report on the issue of causation and damages.

Defendant also argues that the Court limited the testimony regarding the incident between SC and his foster sibling.  Specifically, defendant argues that the full report of Dr. Daniel Pilachowski was improperly excluded.  Defendant failed to proffer Dr. Pilachowski as a witness at trial.  In addition, Dr. Pilachowski filed an addendum to the initial report. Defendant sought to introduce the uncorrected version of the report.  The court excluded the report in the absence of Dr. Pilachowski's testimony regarding the changes.  Thus, defendant's own failure to call Dr. Pilachowski to testify resulted in the exclusion of the full report.  In its pending motion, defendant attempts to utilize portions of Dr. Pilachowski's report that were stricken as inadmissible based upon plaintiff's pre-trial motion in limine.  At no time did Tewksbury request leave from the Court to call Dr. Pilachowski as a witness or to amend its witness list to include Dr. Pilachowski as a witness.

A trial judge has a unique coign of vantage in performing this type of delicate balancing.  In calibrating the appellate scales, therefore, the trial judge's first-hand assessment, reflecting his or her "feel" for the case, is entitled to considerable deference.  See United States v. Sutton , 970 F.2d 1001, 1008 (1st Cir. 1992); United States v. Tierney , 760 F.2d 382, 388 (1st Cir. 1985).  "Only rarely - and in extraordinarily compelling circumstances - will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988).

Defendant also argues that the Court erred in not allowing a supplemental instruction regarding harassment prior to October 2000.  The Court allowed testimony from Mrs. Porto regarding sexual conduct by RC which occurred in the second, third, fourth and fifth grade years for the purpose of establishing notice to the school, as required by Title IX. (Trial Transcript 1, 2).  The Court expressly instructed the jury during the trial that this

testimony was limited to notice.  The Court reiterated its instruction during the jury charge

as follows:  "Also, if I received evidence but told you it was received for a limited purpose,

or if in the instructions I am now giving I tell you that some of the evidence is to be

considered only for a limited purpose, you are bound by that limitation."  Therefore,

defendant's suggestion that the Court erred in not allowing its supplemental instruction on

this issue is without merit.

## IV.  Damages

The Court charged the jury as follows on the issue of damages:

> "Defendant's actions are the legal cause of the plaintiff's injuries if [they were]
> a substantial factor in bringing about the harm . . . it does not matter whether
> other concurrent causes contributed to the plaintiff's injuries so long as you
> find that the defendant's actions were a substantial factor in producing them.
> If defendant's actions were a substantial factor, then they were the legal cause
> or what we call the proximate cause."

The Court further instructed the jury that they could award damages for the

period October 2000 up until SC's placement in February 2002.[7]  Tewksbury

contends that the damage award was inappropriate because the harm suffered by SC

was solely related to family issues and not to sexual harassment.  There was more than

sufficient evidence from which a jury could have determined that SC's exposure to

sexual harassment at school was a substantial factor causing SC emotional distress

during this time period.

Dr. Smith testified that SC was psychiatrically hospitalized three times from the time

he was removed from the Wynn Middle School in January 2001 until his placement at

Eagleton in February 2002.  Dr. Smith also testified that SC's school experience contributed

significantly to his depressed emotional state, suicidal thoughts and self-mutilating behaviors.

---

[7] Defendant agues that SC was isolated by his placement at Eagleton School due to family issues.  However, the
Court limited damages to the time period preceding SC's placement at Eagleton.

(Trial Transcript 7). SC was isolated from the community and in the most restrictive placement possible. Even while he was at home, awaiting placement at Eagleton with tutoring services, Dr. Dragan identified this as the second most restrictive placement because SC had no access to peers, community activities or socialization. (Trial Transcript 6). SC suffered damages, as he lost all of his friends. According to Dr. Dragan, the need for socialization and peer opportunities is especially important to students with special needs such as SC. (Trial Transcript 6).

Contrary to Tewksbury's argument that SC was removed from his home due to his behaviors in the home, SC remained at home with his family from January 12, 2001 (with the exception of periods of hospitalizations) until an appropriate placement opened for him in February 2002. Mrs. Porto wept as she testified that SC was not the same child after what happened to him in school. (Trial Transcript 2). Tewksbury continues to misstate and distort the evidence in an effort to justify a reduction in the damage award. There were no facts entered into evidence that SC molested his sister four to five times per week. Nor did Tewksbury proffer any witnesses or documentation to that effect, in support of this theory.

SC was clearly damaged by years of sexual harassment he suffered while attending the Tewksbury Public Schools. Moreover, plaintiffs proved that Tewksbury had actual notice on at least three occasions between October 2000 and January 2001 thus making them liable for damages.

## V. Pre Judgment and Post Judgment Interest

At the request of the Court, plaintiff submitted a legal memoranda of law in support of its state law claim under G.L. c. 214 §1C on September 28, 2005. The Memoranda is attached hereto as Exhibit No. 1. Based upon the legal theories set forth therein, plaintiff argues that his state law claim is a viable claim that parallels Title IX. At the pre-trial of this

22

matter, the Court stated its practice of allowing the state interest rate on a federal claim to

avoid proceeding on an additional parallel state claim.  Therefore, SC should be awarded pre-

judgment interest on the jury award at the state rate of 12 percent from the date of filing,

pursuant to M.G.L. c. 231 §63, as well as post judgment interest at the same rate on

attorneys fees and costs.

## VI.  Conclusion

Based upon the foregoing, plaintiff respectfully requests that this Honorable Court

deny defendant's Motion for JNOV or, in the Alternative For a New Trial.

Respectfully requested,
PLAINTIFFS
By their Attorneys,


/s/ Lynn A. Leonard                          /s/ Anita B. Sullivan
_____                      _____
Lynn A. Leonard                              Anita B. Sullivan
Attorney-At-Law                              Attorney-At-Law
527 Main Street, Suite 8                     458 Main Street
Melrose, MA  02176                           Wakefield, MA  01880
(781) 662-6161                               (781) 224-0701
B.B.O. No. 561662                            B.B.O. No. 628873

Dated:  December 22, 2005