UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| Ann Marie Porto and Nicholas Porto, Individually and on Behalf of SC, a Minor Person with a Disability <br><br> v. <br><br> Town of Tewksbury | ) <br> ) <br> ) <br> ) <br> ) C.A. No. 04-CV10003-PBS <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFF'S FURTHER OPPOSITION TO MOTION FOR
JUDGMENT NOTWITHSTANDING THE VERDICT,
OR IN THE ALTERNATIVE, FOR A NEW TRIAL**

Plaintiffs, Ann Marie and Nicholas Porto on behalf of SC, submit the following brief in response to the Court's request for evidence introduced at trial to support that RC initiated sexual harassment against SC in the Wynn Middle School bathroom in January 2001.[1] Plaintiff argues that the following documentary and testimonial evidence, when examined in the light most favorable to the plaintiff and drawing all possible inferences in [his] favor, supports the jury's verdict. See Havinga v. Crowley Towing and Transp. Co., 24 F.3d 1480, 1483 (1st Cir. 1994).

**I. Department of Social Services Child Abuse/Neglect Investigation**

The Department of Social Services ("DSS") Child Abuse/Neglect Investigation, authored by investigator Elizabeth Stasio-Englehart pursuant to Massachusetts General Law c. 119 §51B, was properly admitted under exceptions to the hearsay rule including Fed.R.Evid. 803(6) and 803(8). The DSS report was entered into evidence as Exhibit No. 27

---

[1] Plaintiff objected to Jury Instruction No. 13 at trial arguing that the ability to initiate sexual harassment is encompassed in the ability to consent; that welcomeness is simply a non-issue when sexual harassment involves

1

by the plaintiff. Under Rule 803(6), the investigative report is admissible as a business record, a hearsay exception. The rule states:

> 803 (6) <u>Records of regularly conducted activity</u>. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

At trial, the Court admitted the report as both a business record and a public record. (Transcript 4, p. 38-39; Transcript 6, p. 78). Under Fed.R.Evid 803(6), a foundation for admission of the business record must be laid by testimony of the custodian of the record or by some other qualified witness. This requirement may be satisfied by the testimony of the person who actually prepared the record. <u>U.S. v. Jones</u>, 554 F.2d 251 (5th Cir. 1977). Elizabeth Stasio-Englehart, the author of the report, testified at trial. Ms. Englehart established a foundation for the report as well as the agency standards under which the report was authored. Pursuant to M.G.L. c. 119 §51B, DSS is required to follow up and investigate reports of child abuse.[2] Here, the child abuse report that was investigated was filed by Ann Marie Porto. (Trial Exhibit 4). The investigation was assigned to Ms. Stasio-Englehart for the purpose of investigating institutional abuse by the Tewksbury Public

---

a child, or as here, a cognitively impaired minor such as SC; and that the issue of who initiated sexual harassment was, therefore, an improper inquiry for the jury.

2

Schools. (Transcript 6, p. 48).

Ms. Englehart interviewed numerous school personnel as well as SC, as identified in Exhibit 27. DSS routinely investigates child abuse allegations as part of its mandate. The investigation was assigned to Ms. Englehart on January 12, 2001, one day after the child abuse report was filed (also known as a 51A report pursuant to M.G.L. c. 119 §51A). (Trial Exhibit 27). Under Fed.R.Evid. 803(6), the source of the information in the investigation must be a person with first-hand knowledge. White Industries, Inc. v. Cessna Aircraft Co., 611 F.Supp 1049 (W.D.Mo. 1985). If the source of the information for a business record is an outsider to the business, such as the witnesses interviewed by Ms. Enlgehart, the issue of multiple hearsay arises. However, Fed.R.Evid 805 provides that hearsay included within hearsay is not excluded if each part of the combined statement conforms with an exception to the hearsay rule provided in the federal rules.

