# United States Court of Appeals
## For the First Circuit

Nos. 06-1994, 06-2139

ANN MARIE PORTO, Individually and on behalf of
SC, a minor person with a disability;
NICHOLAS PORTO, Individually and on behalf of SC,
a minor person with a disability,

Plaintiffs, Appellees,

v.

TOWN OF TEWKSBURY,

Defendant, Appellant,

TOWN OF TEWKSBURY PUBLIC SCHOOLS; TOWN OF TEWKSBURY
SCHOOL COMMITTEE; CHRISTINE L. MCGRATH; JAMES MCGUIRE;
KEVIN P. MCARDLE; PAULINE KING; LOREEN R. BRADLEY;
MICHELINA DEANGELIS; CHERYL D. PORCARO; CAROLE A. GALLO;
JENNIFER A. FIORE; JULIE E. BOSSDORF-PARAS; ELEANOR EDELSTEIN;
ROBERT WARE; SHARON J. MOSER; WILLIAM X. TRAVEIS;
KARA M. BUCKLEY; ALLISON DIXON,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Torruella and Lynch, Circuit Judges,
and Lisi,* District Judge.

---

*  Of the District of Rhode Island, sitting by designation.

Samuel J. Perkins, with whom Leonard H. Kesten, Deborah I. Ecker, Deidre Brennan Regan, and Brody, Hardoon, Perkins & Kesten, LLP, were on brief, for appellant Town of Tewksbury.
Lynn A. Leonard, for appellees.

———————————————

May 30, 2007

———————————————

**TORRUELLA, Circuit Judge.** This case asks us to determine when a school system may be liable under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., for student-on-student sexual harassment. In Davis v. Monroe County Board of Education, the Supreme Court stated that a school system may not be held liable for student-on-student sexual harassment unless the system has been "deliberately indifferent," which, in the Title IX context, requires that the school system's response to harassment be "clearly unreasonable in light of the circumstances." 526 U.S. 629, 648 (1999). Ann Marie Porto and Nicholas Porto sued the Town of Tewksbury ("Tewksbury") in their individual capacities and on behalf of a minor child, SC, alleging that the school system had been deliberately indifferent to the sexual harassment of SC by a peer. The case proceeded to trial, and the jury found in favor of the Portos, awarding compensatory damages of $250,000 and punitive damages of $1. The district court also awarded attorneys' fees to the Portos. Tewksbury now appeals the jury verdict, various evidentiary rulings, the jury instructions, the damages award, and the amount of attorneys' fees awarded. After careful consideration, we find that the evidence presented at trial is insufficient to sustain the jury's conclusion that Tewksbury was deliberately indifferent to the student-on-student sexual harassment, and as such, we vacate the judgment in favor of the Portos and direct that judgment be granted in favor of Tewksbury.

## I. **Background**

SC was born in March 1987. Shortly after his birth, SC was placed in foster care. In 1989, SC's aunt, Ann Marie Porto, and her husband, Nicholas Porto, took in SC as a foster child. After SC came to live with the Portos, they noticed that SC was experiencing developmental problems, and they took him to various hospitals, where he was diagnosed as suffering from fetal alcohol syndrome and "generalized developmental delays."

SC entered the Tewksbury public schools when he was eight years old. Although the Massachusetts Department of Education identified SC as being developmentally and mentally disabled, and thus eligible for special education services, he initially was placed in a standard first grade class. But after a month, SC's teacher thought he needed more specialized attention, and he was placed in special education classes, where he stayed for the remainder of his tenure in the Tewksbury schools.

SC met another boy, RC, in his first grade special education class. Between first and fifth grade, SC reported to Ann Marie Porto various sexually-charged incidents with RC.[1]    Porto

---

[1]    The district court ruled that for the purposes of the Porto's Title IX claim, the jury could only consider harassment that occurred between October 2000 and January 2001.  Neither party appeals this ruling, and we do not disturb it on appeal. However, the court ruled that the Portos could present evidence of harassment prior to October 2000 for the purpose of proving that Tewksbury had knowledge that harassment was likely to occur between RC and SC.

testified that she reported these incidents to Tewksbury teachers and administrators. In 1999, when SC was in the fifth grade, the Portos took him to see a psychologist, Dr. Bradford Smith, for counseling related to inappropriate sexual behavior at home. After his consultation with SC, Dr. Smith informed the Portos that SC had told him that he and RC had been engaging in oral sex on the school bus since October 1998. The Portos reported this to Tewksbury public school administrators and to the Massachusetts Department of Social Services. In response, the school put SC and RC on different buses and instructed teachers and school aides to keep SC and RC separated and to monitor their interaction.