In this case, SC's statements to the DSS investigator are admissible under Fed.R.Evid. 803(3) to show his then existing state of mind and Fed. R.Evid. 803(1) as a present sense impression; that is, that SC feared RC and that SC felt forced by RC to engage in sexual conduct. SC's statements are also admissible as a statement of a party-opponent, given defendant's limited objection to the conclusion of the report only. (Transcript 6, p. 58); Moss v. Ole South Real Estate, Inc., 933 F.2d 1300, 1331-1332 (5th Cir. 1991). Englehart interviewed SC on January 18, 2001. The relevant portion of the interview follows:

    Q. Can you tell me what happened the last day you were at school?[3]

---

[2] Child abuse investigation reports are also required to be completed pursuant to federal laws including the Child Abuse Prevention T. Act ("CAPTA") as well as the Adoption and Safe Families Act ("ASFA").
[3] It is uncontested that SC's last day of school was January 11, 2001. Further, it is uncontested that Mrs. Edelstein was the teacher assigned to the life skills classroom at the time SC and RC were found in the bathroom.

    A. I was always on a Thurs or Friday, We do it in the gym bathroom. I was there 1st, Richard came in after gym, the kids had already left.
    Q. Do you remember the first time it happened in this school?
    A. No, but I was against the wall and he was behind me, he put his thing in my bum.
    Q. What happened the second time?
    A. It was in the bathroom next to the classroom. He went to the bathroom and he asked Mrs. Edelstein for permission. Both teachers were out of the room so I went to the bathroom. I was against the wall and he put his thing in my bum.
    Q. Did it hurt?
    A. Yes. I didn't want to tell anyone cause they'd call me gay.
    Q. Did you feel forced?
    A. Yes. I told him yes cause I thought he'd beat me up.
    Q. Has he ever hit you?
    A. No. He used to squeeze my bum. I elbowed him in the nose once.

(Trial Exhibit No. 27, p. 5)

There is sufficient evidence including SC's statements, his state of mind and his present sense impression from which the jury could find that SC did not initiate sexual touching, but rather acquiesced to RC's advances due to fear and intimidation.

## II. Trial Testimony of SC

SC reported to the DSS investigator his fear that RC would tell everyone he was gay or that RC would beat him up, and he testified at trial consistently:

    Q. Was there a time when you started to have some problems or some issues with Richard?
    A. Yes.
    Q. Okay. And what was that about?
    A. Me and him had problems. He would always try to touch me.
    Q. Okay. And in what kind of way?
        (Witness pausing.)
    A. Like touching my private parts.
    Q. Okay. And where did that happen?
    A. In the school.
    Q. Okay. Did it happen in a classroom?
    A. Yes.
    Q. Do you remember who the teacher was?
    A. No.
    Q. Okay. Did you tell the teacher?
    A. Yes.

4

> Q. Okay. Did it happen anywhere else?
> A. In the bathrooms.
> Q. Okay. And do you remember where, what school the bathroom was in?
> A. John Wynn School.

(Transcript 6, Part 1, pp. 11-12).

> Q. Did you ever have any other problems with Richard in terms of, you know, hitting him?
> A. He kept on touching me, so I told him, I told him "Stop." He kept on doing it. I took my elbow and punched him in his nose and made it bleed, and then I got detention. He didn't.
> Q. So at that point, did a teacher get involved because you had actually hit Richard?
> A. Yes.
> Q. Okay. And did you tell them at the time what was going on?
> A. Yes.
> Q. Okay. If you remember, what kind of words did you use?
> A. I said, "Stop F'ing touching me."
> Q. Okay. What other kinds of problems did you have with Richard in the classroom?
> A. He was threatening, he was threatening me by words that if I don't do what he said, he's going to tell everybody.
> Q. What was he going to tell everybody?
>    (Witness pausing.)
> A. That I was touching him and everything, he's going to tell his friends.

(Transcript 6, Part 1, pp. 21-22)

Voluntary submission to sexual advances under coercive circumstances does not mean that the conduct was welcome. See, <u>Cummings v. Walsh Constr. Co., 561 F. Supp</u>. 872 (S.D. Ga. 1983) (holding that summary judgment is not appropriate even though plaintiff voluntarily submitted to sexual advances where plaintiff alleges she submitted due to intimidation); <u>Bundy v. Jackson</u>, 641 F.2d 934 (D.C. Cir. 1981) (holding *inter alia* that plaintiff need not demonstrate resistance to the alleged sexual harassment).