During the sixth grade, there was only one additional reported incident involving SC and RC, in which RC allegedly touched SC on the buttocks and SC elbowed him in response. The school separated SC and RC and gave SC detention. Apart from this incident, Ann Marie Porto testified that she perceived that SC enjoyed school during his sixth grade year.

In the fall of 2000, SC entered the seventh grade at Wynn Middle School. SC spent a large part of the day in a life skills class with six other children, one of whom was RC. The life skills class was team taught, with one teacher covering language arts and math in the morning, and a different teacher covering social studies and science in the afternoon. Although there were three different classroom aides who at various times helped with the

-5-

class, all three were not typically assigned to the class at a given time, and one often accompanied a child who was in a wheelchair.

According to school officials, there were three incidents in October 2000 that involved inappropriate touching between RC and SC.  Two of the incidents occurred in the life skills class room. Both incidents involved RC touching SC's leg while they were sitting next to each other.  In one instance, an aide ordered SC and RC to separate, and they complied.  In another, an aide sat down between SC and RC to keep them apart.  There was also a third incident, during gym class, when SC and RC were touching each other while sitting in the bleachers.  Eleanor Edelstein, RC and SC's language arts and math teacher, testified that she heard a verbal description of one of the classroom incidents involving inappropriate touching under a workstation table.

After the third incident, the boys were sent to the school guidance counselor, William Traveis.  Traveis instructed the boys that this type of behavior was inappropriate.  According to Traveis, the boys apologized and told him that they would not do it again.  Traveis testified that he thought the boys understood the discussion, and that he told teachers and aides to monitor them and keep them separated.  No additional incidents were reported to the school until January.

-6-

On the morning of January 11, 2001, RC asked Edelstein for permission to go to the bathroom, and Edelstein excused him. A short time later, SC asked Edelstein if he could get a book from his locker. No aide was present at the time to accompany either RC or SC. There is no evidence that either boy had previously misled Edelstein with respect to similar requests. Edelstein allowed SC to leave the classroom. After two or three minutes, Edelstein noticed that neither of the boys had returned. She stepped out into the hall to look for them, but did not see them. While in the hall, Edelstein spotted Robert Ware, the Behavior Management Facilitator at Wynn Middle School, and asked him to go into the bathroom to investigate. Ware entered the bathroom and discovered SC and RC in a stall, pulling their pants up. Ware took the students to his office and asked them what they had been doing. SC told Ware that he had engaged in sexual intercourse with RC, and that he and RC had been touching each other on a weekly basis for some time. Ware informed James McGuire, the principal of Wynn Middle School, about the incident. McGuire called SC's parents, told them what had happened, and asked them to pick up SC from school.

SC did not return to school after the incident with RC. Between January and October 2001, SC remained at home, receiving ten hours of tutoring per week. In October 2001, SC was hospitalized for a month for behavioral problems, during which time

SC attempted to commit suicide.  From November 2001 until February 2002, SC participated in a daytime academic and counseling program at the Bournewood Hospital.  Finally, in February 2002, SC was sent to a residential treatment program outside of the Tewksbury school district.

The Portos filed suit against Tewksbury on January 5, 2004, alleging that, because it was deliberately indifferent to RC's sexual harassment of SC, Tewksbury had violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.[2]  The case proceeded to a jury trial, which lasted from October 3 until October 21, 2005.  After the Portos presented their case to the jury, Tewksbury moved for a directed verdict pursuant to Fed. R. Civ. P. 50(a), arguing that the Portos had failed to prove any element of their case.  The court denied Tewksbury's motion, and after one day of deliberations, the jury returned a verdict in favor of the Portos, awarding $250,000 in compensatory damages and $1 in punitive damages. Tewksbury then filed a motion for judgment notwithstanding the verdict pursuant to Fed. R. Civ. P. 50(b),

---

[2]  The Portos also alleged that Tewksbury discriminated against SC on the basis of his disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.  The jury found in favor of Tewksbury on this claim, and the Portos do not appeal that aspect of the verdict.  In addition, the Portos brought various Massachusetts law claims against Tewksbury, which were later dismissed, and the Portos do not appeal this decision.  Finally, the Portos initially brought claims under 42 U.S.C. § 1983 against various individuals who worked for the Tewksbury public school system, but later voluntarily dismissed them.

again arguing that the Portos had failed to satisfy their burden on any element of the case.[3]  The court denied the motion by written order on April 28, 2006.  Tewksbury now appeals.