SC's cognitive limitations also contributed to his acquiescence. Trial Exhibit No. 49, the report of Dr. Alexandria Weida, states that "Steven's limitations and hyper-sexual impulses are such that he is himself at risk for sexual victimization by less well intentioned

others in the environment."[4] The Court recognized the impact of SC's limitations in Jury Instruction No. 13 and, at the same time, specifically distinguished the issues of "consent" from "initiation":

> ". . . [ I]f you find that [SC] initiated the sexual touching on any given occasion, he was not the subject of sexual harassment on that occasion . . . Even if you find [SC] consented to [RC's] touching, you may nonetheless determine there was sexual harassment. That is because children of that age and ability cannot legally consent to sexual touching."

Given the Court's instruction, the jury was free to disregard evidence that SC and RC were "touching each other's private parts" or that they "agreed" to engage in sexual touching, as such statements are issues of consent rather than of initiation. Facts regarding SC's participation in sexual activity once initiated by RC are irrelevant. No witnesses testified that SC was a harasser or initiated contact with RC (aside from Attorney Kesten's use of the word initiate in his questioning of Robert Ware). Mr. Ware never testified that SC initiated contact with RC. (Transcript 4, p. 70). Immediately after the incident, the boys admitted to touching each other. However, there was no conversation about initiation. (Transcript 4, p. 70). Later, SC reported at the SAIN meeting (Transcript 4, p. 73-74) that it was RC's idea to have an encounter (Transcript 4, p. 74, lines 6-8).

During the SAIN meeting, Mr. Ware reiterated to SC his understanding of the January 11, 2001 events that SC went to his locker, knew RC was in the bathroom and proceeded to the bathroom. (Tanscript 4, p. 74). It was Ware's interpretation that SC initiated the activity, in agreement with his attorney. Ware had not previously identified, either in his testimony (Transcript 4) or to the 51B investigator (Exhibit 27) that SC initiated sexual contact with RC. Coupled with SC's testimony about his fear of RC, the jury could

---

[4] Dr. Smith testified that SC's long-term exposure to sexual conduct by RC at school caused him to become sexually reactive. (Transcript 7, pp. 92-95).

6

reasonably have concluded that SC did not initiate contact with RC.

The Court has discretion under Fed.R.Evid 803(6) to exclude business records where the source of information in the record or the means of preparation of the record indicate a lack of trustworthiness. The objecting party bears the burden of establishing a lack of trustworthiness. In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238 (3rd Cir. 1983). In this case, the defendant objected "to the conclusion only." (Transcript 6, p. 58). The investigation concluded that SC and RC were neglected by their classroom teacher Eleanor Edelstein. (Trial Exhibit 27, p. 9; Transcript 6, p. 55). The defendant never raised an objection to the report based upon the lack of trustworthiness, and the Court properly allowed the report into evidence subject to the requirements of Fed.R.Evid. 803(6) and (803)(8)(C).

Credibility is not the focus of a trustworthiness inquiry, and the Court must allow the jury to make credibility decisions and decide what weight to afford a report's findings. Moss v. Ole South Real Estate, Inc., 933 F.2d 1300 (5th Cir. 1991). Any inconsistencies in SC's testimony attributable to his disability by law raise questions of credibility only. USA v. Allen J., 127 F.3d 1292 (10th Cir. 1997). Accordingly, SC's disability may not be considered in assessing trustworthiness. A challenge to SC's testimony based upon his cognitive limitations is, in essence, a challenge to SC's competence to testify. Competency was never raised by the defendant at or before trial by means of a Rule 35 request for mental examination.

In a strikingly similar case, the Court in Allen J., *supra*, squarely addressed this issue. The Court held that a witness with fetal alcohol syndrome was competent to testify and any inconsistencies or problems with her testimony raised questions of credibility, not competence. USA v. Allen J., 127 F.3d at 1311. The competency of witnesses to testify is

7

governed by Fed.R.Evid. 601.  Rule 601 establishes a presumption that '[e]very person is competent to be a witness." Fed.R.Evid. 601.  This means there is no minimum or baseline mental capacity requirements witnesses must demonstrate before testifying.  See Fed. R. Evid. 601 Advisory Committee's note.  "The drafters of Rule 601 considered mental capacity not to be a question of competence, but to be a question 'particularly suited to the [trier of fact] as one of weight and credibility.'" USA v. Allen J., 127 F.3d at 1294.  Here, the jury credited plaintiff's statements that RC initiated sexual touching in January 2001.