## II. **Motion for Directed Judgment**

We review the denial of a Rule 50 motion de novo.  Walton v. Nalco Chem. Co., 272 F.3d 13, 23 (1st Cir. 2001).  "We must affirm unless the evidence was 'so strongly and overwhelmingly' inconsistent with the verdicts that no reasonable jury could have returned them."  Id. (quoting Negrón v. Caleb Brett U.S.A., Inc., 212 F.3d 666, 668 (1st Cir. 2000)).  Thus, to reverse, we must find that there was "a total failure of evidence to prove plaintiff's case."  Mayo v. Schooner Capital Corp., 825 F.2d 566, 568 (1st Cir. 1987) (quoting Fact Concerts, Inc. v. City of Newport, 626 F.2d 1060, 1064 (1st Cir. 1980)) (internal quotation marks omitted).  We draw "all reasonable inferences" from the evidence presented at trial in favor of the prevailing party.  Negrón, 212 F.3d at 668.

Under Title IX of the Education Amendments of 1972, a recipient of funding from the United States Department of Education may be liable for damages if "its deliberate indifference [to peer-on-peer sexual harassment] 'subjects' its students to

---

[3]  Tewksbury also filed a motion for a new trial, arguing that the court improperly admitted certain testimony and misinstructed the jury.  Because we find that Tewksbury's motion for a directed verdict should have been granted based on the evidence that was deemed admissible by the district court, we need not decide the correctness of the evidentiary rulings or instructions.

-9-

harassment." Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 644 (1999). A funding recipient is deliberately indifferent to student-on-student harassment when "the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Id. at 648. "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." Id. at 645 (alteration in original) (quoting Random House Dictionary of the English Language 1415 (1966)). In addition, the acts of sexual harassment must be "known" to the funding recipient. Id. at 647. Finally, the harassment must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Id. at 650.

Thus, a funding recipient is not liable under Title IX for all student-on-student sexual harassment. First, the plaintiff must show (1) that he or she was subject to "severe, pervasive, and objectively offensive" sexual harassment by a school peer, and (2) that the harassment caused the plaintiff to be deprived of educational opportunities or benefits. Even then, Davis restricts a funding recipient's liability under Title IX for student-on-student sexual harassment to situations where (3) it knew of the harassment, (4) in its programs or activities and (5) it was deliberately indifferent to the harassment such that its response

-10-

(or lack thereof) is clearly unreasonable in light of the known circumstances.

For the purposes of this appeal, we assume (without deciding) that SC was subject to severe, pervasive, and objectively offensive harassment by RC, that Tewksbury is a funding recipient and had actual knowledge in 2001 of at least some prior incidents of inappropriate sexual behavior, and that the harassment deprived SC of educational opportunities or benefits.[4]  Even making these assumptions, we do not think that the Portos presented sufficient evidence such that a rational jury could have concluded that Tewksbury was <u>deliberately indifferent</u> to the harassment of SC. The Portos argue that Tewksbury was told on multiple occasions that RC was harassing SC, but that the school did nothing more than temporarily separate the boys.  The Portos also note that in spite of Tewksbury's knowledge of the prior sexual harassment, RC and SC were allowed to have unsupervised access to each other at times. The Portos contend that, given the history of sexual harassment between RC and SC that culminated in the school-bus incident in fifth grade, Tewksbury should have not allowed SC to go to his locker alone while RC was in the bathroom.  The Portos point to evidence of a prior directive from Tewksbury to teachers and aides

---

[4]  Thus, we explicitly do not decide whether a minor student's "consent" to sexual conduct is a factor in determining whether that student was subject to sexual harassment.

-11-

that RC and SC not be allowed to travel alone together in or outside the school building.