Under Rule 803(8), the investigative report is admissible as a public record, a hearsay exception.  The rule states:

> 803(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

At trial, the Court admitted the factual findings from the DSS investigation pursuant to Rule 803(8)(C).  (Transcript 6, p. 78.)  Again, Fed.R.Evid 805 provides that hearsay included within hearsay is not excluded if each part of the combined statement conforms with an exception to the hearsay rule provided in the federal rules.  Plaintiff acknowledges that third-party statements in the report are inadmissible.  At trial, the Court excluded such hearsay statements of Ann Marie Porto (Transcript 6, p. 59), but allowed without limitation statements made by SC to the DSS investigator.  (Transcript 6, p. 60).  SC's statements to the DSS investigator are independently admissible under Rule 803(8)(C) as a statement of a party opponent, to show his then existing state of mind and present sense impression.

8

### III. Testimony of Dr. Bradford Smith

Dr. Bradford Smith was SC's treating psychologist in 1999 and in 2001. SC's statements to Dr. Smith are admissible under Fed.R.Evid. 803(4), which creates a hearsay exception for statements made for the purposes of medical diagnosis or treatment. This hearsay exception applies to statements made by a patient to a doctor. Bulthuis v. Rexall Corp., 789 F.2d 1315 (9th Cir. 1985). Statements to a psychologist or psychiatrist are admissible. Bevevino v. Saydjari, 574 F.2d 676 (2nd Cir. 1978). In fact, statements of a child abuse victim to a psychologist have been admitted as pertinent to the witness' diagnosis and treatment. U.S. v. Balfany, 965 F.2d 575 ( 8th Cir. 1992). SC's statements are also admissible as statements of a party opponent, since he was a defense witness, and to show his then existing state of mind and present sense impression.

Dr. Smith testified that in January 2001, SC reported that he was afraid RC would take advantage of him. SC also reported to Dr. Smith that RC initiated sexual conduct. Dr. Smith testified as follows:

    Q. Okay. And there have been several references to the notes today regarding the sexual contact in January, 2001, in that area. It's fair to say that there were several disclosures to you from Stephen, and from Mrs. Porto in fact, that Richard had initiated sexual contact with Stephen; isn't that correct?
    A. There are -- there are some disclosures in there that Richard had initiated.
    Q. Okay. And do you recall that Richard had asked him if he wanted to do it?
    A. That Stephen reported that?
    Q. Yes.
    A. Yes.
    Q. Okay. And do you recall that Stephen reported that Richard told him to face the wall, and he put his penis in his bum?
    A. Yes.
    Q. And do you recall that there was a report that Stephen was afraid he would be taken advantage of?
    A. I don't remember that.
    Q. Okay, well, let me refresh your memory. Do you see a note that says "Afraid he'll be taken advantage of"?
    A. Yes.

(Transcript 7, p. 97)

9

Based upon the foregoing and on the initial Opposition submitted to the Court, plaintiff argues that there was ample non-hearsay evidence from which the jury reasonably concluded that RC initiated sexual touching during the relevant time period. Therefore, defendant's Motion for Judgment Notwithstanding the Verdict or, in the Alternative, For a New Trial must be denied.

Respectfully submitted,

PLAINTIFF
By his Attorneys,

/s/ Lynn A. Leonard                                   /s/ Anita B. Sullivan
_____        _____
Lynn A. Leonard                                        Anita B. Sullivan
Attorney-At-Law                                        Attorney-At-Law
527 Main Street, Suite 8                           458 Main Street
Melrose, MA  02176                                 Wakefield, MA  01880
(781) 662-6161                                         (781) 224-0701
B.B.O. No. 561662                                  B.B.O. No. 628873

Dated:  March 1, 2006