The problem with the Portos' argument is that it suggests only that Tewksbury perhaps should have done more to prevent RC from sexually harassing SC. However, a claim that the school system could or should have done more is insufficient to establish deliberate indifference; in the Title IX context, "funding recipients are deemed deliberately indifferent to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. The Supreme Court has described deliberate indifference as "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action" or inaction. Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 410 (1997) (emphasis added). Thus, before holding a municipality liable for a police officer's excessive force, we have required plaintiffs to prove that the municipality knew that the excessive force would be a "plainly obvious consequence" of hiring the officer. Crete v. City of Lowell, 418 F.3d 54, 66 (1st Cir. 2005); see also Young v. City of Providence, 404 F.3d 4, 28 (1st Cir. 2005) (holding that a reasonable jury could find deliberate indifference where excessive force was a "highly predictable consequence" of the municipality's failure to train its police officers (quoting Brown, 520 U.S. at

-12-

409). Likewise, in Bisbal-Ramos v. City of Mayagüez, we found that the evidence was sufficient to support a finding of deliberate indifference by a supervisor where a municipal employee turned city hall into the campaign headquarters for a candidate, with the obvious consequence that employees who were supporters of the rival candidate would feel that they had been discriminated against in violation of their First Amendment rights. 467 F.3d 16, 25 (1st Cir. 2006). In the educational setting, we have suggested that a school might be deliberately indifferent to a teacher's sexual harassment of a student where it had notice of the sexual harassment, and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective. Wills v. Brown Univ., 184 F.3d 20, 26 (1st Cir. 1999).

The Portos do not claim that Tewksbury did nothing to address RC's sexual harassment of SC. They acknowledge that Tewksbury separated SC and RC after each episode of sexual harassment and later had the school guidance counselor intervene. Compare with Doe ex rel. A.N. v. E. Haven Bd. of Educ., 200 F. App'x 46, 49 (2d Cir. 2006) (unpublished) (finding deliberate indifference where "alleged victim of a rape complained of verbal harassment based on her sex and related to the rape for five weeks before authorities took concrete action to get the perpetrators of the harassment to stop"). Rather, the Portos claim that these

-13-

measures were ineffective.   There is no doubt that the bathroom incident is evidence that RC's inappropriate sexual behavior was not abated.   However, the fact that measures designed to stop harassment prove later to be ineffective does not establish that the steps taken were clearly unreasonable in light of the circumstances known by Tewksbury at the time.   The test for whether a school should be liable under Title IX for student-on-student harassment is not one of effectiveness by hindsight.

The Portos' proof is inadequate on several different levels.   First, there was no evidence presented at trial to suggest that Tewksbury knew or even suspected that when SC asked to go to his locker, he was really going to go to the bathroom to meet RC. The Portos suggest that because SC was mentally disabled, it would have been prudent to have had a teacher's aide accompany him to his locker.   However, this suggests only that Tewksbury may have been negligent; to prove deliberate indifference, the Portos had to show at least that Tewksbury knew that the failure to accompany SC to his locker would lead to SC following RC to the bathroom and that there was a high degree of risk that SC would be subject there to inappropriate sexual behavior by RC.   Edelstein offered uncontradicted testimony that the boys had never given a "reason for [her] to ever question that they couldn't be trusted going to the bathroom or going to a locker," and that she "trusted that they would follow the rules."   Thus, there was no evidence that anyone

-14-

had a reason to suspect that SC intended to deceive Edelstein when he asked for permission to visit his locker.

Furthermore, there was no evidence that the school knew or that it was obvious that RC would continue to sexually harass SC after October 2000. To put the Portos' claim in context, it is important to note that between March 1999 and October 2000, there was only one alleged minor incident of sexual harassment. Apart from this, according to Ann Marie Porto, SC was generally happy at school and had no problems, and there was no evidence that Tewksbury was aware of any additional problems during this time. It was not until October 2000 that RC's inappropriate touching resumed. The first two times this occurred, the school separated the boys. After the third instance of inappropriate touching, school officials sent the boys to talk to Traveis, the school counselor. RC and SC spoke with Traveis, who testified that it was his understanding that the boys knew that what they were doing was wrong, and that they promised not to do it again.   It was reasonable for Tewksbury to conclude that this intervention worked: there was no evidence presented that Tewksbury was aware of any further sexual harassment by RC between Traveis's intervention in October 2000 and the January 11, 2001 incident.[5]  Even the Portos'

---

[5] Nor were the Portos aware of any sexual harassment during this period.  In fact, Ann Marie Porto met with school officials in November 2000, but did not report any additional instances of sexual harassment between SC and RC.  There was, however, evidence that the harassment did continue unbeknownst to Tewksbury.

expert, Dr. Dragan, testified only that Tewksbury could have done more. Thus, there was no evidence from which it could be inferred that Tewksbury had reason to believe that RC was continuing to sexually harass SC. In other words, further sexual harassment, much less sexual intercourse, was not a "known or obvious consequence" of Tewksbury's failure to accompany SC to his locker on January 11, 2001.[6]

Therefore, this is not a case, as the Portos contend, where a school "continued to use the same ineffective methods to no acknowledged avail." Vance v. Spencer County Pub. Sch. Dist., 231 F.3d 253, 262 (6th Cir. 2000). By all indications, Tewksbury's methods were working: until January 11, 2001, Tewksbury was not aware that RC had been engaging in any further sexual harassment after October 2000. Nor is this case analogous to Williams v. Board of Regents, 477 F.3d 1282 (11th Cir. 2007), where the Eleventh Circuit found that the plaintiff had adequately alleged that University of Georgia was deliberately indifferent when it failed to properly instruct or supervise a student athlete who had recently been accused of sexual harassment while attending another institution. In Williams, prior to attending the University of

---

[6]    Likewise, the fact that Tewksbury did not have a sexual harassment policy that complied with Department of Education regulations is insufficient to establish deliberate indifference; the Portos have not offered any evidence that would permit the inference that RC's harassment was a known consequence of such noncompliance.

-16-

Georgia, a student athlete had been disciplined by two colleges for sexual assault and sexual harassment. Id. at 1290. Thus, recent history suggested that the interventions by the student's former schools -- dismissal of the student from one school and dismissal from the other's basketball team -- had not been successful in curbing the student's inappropriate sexual behavior. Based on her claims that the defendants failed to properly instruct or supervise the student to make sure that he did not sexually assault persons affiliated with the university, the plaintiff adequately alleged that the defendants exhibited "deliberate indifference" to an obvious consequence of their inaction, i.e., another sexual assault. Id. at 1296. In the present case, the evidence clearly shows that after Traveis's intervention, Tewksbury reasonably believed that it had been successful in stopping RC's inappropriate behavior. Because continued sexual harassment was not a "known or obvious consequence" of the school's inaction as in Vance and Williams, Tewksbury cannot have been deliberately indifferent to SC's plight.

More analogous to the situation in this case is Gabrielle M. v. Park Forest-Chicago Heights, Illinois School District 163, 315 F.3d 817 (7th Cir. 2003). In Gabrielle M., school officials initially suspended a boy who had been sexually harassing female classmates. Id. at 819. After the boy returned to school, administrators eventually allowed the boy to return to lunchtime

and recess with the classmates, but asked aides to keep an eye on him. Id. at 819-20. The Seventh Circuit held that this was not an unreasonable response to the known risk that the boy might harass his classmates again:

> Davis [v. Monroe County Board of Education,
> 526 U.S. 629 (1999)] does not require funding
> recipients to remedy peer harassment. Davis
> disapproved of a standard that would force
> funding recipients to suspend or expel every
> student accused of misconduct. All that Davis
> requires is that the school not act clearly
> unreasonably in response to known instances of
> harassment. Here, in light of each of the
> immediate disciplinary and preventative steps
> the school district had already taken in
> response to Jason's conduct, including most
> prominently the decisions to move him to
> another class entirely and eventually to grant
> Gabrielle's request for a school transfer, it
> was not clearly unreasonable as a matter of
> law initially to assign an instructor to
> oversee a communal recess and lunch period
> instead of immediately rescheduling the lunch
> and recess period for a whole kindergarten
> class.

Id. at 825 (internal citations omitted). Likewise, Tewksbury acted reasonably in responding to RC's inappropriate touching by separating RC and SC and sending them to the guidance counselor. Thus, drawing all inferences favorable to the Portos, the evidence in this case overwhelmingly fails, as a matter of law, to demonstrate that Tewksbury acted with deliberate indifference in failing to address RC's sexual harassment of SC.  Therefore, the

-18-

Portos cannot prevail on their claim, and the district judge should
have granted Tewksbury's motion for a directed verdict.[7]

### III. **Conclusion**

For the foregoing reasons, we reverse the judgment of the
district court, and remand with instructions to the district court
to enter judgment in favor of Tewksbury.  No costs to either party.

**Reversed**.

---

[7]    Because we find that the evidence presented at trial was
insufficient, we see no reason to reach Tewksbury's claims as to
damages.   Likewise, as we noted before, we need not address
Tewksbury's claims regarding evidentiary rulings or jury
instructions.   Finally, because we have vacated the judgment
against Tewksbury, we also vacate the judgment awarding attorneys'
fees to the Portos.  See 42 U.S.C. § 1988(b) (authorizing, in the
discretion of the district judge, the award of attorneys' fees to
the prevailing party).